UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOC # _____ 1

---------------------------------------------------x

EDWARD P. ZEMPRELLI, on Behalf of
Himself and All Others Similarly Situated,

                   Plaintiff,

    vs.

DEUTSCHE BANK AG, DEUTSCHE BANK
CAPITAL FUNDING TRUST VIII,
DEUTSCHE BANK CAPITAL FUNDING
LLC VIII, DEUTSCHE BANK CAPITAL
FUNDING TRUST X, DEUTSCHE BANK
CAPITAL FUNDING LLC X, JOSEF
ACKERMANN, ANTHONY DI IORIO,
HUGO BANZIGER, TESSEN VON
HEYDEBRECK, HERMANN-JOSEF
LAMBERTI, MARTIN EDELMANN, PETER
STURZINGER, DETLEF BINDERT,
JONATHAN BLAKE, MARCO
ZIMMERMANN, UBS SECURITIES LLC,
CITIGROUP GLOBAL MARKETS INC.,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED, WACHOVIA
CAPITAL MARKETS, LLC, MORGAN
STANLEY & CO. INCORPORATED,
DEUTSCHE BANK SECURITIES INC. and
BANC OF AMERICA SECURITIES LLC,

                   Defendants.

---------------------------------------------------x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who acquired the 6.375% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust VIII ("6.375% Securities") and/or the 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X ("7.35% Securities") (collectively, the "Securities") pursuant or traceable to materially false and misleading registration statements and prospectuses (collectively, the "Registration Statements") issued in connection with the October 2006 and November 2007 offerings, respectively, of the Securities (the "Offerings"). This action asserts strict liability claims under the Securities Act of 1933 ("1933 Act") against Deutsche Bank AG, certain of its subsidiaries, its senior insiders, and the investment banks that underwrote the Offerings (collectively, "defendants").

2.      Deutsche Bank AG ("DB" or the "Company") is an investment bank headquartered in Frankfurt am Main, Germany, which has offices in the United States and in this District.

3.      In October of 2006, DB consummated the offering of the 6.375% Securities ("2006 Offering") pursuant to a false and misleading registration statement (the "2006 Registration Statement"), selling 24 million 6.375% Securities at $25 per share for proceeds of approximately $600 million. The 2006 Registration Statement incorporated DB's financial results for the six months ending June 30, 2006 and statements in the Company's 2005 Annual Report on Form 20-F filed with the SEC.

4.      In November 2007, DB consummated the offering of the 7.35% Securities ("2007 Offering") pursuant to a false and misleading registration statement (the "2007 Registration Statement"), selling 32.2 million 7.35% Securities at $25 per share for proceeds of approximately $805 million (including the over-allotment). The 2007 Registration Statement incorporated DB's

- 1 -

financial results for 2006 and statements in the Company's 2006 Annual Report on Form 20-F filed with the SEC.

5.    The true facts which were omitted from the Registration Statements were:

(a)    The Company failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and exposure to monoline insurers;

(b)    The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and the Company's exposure to monoline insurers;

(c)    The Company's internal risk management systems were inadequate to limit the Company's exposure to credit trading, equity derivatives, and proprietary equity trading; and

(d)    The Company was not as well capitalized as represented, and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the German government.

6.    After the Offerings, on January 14, 2009, DB issued a press release which stated:

Deutsche Bank today announced, on a preliminary and unaudited basis, key elements of its fourth quarter 2008 financial performance:

- **Fourth-quarter loss**: The bank currently anticipates a loss after taxes in the region of EUR 4.8 billion for the fourth quarter 2008. This development reflects exceptional market conditions, which severely impacted results in the sales and trading businesses, most notably in Credit Trading including its proprietary trading business, Equity Derivatives and Equities Proprietary Trading. The result also reflects exposure reduction and other de-risking measures, a significant increase in provisions against certain of our monoline counterparties, and certain other exceptional gains and charges, including reorganisation charges. In Asset and Wealth Management, the bank anticipates a fourth quarter loss driven by an impairment charge on intangible assets related to DWS Scudder and substantial injections into money market funds.

