UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ x | | |
| In re DEUTSCHE BANK AG SECURITIES LITIGATION | : : : | Master File No. 1:09-cv-01714-DAB CLASS ACTION |
| _____ | : : | |
| This Document Relates To: | : : | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE |
| ALL ACTIONS. | : : | FEDERAL SECURITIES LAWS |
| _____ x | | |

478900_1

## NATURE OF THE ACTION

1.       This is a securities class action brought on behalf of all persons who purchased or acquired securities issued by Deutsche Bank AG ("DB" or the "Company"), pursuant or traceable to the registration statement, prospectus, and prospectus supplements (referred to collectively as the "Offering Materials") set forth hereafter.  The Offering Materials used were false and/or misleading in violation of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l, and 77o.  This action is brought against DB, its senior insiders and auditor, and the investment banks that underwrote the Offerings (collectively, "defendants").  The claims asserted herein exclusively rely upon theories of strict liability and negligence.  They do not sound in or arise from allegations of fraud.

2.       On or about October 10, 2006, DB filed with the Securities and Exchange Commission ("SEC") a Form F-3 Registration Statement and Prospectus (the "Registration Statement") utilizing a "shelf" registration process which allowed defendants to sell, from time to time, any combination of securities described in the prospectus.  Subsequently, between October 2006 and May 2008, DB conducted six offerings of preferred securities (collectively the "Offerings"), and filed, pursuant to Rule 424(b)(2) of the 1933 Act, prospectus supplements to the Registration Statement.  The six offerings raised over $6.2 billion of Tier 1 capital from plaintiffs and the class via the sale of 248 million shares of the preferred securities at a price of $25 per share as follows:

| Offering | Date Filed | Total Proceeds (Including Over Allotment) | SEC Filings Incorporated by Reference[1] |
|---|---|---|---|
| 6.375% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust VIII | October 13, 2006 | $600 million | 4/3/06 6-K; 8/2/06 6-K; 2005 20-F |
| 6.55% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | May 16, 2007 | $800 million | 4/20/07 6-K; 5/8/07 6-K; 2006 20-F |
| 6.625% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust IX | July 16, 2007 | $1 Billion | 4/20/07 6-K; 5/8/07 6-K; 2006 20-F |
| 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X | November 6, 2007 | $805 million | 4/20/07 6-K; 8/2/07 6-K & 6-K/A; 8/13/07 6-K; 11/1/07 6-K; 2006 20-F |
| 7.60% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III | February 14, 2008 | $1.75 Billion | 4/20/07 6-K; 8/2/07 6-K & 6-K/A; 8/13/07 6-K; 11/1/07 6-K; 2/7/08 6-K; 2006 20-F |
| 8.05% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | May 5, 2008 | $1.1 Billion | 4/29/08 6-K; 2006 20-F 2007 20-F |

3.     The Securities were sold pursuant to materially false and misleading Offering Materials which misrepresented or omitted material facts including: (i) that the Company had as much as €20 billion in exposure to high-risk subprime and nonprime residential mortgage markets through RMBS and CDO assets, in violation of GAAP, SEC regulations and IFRS; (ii) that the Company's disclosures concerning market risks and credit risks were false and misleading in that

---

[1]     The Form 6-K is similar to the Form 10-Q, and the Form 20-F is similar to the Form 10-K used by U.S. Companies.

they misrepresented DB's true exposure to RMBS/CDO securities and other mortgage-related assets; (iii) that the Company's assertions concerning its compliance with GAAP were false and misleading as DB's 2005 and 2006 Form 20-Fs did **not** comply with GAAP in that they omitted and/or misrepresented DB's true exposure to RMBS/CDO securities and other mortgage-related assets; (iv) that the Company engaged extensively in high-risk proprietary trading, *i.e.*, gambling on the Company's own account using huge, undisclosed leverage; and (v) that the Company's 2007 Form 20-F disclosures were false and misleading in that they failed to reflect the actual risk associated with DB's proprietary trading practices.

## INTRODUCTION

4.      Between 2005 and 2007, DB significantly increased its involvement in structuring, trading and investing highly risky residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDO"), backed by U.S. residential subprime and nonprime ("Alt-A") mortgages.  During this period, DB and the Individual Defendants caused the Company to acquire billions of dollars in these highly risky securities.

5.      Subprime and Alt-A (nonprime) RMBSs are securities backed by residential mortgages extended to borrowers who do not qualify for standard loans, and therefore are inherently more risky than RMBSs backed by conforming loans.  DB's portfolio of subprime and Alt-A RMBSs and CDOs was made riskier still by the fact that a significant amount of these RMBSs/CDOs were comprised of "option ARM" and negative amortization ("NegAm") loans – loans that allowed borrowers to pay low monthly payments for a period of time before payments increased dramatically, often forcing borrowers to default.

6.      The value of DB's subprime and Alt-A RMBS/CDO portfolios was directly tied to the strength of the U.S. housing market.  When housing prices began to stall and interest rates began

- 3 -

to rise in early 2006, homeowners who over-extended themselves and those with poor credit and unstable income began to default on their loans. Default rates began to rise dramatically throughout 2006 and accelerated into 2007, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

7. The Offering Materials were false and misleading, in that they misrepresented and/or omitted material facts regarding the Company's significant exposure to RMBS/CDO securities and other mortgage-related assets, in violation of Generally Accepted Accounting Principles ("GAAP"), Securities and Exchange Commission ("SEC") regulations and later International Financial Reporting Standards ("IFRS"). For example, in spite of the historic collapse of the U.S. housing and mortgage markets, defendants failed to disclose in the Offering Materials used in connection with the first five offerings (October 2006, May 2007, July 2007, November 2007, and February 2008) material information about DB's massive position in these high-risk securities, including the nature and extent of DB's investment in those securities, that DB's position included RMBSs and CDOs backed by some of the very riskiest mortgages with the highest rates of default, and the financial and the liquidity risks those securities posed to the Company.

8. The Offering Materials also omitted the significant risks inherent in DB's highly-leveraged "proprietary trading" operations. While defendants were exposing the Company to billions in potential trading losses, defendants were publicly characterizing the Company's risk controls as, among other things, "highly sophisticated" and "industry leading." Even as late as 2008, defendant Ackerman continued to represent that "we again demonstrated the quality of our risk management. We had no net write-downs related to sub-prime, CDO or RMBS exposures. Those

- 4 -

trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter."

9.       Defendants' mischaracterization of DB's risk management policies and controls was both material and false as the Company lacked meaningful risk controls, permitting DB traders to expose the Company to billions of euros in losses.

10.      In the end, DB's trading portfolio was so toxic that DB was forced to announce on January 14, 2009 that the firm anticipated a loss after taxes of **_€4.8 billion_** for the fiscal 2008 fourth quarter, driven by negative revenues of **_€4.8 billion_** in the Company's sales and trading businesses: Credit Trading, Equity Derivatives and Equity Proprietary Trading.  On February 5, 2009, the Company further announced **_its first annual net loss since World War II of €3.9 billion_** for the entire fiscal year 2008, and a loss before income taxes of **_€5.7 billion_**.  The deterioration of DB's mortgage-related assets also contributed to the Company's historic 2008 losses.  For the full fiscal year, the Company recorded **_€5.3 billion_** in write-downs on debt securities and other mortgage-related products, including leveraged loans and loan commitments, RMBSs/CDOs, monoline insurers, and commercial real estate.

11.      Each of the Securities was purchased in connection with the initial Offerings at $25.00 per share.  By February 24, 2009, the date that the initial lawsuit in this litigation was commenced, the value of the 6.375% Securities was $8.10 per share, the 6.55% Securities was $8.00 per share, the 6.625% Securities was $7.98 per share, the 7.35% Securities was $8.35 per share, the 7.60% Securities was $8.99 per share, and the 8.05% Securities was $11.20 per share.  Plaintiffs have suffered billions of dollars of damages as a result of defendants' dissemination of the false and misleading Offering Materials.

478900_1

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22(a) of the Securities Act, 15 U.S.C. §77v(a).

14.     Venue is proper in this Judicial District pursuant to §22(a) of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b), because many of the alleged acts, transactions, and conduct constituting violations of law, including the issuance and dissemination of materially false and misleading information to the investing public, occurred, at least in part, in this District. Additionally, Defendants reside, maintain their headquarters, or conduct substantial business in this District.

15.     In connection with the acts, conduct, and other wrongs alleged in this Consolidated Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

16.     Lead Plaintiff Belmont Holdings Corp. ("Belmont") acquired the 7.60% and 8.05% Securities issued pursuant or traceable to the false and misleading Registration Statement and Prospectuses as set forth in the Certification filed with the Court on April 20, 2009.  Belmont was appointed Lead Plaintiff by Order on November 24, 2009.

17.     Lead Plaintiffs Norbert G. Kaess ("Kaess") and Maria G. Farruggio ("Faruggio") acquired the 6.625% and 7.35% Securities issued pursuant or traceable to the false and misleading

- 6 -

Registration Statement and Prospectuses as set forth in the Certification filed with the Court on March 17, 2009.  Kaess and Farruggio were appointed Lead Plaintiffs by Order on November 24, 2009.

18.      Plaintiff Edward P. Zemprelli acquired the 6.375% and 7.35% Securities issued pursuant or traceable to the false and misleading Registration Statement and Prospectuses as set forth in the Certification filed with the Court on February 19, 2009.

19.      Plaintiff Plumbers' Union Local No. 12 Pension Fund acquired the 6.55% Securities issued pursuant or traceable to the false and misleading Registration Statement and Prospectus.

**The Company Defendants**

20.      Defendant DB is a global financial services firm with its principal executive offices in Frankfurt am Main, Germany.  The Company's businesses offer a variety of products and services to private individuals, corporate entities and institutional clients throughout the world.  DB is the Registrant of the false and misleading Registration Statement and Prospectuses, and created the entities listed below for the purposes of issuing the Securities.

21.      Defendant Deutsche Bank Capital Funding Trust VIII ("DB Trust VIII") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust VIII was formed by DB for the purpose of issuing 6.375% Securities.  DB Trust VIII used the proceeds from the October 2006 offering to buy the Class B preferred securities issued by Deutsche Bank Capital Funding LLC VIII.

22.      Defendant Deutsche Bank Capital Funding LLC VIII ("DB Capital LLC VIII") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC VIII issued and sold the 6.375% Securities to DB Trust VIII, issued and sold one Class A

- 7 -

preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC VIII to DB.

23.    Defendant Deutsche Bank Contingent Capital Trust II ("DB Trust II") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust II was formed by DB for the purpose of issuing the 6.55% Securities.  DB Trust II used the proceeds from the May 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC II.

24.    Defendant Deutsche Bank Contingent Capital LLC II ("DB Capital LLC II") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC II, a sponsor of DB Trust II, issued and sold the 6.55% Securities to DB Trust II, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC II to DB.

25.    Defendant Deutsche Bank Capital Funding Trust IX ("DB Trust IX") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust IX was formed by DB for the purpose of issuing 6.625% Securities.  DB Trust IX used the proceeds from the July 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Capital Funding LLC IX.

26.    Defendant Deutsche Bank Capital Funding LLC IX ("DB Capital LLC IX") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC IX issued and sold the 6.625% Securities to DB Trust IX, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC IX to DB.

27.    Defendant Deutsche Bank Capital Funding Trust X ("DB Trust X") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust X was formed by DB for

- 8 -

the purpose of issuing 7.35% Securities.  DB Trust X used the proceeds from the November 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Capital Funding LLC X.

28.     Defendant Deutsche Bank Capital Funding LLC X ("DB Capital LLC X") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC X issued and sold the 7.35% Securities to DB Trust X, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC X to DB.

29.     Defendant Deutsche Bank Contingent Capital Trust III ("DB Trust III") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust III was formed by DB for the purpose of issuing the 7.60% Securities.  DB Trust III used the proceeds from the February 2008 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC III.

30.     Defendant Deutsche Bank Contingent Capital LLC III ("DB Capital LLC III") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC III issued and sold the 7.60% Securities to DB Trust III, and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC III to DB.