\*      \*      \*

- 2 -

Dr. Josef Ackermann, Chairman of the Management Board, said: "We are very disappointed at this fourth quarter result, which leads to a loss for the year. The exceptionally difficult market environment of the quarter exposed some weaknesses in our platform, and we have determined a number of measures to address these weaknesses. Implementation of these measures is already underway.

7.     As a result of this disclosure, the prices of the Securities plunged dramatically.

### JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]. In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the underwriter defendants conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### PARTIES

12.     Plaintiff Edward P. Zemprelli acquired the Securities pursuant or traceable to the Offerings as set forth in the attached certification and has been damaged thereby.

13.     Defendant DB is a global financial services firm headquartered in Frankfurt am Main, Germany. DB guaranteed the Securities issued in the Offerings.

- 3 -

14.     Defendant Deutsche Bank Capital Funding Trust VIII ("DB Trust VIII") is a Delaware statutory trust formed for the purpose of issuing the 6.375% Securities. DB Trust VIII used the proceeds from the 2006 Offering to buy a class of preferred securities issued by Deutsche Bank Capital Funding LLC VIII. Its principal offices are in New York, New York.

15.     Defendant Deutsche Bank Capital Funding LLC VIII ("DB Capital VIII") is a Delaware limited liability company and sponsor of DB Trust VIII. Its principal offices are in New York, New York. DB Capital VIII issued and sold preferred securities to DB Trust VIII, issued and sold one preferred security of a separate class to DB, and issued and sold one common security representing a limited liability company interest in DB Capital VIII to DB.

16.     Defendant Deutsche Bank Capital Funding Trust X ("DB Trust X") is a Delaware statutory trust formed for the purpose of issuing the 7.35% Securities. DB Trust X used the proceeds from the 2007 Offering to buy a class of preferred securities issued by Deutsche Bank Capital Funding LLC X. Its principal offices are in New York, New York.

17.     Defendant Deutsche Bank Capital Funding LLC X ("DB Capital X") is a Delaware limited liability company and sponsor of DB Trust X. Its principal offices are in New York, New York. DB Capital X issued and sold preferred securities to DB Trust X, issued and sold one preferred security of a separate class to DB, and issued and sold one common security representing a limited liability company interest in DB Capital X to DB.

18.     Defendant Josef Ackermann ("Ackermann") is, and at all relevant times was, Chairman of the Management Board of DB. Ackermann signed both false and misleading Registration Statements.

- 4 -

19.     Defendant Anthony Di Iorio ("Di Iorio") was, at all relevant times, Chief Financial Officer ("CFO") and a member of the Management Board of DB. Di Iorio retired in September 2008. Di Iorio signed both false and misleading Registration Statements.

20.     Defendant Hugo Banziger ("Banziger") is, and at all relevant times was, Chief Risk Officer and a member of the Management Board of DB. Banziger signed both false and misleading Registration Statements.

21.     Defendant Hermann-Josef Lamberti ("Lamberti") is, and at all relevant times was, Chief Operating Officer ("COO") and a member of the Management Board of DB. Lamberti signed both false and misleading Registration Statements.

22.     Defendant Martin Edelmann ("Edelmann") is, and at all relevant times was, a Managing Director of DB. Edelman signed both false and misleading Registration Statements.

23.     Defendant Peter Sturzinger ("Sturzinger") is, and at all relevant times was, an authorized representative in the United States of DB. Sturzinger signed both false and misleading Registration Statements.

24.     Defendant Marco Zimmermann ("Zimmermann") was, at relevant times, Vice President of DB, DB Trust VIII and DB Trust X. Zimmermann signed both false and misleading Registration Statements.

25.     Defendant Detlef Bindert ("Bindert") was, at relevant times, a Managing Director of DB Trust VIII. Bindert signed the false and misleading 2006 Registration Statement.

26.     Defendant Tessen von Heydebreck ("von Heydebreck") was, at all relevant times, Chief Administrative Officer and a member of the Management Board of DB. Von Heydebreck left the Management Board in May 2007. Von Heydebreck signed the false and misleading 2006 Registration Statement.