31.     Defendant Deutsche Bank Contingent Capital Trust V ("DB Trust V") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust V was formed by DB for the purpose of issuing the 8.05% Securities.  DB Trust V used the proceeds from the May 2008 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC V.

32.     Defendant Deutsche Bank Contingent Capital LLC V ("DB Capital LLC V") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital V

- 9 -

issued and sold the 8.05% Securities to DB Trust V, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital V to DB.

33.     DB Trust VIII, DB Trust II, DB Trust IX, DB Trust X, DB Trust III and DB Trust V are referred to herein as the "Trust Defendants."  DB Capital LLC VIII, DB Capital LLC II, DB Capital LLC IX, DB Capital LLC X, DB Capital LLC III and DB Capital LLC V are referred to herein as the "LLC Defendants."

**Individual Defendants**

34.     Defendant Josef Ackermann is, and at all relevant times was, Chairman of the Management Board of DB.  Ackermann signed the materially false and misleading October 2006 and July 2007[2] Registration Statements, and the Company's 2005, 2006 and 2007 Form 20-Fs.

35.     Defendant Anthony Di Iorio was, at all relevant times, Chief Financial Officer ("CFO") and a member of the Management Board of DB.  Di Iorio retired in September 2008.  Di Iorio signed the materially false and misleading October 2006 and July 2007 Registration Statements, and the Company's 2006 and 2007 Form 20-Fs.

36.     Defendant Hugo Banziger is, and at all relevant times was, Chief Risk Officer and a member of the Management Board of DB.  Banziger signed the materially false and misleading October 2006 and July 2007 Registration Statements.

---

[2]     DB's July 2007 Registration Statement was simply an amendment to add two registrants (DB Capital Funding LLC IX and DB Capital Funding Trust IX) to its October 2006 Registration Statement.

478900_1

37.      Defendant Hermann-Josef Lamberti is, and at all relevant times was, Chief Operating Officer ("COO") and a member of the Management Board of DB.  Lamberti signed the materially false and misleading October 2006 and July 2007 Registration Statements.

38.      Defendant Martin Edelmann is, and at all relevant times was, a Managing Director of DB.  Edelmann signed the materially false and misleading October 2006 and July 2007 Registration Statements.

39.      Defendant Peter Sturzinger is, and at all relevant times was, DB's Authorized Representative in the United States for DB.  Sturzinger signed the materially false and misleading October 2006 and July 2007 Registration Statements.

40.      Defendant Marco Zimmermann was, at all relevant times, Vice President of DB, DB Trust IX, and DB Trust X.  Zimmermann signed the materially false and misleading October 2006 and July 2007 Registration Statements.  Zimmermann also signed the May 2007, November 2007, February 2008 and May 2008 Form 8-A Registration Statements.

41.      Defendant Detlef Bindert was, at all relevant times, Managing Director of DB Trust VIII.  Bindert signed the materially false and misleading October 2006 Registration Statement.

42.      Defendant Rainer Rauleder was, at all relevant times, Global Head of Capital Management & Treasurer Europe DB and DB Trust IX.  Rauleder signed the false and misleading October 2006 and July 2007 Registration Statements.

43.      Defendant Jonathan Blake was, at all relevant times, a director of DB.  Blake signed the false and misleading July 2007 Registration Statement.  Blake also signed the November 2007, February 2008 and May 2008 Form 8-A Registration Statements.

44.      Defendant Tessen von Heydebreck was, at all relevant times, Chief Administrative Officer and a member of the Management Board of DB.  Von Heydebreck left the Management

- 11 -

Board in May 2007.  Von Heydebreck signed the materially false and misleading October 2006 Registration Statement.

45.     Defendants named above in ¶¶34-44 are referred to herein as the "Individual Defendants."

**Underwriter Defendants**

46.     Defendant Deutsche Bank Securities Inc. ("DB Securities") is the investment banking arm of DB.  DB Securities acted as an underwriter in connection with all of the Offerings.

47.     Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank.  UBS Investment Bank provides a range of financial products and services worldwide.  UBS acted as an underwriter in connection with the October 2006, July 2007, November 2007, February 2008 and May 2008 Offerings.

48.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Citigroup acted as an underwriter in connection with the October 2006, July 2007, November 2007, February 2008 and May 2008 Offerings.

49.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a wholly owned subsidiary of Merrill Lynch & Co. and acted as underwriter in the sale of corporate securities.  In January 2009, Merrill Lynch & Company became a wholly owned subsidiary of Bank of America Corporation.  Merrill Lynch acted as an underwriter in connection with the October 2006, July 2007, November 2007, February 2008 and May 2008 Offerings.

50.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are

subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing.  It also offers real estate financing, risk management services, and structured products such as asset-backed and mortgage-backed securities.  Wachovia Capital acted as an underwriter in connection with the October 2006, July 2007, November 2007, February 2008 and May 2008 Offerings.

51.     Defendant Morgan Stanley & Co. ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions, and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley acted as an underwriter in connection with the October 2006, July 2007, November 2007, February 2008 and May 2008 Offerings.

52.     Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America.  Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions.  Banc of America acted as an underwriter in connection with the July 2007, November 2007, February 2008 and May 2008 Offerings.

53.     Defendants referenced in ¶¶46-52 above are referred to herein as the "Underwriter Defendants."

54.     Each of the Individual Defendants and each of the Underwriter Defendants participated in the drafting, preparation, or approval of various materially false and misleading

- 13 -

statements contained in the Offering Documents, as complained of herein.  Each of the Defendants was responsible for ensuring the truth and accuracy of the statements contained in these documents.

55.  Each of the Defendants owed to the purchasers, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time of the Offerings.  This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained therein not misleading.  As herein alleged, each of the Defendants violated these specific duties and obligations.  The Underwriter Defendants are liable for the materially false and misleading statements in the Offering Documents.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Offering Documents and were paid fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**Auditor Defendant**

56.  Defendant KPMG International is the parent of defendant KPMG Deutsche Treuhand-Gesellschaft (collectively, "KPMG") an audit, tax and advisory firm that served as the Company's auditor during the relevant period and, with its consent, was named as having certified a portion of the Registration Statement, as well as the financial statements in DB's Form 20-F Annual Reports filed with the SEC and incorporated into each of the Prospectuses.

## THE MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT, PROSPECTUS AND PROSPECTUS SUPPLEMENTS

57.  On October 10, 2006, DB filed an SEC Form F-3 Registration Statement and Prospectus, signed by Defendants Ackerman, Di Iorio, Banziger, Lamberti, Edelmann, Sturzinger, Zimmermann, Bindert and von Heydebreck.  By utilizing a "shelf" registration, or continuing

- 14 -

478900_1

offering process, DB was entitled to sell any combination of securities described in the prospectus by

issuing future prospectus supplements.  More specifically, the Registration Statement and Prospectus

stated:

> This prospectus is part of a registration statement on Form F-3 that we filed with the Securities and Exchange Commission utilizing a "shelf" registration process.  Under this shelf registration process, we may from time to time sell any combination of the securities described in the prospectus in one or more offerings. . . . [this prospectus] provides you with a general description of the securities we may offer.  Each time we sell securities we will provide one or more prospectus supplements that will contain specific information about the terms of the offering.

58.     The Registration Statement also contained the following statement from KPMG:

Consent of Independent Registered Public Accounting Firm

To the Supervisory Board of Deutsche Bank Aktiengesellschaft:

We consent to the incorporation by reference in the Registration Statement as filed with the Securities and Exchange Commission on October 10, 2006 of Deutsche Bank Aktiengesellschaft, Deutsche Bank Capital Funding LLC VIII and Deutsche Bank Capital Funding Trust VIII of our audit report dated March 9, 2006 with respect to the consolidated balance sheets of Deutsche Bank Aktiengesellschaft and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005, and to the reference to our firm under the heading "Independent Registered Public Accounting Firm" in the prospectus.

**October 13, 2006 Offering**

59.     On or about October 13, 2006, DB and DB Trust VIII filed with the SEC pursuant to

Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "October 2006 Prospectus

Supplement") in connection with the primary offering of securities on a delayed basis.

60.     The October 13, 2006 Prospectus Supplement offered for sale 24,000,000 6.375%

preferred securities for $25 per share with an issue date of October 18, 2006 (the "October 2006

Offering").

- 15 -

61.     The October Registration Statement and October 13, 2006 Prospectus Supplement incorporated other SEC filings by reference, including the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2005 filed on March 23, 2006 ("2005 20-F").

62.     The 2005 20-F stated the following regarding DB's risk policies, procedures and methodologies:

•       Our Management Board provides overall risk management supervision for our consolidated Group as a whole.  Our Supervisory Board regularly monitors our risk profile.

•       We manage credit, market, liquidity, operational, business and reputational risks in a coordinated manner at all relevant levels within our organization.  This also holds true for complex products which we typically manage within our framework established for trading exposures.

*       *       *

For each of our Group Divisions, risk management units are established with the mandate to:

•       Ensure that the business conducted within each division is consistent with the risk appetite the Group Risk Committee has set;

•       Formulate and implement risk policies, procedures and methodologies that are appropriate to the businesses within each division;

•       Approve credit risk and market risk limits;

•       Conduct periodic portfolio reviews to ensure that the portfolio of risks is within acceptable parameters; and

•       Develop and implement risk management infrastructures and systems that are appropriate for each division.

63.     The 2005 20-F emphasized the fact that DB utilized "a detailed risk assessment of every credit exposure" with regard to the Company's Credit Risk Ratings stating:

A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with an obligor.  Our risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure.  This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also

- 16 -

478900_1

influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties.  Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution.  While we generally rate all our credit exposures individually, at times we rely on rating averages for measuring risk.  When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

64.     Regarding market risk, the 2005 20-F provided:

MARKET RISK MANAGEMENT FRAMEWORK

We assume market risk in both our trading and our nontrading activities.  We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits.  Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios.  Value-at-risk is a common metric we use in the management of our trading market risks.

Our Management Board and Group Risk Executive Committee, supported by Group Market Risk Management, which is part of our independent risk and capital management function, set a Group-wide value-at-risk limit for the market risks in the trading book.  Group Market Risk Management sub-allocates this overall limit to our Group Divisions.  Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

65.     Describing credit risk as a specific banking risk, the incorporated 2005 20-F stated:

•       Credit risk arises from all transactions that give rise to actual, contingent or potential claims against any counterparty, obligor or borrower (which we refer to collectively as "counterparties").  This is the largest single risk we face.

66.     Additionally, the 2005 20-F also included the following statement from the

Company's auditor KPMG:

Report of Independent Registered Public Accounting Firm

- 17 -

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Deutsche Bank Aktiengesellschaft and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2005, *in conformity with U.S. generally accepted accounting principle*s.

67.     The statements in ¶¶62-66 above were materially false and misleading when made because:

(a)     DB failed to disclose that the Company had significant exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets, in violation of GAAP and SEC regulations;

(b)     DB's disclosures concerning market risks and credit risks were false and misleading in that they failed to disclose the Company's true exposure to RMBS/CDO securities and other mortgage-related assets; and

(c)     DB's and KPMG's assertions concerning compliance with GAAP were false and misleading because the Company's 2005 20-F did not comply with GAAP.

68.     DB violated GAAP by failing to properly disclose material concentrations of risk and exposure to risk arising from subprime/nonprime-backed CDOs and non-prime mortgage-related assets.  Paragraph 15A of FASB Statement of Financial Accounting Standards ("SFAS") No. 107, Disclosures about Fair Value of Financial Instruments, required DB to disclose "*all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties*." (Emphasis added.)  Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.

- 18 -

69. DB's subprime/nonprime exposure represented a group concentration of credit risk. If a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion (APB") No. 28, *Interim Financial Reporting*. The purpose behind the risk disclosure provisions in GAAP is to warn investors about concentrations that may result in losses under changed conditions – not to wait until those losses become substantial and disclose the concentration of risk *after* the losses are already harming investors.

70. GAAP also requires that financial statements disclose contingencies when it is at least reasonably possible (*e.g.*, a greater than slight chance) that a loss may have been incurred. SFAS No. 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made. *Id*.