- 5 -

27.    Defendant Jonathan Blake ("Blake") was, at all relevant times, a director of DB and DB Trust X. Blake signed the false and misleading 2007 Registration Statement.

28.    The defendants named above in ¶¶18-27 are referred to herein as the "Individual Defendants."

29.    Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank. UBS Investment Bank provides a range of financial products and services worldwide. UBS acted as an underwriter in connection with both Offerings.

30.    Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Citigroup acted as an underwriter in connection with both Offerings.

31.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis. Merrill Lynch acted as an underwriter in connection with both Offerings.

32.    Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia). Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing. It also offers real estate financing, risk management services, and structured products such as asset-backed and mortgage-backed securities. Wachovia Capital acted as an underwriter in connection with both Offerings.

- 6 -

33.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley acted as an underwriter in connection with both Offerings.

34.     Defendant Deutsche Bank Securities Inc. ("DB Securities") is the investment banking arm of DB. DB Securities acted as an underwriter in connection with both Offerings.

35.     Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America acted as an underwriter in the 2007 Offering.

36.     Pursuant to the 1933 Act, the defendants referenced in ¶¶29-35 above are referred to herein as the "Underwriter Defendants."

37.     The Underwriter Defendants are **_strictly liable_** for the false and misleading statements in the Registration Statements. In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Registration Statements and were paid fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Securities pursuant or traceable to the Company's false and misleading Registration Statements

issued in connection with the Company's Offerings and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. The Securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether the 1933 Act was violated by defendants' acts as alleged herein; whether statements made by defendants to the investing public in the Registration Statements misrepresented material facts about the business, operations and management of DB; and to what extent the members of the Class have sustained damages and the proper measure of damages.

- 8 -

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE FALSE AND DEFECTIVE 2006 REGISTRATION STATEMENT AND PROSPECTUS

44.     On or about October 10, 2006, DB filed with the SEC a Form F-3 Registration Statement (the "2006 Registration Statement").  The Form F-3 reported, as of June 30, 2006, shareholder equity of €29 billion.

45.     On or about October 13, 2006, DB filed, pursuant to Rule 424(b)(2) of the 1933 Act, its prospectus for the 2006 Offering (the "2006 Prospectus"), which formed part of the 2006 Registration Statement.  The 2006 Prospectus reported DB shareholder equity of €29 billion and net income for the six months ended June 30, 2006 of €2.9 billion.

46.     The 2006 Prospectus incorporated by reference the Form 20-F Annual Report for the year 2005 that DB filed with the SEC on March 23, 2006 (the "2005 20-F").  Regarding the Company's risk management in general, the 2005 20-F stated:

–       Our Management Board provides overall risk management supervision for our consolidated Group as a whole. Our Supervisory Board regularly monitors our risk profile.

–       We manage credit, market, liquidity, operational, business and reputational risks in a coordinated manner at all relevant levels within our organization. This also holds true for complex products which we typically manage within our framework established for trading exposures.

–       The structure of our risk management function is closely aligned with the structure of our Group Divisions.

–       The risk management function is independent of our Group Divisions.

- 9 -

*     *     *

For each of our Group Divisions, risk management units are established with the mandate to:

–     Ensure that the business conducted within each division is consistent with the risk appetite the Group Risk Committee has set;

–     Formulate and implement risk policies, procedures and methodologies that are appropriate to the businesses within each division;

–     Approve credit risk and market risk limits;

–     Conduct periodic portfolio reviews to ensure that the portfolio of risks is within acceptable parameters; and

–     Develop and implement risk management infrastructures and systems that are appropriate for each division.

47.     Regarding credit risk specifically, the 2005 20-F stated:

–     Credit risk arises from all transactions that give rise to actual, contingent or potential claims against any counterparty, obligor or borrower (which we refer to collectively as "counterparties"). This is the largest single risk we face.

*     *     *

Credit Risk Ratings

A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with an obligor. Our risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure. This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties. Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution. While we generally rate all our credit exposures individually, at times we rely on rating averages for measuring risk. When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

- 10 -

48.     Regarding market risk, the 2005 20-F stated:

Market Risk Management Framework

> We assume market risk in both our trading and our nontrading activities. We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

> We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits. Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios. Value-at-risk is a common metric we use in the management of our trading market risks.