71. The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S‑X [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

72. The SEC has also stated in SEC Release Nos. 33-8040; 34-45149; FR-60: *Cautionary Advice Regarding Disclosure About Critical Accounting Policies* that public companies should be mindful of existing disclosure requirements in GAAP. The SEC commented that accounting standards require information in financial statements about the risks and uncertainties inherent in significant estimates. Specifically, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6"), requires disclosures to be made in financial

statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations.  SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity."

73.     Defendants also had a duty to disclose pertinent information in the Registration Statement and Prospectuses pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

74.     By failing to disclose *any* information about the level and structure of its subprime/nonprime asset holdings nor any of the required disclosures about the nature, extent, concentrations, or exposure of risks arising from its subprime and nonprime asset holdings, the Offering Materials prevented investors from determining the effect that the subprime and nonprime mortgage crisis was having on the Company prior to the Offering(s), *i.e.*, its exposure to the subprime crisis.  Accordingly, investors were unable to consider the impact on DB of the adverse events in the subprime and nonprime markets because defendants effectively represented that the Company had no exposure.

75.     Moreover, the massive amount of subprime/nonprime-backed CDOs and other U.S. residential mortgage-backed assets held by DB – *as much as €20 billion* – in itself created a concentration of assets that was significant and material to DB's financial position and performance and was therefore required under GAAP and SEC regulations to be disclosed to investors.  However, with the additional information available to defendants prior to the Offering(s) (described at ¶¶95, 105-106, 115) regarding the deterioration and illiquidity of its subprime/nonprime-related assets, defendants were required under GAAP and SEC to disclose the breadth of  DB's *entire*

- 20 -

subprime/nonprime exposure.  The disclosure of these exposures and risks was necessary to prevent DB's financial statements from being materially misleading.  Instead, DB investors were kept in the dark as DB's subprime/nonprime exposure was not disclosed until ***well after*** the losses were required to be realized and were already harming investors.  Defendants failed to disclose any information whatsoever about the Company's subprime/nonprime exposure until October 2007, and failed to ***fully disclose its true exposure and risks until early 2009***, when the Company finally recorded significant write-downs.

**May 16, 2007 Offering**

76.     On or about May 16, 2007, DB and DB Trust II filed with the SEC, pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "May 2007 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

77.     The May 2007 Prospectus Supplement offered for sale 32,000,000 6.55% preferred securities for $25 per share with an issue date of May 21, 2007 (the "May 2007 Offering").

78.     The May 2007 Prospectus Supplement incorporated by reference the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2006 filed on March 27, 2007 ("2006 20-F").

**July 16, 2007 Offering**

79.     On or about July 16, 2007 DB and DB Trust IX filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "July 2007 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

80.     The July 2007 Prospectus Supplement offered for sale 40,000,000 6.625% preferred securities for $25 per share with an issue date of July 20, 2007 (the "July 2007 Offering").

- 21 -

81.     The July 2007 Prospectus Supplement incorporated by reference the 2006 20-F, filed with the SEC on March 27, 2007.

**November 6, 2007 Offering**

82.     On or about November 6, 2007, DB and DB Trust X filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the November 2007 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

83.     The November 2007 Prospectus Supplement offered for sale 32,200,000 7.35% preferred securities for $25 per share with an issue date of November 7, 2007 (the "November 2007 Offering").

84.     The November 2007 Prospectus Supplement incorporated by reference the 2006 20-F, filed with the SEC on March 27, 2007.

85.     The 2006 20-F incorporated into the three 2007 Offerings stated the following with respect to the Company's Credit Risk Ratings:

> A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with a counterparty.  Our risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure.  This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

> We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties.  Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution.  While we generally rate all our credit exposures individually, at times we rely on rating averages for measuring risk.  When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

- 22 -

86.     Regarding market risk, the 2006 20-F provided:

MARKET RISK MANAGEMENT FRAMEWORK

We assume market risk in both our trading and our nontrading activities.  We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits.  Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios.  Value-at-risk is a common metric we use in the management of our trading market risks.

Our Management Board and Risk Executive Committee, supported by Market Risk Management, which is part of our independent risk and capital management function, set a Group-wide value-at-risk limit for the market risks in the trading book.  Market Risk Management sub-allocates this overall limit to our Group Divisions.  Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

87.     Regarding Proprietary Trading, the incorporated 2006 20-F provided:

Within Corporate Banking & Securities, we conduct proprietary trading, or trading on our own account, in addition to providing products and services to customers. ***Most trading activity is undertaken in the normal course of facilitating client business.***  For example, to facilitate customer flow business, traders will maintain long positions (accumulating securities) and short positions (selling securities we do not yet own) in a range of securities and derivative products, reducing this exposure by hedging transactions where appropriate. ***While these activities give rise to market and other risk, we do not view this as proprietary trading.***  However, we also use our capital to exploit market opportunities, and this is what we term proprietary trading.

We undertake designated proprietary trading across all asset classes.  Some of this proprietary trading activity takes the form of arbitrage.  For example, in index arbitrage we identify differences between the prices of exchange-traded derivatives (such as futures contracts on an equity index) and the underlying prices on the stock exchange of the individual stocks in the index.  In convertible arbitrage, we identify volatility-related pricing differences between the market for convertible debt instruments and the cash and derivatives markets.  In credit and equity arbitrage, we use statistics-driven trading strategies based on short-term market movements and indicators to manage our trading book so that the market value of our long positions remains roughly equal to the market value of our short positions.  We also undertake risk-arbitrage, which is generally related to mergers and acquisitions, involving, for example, transactions such as buying a target company's shares at the same time as selling the bidding company's shares.

- 23 -

478900_1

*       *       *

*While we have taken selective trading opportunities and risks throughout the year, our value-at-risk for the trading units remained within a band between €58.3 million and €82.0 million.  The higher value-at-risk levels continue to be driven by interest rate risk exposures and/or equity positions.  The average value-at-risk in 2006 was €69.5 million, which is 5.5% above the 2005 average of €65.8 million.*

88.     Additionally, the 2006 20-F also included the following statement from the

Company's auditor KPMG:

Report of Independent Registered Public Accounting Firm

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Deutsche Bank Aktiengesellschaft and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2006, *in conformity with U.S. generally accepted accounting principles.*

89.     On November 1, 2007, DB filed a Form 6-K which was incorporated by reference in

the November 2007 and February 2008 Offerings.  The Form 6-K included the following statements

regarding the Company's trading operations:

In the Corporate and Investment Bank (CIB), revenues were €1.9 billion, down by €2.1 billion, or 52%, reflecting charges totaling €2.2 billion in Corporate Banking & Securities (CB&S).  *Of these charges, €€1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities.*  Reflecting these charges, revenues in Sales & Trading (Debt and other products) declined 71% versus the prior year quarter to €576 million.

*       *       *

SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €576 million in the third quarter 2007, a decrease of 71%, or €1.4 billion, versus the third quarter 2006.  Performance suffered primarily from the rapid loss of liquidity in credit markets from August onwards.  The substantial market turbulence caused breakdowns in relationships between credit securities and hedging instruments such as derivatives based on broad market indices.  These together with the loss of liquidity negatively impacted credit trading positions in relative value trading, CDO correlation trading and residential mortgage-backed securities, even after taking into account significant gains on offsetting hedge positions.

*       *       *

- 24 -

Looking forward, challenges undoubtedly remain. Difficulties in the U.S. residential mortgage market may persist, impacting the wider economy. Financial markets are likely to remain more cautious in their appetite for risk. However, this is also a time of opportunity for Deutsche Bank. As a market leader in investment banking, and a major global asset gatherer, we stand to benefit from the flight to quality. We have forged deep client relationships, and while clients' priorities may change, our ability to act as trusted advisor and partner will remain. Our capital strength and well-diversified funding base are valuable competitive advantages in an environment where liquidity and capital commitment command a premium in the eyes of clients. ***Investors continue to search for yield, and we continue to see demand for good-quality assets at prices which reflect a reasonable balance between risk and reward. Our sales and trading business model, with its emphasis on intellectual capital, continues to be a critical part of our platform.***

90.     The statements in ¶¶85-89 above were materially false and misleading for the following reasons:

        (a)     As set forth in ¶¶68-75 and below, DB failed to disclose that the Company had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets, in violation of GAAP, SEC regulations and IFRS;

        (b)     As set forth in ¶¶68-75 and below, DB's disclosures concerning market risks and credit risks were false and misleading in that they misrepresented the Company's true exposure to RMBS/CDO securities and other mortgage-related assets; and

        (c)     As set forth in ¶¶68-75 and below, DB's assertions concerning its compliance with GAAP were false and misleading because the Company's 2006 20-F did not comply with GAAP. More specifically, under SFAS No. 157, "*Fair Value Measurement*," DB was required to accurately value its subprime-backed CDOs and other subprime-related assets at their fair value at each reporting period and to record losses in its income statement, in the form of write-downs, arising from any decreases in fair value since the prior reporting period. SFAS No. 157, issued in September 2006 and effective January 1, 2008, defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market

- 25 -

participants at the measurement date."  "At the measurement date" means that fair value must reflect the conditions that exist as of the date of the relevant balance sheet.  SFAS No. 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or liability."

91.     Although SFAS No. 157 did not become formally effective until January 1, 2008, it reflected essentially the same definition of fair value as had previously existed under GAAP, including SFAS 107, "Disclosures about Fair Value of Financial Instruments."   Under SFAS No. 107, quoted market prices are the best indication of fair value.  In the absence of quoted market prices, a company is required to develop its "best estimate" using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services.   Under SFAS No. 107, DB was required to incorporate all relevant factors, including those described herein at ¶¶95, 105-112, 115-119, as opposed to relying on its own contrived valuation assumptions to calculate the fair value of its subprime-backed assets and to determine if write-downs were necessary.

92.     SFAS Nos. 107 and 157 applied to DB's portfolio of subprime/nonprime-backed assets.  As the subprime/nonprime crisis worsened, DB was required at the end of each period to value its subprime/nonprime-backed CDOs and other assets at their true fair value based on the then-current market conditions - not a hypothetical value based on DB's own internal assumptions.  Sir David Tweedie, Chairman of the International Accounting Standards Board ("IASB"), commenting on the fair value calculations of instruments affected by the subprime crisis, stated, "accounts [including those affected by the subprime crisis] are supposed to reflect the current situation, not a probable future one."  Tweedie also commented that "***[a]ccounting has to reflect facts, not assume stability when it doesn't exist***."

- 26 -

93.     Similarly, the IASB has issued the following comments related to fair value calculations affected by the subprime crisis:

> Some have suggested that, when market prices are depressed or markets are 'in crisis', fair value should be measured using a fundamental value approach based primarily on management's estimate of future cash flows.  In such an approach, if cash flow estimates are not expected to decline over the life of the instrument (*i.e.*, until settlement or maturity), there should be no decline in the fair value of the instrument.  The argument put forward is that, in market turmoil, adverse market sentiment creates an illogical view of risk, and this should not be taken into account when measuring fair value.
>
> *However, fundamental values are not consistent with the objective of a fair value measurement because they do not take into account factors that market participants would consider when pricing the instrument, such as illiquidity and credit risk.  Fair value reflects the amount for which financial instruments can be exchanged in the market for those instruments.  Transaction prices continue to reflect fair value and cannot be ignored, even in a market crisis.  Accordingly, a value measured using a 'fundamental value' approach might not represent an estimate of a current transaction price*.  (IASB draft release: Fair value of financial instruments in markets that are no longer active; Sept, 2008).  [Emphasis added.]

94.     Consistent with DB's failure to comply with the IASB disclosure requirements described above, DB specifically failed to comply with GAAP in valuing its subprime and other mortgage-backed assets.  DB improperly valued these assets using internally generated valuation models that relied on variables and highly subjective forward-looking estimates supplied by DB's own management.  These valuations were clearly inconsistent with actual current market conditions (including the factors described at ¶¶95, 105-112, 115-119) and blatantly missed the objective of fair value.  The result was a valuation that allowed DB to avoid reporting significant losses on its subprime/nonprime exposure prior to the Offering(s), despite the fact that all indications of fair value (as described herein at *id*.) explicitly showed these assets were nowhere near the value that DB's models purported to show.