> Our Management Board and Group Risk Committee, supported by Group Market Risk Management, which is part of our independent risk management function, set a Group-wide value-at-risk limit for the market risks in the trading book. Group Market Risk Management sub-allocates this overall limit to our Group Divisions. Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

49.     On October 18, 2006, defendants sold at least 24 million 6.375% Securities to the public at $25.00 per share pursuant to the 2006 Registration Statement and Prospectus.

50.     The 2006 Registration Statement and Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.

51.     The true facts which were omitted from the 2006 Registration Statement were:

(a)     The Company failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and exposure to monoline insurers;

(b)     The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and the Company's exposure to monoline insurers;

(c)     The Company's internal risk management systems were inadequate to limit the Company's exposure to credit trading, equity derivatives, and proprietary equity trading; and

(d)      The Company was not as well capitalized as represented, and, notwithstanding

the billions of dollars raised in the 2006 Offering, the Company would have to raise an additional

€10 billion by selling equity in the Company to the German government.

## THE FALSE AND DEFECTIVE 2007 REGISTRATION
## STATEMENT AND PROSPECTUS

52.      On or about November 6, 2007, DB filed with the SEC a Form F-3 Registration

Statement (the "2007 Registration Statement").

53.      On or about November 6, 2007, DB also filed, pursuant to Rule 424(b)(2) of the 1933

Act, its prospectus for the 2007 Offering (the "2007 Prospectus"), which formed part of the 2007

Registration Statement.  The 2007 Prospectus reported DB shareholder equity of €29 billion and net

income for the six months ended June 30, 2006 of €2.9 billion and incorporated by reference DB's

publicly reported financial results for 2006.

54.      The 2007 Prospectus incorporated by reference the Form 20-F Annual Report for the

year 2006 that DB filed with the SEC on March 23, 2007 (the "2006 20-F").  The 2006 20-F stated

in part:

CREDIT RISK RATINGS

A primary element of the credit approval process is a detailed risk assessment
of every credit exposure associated with a counterparty. Our risk assessment
procedures consider both the creditworthiness of the counterparty and the risks
related to the specific type of credit facility or exposure. This risk assessment not
only affects the structuring of the transaction and the outcome of the credit decision,
but also influences the level of decision-making authority required to extend or
materially change the credit and the monitoring procedures we apply to the ongoing
exposure.

We have our own in-house assessment methodologies, scorecards and rating
scale for evaluating the creditworthiness of our counterparties. Our granular 26-
grade rating scale, which is calibrated on a probability of default measure based
upon a statistical analysis of historical defaults in our portfolio, enables us to
compare our internal ratings with common market practice and ensures
comparability between different sub-portfolios of our institution. While we generally
rate all our credit exposures individually, at times we rely on rating averages for

measuring risk. When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

55.    Regarding market risk specifically, the 2006 20-F stated:

We assume market risk in both our trading and our nontrading activities. We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits. Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios. Value-at-risk is a common metric we use in the management of our trading market risks.

*         *         *

Our Management Board and Risk Executive Committee, supported by Market Risk Management, which is part of our independent risk and capital management function, set a Group-wide value-at-risk limit for the market risks in the trading book. Market Risk Management sub-allocates this overall limit to our Group Divisions. Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

Our value-at-risk disclosure for the trading businesses is based on our own internal value-at-risk model. In October 1998, the German Banking Supervisory Authority (now the BaFin) approved our internal value-at-risk model for calculating the market risk capital for our general and specific market risks. Since then the model has been periodically reviewed and approval has been maintained.

Our value-at-risk disclosure is intended to ensure consistency of market risk reporting for internal risk management, for external disclosure and for regulatory purposes.

56.    On November 7, 2007, defendants sold at least 32.2 million 7.35% Securities to the

public at $25.00 per share pursuant to the 2007 Registration Statement and Prospectus.

57.    The 2007 Registration Statement and Prospectus contained untrue statements of

material fact or omitted to state other facts necessary to make the statements made therein not

misleading and was not prepared in accordance with applicable SEC rules and regulations.