- 27 -

95.     Under GAAP and/or IFRS (*see ¶¶*130-140), DB was required to incorporate the risks arising from these assets in valuing and writing down its RMBS/CDOs and other mortgage-backed assets.  Specifically, defendants were aware of, or otherwise ignored, all of the following:

(a)     DB's subprime/nonprime exposure was massive, totaling more than *€20 billion*, and highly susceptible to the adverse events occurring in the U.S. subprime real estate market;

(b)     warning signs demonstrating the U.S. subprime crisis directly affected the collateral underlying DB's subprime-backed assets;

(c)     the ABX index, a leading indicator of the value of mortgage-backed assets, was rapidly declining; and

(d)     DB's own trading experience revealed the increasing illiquidity of its CDOs and mortgage-backed assets.

96.     Unbeknownst to investors (due to the Company's failure to comply with the required GAAP and/or IFRS disclosures or any indication of write-downs in the Offering Materials), DB had massive exposure to the U.S. residential real estate mortgage market, totaling over €20 billion in 2007.  This exposure clearly represented a concentration that was significant to DB's financial position and performance as evidenced by the more than €5.3 billion in write-downs that DB recorded on these assets in fiscal 2008 alone.  DB's primary exposures consisted of the following categories:

**a.     CDOs**

97.     In 2007, DB had €3.46 billion of gross exposure to CDOs backed primarily by subprime/nonprime mortgages.

- 28 -

98.     Of this amount, 30% or €1.1 billion consisted of mezzanine CDOs.  Mezzanine CDOs were particularly risky and susceptible to the decline of the subprime mortgage market because they were backed by nothing more than the ***lowest rated*** and ***highest risk*** tranches of RMBS.  In fact, DB's Mezzanine CDOs were susceptible to catastrophic loss, even at relatively benign stages of what would become the subprime financial crisis.  The collateral underlying DB's €1.1 billion of Mezzanine CDOs consisted of 10% subprime mortgages.  Not only did DB fail to quantify its total exposure to CDOs, but the Company also did not disclose that ***100% of its Mezzanine CDOs could be wiped out even if the default rate of the underlying subprime mortgages only reached 10%***.

**b.     Exposure to Monoline Insurers**

99.     DB also had an additional portfolio of approximately €9 billion of net counterparty exposures to monoline insurers with respect to residential mortgage-related activity.[3]  Even though these investments were purportedly "hedges," they represented significant exposure to U.S. subprime mortgages losses and ultimately resulted in significant losses.

100.    DB's risks and exposures were tied to the values of the CDOs (and other market-traded securities) ***and the ability of the monoline insurers to absorb the losses on the billions of dollars worth of subprime/nonprime assets they insured***.  In the event the monoline insurers failed – and many did – exposure on hedged CDOs was no different than on unhedged and Mezzanine CDOs.  Therefore, the nature, extent and concentrations of risk associated with these monoline exposures were required to be disclosed under the GAAP rules described above (and the applicable IFRS rules described at ¶¶130-140).  The purpose behind the GAAP/IFRS disclosure

---

[3]     The €9.9 billion figure represents DB's "gross national value of bought protection."  *See* April 29, 2008 Company Form 6-K.

requirements was to warn investors about concentrations in financial instruments that ***may*** result in losses under changed conditions  not to wait until those losses were substantial and realized and then disclose the concentration of risk ***after*** the losses were already recorded.

101.    By early 2007, it was clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, were overextending themselves by insuring hundreds of billions of dollars worth of subprime-backed CDOs and other mortgage-backed assets.  Accordingly, the notion that such assets were "hedges" was illusory, as monoline insurers could quickly be wiped out, leaving the holders of such assets to absorb the losses themselves.  On March 14, 2007, *The Wall Street Journal* reported that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults."  Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of subprime-backed CDOs and other subprime-related assets.

     **c.**     **RMBS**

102.    In 2007, DB also had an additional €9.7 billion of RMBS backed primarily by U.S. subprime and other non-prime mortgages.  Of the subprime collateral, a large percentage was originated in 2006 and 2007 vintages for which mortgage default rates were more than double the loss rates of 2005 and earlier vintages.  Despite not disclosing the true nature and extent of its mortgage-related exposure prior to the offerings, DB recorded almost €5.3 billion in losses on these assets in fiscal 2008.

- 30 -

d.    **CDS**

103.    DB also had a significant unknown amount of credit-default swaps ("CDS").  These instruments allowed traders to bet on the creditworthiness of individual companies, but the value of CDSs had been questioned by economists, who thought the market became little more than a casino – a casino with $60 trillion of bets outstanding at its peak in 2008.  Despite not disclosing a single word about its significant CDS exposure prior to the Offerings, DB recorded almost $2 billion in losses associated with these assets by the end of 2008.  (*See* ¶¶141-152.)

104.    Because Defendants failed to disclose DB's massive subprime/nonprime exposure, investors were unable to evaluate the risk or understand the effect the U.S. subprime crisis was having on DB.  Instead, investors were led to believe that DB was ***not*** exposed to the U.S. subprime crisis.

105.    From late 2006 to early 2007, well prior to DB's first disclosure of any U.S. subprime exposure, the Company's exposure to subprime-related assets created significant concentrations of risk that needed to be disclosed at least in part based on the following indications of market conditions:

- By September 2006, the number of properties that had entered into foreclosure had increased 53% from a year earlier.

- By November 2006, subprime loans made in 2006 were "going bad" at a rate of 50% faster than the rate for those made in 2005.

- By December 2006, subprime borrowers had a delinquency rate of more than 12.5% in the third quarter, ***the highest in more than three years***.  The delinquency rate for borrowers holding adjustable-rate mortgages was even higher at more than 13% in the third quarter.

- By February 2007, HSBC (the largest subprime mortgage originator in the U.S.) announced that's its loan loss provisions would exceed analysts' estimates due to, among other things, increasing subprime delinquencies and that it was raising its loan loss provision by 20%.

- 31 -

- According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on subprime mortgage loans in 2006 **more than doubled** from 2005.

- On February 13, 2007, ResMae Mortgage Corp., the country's 26th largest subprime lender, filed for Chapter 11 bankruptcy protection.

- In early March 2007, the Mortgage Bankers Association reported that about 13% of subprime loans were delinquent, more than five times the delinquency rate for home loans to prime borrowers.

- During March 2007, the subprime mortgage industry continued to collapse with several more subprime lenders declaring bankruptcy, announcing significant losses, or putting themselves up for sale, including Accredited Home Lenders, DR Horton, Countrywide Financial, and SouthStar Funding LLC.

- By April 2007, the signs of distress described above turned into actual CDO failures, when Merrill Lynch had cancelled planned auctions for most of the securities that it had seized from the Bear Stearns funds and, instead, took them in-house. Investors were too baffled by the ultra-complex securities, known as CDOs, to offer attractive bids because the instruments were so illiquid that trades – even at fire sale prices – would have forced a wide scale re-evaluation of prices across the sector, perhaps **leading some CDO issues to be marked down as much as 30 percent**.

Despite these red flags, DB failed to disclose its subprime/nonprime exposure to investors in the Offering Materials.

106.   The ABX Index was created in January 2006 when several banks collaborated with a Company called "Markit" to create an index which provided banks with the ability to track RMBSs and to estimate CDO market values. The ABX Index tracked the performance of 15 to 20 equally-weighted RMBS tranches backed by subprime collateral and was a leading indicator of the value of subprime-backed CDOs and other subprime assets. In fact, the ABX Index was used by DB as a barometer for assessing how subprime mortgage-related assets were performing in the marketplace. The ABX Index tracked the cost of buying and selling CDSs on selected RMBS tranches. Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating.

107.    The "TABX Index," launched in February 2007, tracked the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination.  Like CDOs, which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as those owned by DB.  The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%.

108.    The ABX and TABX indices were additional objectives, directly observable, *real-time* indicators of the value of DB's subprime-backed CDOs and other subprime-related assets.  These indices were closely tracked by defendants.

109.    Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans."  Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation.  Therefore, defendants reasonably should have known that the ABX should have been used in valuing RMBS and CDOs and that disregarding this market index in the Company's mark-to-market valuations was a violation of SFAS Nos. 107 and 157, as described above.

110.    By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered serious declines, with some BBB- tranches dropping as much as 60%.  By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters.

111.    The ABX Index showed that all subprime RMBS tranches were being adversely affected by the subprime mortgage crisis beginning in late 2006 and into 2007.  As shown in the

chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted.



112.    The TABX indices also plunged.  From its inception in February 2007, when it was already indicating CDO values were more than 15% under par, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007.

| Date | Value (100 = 100% of par) |
|------|---------------------------|
| 3/30/2007 | 83.8 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |

113.    The collapse of the ABX and TABX indices made it clear to defendants that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering.  GAAP and IFRS required DB to: (1) disclose the risks associated with these assets; and (2) timely writedown the value of its RMBS/CDO holdings to fair value in accordance with SFAS Nos. 107 and 157 (and the applicable IFRS rules described at ¶¶130-140).  Nonetheless, DB failed to disclose or record its first write-downs of its

- 34 -

RMBS/CDO holdings until October 2007 and they did not accurately record the write-downs until the end of 2008.

114.    Indeed, DB's 11/1/07 6-K – the Company's first 6-K disclosure concerning its RMBS/CDO exposure – only stated that the Company would be taking a €1.6 billion charge "on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities."  This SEC filing, which was incorporated by reference into the November 2007 and February 2008 Offerings, did not contain any other information regarding the nature and extent of DB's RMBS/CDO holdings.  The disclosure of these exposures and risks was necessary to prevent DB's financial statements from being materially misleading.  Especially since the Company in the same 6-K assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight."

**Industry Signs of an Impending Collapse in Mortgage-Related Asset Values**

115.    By October 2007, banks continued to reveal losses as a consequence of the mortgage crisis.  Merrill Lynch announced that it would write-down its ABS CDOs by $12.4 billion.  Also in October 2007, Swiss banking giant UBS wrote-down $4.4 billion in subprime related RMBS and CDOs.

116.    In November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion write-off and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital.  The Federal Reserve also injected $41 billion into the money supply for the banks to borrow, the largest single expansion since September 11, 2001.

117.    In December 2007, UBS reported an additional $10 billion write-down in subprime related RMBS and CDOs and Bank of America liquidated a $12 billion cash fund.  During the same time frame, Merrill Lynch received a $6.2 billion cash infusion from outside investors.

- 35 -

118.     The year 2008 saw the housing and credit crisis continue unabated.  On January 30, 2008, UBS announced that it had written-down an additional $4 billion on its mortgage-related assets as of December 31, 2007.  Then in February 2008, UBS announced that its write downs for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages.  This total included a $2 billion write down for the fourth quarter of 2007 on the bank's $26.6 billion Alt-A portfolio.

119.     By March 2008, the collapsing real estate and credit markets led to the destruction of one of this country's oldest investment banks.  On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy.  The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to cover potential Bear Stearns losses – mostly resulting from mortgage-backed securities.

120.     In sum, as property values dropped and the mortgages underlying mortgaged-backed securities defaulted, the market for those securities became illiquid.  As a result, the value of DB's subprime and nonprime RMBS/CDO portfolios plummeted.

**February 14, 2008 Offering**

121.     On or about February 14, 2008, DB and DB Trust III filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "February 2008 Prospectus Supplement") in connection with the primary offering of securities on a delayed basis.

122.     The February 2008 Prospectus Supplement offered for sale 70,000,000 7.6% preferred securities for $25 per share with an issue date of February 20, 2008 (the "February 2008 Offering").

123.     The February 2008 Prospectus Supplement incorporated by reference the false and misleading 2006 20-F described above, filed with the SEC on March 27, 2007.