58.    The true facts which were omitted from the 2007 Registration Statement were:

- 13 -

(a)     The Company failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and exposure to monoline insurers;

(b)     The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-backed securities, commercial real estate loans, and the Company's exposure to monoline insurers;

(c)     The Company's internal risk management systems were inadequate to limit the Company's exposure to credit trading, equity derivatives, and proprietary equity trading; and

(d)     The Company was not as well capitalized as represented, and, notwithstanding the billions of dollars raised in the Offerings, the Company would have to raise an additional €10 billion by selling equity in the Company to the German government.

## THE TRUTH BEGINS TO COME TO LIGHT

59.     On January 14, 2009, DB issued a press release entitled "Deutsche Bank provides update on fourth quarter 2008 performance," which stated in part:

> Deutsche Bank today announced, on a preliminary and unaudited basis, key elements of its fourth quarter 2008 financial performance:
>
> • **Fourth-quarter loss**: The bank currently anticipates a loss after taxes in the region of EUR 4.8 billion for the fourth quarter 2008. This development reflects exceptional market conditions, which severely impacted results in the sales and trading businesses, most notably in Credit Trading including its proprietary trading business, Equity Derivatives and Equities Proprietary Trading. The result also reflects exposure reduction and other de-risking measures, a significant increase in provisions against certain of our monoline counterparties, and certain other exceptional gains and charges, including reorganisation charges. In Asset and Wealth Management, the bank anticipates a fourth quarter loss driven by an impairment charge on intangible assets related to DWS Scudder and substantial injections into money market funds.
>
> *          *          *
>
> Dr. Josef Ackermann, Chairman of the Management Board, said: "We are very disappointed at this fourth quarter result, which leads to a loss for the year. The exceptionally difficult market environment of the quarter exposed some weaknesses

- 14 -

in our platform, and we have determined a number of measures to address these weaknesses. Implementation of these measures is already underway.

60.    On this news, the prices of the Securities dropped significantly.

61.    On February 5, 2009, the Company issued a press release entitled "Deutsche Bank reports net loss of EUR 3.9 billion for the year 2008," which stated in part:

> For the fourth quarter 2008, the bank reported a net loss of EUR 4.8 billion, compared to net income of EUR 1.0 billion in the fourth quarter 2007. The bank reported a loss before income taxes of EUR 6.2 billion, versus income before income taxes of EUR 1.4 billion in the prior year quarter.

*     *     *

> In the Corporate and Investment Bank (CIB), net revenues were EUR 3.0 billion negative, versus EUR 4.5 billion positive in the fourth quarter 2007.

> In Corporate Banking & Securities (CB&S), net revenues were EUR 3.8 billion negative in the fourth quarter, versus EUR 3.8 billion positive in the fourth quarter 2007. This development reflects negative revenues of EUR 4.8 billion in Sales & Trading, driven by significant losses in key businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading. These losses reflect the impact on Deutsche Bank's business model of unprecedented levels of market volatility, correlation across asset classes, and the breakdown of historically observed relationships between asset classes, compounded by extreme illiquidity, in an exceptionally turbulent market environment.

*     *     *

> Provision for credit losses was EUR 591 million in the fourth quarter, up 80% versus the fourth quarter 2007, and including EUR 185 million of provisions in respect of loans reclassified in accordance with amendments to IAS 39. In CIB, provision for credit losses was EUR 361 million, up 90% versus the prior year quarter, primarily reflecting provisions in respect of reclassified loans. In PCAM, provision for credit losses was EUR 229 million, up 68%, primarily in PBC reflecting a rise in provision against the backdrop of a deteriorating credit environment and business growth.

*     *     *

> Corporate Banking & Securities (CB&S)

> Deutsche Bank's Sales & Trading businesses were severely impacted by the unprecedented market turmoil that started in September and continued to deteriorate in the fourth quarter. Many market participants, including hedge funds, were forced to liquidate substantial positions in assets such as convertibles, investment-grade and

- 15 -

high-yield bonds, default swaps, and in long-short equity strategies. These actions drove higher volatilities and correlations in all markets and a significant dislocation in the relationship (or basis) between trading positions and their hedges.