124.     The statements contained in 2006 20-F were materially false and misleading for the following reasons:

(a)     As set forth in ¶¶68-75 and 90(c)-120, DB failed to disclose that the Company had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets, in violation of GAAP and SEC regulations;

(b)     As set forth in ¶¶68-75 and 90(c)-120, DB's disclosures concerning market risks and credit risks were false and misleading in that they failed to disclose the Company's true exposure to RMBS/CDO securities and other mortgage-related assets; and

(c)     As set forth in ¶¶68-75 and 90(c)-120, DB's disclosures concerning its compliance with GAAP were false and misleading.

125.     On February 7, 2008, DB filed a Form 6-K with the SEC which was also incorporated by reference into the February 2008 Prospectus Supplement.

(a)     The Form 6-K attached a release from the Company which asserted that DB had sustained "no further losses" on its remaining CDO exposure, noting:

In Sales & Trading (Debt and other products), revenues in foreign exchange, interest rate trading, and money markets saw strong year-on-year growth while revenue levels in some credit trading areas, and residential mortgage-backed securities, were significantly lower, reflecting conditions in credit markets. Sales & Trading (Equity) saw a modest year-on-year growth, driven by the customer-focused businesses, while revenues in designated proprietary trading were lower than in the prior year quarter.

*      *      *

Revenues from Sales & Trading (Debt and other products) were EUR 1.6 billion in the fourth quarter, a decrease of 10% or EUR 185 million versus the fourth quarter 2006, reflecting weaker performance in trading of asset backed securities (including those backed by residential and commercial mortgages), partly offset by continued strength in CB&S's foreign exchange, interest rates and money markets businesses.

- 37 -

Our credit trading businesses showed a significant recovery after an exceptionally difficult third quarter, though revenues were lower than in the fourth quarter 2006. ***Following our decision to proactively manage down troubled risk positions in the third quarter and ongoing active risk management, we took no further losses on our remaining CDO exposures in the current quarter after taking into account related gains on hedge positions.***

> (b)    The Form 6-K also emphasized that DB's "[e]ffective risk management" was

responsible for DB's ability to avoid write-offs for 4Q 07, noting:

Revenues from Sales & Trading (Equity) totaled EUR 1.1 billion in the fourth quarter, an increase of 1%, or EUR 8 million, versus the fourth quarter 2006, reflecting significant improvements across customer-driven businesses, offset by a decline in the contribution from designated proprietary trading. Both customer-driven and designated proprietary trading businesses improved versus the third quarter 2007.

For the full year, Sales & Trading performed well, given the exceptionally challenging markets of the second half 2007. Sales & Trading (Debt and other products) revenues were EUR 8.4 billion, a decrease of 7%, or EUR 609 million, compared to 2006. ***Effective risk management resulted in contained losses in our collateralized debt obligations and U.S. residential mortgage businesses, despite the investment banking industry facing substantial problems in both sectors***.

*        *        *

He added: "***In the fourth quarter, we again demonstrated the quality of our risk management. We had no net write-downs related to sub-prime, CDO or RMBS exposures***. Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter. In leveraged finance, where we had significant write-downs in the third quarter, net write-downs in the fourth quarter were less than EUR 50 million." [Emphasis added.]

126.    The statements in ¶¶125(a)-(b) were false and misleading, as it was not DB's

effective risk management that contained its reported CDO losses for 2007, but rather because

defendants refused to properly account for its CDO and RMBS securities held as of December 31,

2007.

127.    The Form 6-K also stated the following concerning DB's overall performance:

Dr. Josef Ackermann, Chairman of the Management Board, said: "I am pleased to report robust earnings for the fourth quarter, which concludes one of our best years ever and a year of solid performance in challenging times. In 2007 we clearly

- 38 -

strengthened our competitive position and delivered another year of profit growth while simultaneously maintaining our capital strength.  This performance enables us to recommend to our shareholders another increase in our dividend, to EUR 4.50 per share."

128.    The statements in ¶127 were false and misleading, as defendants knew or should have known.

(a)    That absent the accounting improprieties detailed in ¶¶68-75, ¶¶90(c)-120, and ¶¶130-140 herein, DB would not have reported the "robust earnings" for 4Q 07; and

(b)    That DB's lack of net write-downs related to RMBS/CDO-related exposure was not due to the quality of DB's risk management, but rather due to the failure to accurately account for its RMBS/CDO-related assets as detailed in ¶¶68-75, ¶¶90(c)-120, and ¶¶130-140 herein herein.

129.    In addition to the reasons set forth above and in ¶¶68-75 and ¶¶90(c)-120, these statements were materially false and misleading for the following reasons:

(a)    DB failed to disclose that the Company had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets, *in violation of IFRS*; and

(b)    As set forth in ¶¶141-152, DB failed to disclose that the Company engaged extensively in high-risk proprietary trading, *i.e.*, gambling on the Company's own account using huge undisclosed leverage that would ultimately cost DB billions of euros in trading losses.

**A.    Applicable Accounting Standards**

130.    Pursuant to Regulation (EC) 1606/2002, beginning with fiscal year 2007 DB prepared their consolidated financial statements in accordance with International Financial Reporting Standards, or IFRS.

131.    IFRS are those principles adopted by the International Accounting Standards Board ("IASB") and recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted international accounting practices at a particular time.  IFRS are promulgated by the IASB (formerly the Board of the International Accounting Standards Committee ("IASC")).  Narrowly, IFRS refers to the numbered series of pronouncements currently being issued by the IASB, as distinct from the IAS's numbered series of pronouncements issued by its predecessor.

132.    DB's compliance with IFRS and all statements describing the fair presentation of its financial results were covered by IAS 1, which states:

> An entity whose financial statements comply with IFRSs shall make an explicit and unreserved statement of such compliance in the notes.  Financial Statements shall not be described as complying with IFRSs unless they comply with all the requirements of IFRSs. . . .  The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.

133.    As a publicly traded company, DB was required by the EU Commission, Regulation (EC) No. 1606, Article 4 to issue financial results in accordance with International Financial Reporting Standards.

**B.    IFRS Required DB to Disclose the Risks Arising from Its Subprime and Nonprime Exposure**

134.    The statements in ¶¶125 and 127 were materially false and misleading when made because the Company failed to disclose, in violation of the IFRS, that it had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets.

135.    International Financial Reporting Standard No. 7 *Financial Instruments: Disclosures* ("IFRS 7"), which was effective beginning January 1, 2007, requires disclosures that enable users of

- 40 -

the financial statements to evaluate the significance of financial instruments, such as subprime-backed CDOs and other subprime-related assets, to an entity's financial position and performance. IFRS 7 also requires the disclosure of the nature and extent of risks arising from those financial instruments.

136.    Specifically IFRS 7 states:

An entity shall disclose information that ***enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed*** at the end of the reporting period. . . . These risks typically include, but are not limited to, ***credit risk, liquidity risk and market risk***.

For each type of risk arising from financial instruments, an entity ***shall disclose***:

(a)     the ***exposures to risk*** and how they arise;

(b)     its objectives, policies and processes for managing the risk and the methods used to measure the risk; and

(c)     any changes in (a) or (b) from the previous period.

*       *       *

Entities [are required] to provide disclosures in their financial statements that enable users to evaluate:

(a)     ***the significance or financial instruments for the entity's financial position and performance***; and

(b)     the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the end of the reporting period, and how the entity manages those risks.  [Emphasis added.]

137.    Prior to the effective date of IFRS 7, International Accounting Standard No. 32 Financial Instruments: Disclosure and Presentation ("IAS 32") and International Accounting Standard No. 30 Disclosures in Financial Statements of Banks and Similar Financial Institutions ("IAS 30") required similar disclosures.

- 41 -

138.     Specifically, IAS 32 states:

Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. ***The required disclosures provide information that assists users of financial statements in assessing the extent of risk related to*** both recognized and unrecognized ***financial instruments***:

(a)     Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

\*          \*          \*

(iii) ***Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices*** whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

\*          \*          \*

(b)     ***Credit risk*** – Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and ***cause the other party to incur a financial loss***.

(c)     ***Liquidity risk*** – Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. ***Liquidity risk may result from an inability to sell a financial asset quickly at close to its fair value***.

\*          \*          \*

For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose: (a) information about the extent and nature of financial instruments, ***including significant terms and conditions that may affect the amount, timing and certainty of future cash flows*** . . . .  [Emphasis added.]

139.    IAS 30 states:

***A bank should disclose any significant concentrations of its assets, liabilities and off balance sheet items.*** Such disclosures shall be made in terms of geographical areas, customer or industry groups ***or other concentrations of risk***. . . .

***A bank discloses significant concentrations*** in the distribution of its assets and in the source of its liabilities ***because it is a useful indication of the potential risk inherent in the realization of the assets and the funds available to the bank***. Such disclosures are made in terms of geographical areas, customer or industry groups or

- 42 -

other concentrations of risk which are appropriate in the circumstances of the bank. [Emphasis added.]

140.    Similar to SFAS Nos. 157 and 107, under IAS 39, DB was also required to accurately value its subprime-backed CDOs and other subprime-related assets at their fair value at each reporting period and to record losses in its income statement, in the form of write-downs, arising from any decreases in fair value since the prior reporting period.  Under IAS 39, DB was required to incorporate all relevant factors, including those described herein at ¶¶95, 105-112, 115-119, as opposed to relying on its own unrealistic valuation assumptions to calculate the fair value of its subprime-backed assets and to determine if write-downs were necessary.  IAS 39 states, in relevant part:

> The objective of using a valuation technique is to ***establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations***.  Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same. . . . ***The chosen valuation technique makes maximum use of market inputs*** and relies as little as possible on entity-specific inputs.  ***It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments***.  Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (*i.e*., without modification or repackaging) or based on any available observable market data.  [Emphasis added.]

## C.    DB's Undisclosed Proprietary Trading Practices

141.    Although DB engages in traditional banking, during the relevant period the Company relied on massive risk-taking by aggressive traders deploying the firms' own money for much of DB's profit.  The Company publicly referred to this practice as "proprietary trading," in which the bank hired traders to gamble with large amounts of its own capital using complex financial instruments such as derivatives and credit-default swaps ("CDS").  In 2006, as much as 20% of the Company's revenue was generated by proprietary trading, which is inherently riskier than trading

- 43 -

undertaken in the normal course of facilitating client business. Neither the extremely risky nature of this practice nor the large percentage of revenues relied upon by the Company from this practice was properly disclosed to investors prior to the Offerings.

142.    In the years leading up to the Offerings, DB specialized in credit and equity derivative trading, which often required the Company to risk several times the amount of capital it had on hand to execute the trading strategy. One of DB's signature trades was a strategy called "capital structure arbitrage," based on gaps in pricing between various securities of a single company. Arbitrage involves engaging in offsetting trades and then capturing the difference in yield, which results in a small profit margin. With proper risk control management systems in place, arbitrage activities should carry little risk. The essential key to this type of trading, however, is risk control management.

143.    There was no such risk control management for the Company's "proprietary trading" operations. The freewheeling gambling culture at DB can best be illustrated through the rise and fall of its most powerful trader, Boaz Weinstein. As a chess master, poker and blackjack devotee and top trader at DB, Weinstein made big bets on behalf of the Company using complex financial instruments. These complex instruments let his trading group augment their bets with borrowed money, multiplying profits when things went right but magnifying huge losses during bad times.

144.    Weinstein brought in traders to his group who shared his interest in gambling. For example, one of Weinstein's most trusted traders was Bing Wang, who was recruited because he was an avid poker player who finished 34th in the World Series of Poker in 2005. On Fridays after the closing bell, Weinstein's group would gather for high-stakes poker in a room off DB's trading floor. Weinstein also regularly led a group of DB traders – including members of an infamous card-counting blackjack team who had purportedly been banned from every U.S. casino – on "team-

- 44 -

bonding" trips to Las Vegas where the group would reportedly wager large sums of money on the blackjack and poker tables.