In this challenging environment, Deutsche Bank continued to suffer significant losses in the Credit Trading business, including Credit Proprietary Trading, and Equity Proprietary Trading (EPT) books. Proprietary positions were significantly reduced in size, although market liquidity was not sufficient to eliminate risk in all cases and the bank retains some potential exposure to any further deterioration in these positions.

Sales & Trading (Debt and other products) revenues were negative EUR 2.7 billion in the fourth quarter 2008, compared to positive EUR 1.6 billion in the fourth quarter 2007.

The fourth quarter 2008 included losses in Credit Trading of EUR 3.4 billion, of which EUR 1.0 billion related to the Credit Proprietary Trading business. The losses in the Credit Proprietary Trading business were mainly driven by losses on long positions in the U.S. Automotive sector and by falling corporate and convertible bond prices and basis widening versus the Credit Default Swaps (CDS) established to hedge them. The remaining losses in the Credit Trading business were driven across many sectors as bonds were sold off and basis spreads widened, driven by significant market de-leveraging and low levels of liquidity.

Further mark-downs of EUR 1.7 billion were taken relating to additional reserves against monoline insurers (EUR 1.1 billion), driven in part by additional specific reserves related to certain insurers, and additional provisions against residential mortgage-backed securities (EUR 244 million), commercial real estate loans (EUR 214 million), and impairment losses on available for sale positions (EUR 58 million).

\* \* \*

Sales & Trading (Equity) revenues were negative EUR 2.1 billion in the fourth quarter 2008, compared to positive EUR 1.1 billion in the same quarter 2007. In an environment characterized by severely dislocated equity markets, with unprecedented levels of volatility and very low levels of liquidity, Equity Derivatives incurred losses of EUR 1.7 billion from managing structural risks, particularly around correlation, volatility and dividend risk related to single stocks. Equity Proprietary Trading losses of EUR 413 million were driven by market-wide de-leveraging which drove down convertible values and widened basis risk.

\* \* \*

Asset and Wealth Management (AWM)

\* \* \*

Noninterest expenses in the fourth quarter 2008 were EUR 1.5 billion, an increase of 56%, or EUR 520 million, compared to the same quarter in 2007. The increase was primarily due to an impairment of EUR 302 million on DWS Scudder intangible assets (compared to EUR 74 million in the fourth quarter 2007) and a goodwill impairment of EUR 270 million in a consolidated investment.

62.     On February 5, 2009, on the Company's preliminary 2008 earnings conference call,

defendant Ackermann made the following statements:

But we use the leverage ratio as a benchmark just to demonstrate that we take the assets serious, and have of course, contrary than what we did in the past, in the last six months very, very much focused on granular trading and balance sheet positions, and that is what we want to demonstrate.

\*     \*     \*

The focus was on getting a 10% and getting the leverage ratio down and, of course, getting risk down that we start on a different platform into 2009.

\*     \*     \*

[I]n the fourth quarter, after Lehman, things happen which really got to the franchise, to the core of our sales and trading business and that is primarily all this indirect risk, not the directional risk, we didn't have directional risk. That's why we were relatively strong for a long time.

But we had basis risk, we had correlation risk and so on, so on. And that is really what's got us into this difficult situation in the fourth quarter.

\*     \*     \*

[T]here were two areas, prop trading where relative value strategy suffered from all that I just said, and our assumptions were wrong in this very difficult market.

Some would argue they come back and make a lot of money, it may well be. But we had a different approach we said we just can't afford that. So we get rid of it, we take the losses and want to have – start from a new platform, even if in five years from now someone says opportunity costs would have been pretty important.

The second one is scale. We have been too big, and that is something we have to work down and we will work on that, that's fine. We came down in non-derivative trading assets from EUR460b some time ago to slightly over EUR200b, and we will have a further cut in the first quarter of this year. We want to get the kind of exposure down so whatever happens we cannot have similar volatilities on our P&L.

- 17 -

And the last point is complexity what I said with intellectual leadership, and so we had exposure to volatility and correlation risk. Also something we have to control and monitor better.