145.    This behavior extended to their work at DB; but there, they were gambling with firm money.  Throughout 2006 and into 2007, DB's proprietary trading positions continued to increase and the Company's exposure to losses increased dramatically.  By early 2008, Weinstein's group was leveraged approximately 300%, exposing DB to $30 billion in market risk.  This was especially worrisome because the group had taken the extreme-minority position in mid-2007 that that the mortgage crisis was contained – purchasing huge positions in corporate bonds or loans, as well as CDSs.  As reported by *The Independent* (London) on February 7, 2009, in an article entitled *Exposed: Chess Genius Who Lost His Bank $1.8 bn; Deutsche Trader Had Taken Home $40m Annual Bonuses*, "these instruments allowed traders to bet on the creditworthiness of individual companies, but their value has been questioned by economists, who [thought] the market became little more than a casino – a casino with $60 trillion of bets outstanding at its peak [in 2008]."

146.    As corporate bonds rallied in March 2008, after the Fed's brokering of a deal for the troubled Bear Stearns stabilized the credit markets, Weinstein added to DB's risky position in succeeding months – even as the financial crisis showed signs of further deterioration.

147.    The value of DB's holdings of corporate bonds and loans continued to plummet as banks and institutional investors, needing to raise capital, sold such securities.  At the same time, trading in CDSs was curtailed because market players were concerned about entering trades with banks that potentially could collapse.  This left DB increasingly unprotected against losses in corporate bonds and loans, because the Company used CDSs to hedge these positions.

148.    By the end of 2008, trading losses from Weinstein's group **alone** ballooned to almost $2 billion.  In total, DB reported a loss of approximately $6.8 billion in the fourth quarter, mainly

- 45 -

attributed to losses in the Company's credit-market proprietary trading and exposure to troubled bond insurers and mortgage-backed securities.

149.    Shortly after reporting its disappointing 2008 results, the Company announced that it would significantly scale back the amount of borrowed money it puts at risk in the markets. Defendant Josef Ackerman, DB's Chairman, admitted to analysts in February 2009 that to earn a $1.5 billion profit from proprietary trading the bank needed to risk several times that amount in capital: "You can easily lose two to three billion.  That's what we have seen in 2008 and something we don't want to see again."  Defendant Ackerman also confirmed that Weinstein was no longer with the Company.

150.    While Weinstein and the Individual Defendants were exposing the Company to billions in trading losses, defendants not only failed to disclose these risks but were publicly characterizing the Company's risk controls as, among other things, "highly sophisticated" and "industry leading."  Defendant Ackerman told investors on February 7, 2008 (in the above 6-K at ¶125(b)) that "*we again demonstrated the quality of our risk management.  We had no net write-downs related to sub-prime, CDO or RMBS exposures.  Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter*."

151.    Defendants' omitted material facts and made false positive statements about DB's risk management policies and its inadequate risk controls necessary to prevent traders at the Company from exposing DB to billions of euros in losses.  Investors would have considered this information, including the lack of risk controls at DB, to be highly material information given the Company's highly leveraged positions and purported risk control expertise and the importance of risk control to the Company's business, particularly its highly-risky proprietary trading.

- 46 -

152.    In the end, DB's trading portfolio was so toxic to the Company's balance sheet that it announced on January 14, 2009 that the firm anticipated a loss after taxes in the area of **€4.8 billion** for the fiscal 2008 fourth quarter, driven by negative revenues of **€4.8 billion** in the Company's Sales and Trading businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading.  In a press release dated February 5, 2009, the Company further announced **its first annual net loss since World War II of €3.9 billion** for the entire fiscal year 2008, and a loss before income taxes of **€5.7 billion**.

### 7.    May 5, 2008 Offering

153.    On or about May 5, 2008, DB and DB Trust V filed with the SEC pursuant to Rule 424 (b)(2) of the Securities Act a prospectus supplement (the "May 2008 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

154.    The May 2008 Prospectus Supplement offered for sale 44,000,000 8.05% preferred securities for $25 per share with an issue date of May 9, 2008 (the "May 2008 Offering").

155.    The May 2008 Prospectus Supplement incorporated by reference the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2007 filed on March 26, 2008 ("2007 20-F").

156.    In addressing DB's income for the year, the 2007 20-F provided in part:

> In 2007, income before income tax expense was €8.7 billion, a 5% increase over 2006, and revenues were €30.7 billion, up 8%.  We reported a pre-tax return on average active equity of 29% in 2007 and 33% in 2006, with the decline due largely to an increase in average active equity to €29.8 billion in 2007 versus €25.5 billion in 2006 (pre-tax return on average shareholders' equity was 24% and 28%, for 2007 and 2006, respectively).  **In 2007, net income was €6.5 billion, up 7% versus 2006**. Diluted earnings per share increased by 14% to €13.05.

157.    The incorporated 2007 20-F also stated the following regarding DB's risk policies, procedures and methodologies:

- 47 -

- Our Management Board provides overall risk and capital management supervision for our consolidated Group as a whole.  Our Supervisory Board regularly monitors our risk and capital profile.

- We manage credit, market, liquidity, operational, business, legal and reputational risks as well as our capital in a coordinated manner at all relevant levels within our organization.  This also holds true for complex products which we typically manage within our framework established for trading exposures.

*        *        *

Dedicated legal, risk & capital units are established with the mandate to:

- Ensure that the business conducted within each division is consistent with the risk appetite that the Capital and Risk Committee has set;

- Formulate and implement risk and capital management policies, procedures and methodologies that are appropriate to the businesses within each division;

- Approve credit risk, market risk and liquidity risk limits;

- Conduct periodic portfolio reviews to ensure that the portfolio of risks is within acceptable parameters; and

- Develop and implement risk and capital management infrastructures and systems that are appropriate for each division.

158.   Emphasizing DB's rigorous risk management processes and procedures regarding

Credit Risk Ratings, the incorporated 2007 20-F stated:

A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with a counterparty.  Our risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure.  This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties.  Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution. . . .  We generally rate all our credit exposures individually.  When we assign our internal risk ratings, we compare them with

- 48 -

external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

159.    Regarding DB's market risk management framework, the incorporated 2007 20-F

stated:

MARKET RISK MANAGEMENT FRAMEWORK

We assume market risk in both our trading and our nontrading activities.  We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits.  Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios.  ***Value-at-risk is the primary metric we use in the management of our trading market risks***.  Our risk sensitivities, value-at-risk, stress testing and economic capital metrics also reflect basis risks arising from our trading activities.

Our Management Board and Risk Executive Committee, supported by Market Risk Management, which is part of our independent legal, risk & capital function, set a Group-wide value-at-risk limit for the market risks in the trading book.  Market Risk Management sub-allocates this overall limit to our group divisions.  Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

160.    In addition to the reasons set forth in ¶¶141-152, the above statements were materially

false and misleading when made because the Company's internal risk management systems were

inadequate to limit the Company's exposure to proprietary trading.

161.    One key measure of DB's risk was its reported Value at Risk ("VaR"), a key

statistical measure of market risk based on estimated likelihood of losses.  VaR is a measure, with a

given degree of confidence, of how much one can lose from one's portfolio over a given time

horizon.  VaR analysis assumes a kind of "grading curve" for investors.  Just as a few students in a

class with a grading curve receive low grades, investors can expect that on a few trading dates of

each year they will lose money.  VaR analysis assumes that investor returns for each day can be

arrayed along a bell-shaped normal distribution, like student grades.  The trading dates with the

- 49 -

largest losses – like "D" and "F" grades – are grouped in the left-most tail of the distribution, and the size of the losses in that tail are called the VaR.  For example, of approximately 250 trading days in a year, a VaR measure might describe the expected losses on the worst two or three days.

162.     The 2007 20-F stated that DB's equities trading VaR ranged between $43.5 million and $90.5 million during 2007.  Despite DB's assurances relating to its VaR calculation that its "trading market risk outside of these units is immaterial," the Company reported equities trading losses for 2008 almost 700% above the supposed "maximum exposure" of $90.5 million.  In fact, for 2008 DB reported total losses in equities sales and trading amounted to a massive ***$630 million***.

163.     These reported VaR metrics were therefore false as they failed to reflect the actual risk associated with DB's equities trading.  If DB had reported an accurate VaR measure in the Offering Materials, to account for the volatility of the Company's positions, investors and analysts would have applied a higher discount rate to DB's expected future cash flows to adjust for the increased risk associated with the Company's trades.

164.     Regarding proprietary trading the 2007 20-F stated:

Within Corporate Banking & Securities, we conduct proprietary trading, or trading on our own account, in addition to providing products and services to customers. Most trading activity is undertaken in the normal course of facilitating client business.  For example, to facilitate customer flow business, traders will maintain long positions (accumulating securities) and short positions (selling securities we do not yet own) in a range of securities and derivative products, reducing this exposure by hedging transactions where appropriate.  While these activities give rise to market and other risk, we do not view this as proprietary trading.  However, we also use our capital to exploit market opportunities, and this is what we term proprietary trading.

We undertake designated proprietary trading across all asset classes.  Some of this proprietary trading activity takes the form of arbitrage.  For example, in index arbitrage we identify differences between the prices of exchange-traded derivatives (such as futures contracts on an equity index) and the underlying prices on the stock exchange of the individual stocks in the index.  In convertible arbitrage, we identify volatility-related pricing differences between the market for convertible debt instruments and the cash and derivatives markets.  In credit and equity arbitrage, we use statistics-driven trading strategies based on short-term market movements and

- 50 -

indicators to manage our trading book so that the market value of our long positions remains roughly equal to the market value of our short positions.  We also undertake risk-arbitrage, which is generally related to mergers and acquisitions, involving, for example, transactions such as buying a target company's shares at the same time as selling the bidding company's shares.

*       *       *

Designated proprietary trading gains were lower compared to 2006, in both absolute terms and as a percentage of net revenues, having been negatively affected by the market dislocations occurring in the second half of the year.

165.    These statements were materially false and misleading for the reasons set forth in ¶¶141-152.  DB failed to disclose that the Company engaged extensively in high-risk proprietary trading, *i.e.*, gambling on the Company's own account using huge undisclosed leverage that would ultimately cost DB billions of euros in trading losses.

166.    Regarding exposure to monoline insurers, the 2007 20-F stated:

MONOLINE EXPOSURE: The deterioration of the U.S. subprime mortgage market has generated large exposures for financial guarantors, such as monoline insurers, that have insured or guaranteed the value of pools of collateral referenced by CDOs and other market-traded securities.  This has led to some uncertainty as to whether the ultimate liabilities of monoline insurers to banks and other buyers of protection will be met and may, in some cases, lead to a ratings downgrade of those insurers. The following table summarizes our net counterparty exposures to monoline insurers with respect to residential mortgage-related activity, as of December 31, 2007, on the basis of the mark-to-market value of the assets compared with the face value guaranteed or underwritten by monoline insurers.

| Monoline exposure related to U.S. residential Mortgages in €m. | Market value of bought protection Dec 31, 2007 |
| --- | --- |
| Super Senior ABS CDO | 805 |
| Other subprime | 69 |
| Alt-A | 229 |
| **Total value of bought CDS protection** | **1,103** |

*       *       *

As of December 31, 2007, we had made credit valuation adjustments of €82 million against these exposures, including a full provision against our exposure to one

- 51 -

monoline counterparty.  The credit valuation adjustments are based on a name-by-name assessment of credit worthiness.

In addition to the residential mortgage-related activities shown in the table above, we have other exposures of €1.2 billion as of December 31, 2007, related to net counterparty exposure to monoline insurers, based on the mark-to-market value of other insured assets.  These arise from a range of client activity, including financing of collateralized loan obligations, commercial mortgage-backed securities, trust preferred securities, student loans and public sector or municipal debt.

167.    In addition to the reasons set forth in ¶¶99-101, the above statements were materially false and misleading when made because they failed adequately to disclose the truth about the Company's actual exposure to monoline insurers.  For instance, by the end of 2008, the Company was forced to mark-down *€2.2 billion* relating to additional reserves against monoline insurers, and still maintained an additional *€1.6 billion* in monoline exposure going forward.

168.    Additionally, the 2007 20-F also included the following statement from the Company's auditor KPMG:

Report of Independent Registered Public Accounting Firm

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Deutsche Bank Aktiengesellschaft and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2007, *in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.*

169.    This statement was materially false and misleading when made because DB failed to adequately disclose the truth about the Company's actual exposure to monoline insurers, as described above in ¶167.