63.    On the same call, Ackermann further stated:

I think we told you many, many times that our prop trading is about 10% to 15% of our revenues. And we also felt that a relatively modest number.

But in order to, if you take 10% out of EUR15b it's only EUR1.5b. But to achieve EUR1.5b you need actually a risk allocation and a risk equivalent and capital equivalent of several times more. So let's assume it's a 20% return you need five times more so you talk about EUR7b to EUR8b.

And if you have swings, as we had, on this EUR8b you can easily lose EUR2b, EUR3b. And that is what we have seen in 2008, and something we don't want to see again.

*      *      *

[W]e are reducing to a minimum the highly illiquid positions. And we have closed our exclusively dedicated prop trading desks.

*      *      *

So the proprietary trading risk has been reduced by 90%. Then we have reduced our RMBS exposures to 50%.

*      *      *

Lehman came and changed the whole picture within hours. And then you couldn't move. And it shows us (inaudible) what was the most difficult part in the fourth quarter. The difficult was [sic] that you were stuck with positions you couldn't liquidate and you just saw how much value they lost every day. And normally I'm very eager to see P&L. I tell you, before Christmas, I stopped looking at it. It just was awful, every day you lost such and such much. And you couldn't move any more.

64.    The February 5, 2009 conference call also included the following colloquy with

investments analysts:

Matthew Clark – Keefe, Bruyette & Woods – Analyst

. . . Do you think you can continue to have the pretty market share of the equity derivatives market going forward if you do charge your clients more in order to compensate yourselves a bit better for the risk there?

- 18 -

\*      \*      \*

Stefan Krause – Deutsche Bank –CFO

\*      \*      \*

So one of our conclusions is not only that we were too complex and didn't have enough reserves, one conclusion is we did too much volume-wise, and that's what we're going to reduce.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

65.    Plaintiff repeats and realleges each and every allegation contained above.

66.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

67.    The Registration Statements were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

68.    DB was the registrant for the Offerings.  As issuer of the Securities, DB is strictly liable to plaintiff and the Class for the misstatements and omissions.

69.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statements.  Each of the Individual Defendants signed or authorized the signing of the Registration Statements.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained

- 19 -

in the Registration Statements were true and without omissions of any material facts and were not misleading.

70.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

71.     Plaintiff acquired the Securities pursuant and/or traceable to the Registration Statements.

72.     Plaintiff and the Class have sustained damages. At the time of their purchases of the Securities, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 2009. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants DB Trust VIII, DB Capital VIII,
### DB Trust X, DB Capital X and the Underwriter Defendants

73.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

74.     For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

75.     By means of the defective Prospectuses, the defendants named herein assisted in the sale of the Securities to plaintiff and other members of the Class.

76.     The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  The defendants named in this Count owed plaintiff and the other members of the Class who purchased the Securities pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

77.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time plaintiff acquired the Securities.

78.     By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Securities pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the Securities.  Accordingly, plaintiff and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to the defendants sued herein.  Class members who have sold their Securities seek damages to the extent permitted by law.

**COUNT III**

**Violations of §15 of the 1933 Act**
**Against the Individual Defendants**

79.     Plaintiff repeats and realleges each and every allegation contained above.

80.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation

that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

81.     Each of the Individual Defendants was a control person of DB by virtue of his or her position as a director, senior officer and/or major shareholders of DB which allowed each of these defendants to exercise control over DB and its operations.

82.     Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: February 24, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

- 23 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

EDWARD P. ZEMPRELLI ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Acquisitions: | Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|---|
| | 10/11/06 | 1,000 shares of 6.375% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust VIII | $25 |
| | 11/07/07 | 2,000 shares of 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X | $25 |

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Zemprelli v. The Royal Bank of Scotland Group plc., et al.,* No. 09-cv-00300 (S.D.N.Y.)
*Freidus, et al. v. ING Groep, N.V., et al.,* No. 09-cv-01049 (S.D.N.Y.)


6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

DEUTSCHE PREFERRED

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of _____, 2009.

_____
EDWARD P. ZEMPRELLI

- 2 -

DEUTSCHE PREFERRED