170.    On April 29, 2008, DB filed a Form 6-K which was incorporated by reference in the May 2008 Prospectus Supplement.  The Form 6-K reported DB's financial results for the quarter ending March 31, 2008, providing:

NET REVENUES were €4.6 billion in the quarter, versus €9.6 billion in the first quarter of 2007.  In Corporate Banking & Securities (CB&S), net revenues were €880

- 52 -

million, versus €6.1 billion in the prior year quarter.  Revenues in Sales & Trading (Debt and other products) were €1.3 billion, down from €3.4 billion in the record prior year quarter, reflecting mark-downs on Commercial Real Estate activities and on Residential Mortgage-Backed Securities, together with significantly lower revenues in the credit trading business.  This development was to some extent counterbalanced by substantial year-on-year revenue growth in foreign exchange and money market trading, core fixed income trading and commodities trading.  Revenues in Sales & Trading (Equity) were €745 million, down from €1.7 billion in the prior year quarter, reflecting significantly lower revenues in equity derivatives trading and a modest loss in designated equity proprietary trading.  Revenues in cash equities were somewhat below the exceptional levels of the prior year quarter, while revenues in prime services were ahead of the prior year quarter.  Revenues in Advisory were €128 million, down from €250 million in the prior year quarter, while revenues in Origination (Equity) were €85 million, down €146 million both reflecting lower levels of market activity.  Revenues in Origination (Debt) were negative €1.4 billion, versus €401 million in the prior year quarter, primarily reflecting the mark-downs in leveraged finance of €1.8 billion.  Revenues for the quarter included a gain of €77 million from changes in the credit spreads on certain of the firm's own debt on which the fair value option was used.  The application of the fair value option on our liabilities remained unchanged from prior reporting periods.  The aggregate gain recorded on our own debt since January 1, 2007 is less than €100 million, a very modest amount by industry standards.

*       *       *

SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €1.3 billion in the first quarter, a decrease of €2.0 billion, or 61%, compared to the first quarter 2007.  The decrease includes net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans. Earnings in our structured credit business also fell as a result of depressed client activity in CDOs and related products, and challenging markets in which previously stable relationships between cash and derivative instruments broke down. . . .

SALES & TRADING (EQUITY) generated revenues of €745 million, a decrease of €969 million, or 57%, versus the first quarter 2007.  Performance in our equity derivatives business was negatively impacted by the increased correlation between equity markets, which led to a deterioration in the value of residual derivative positions arising from our activities in European retail structured products.  Growth in cash equities' revenues in Asia and North America was more than offset by a decline in Europe. The prime services business benefited from investors' increasing preference for more stable prime brokerage counterparties.  Designated Equity Proprietary Trading reported a small loss in the quarter, compared to a positive contribution in the first quarter 2007.

171.    These statements were materially false and misleading for the reasons set forth in

¶¶141-152, 161-163.  DB failed to disclose that the Company engaged extensively in high-risk

- 53 -

proprietary trading, *i.e.*, gambling on the Company's own account using huge undisclosed leverage that would ultimately cost DB billions of euros in trading losses.

## DEFENDANTS ARE FORCED TO ADMIT THE TRUTH

172.    On January 14, 2009, a press release was issued by DB entitled "Deutsche Bank provides update on fourth quarter 2008 performance," which stated in part:

> Deutsche Bank (XETRA:DBKGn.DE/NYSE:DB) today announced, on a preliminary and unaudited basis, key elements of its fourth quarter 2008 financial performance:
>
> **Fourth-quarter loss:** The bank currently anticipates a loss after taxes in the region of EUR 4.8 billion for the fourth quarter 2008.  This development reflects exceptional market conditions, which severely impacted results in the sales and trading businesses, most notably in Credit Trading including its proprietary trading business, Equity Derivatives and Equities Proprietary Trading.  The result also reflects exposure reduction and other de-risking measures, a significant increase in provisions against certain of our monoline counterparties, and certain other exceptional gains and charges, including reorganisation charges.  In Asset and Wealth Management, the bank anticipates a fourth quarter loss driven by an impairment charge on intangible assets related to DWS Scudder and substantial injections into money market funds.

173.    Then on February 5, 2009, the Company issued a release concerning the loss, entitled "***Deutsche Bank reports net loss of EUR 3.9 billion for the year 2008***," which stated in part:

> For the fourth quarter 2008, the bank reported a net loss of EUR 4.8 billion, compared to net income of EUR 1.0 billion in the fourth quarter 2007.  The bank reported a loss before income taxes of EUR 6.2 billion, versus income before income taxes of EUR 1.4 billion in the prior year quarter.
>
> *           *           *
>
> In the Corporate and Investment Bank (CIB), net revenues were EUR 3.0 billion negative, versus EUR 4.5 billion positive in the fourth quarter 2007.
>
> In Corporate Banking & Securities (CB&S), net revenues were EUR 3.8 billion negative in the fourth quarter, versus EUR 3.8 billion positive in the fourth quarter 2007.  ***This development reflects negative revenues of EUR 4.8 billion in Sales & Trading, driven by significant losses in key businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading***. These losses reflect the impact on Deutsche Bank's business model of unprecedented levels of market volatility, correlation across asset classes, and the breakdown of

- 54 -

historically observed relationships between asset classes, compounded by extreme illiquidity, in an exceptionally turbulent market environment.

*      *      *

<u>Provision for credit losses</u> was EUR 591 million in the fourth quarter, up 80% versus the fourth quarter 2007, and including EUR 185 million of provisions in respect of loans reclassified in accordance with amendments to IAS 39.  In CIB, provision for credit losses was EUR 361 million, up 90% versus the prior year quarter, primarily reflecting provisions in respect of reclassified loans.  In PCAM, provision for credit losses was EUR 229 million, up 68%, primarily in PBC reflecting a rise in provision against the backdrop of a deteriorating credit environment and business growth.

*      *      *

<u>Corporate Banking & Securities (CB&S)</u>

Deutsche Bank's Sales & Trading businesses were severely impacted by the unprecedented market turmoil that started in September and continued to deteriorate in the fourth quarter.  Many market participants, including hedge funds, were forced to liquidate substantial positions in assets such as convertibles, investment-grade and high-yield bonds, default swaps, and in long-short equity strategies.  These actions drove higher volatilities and correlations in all markets and a significant dislocation in the relationship (or basis) between trading positions and their hedges.

In this challenging environment, Deutsche Bank continued to suffer significant losses in the Credit Trading business, including Credit Proprietary Trading, and Equity Proprietary Trading (EFT) books.  Proprietary positions were significantly reduced in size, although market liquidity was not sufficient to eliminate risk in all cases and the bank retains some potential exposure to any further deterioration in these positions.

<u>Sales & Trading (Debt and other products)</u> revenues were negative EUR 2.7 billion in the fourth quarter 2008, compared to positive EUR 1.6 billion in the fourth quarter 2007.

***The fourth quarter 2008 included losses in Credit Trading of EUR 3.4 billion, of which EUR 1.0 billion related to the Credit Proprietary Trading business***.  The losses in the Credit Proprietary Trading business were mainly driven by losses on long positions in the U.S. Automotive sector and by falling corporate and convertible bond prices and basis widening versus the Credit Default Swaps (CDS) established to hedge them.  The remaining losses in the Credit Trading business were driven across many sectors as bonds were sold off and basis spreads widened, driven by significant market de-leveraging and low levels of liquidity.

Further mark-downs of EUR 1.7 billion were taken relating to additional reserves against monoline insurers (EUR 1.1 billion), driven in part by additional specific reserves related to certain insurers, and additional provisions against residential

- 55 -

mortgage-backed securities (EUR 244 million), commercial real estate loans (EUR 214 million), and impairment losses on available for sale positions (EUR 58 million).

\* \* \*

For the full year, Sales & Trading (Debt and other products) revenues were EUR 124 million, compared to EUR 8.4 billion in 2007.  ***Key drivers of the decline were mark-downs of EUR 5.3 billion, compared to EUR 1.6 billion in 2007, and the aforementioned trading losses in the fourth quarter 2008***. . . .

Sales & Trading (Equity) revenues were negative EUR 2.1 billion in the fourth quarter 2008, compared to positive EUR 1.1 billion in the same quarter 2007.  In an environment characterized by severely dislocated equity markets, with unprecedented levels of volatility and very low levels of liquidity, Equity Derivatives incurred losses of EUR 1.7 billion from managing structural risks, particularly around correlation, volatility and dividend risk related to single stocks.  Equity Proprietary Trading losses of EUR 413 million were driven by market-wide de-leveraging which drove down convertible values and widened basis risk.  [Emphasis added.]

174.    On February 5, 2009, during the Company's Q4 2008 and preliminary 2008 earnings

conference call, defendant Ackermann made the following statements:

But we use the leverage ratio as a benchmark just to demonstrate that we take the assets serious, and have of course, contrary than what I did in the past, in the last six months very, very much focused on granular trading and balance sheet positions, and that is what we want to demonstrate.

\* \* \*

The focus was on getting a 10% and getting the leverage ratio down and, of course, getting risk down that we start on a different platform into 2009.

\* \* \*

[T]here were two areas, prop trading where relative value strategy suffered from all that I just said, and our assumptions were wrong in this very difficult market.

Some would argue they come back and make a lot of money, it may well be.  But we had a different approach we said we just can't afford that.  So we get rid of it, we take the losses and want to have – start from a new platform, even if in five years from now someone says opportunity costs would have been pretty important.

The second one is scale.  We have been too big, and that is something we have to work down and we will work on that, that's fine.  We came down in non-derivative trading assets from EUR460b some time ago to slightly over EUR200b, and we will

- 56 -

have a further cut in the first quarter of this year.  We want to get the kind of exposure down so whatever happens we cannot have similar volatilities on our P&L.

And the last point is complexity what I said with intellectual leadership, and so we had exposure to volatility and correlation risk.  Also something we have to control and monitor better.

175.    On that same call, further illustrating the earlier material omissions, Ackermann stated:

I think we told you many, many times that our prop trading is about 10% to 15% of our revenues.  And we also felt that a relatively modest number.

But in order to, if you take 10% out of EUR15b it's only EUR 1.5b.  But to achieve EUR1.5b you need actually a risk allocation and a risk equivalent and capital equivalent of several times more.  So let's assume it's a 20% return you need five times more so you talk about EUR7b to EUR8b.

And if you have swings, as we had, on this EUR8b you can easily lose EUR2b, EUR3b.  And that is what we have seen in 2008, and something we don't want to see again.

*        *        *

So the proprietary trading risk has been reduced by 90%.  Then we have reduced our RMBS exposures to 50%.

176.    During the call, Ackermann referred to the below presentation that illustrates the extent of the Company's involvement in proprietary trading during the period in which the Offerings were made, demonstrating the true extent of the Company's exposure to proprietary trading risk:

- 57 -



177.    During the call, Krause referred to a presentation that illustrated the Company's true exposure to the subprime market, as well as the Company's dangerously high leverage ratio, during the period of time in which the Offerings were made:



### Trading exposures in key areas

In EUR bn

*CDO / RMBS: Exposure represents our potential loss in the event of a 100% default of securities and related hedges / derivatives assuming zero recovery; net represents net of hedges and other protection purchased; RMBS also includes other trading related net positions*
*CRE / LevFin: Exposure represents carrying value and includes impact of synthetic sales, securitizations and other strategies; for unfunded commitments carrying value represents notional value of commitments; for 31 Dec 2008 exposure represents loans and loan commitments held at fair value pre 1 Jan 2008; 31 Dec 2007 incl. loans held of EUR 1.3 bn; net represents less life-to-date gross mark-downs, excluding fees and hedges on remaining exposure   (1) After reclassification of exposures under IAS 39 per 31 Dec 2008 for CRE: EUR 6.9 bn and LevFin: EUR 8.5 bn  (2) Net of risk reduction*
Investor Relations 02/09 · 7



### Leverage ratio development

Balance sheet leverage ratio per target definition*

*\* Assets based on U.S. GAAP 'pro-forma'; 30 Sep 2008 and 31 Dec 2008 figures reflect revision of application of U.S. GAAP netting rules*
Investor Relations 02/09 · 18



478900_1

178.    Further disclosing the deterioration caused by the Company's toxic trading portfolio,

the Company issued its 2008 Annual Report on March 23, 2009, which stated in part:

> Net gains (losses) on financial assets/liabilities at fair value through profit or loss
> from CIB – Sales & Trading (debt and other products) were a loss of €6.6 billion in
> 2008, compared to a gain of €3.9 billion in 2007.  This development was mainly
> driven by mark-downs relating to reserves against monoline insurers, provisions
> against residential mortgage-backed securities and commercial real estate loans and
> significant losses in our credit trading businesses, including our proprietary trading
> businesses in the third and fourth quarter of 2008, which are described in more detail
> in the discussion of the results of CB&S. . . .  The main contributor to the net loss of
> €1.8 billion on financial assets/liabilities at fair value through profit or loss from
> Other products were net mark-downs of €1.7 billion on leveraged finance loans and
> loan commitments during 2008.

> *        *        *

> Sales & Trading (debt and other products) revenues for the year were €124 million,
> compared to €8.4 billion in 2007.  Key drivers of the decline were mark-downs of
> €5.8 billion, relating to additional reserves against monoline insurers (€2.2 billion),
> further mark-downs on residential mortgage-backed securities (€2.1 billion) and
> commercial real estate loans (€1.1 billion), and impairment losses on available for
> sale positions (€190 million), compared to a total of €1.6 billion in 2007.  If
> reclassification, in accordance with the amendments to IAS 39, had not been made,
> the income statement for the year would have included additional negative fair value
> adjustments of €2.3 billion in Sales & Trading (debt and other products).

> In Credit Trading, we incurred further losses of €3.2 billion, predominantly in the
> fourth quarter, of which €1.7 billion related to Credit Proprietary Trading.  The losses
> in the Credit Proprietary Trading business were mainly driven by losses on long
> positions in the U.S. automotive sector and by falling corporate and convertible bond
> prices, as well as basis widening on significant other debt trading inventory versus
> the credit default swaps (CDS) established to hedge them.

> *        *        *

> As of December 31, 2008, the [€868 million in] Super Senior and Mezzanine
> [subprime residential mortgage-related available-for-trading CDO] gross exposures
> and hedges consisted of approximately 1% 2007, 30% 2006, 35% 2005, and 34%
> 2004 and earlier vintages.

> *        *        *

> On December 31, 2008, the [€4.8 billion in] Alt-A and subprime gross assets, and
> hedges and other protection purchased, consisted of approximately 89% 2007, 9%
> 2006, and 2% 2005 and earlier vintages.

- 60 -

\*      \*      \*

Exposure to Monoline Insurers: The deterioration of the U.S. subprime mortgage and related markets has generated large exposures to financial guarantors, such as monoline insurers, that have insured or guaranteed the value of pools of collateral referenced by CDOs and other market-traded securities.  Actual claims against monoline insurers will only become due if actual defaults occur in the underlying assets (or collateral).  There is ongoing uncertainty as to whether some monoline insurers will be able to meet all their liabilities to banks and other buyers of protection.  Under certain conditions (e.g. liquidation) we can accelerate claims regardless of actual losses on the underlying assets.

The following table summarizes the fair value of our counterparty exposures to monoline insurers with respect to U.S. residential mortgage-related activity, on the basis of the fair value of the assets compared with the notional value guaranteed or underwritten by monoline insurers.  [Table shows €1.576 billion in exposure.]

179.    Plaintiffs have suffered billions of dollars of damages as a result of defendants' dissemination of the false and misleading Offering Materials.  Each of the Securities was purchased in connection with the initial Offerings at $25.00 per share.  By February 24, 2009, the date that the initial lawsuit in this litigation was commenced, the value of the 6.375% Securities was $8.10 per share, the 6.55% Securities was $8.00 per share, the 6.625% Securities was $7.98 per share, the 7.35% Securities was $8.35 per share, the 7.60% Securities was $8.99 per share, and the 8.05% Securities was $11.20 per share.

## CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the Securities pursuant to or traceable to the Offering Documents and who were damaged thereby, exclusive of Defendants, the officers and directors of any Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest (the "Class").

181.    The members of the Class are so numerous that joinder of all members is impracticable.  The Securities were traded on the New York Stock Exchange ("NYSE").  While the exact number of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182.    Plaintiffs' claims are typical of the claims of the other Class members as all Class members are similarly affected by Defendants' illegal conduct that is complained of herein.

183.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

184.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the Defendants misrepresented and/or failed to disclose material facts in the Offering Documents as described herein;

(c)    whether the Individual Defendants and/or KPMG International are "controlling persons" within the meaning of Section 15 of the Securities Act; and

(d)    whether Defendants' acts caused damages, and if so, the proper measure of such damages.

478900_1

185.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

186.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

187.     First, none of the statements complained of herein was a forward-looking statement.  Rather they were historical statements, or statements (or omissions) of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

188.     To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with applicable accounting rules.

- 63 -

## COUNT I

### Violations of §11 of the Securities Act
### (Against All Defendants)

189.     Plaintiffs repeat and reallege each and every allegation contained above.  Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

190.     This Count is asserted by Plaintiffs against all Defendants under and brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Class.

191.     As set forth above, the Registration Statement was materially false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

192.     DB was the registrant for the Offerings, and created the Trust Defendants and the LLC Defendants for the sole purpose of issuing the Securities and obtaining the proceeds therefrom. As issuers of the Securities, DB, the Trust Defendants and the LLC Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions above pursuant to §11 of the Securities Act.

193.     The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement, was responsible for the contents and dissemination of the Registration Statement, and is liable to the Plaintiff and the Class for the misstatements and omissions identified above pursuant to §11 of the Securities Act.

- 64 -

194.    The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement, and are liable to the Plaintiffs and the Class for the misstatements and omissions identified above pursuant to §11 of the Securities Act.

195.    Defendant KPMG was responsible for the contents and dissemination of the Registration Statement, and is liable to the Plaintiffs and the Class for the misstatements and omissions identified above pursuant to §11 of the Securities Act.

196.    Defendant KPMG acted as DB's auditor and consented as having certified in part the Registration Statement.  Underwriter Defendants and KPMG owed to the holders of securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement.

197.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

198.    The Registration Statement was false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

199.    By reason of the conduct herein alleged, each defendant violated §11 of the Securities Act.

200.    Plaintiffs acquired the Securities pursuant and/or traceable to the Registration Statement.

201.    Plaintiffs and the Class have sustained damages.  The securities were sold at the initial offerings at $25.00 a share.  On February 24, 2009, the date that the initial litigation was filed against Deutsche Bank, the 6.375% Securities closed at $8.10, the 6.55% Securities closed at $8.00,

- 65 -

the 6.625% Securities closed at $7.98, the 7.35% Securities closed at $8.35, the 7.60% Securities closed at $8.99, and the 8.05% Securities closed at $11.20.

202.    At the time of their purchases of the Securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 2009.  Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed the complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed the complaint.

## COUNT II

### Violations of §12(a)(2) of the Securities Act
### (Against DB, the Trust Defendants, the LLC Defendants
### and the Underwriter Defendants)

203.    Plaintiffs repeat and reallege each and every allegation contained above.  Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

204.    This Count is asserted by Plaintiffs pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all members of the Class.

205.    The Registration Statement contained a Prospectus and Prospectus Supplements in connection with the Offerings.

206.    The Prospectus and the Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants named in this Count owed Plaintiffs and the other members of the Class who purchased the

Securities pursuant to the Prospectus and Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus and Prospectus Supplements as set forth above.

207.    By means of the defective Prospectus and Prospectus Supplements, defendants named herein sold and assisted in the sale of the Securities to Plaintiffs and other members of the Class.

208.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus and Prospectus Supplements at the time Plaintiffs acquired the Securities.

209.    By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased the Securities pursuant to the Prospectus and Prospectus Supplements sustained substantial damages as described above in connection with their purchases of the Securities.  Accordingly, Plaintiffs and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to Defendants sued herein.  Class members who have sold their Securities seek damages to the extent permitted by law.

### COUNT III

**Pursuant to §15 of the Securities Act**
**(Against DB, the Individual Defendants and KPMG International)**

210.    Plaintiffs repeat and reallege each and every allegation contained above.

- 67 -

211.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against DB, the Individual Defendants and KPMG International.

212.    DB owned and controlled the Trust Defendants and LLC Defendants, having created these entities for the sole purpose of issuing the Securities.

213.    Each of the Individual Defendants acted as a control person of DB by virtue of his position as a director, senior officer, and/or major shareholder of DB which allowed each of these Defendants to exercise control over DB and its operations.

214.    Defendant KPMG International acted as a control person of defendant KPMG Deutsche Treuhand-Gesellschaft by virtue of its parent relationship and corporate affiliation.

215.    DB, the Individual Defendants and KPMG International were all culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

216.    By reason of their control person status, as alleged above, DB, the Individual Defendants and KPMG International are all jointly and severally liable for the violations of §11 of the Securities Act pursuant to §15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 68 -

    C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees;

    D.      Awarding rescission or a rescissory measure of damages; and

    E.      Such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

    Plaintiffs hereby demand a trial by jury.

DATED: January 25, 2010              COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP
                         SAMUEL H. RUDMAN
                         DAVID A. ROSENFELD
                         MARIO ALBA JR.



                               SAMUEL H. RUDMAN

                       58 South Service Road, Suite 200
                       Melville, NY  11747
                       Telephone:  631/367-7100
                       631/367-1173 (fax)

                       COUGHLIN STOIA GELLER
                         RUDMAN & ROBBINS LLP
                       ANDREW J. BROWN
                       ERIC I. NIEHAUS
                       LUCAS F. OLTS
                       655 West Broadway, Suite 1900
                       San Diego, CA  92101
                       Telephone:  619/231-1058
                       619/231-7423 (fax)

                       LAW OFFICES OF BERNARD M.
                         GROSS, P.C.
                       DEBORAH R. GROSS
                       Wanamaker Bldg., Suite 450
                       100 Penn Square East
                       Philadelphia, PA  19107
                       Telephone:  215/561-3600
                       215/561-3000 (fax)

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY
LEE ALBERT
BRIAN D. BROOKS
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone:  212/682-1818
212/682-1892 (fax)

Co-Lead Counsel for Plaintiffs

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the Melville, New York, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 58 South Service Road, Suite 200, Melville, New York 11747.

2.      That on January 25, 2010, declarant served the **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on January 25, 2010, at Melville, New York.

_____
KELLY STADELMANN

478900_1

DEUTSCHE BANK PFD 6.375
Service List - 1/25/2010   (09-0039)
Page 1 of  2

## Counsel For Defendant(s)

Charles A. Gilman
David G. Januszewski
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY  10005-1702
   212/701-3000
   212/269-5420 (Fax)

Jay B. Kasner
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036
   212/735-3000
   212/735-2000 (Fax)

## Counsel For Plaintiff(s)

D. Seamus Kaskela
David M. Promisloff
Steven D. Resnick
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA  19087
   610/667-7706
   610/667-7056 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

Andrew J. Brown
Eric I. Niehaus
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
100 Penn Square East, Suite 450
Wanamaker Bldg.
Philadelphia, PA  19107
   215/561-3600
   215/561-3000 (Fax)

Curtis V. Trinko
Wai K. Chan
Law Offices of Curtis V. Trinko LLP
16 West 46th Street, Seventh Floor
New York, NY  10036
   212/490-9550
   212/986-0158 (Fax)

Brian P. Murray
Eva  Hromadkova
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY  10016
   212/682-1818
   212/682-1892 (Fax)

DEUTSCHE BANK PFD 6.375

Service List - 1/25/2010    (09-0039)

Page 2 of  2

Joesph H. Weiss

Weiss & Lurie

551 Fifth Avenue, Suite 1600

New York, NY  10176

   212/682-3025

   212/682-3010 (Fax)