UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re DEUTSCHE BANK AG SECURITIES LITIGATION | : | Master File No. 1:09-cv-01714-DAB |
| | : | |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : | PLAINTIFFS' CONSOLIDATED |
| | : | MEMORANDUM OF LAW IN |
| ALL ACTIONS. | : | OPPOSITION TO DEFENDANTS' |
| | : | MOTIONS TO DISMISS |
| | x | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS ......................................................................5

III.  ARGUMENT .......................................................................................15

    A.    Legal Standard Governing Defendants' Motions to Dismiss ................15

    B.    The Offering Materials for Each of the Offerings in 2006 and 2007 Were False and Misleading ..........................................................17

        1.    DB's Mortgage-Backed Securities Portfolio Was Material.....................18

        2.    Defendants Had a Duty to Disclose DB's €20 Billion of Mortgage-Backed Securities ..................................................18

    C.    DB's Financial Statements Overstated the Value of Its Mortgage-Backed Securities ..................................................................24

    D.    The February 2008 Offering Materials Were False and Misleading ..................32

        1.    DB's Statements Regarding the Company's Risk Management, Lack of Further Write-downs, and Overstated Earnings Were Materially Misleading ..........................................32

            a.    The Challenged Statements Are Not "Puffery" .............................32

            b.    Defendants' "Warnings" Were Ineffective ....................................34

        2.    The February 2008 Offering Materials Violated IFRS.............................37

        3.    DB's Statements Regarding Its Proprietary Trading Operations Were Materially False and Misleading ......................................38

    E.    The May 2008 Offering Materials Were False and Misleading ...........40

        1.    The May 2008 Offering Materials Falsely Misrepresented DB's Reported "Value at Risk"..........................................................40

        2.    DB Materially Misrepresented Its Monoline Exposure ...........................41

    F.    Plaintiffs' Claims Asserted in Connection with the May 2007 Offering Are Timely ..................................................................42

        1.    The Claims Relate Back to the First-Filed Complaint...............................44

- i -

**Page**

2.      Plaintiffs' Claims Were Tolled Until the Filing of the CAC ..................... 45

G.      Plaintiffs Allege Standing to Pursue Their §12(a)(2) Claims Against the Underwriter and the DB Defendants........................................................................ 48

H.      Plaintiffs Allege a Violation of Section 15 Against the DB Defendants ............... 52

IV.    CONCLUSION ............................................................................................................ 54

- ii -

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
 284 F.3d 72 (1st Cir. 2002)...........................................................................36

*American Pipe & Constr. Co. v. Utah*,
 414 U.S. 538 (1974) .................................................................................45

*Ashcroft v. Iqbal*,
 __ U.S. __, 129 S.Ct. 1937 (2009)............................................................4, 15

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)..................................................................................18

*Bates v. C & S Adjusters, Inc.*,
 980 F.2d 865 (2d Cir. 1992).......................................................................17

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)........................................................................15, 29, 31

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
 No. 10528, 2010 WL 148617
 (S.D.N.Y. Jan. 14, 2010)........................................................3, 4, 21, 42

*Bryant Park Capital, Inc. v. Jelco Ventures*,
 No. 05 Civ. 8702 (GEL), 2007 U.S. Dist. LEXIS 54747
 (S.D.N.Y. July 23, 2007) ...........................................................................17

*Caiola v. Citibank, N.A.*,
 295 F.3d 312 (2d Cir. 2002)................................................................19, 35 39

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
 No. 00-4285 (GEB), 2002 U.S. Dist. LEXIS 27189
 (D.N.J. June 26, 2002) ...............................................................................46

*Capri v. Murphy*,
 856 F.2d 473 (2d Cir. 1988)........................................................................51

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
 No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706
 (S.D.N.Y. Mar. 26, 2010) ..........................................................................21

**Page**

*City of Omaha v. CBS Corp.*,
    No. 08 CIV. 10816 (PKC), 2010 WL 1029290
    (S.D.N.Y. Mar. 16, 2010) ......................................................................................23

*Credit Suisse First Boston Corp. v. Arm Fin. Group*,
    No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332
    (S.D.N.Y. Mar. 27, 2001) ......................................................................................51

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)............................................................................19, 53

*Dorchester Investors v. Peak Trends Trust*,
    No. 99 Civ. 4696 (LMM) (FM), 2003 U.S. Dist. LEXIS 1446
    (S.D.N.Y. Feb. 3, 2003) ........................................................................................51

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................33

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ...............................................................................................15

*Feiner v. SS&C Techs., Inc.*,
    47 F. Supp. 2d 250 (D. Conn. 1999)....................................................................52

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005).............................................................30, 53

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)............................................................................18, 19

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008),
    *aff'd* 347 Fed. Appx. 665 (2d Cir. 2009) ....................................................51, 16, 24

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)..............................................................................................48

*Feiner v. SS&C Techs. Inc.*,
    11 F. Supp. 2d 204 (D. Conn. 1998)....................................................................36

*Florida St. Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ................................................................................31

- iv -

**Page**

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)....................................................................................5, 16

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004)..................................................................................47

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
  No. 08 Civ. 411 (NRB), 2010 WL 727227
  (S.D.N.Y. Feb. 22, 2010) ............................................................................ *passim*

*In re APAC Teleservs., Inc. Sec. Litig.*,
  No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
  (S.D.N.Y. Nov. 19, 1999) ....................................................................................50

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)..........................................................20, 36

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) .............................................................................31, 37

*In re CIT Group, Inc.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004).................................................................30

*In re Colonial Ltd. Partnership Litig.*,
  854 F. Supp. 64 (D. Conn. 1994).......................................................................45

*In re Deutsche Telekom AG Sec. Litig.*,
  No. 00 Civ. 9475 (SHS), 2002 U.S. Dist. LEXIS 2627
  (S.D.N.Y. Feb. 20, 2002) ....................................................................................50

*In re Duke Energy Corp. Sec. Litig.*,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................24

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ...............................................................46

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005).....................................................45, 46, 49

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009).........................................................35, 41

*In re Fuwei Films Sec. Litig.*,
  247 F.R.D. 432 (S.D.N.Y. 2008) ........................................................................47

- v -

**Page**

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009)..................................................16. 21, 35

*In re Gas Reclamation, Inc. Sec. Litig.*,
    733 F. Supp. 713 (S.D.N.Y. Sept. 20, 1990) ...................................................51

*In re Giant Interactive Group, Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009).........................................................36, 52

*In re Global Crossing, Ltd., Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) .......................................................30, 47

*In re Globalstar Sec. Litig.*,
    No. 01 Civ. 1748 (SHS), 2003 WL 22953163
    (S.D.N.Y. Dec. 15, 2003) .................................................................19, 35, 39

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)............................................................53

*In re Initial Pub. Offering*,
    214 F.R.D. 117 (S.D.N.Y. 2002) ..................................................................47

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004).......................................................15, 17

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ........................................................45

*In re MBIA, Inc., Sec. Litig.*,
    __ F. Supp. 2d __, No. 08-CV-264 KMK, 2010 WL 1253925
    (S.D.N.Y. Mar. 31, 2010) ...........................................................................19

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)............................................................33

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................23, 30, 37

*In re New York Community Bancorp, Inc. Sec. Litig.*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ...........................................................20

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    No. 08 Civ. 9203 (RJS), 2010 U.S. Dist. LEXIS 34459
    (S.D.N.Y. Mar. 31, 2010) ...........................................................................44

- vi -

**Page**

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)............................................................36

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)............................................................35

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................34, 35

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................35, 39

*In re RAIT Fin. Trust Sec. Litig.*,
    No. 2:07-cv-03148-LDD, 2008 WL 5378164
    (E.D. Pa. Dec. 22, 2008) ..............................................................23, 30, 31

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..........................................15, 31, 52, 54

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004) ...........................................................48

*In re Salomon Analyst Level 3 Litigation*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)..........................................................30

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..................................................................22, 32

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................. *passim*

*In re Software Toolworks Sec. Litig.*,
    50 F.3d 615 (9th Cir. 1994) .....................................................................36

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998)............................................................48

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)....................................................................52

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).........................................................22

**Page**

*In re Wash. Mut.*,
    259 F.R.D. 490 (W.D. Wash. 2009) .................................................................23, 30

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)................................................................................49

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ......................................................................49

*In re WorldCom Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)................................................................49

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005)................................................45, 46, 49

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 CIV. 3288 (DLC), 2005 U.S. Dist. LEXIS 4193
    (S.D.N.Y. Mar. 21, 2005) ................................................................................53

*Indymac Mortgage Holdings, Inc. v. Reyad*,
    167 F. Supp. 2d 222 (D. Conn. 2001)...............................................................17

*Jaffe v. Household Int'l, Inc.*,
    No. 1:02-cv-05893 (N.D. Ill.) ............................................................................3

*Korwek v. Hunt*,
    827 F.2d 874 (2d Cir. 1987)..............................................................................45

*Kruse v. Wells Fargo Home Mortgage, Inc.*,
    No. 02-CV-3089 (ILG), 2006 WL 1212512
    (E.D.N.Y. May 3, 2006) ...................................................................................47

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
    659 F. Supp. 2d 532 (S.D.N.Y. 2009)...............................................................28

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................19, 33

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999).................................................................51

*Nolte v. Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ............................................................................20

**Page**

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...................................................................34

*P. Stolz Family P'ship, L.P. v. Daum*,
166 F. Supp. 2d 874 (S.D.N.Y. 2001)...................................................53

*Panther Partners Inc. v. Ikanos Communications Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)...................................................22

*Pinter v. Dahl*,
486 U.S. 622, 642, 647 (1988)...........................................................48, 51

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
Commerce*,
__ F. Supp. 2d __, No. 08 CIV. 8143 (WHP), 2010 WL 961596
(S.D.N.Y. Mar. 17, 2010) ...........................................................4, 23, 41

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
658 F. Supp 2d 299 (D. Mass. 2009) ...................................................23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................16, 34, 35, 43

*Scibelli v. Roth*,
No. 98 CIV. 7228, 2000 WL 122193
(S.D.N.Y. Jan. 31, 2000)...................................................................22

*Schoenhaut v. Am. Sensors*,
986 F. Supp. 785 (S.D.N.Y. 1997) .......................................................49

*Seow Lin v. Interactive Brokers Group, Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...................................................21

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992)...............................................................20

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761
(S.D.N.Y. Sept. 19, 2001)...................................................................51

*Tanne v. Autobytel, Inc.*,
226 F.R.D. 659 (C.D. Cal. 2005) .......................................................48

Page

*Walters v. Edgar*,
    163 F.3d 430 (7th Cir. 1998) ...................................................................47

*Wilson v. Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989) ..................................................................51

*Yu v. State Street Corp.*,
    __ F. Supp. 2d __, No. 08 Civ. 8235 (RJH), 2010 WL 668645
    (S.D.N.Y. Feb. 25, 2010) ...................................................................4, 29

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77k........................................................................................... *passim*
    §77k(a) .......................................................................................5, 16
    §77k(a)(2) ........................................................................................16
    §77k(b)(3)(C) ...................................................................................36
    §77l(a)(2) ........................................................................................48
    §77m........................................................................................43, 45
    §77o..................................................................................................52
    §78u-4(a)(3)(B) ................................................................................47

Federal Rules of Civil Procedure
    Rule 8 ...............................................................................................50
    Rule 8(a)..........................................................................15, 31, 32, 52
    Rule 9(b) ...............................................................................4, 15, 31
    Rule 12(b) .........................................................................................17
    Rule 12(b)(2) ....................................................................................17
    Rule 12(b)(6) ...........................................................................15, 17
    Rule 15(a)(2) ....................................................................................54
    Rule 15(c) .........................................................................................44
    Rule 23 .............................................................................................46

17 C.F.R.
    §229.503(c) .......................................................................................21
    §240.10b-5 ........................................................................................30

## I.    INTRODUCTION

Between October 2006 and May 2008, as the United States housing and mortgage-backed securities markets were collapsing and wiping out billions of dollars of equity from investors and financial institutions, Deutsche Bank AG ("DB" or the "Company") sold $6.2 billion of preferred securities to the public in order to raise capital.[1] ¶2. The prospectuses for these Offerings, however, materially misrepresented and omitted DB's exposure to the very toxic mortgage-backed securities that were plaguing the world's financial markets. In fact, in all but one of the Offerings DB **_failed to disclose any indication whatsoever_** that it was holding more than €20 billion in Collateralized Debt Obligations ("CDOs"), Residential Mortgage Backed Securities ("RMBS"), Credit Default Swaps ("CDSs"), and monoline insurance exposure. ¶¶7, 96-104.

The CAC alleges that the Offering Materials for the first five of the six offerings (October 2006, May, July, and November 2007, and February 2008) were false and misleading because (1) defendants failed to disclose the Company's €20 billion in high-risk subprime and nonprime mortgage-backed securities in violation of Generally Accepted Accounting Principles ("GAAP"), International Financial Reporting Standards ("IFRS"), and Securities and Exchange Commission ("SEC") regulations; (2) the Company's statements regarding its risk management misrepresented DB's true exposure to mortgage-backed securities and the financial and liquidity risks the securities posed to the Company; and (3) the Company's assertions that it complied with GAAP and IFRS were false as DB's 2005 and 2006 20-Fs failed to accurately account for DB's mortgage-backed securities in accordance with the collapse of a market for such securities.

---

[1]    For the purpose of this opposition, plaintiffs adopt all shorthand references from the Consolidated Amended Complaint for Violation of the Federal Securities Laws ("Complaint" or "CAC"). All "¶__" or "¶¶__" references are to the CAC.

Once defendants did finally acknowledge the risk, they began taking miniscule write downs even though the market for these assets was collapsing. While market indicators and write downs on these same assets by competitors demonstrated that these assets were quickly becoming worthless, defendants were writing them down by single-digit percentages. At the same time, defendants reassured investors that their extensive, industry-leading risk management practices "contained" DB losses, even as the rest of the market collapsed. ¶¶125-126.

The same Offering Materials also misrepresented DB as a safe, conservative banking institution. In truth, while the Company touted its "highly sophisticated" and "industry leading" risk management practices, DB ran a highly leveraged "proprietary trading" operation that allowed its traders to gamble vast sums of the Company's money on the riskiest of financial instruments, including derivatives and credit-default swaps. ¶¶141, 150. During the time of the Offerings, DB's traders were leveraged by as much as 300%, exposing the Company to $30 billion in market risk. In early 2007, these traders made huge bets that the mortgage-market decline would end. *Id.* But it was not until long after the Offerings that the true risk associated with these bets was disclosed – to the tune of $6.8 billion in losses for DB in the fourth quarter of 2008, most of which was directly attributable to losses from the Company's proprietary trading and mortgage-backed securities.

Like the earlier offerings, the May 2008 Offering Materials materially misrepresented DB's risk management, drastically understating the "value-at-risk" (or "VaR") of DB's trading activities, and misleading investors regarding the Company's exposure to monoline insurers. ¶¶160-167. In fact, the Company eventually was forced to admit that its equities trading losses were almost 700% more than DB had previously claimed was its "maximum exposure." ¶162. Likewise, DB was forced to mark down an ***additional €2.2 billion*** in exposure to monoline insurers, while admitting it still maintained €1.6 billion in monoline exposure. ¶167.

- 2 -

Ignoring all of this, defendants claim plaintiffs have failed to allege a single false statement or omission in *any* of the six Offerings. Defendants seek to dismiss the Complaint, blaming the "economic tsunami" in September, 2008 for DB's failure to truthfully disclose crucial material information about the Company's operations and toxic holdings. The Deutsche Bank and Individual Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint ("Defs.' Mem.") at 2. But far from simply claiming defendants failed to foresee the fall of the U.S. housing market, the CAC alleges defendants omitted and misrepresented DB's exposure *even after the collapsing mortgage market had already wiped out billion of euros of DB's assets*. ¶¶105-120

Distorting the CAC's allegations, defendants attempt to lump this case in with a handful of decisions in which claims against other financial institutions were dismissed.[2] Defs.' Mem. at 2. Those decisions, however, fail to insulate defendants here. Just the opposite, in fact. The cases relied upon so heavily by defendants demonstrate the exact types of disclosure DB *should have made, but did not*.

In *Blackmoss Investments Inc. v. ACA Capital Holdings*, *Inc*., No. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010), the court dismissed the plaintiffs' claims because *ACA's prospectus specifically disclosed* the company's investment in risky CDOs, that its CDOs contained RMBS, that ACA had "'significantly increased'" its CDO business, and that it "'intend[ed] to continue to grow'"

---

[2] For some reason, defendants fixate on plaintiffs' *counsel* in some of the cases, apparently because plaintiffs' counsel in those cases are from the same firm as one of the lead counsel in *this* case. *See* Defs.' Mem. at 2. But defendants do not articulate any reason why this matters. It does not any more than the fact that defense counsel here is from the same firm that represented defendants in *Jaffe v. Household Int'l, Inc.* – a case in which a jury found defense counsel's clients had intentionally violated federal securities laws, costing shareholders billions of dollars. *Jaffe v. Household Int'l, Inc*., No. 1:02-cv-05893 (N.D. Ill.).

- 3 -

its CDO portfolio." *Id*. at *8.  Similarly, in *Yu v. State Street Corp.*, __ F. Supp. 2d __, No. 08 Civ. 8235 (RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010), the court dismissed the plaintiffs' allegations that a mutual fund had misrepresented the amount of its mortgage-related holdings because the company had ***specifically disclosed*** the exact percentage of the fund that was comprised of "mortgage-backed" and "asset-backed" securities, and the actual ***names*** of the mortgage-related securities the fund held.  *Id*. at *8.[3]

These decisions stand in stark contrast to DB's utter failure to disclose ***any information*** regarding its subprime/nonprime mortgage-backed securities in the 2006, 2007 and February 2008 Offerings, its risky-proprietary trading operations, or the inflation of its balance sheet.  ¶7.

Perhaps realizing this, defendants also attempt to measure the CAC against cases evaluating fraud claims brought under Section 10(b) of the Exchange Act.  Defendants rely heavily upon *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, __ F. Supp. 2d __, No. 08 CIV. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*"), where the court dismissed plaintiffs' §10(b) fraud claims because the complaint failed to allege scienter and meet the pleading requirements of the PSLRA and Rule 9(b).  *Id*. at *12-*14.  But here, the CAC's Securities Act claims are based on strict liability and negligence, not fraud.  As such, plaintiffs need only "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009).  Having done so, "***[l]iability against the issuer of a security is***

---

[3]    Moreover, the court in *Yu* held that the plaintiffs had not alleged that the misrepresentations related to the defendants' mortgage-related securities were material.  2010 WL 668654, at *5-*6.  Defendants here, however, do not argue that their failure to disclose the Company's mortgage-backed assets was immaterial.

*virtually absolute, even for innocent misstatements*."[4] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *see* 15 U.S.C. §77k(a).

Once the rhetoric and inapplicable law is stripped away, defendants' motions to dismiss are based primarily upon the argument that defendants had "no duty" to disclose the Company's €20 billion in toxic assets. Defs.' Mem. at 21-27. The law is to the contrary. Due to the material risk the toxic assts posed to DB, the applicable accounting standards, and defendants' own disclosures regarding the Company's credit and market risk and risk management procedures, defendants were required to speak fully and truthfully regarding the extent of their massive portfolio of mortgage-backed securities and related investments. ¶¶68-75, 90, 134-140. They did not.

In the end, defendants have failed to refute any of plaintiffs' allegations of negligent misrepresentation and omission. They have either ignored the allegations in the CAC or misapplied the law, or both. Defendants' motions to dismiss should be denied.

## II.    STATEMENT OF FACTS

Prior to the first Offering, DB began acquiring billions of dollars of exposure to the U.S. residential real estate mortgage market, totaling over €20 billion by 2007. ¶96. DB had €3.46 billion of gross exposure through CDOs, structured asset-backed securities whose value and payments are derived from a portfolio of fixed-income underlying assets, including subprime/nonprime mortgages. ¶97. Of this amount, 30% or €1.1 billion consisted of mezzanine CDOs, which were particularly risky and susceptible to the decline of the subprime mortgage market because they were backed by nothing more than the lowest rated and highest risk tranches of RMBS, or groups of mortgages that were repackaged into securities. ¶98. DB also had another €9.7 billion

---

[4]    Unless otherwise noted, citations are omitted and emphasis is added.

exposure directly through RMBS.  ¶102.  Of the subprime collateral, a large percentage was originated in 2006 and 2007 for which mortgage default rates were more than double the loss rates of 2005 and earlier vintages.  *Id.*  DB had an additional €9 billion of net counterparty exposures to monoline insurers, which provide insurance for debt payments in the event of an issuer's default. ¶99.  While DB represented it utilized these monoline insurers as "hedges," in reality they were woefully inadequate for that purpose because due to the extreme risk of the subprime/nonprime assets they insured, many monoline insurers could not cover all the defaults they insured and ultimately failed.  *Id.*

Despite these risky investments, DB reassured investors time and again that it was protected by superior top-down risk policies, procedures, and methodologies, noting that both DB's Management Board and Supervisory Board monitored risk management.  ¶62.  DB stated it "manage[d] credit, market, liquidity, operational, business, legal and reputational risks as well as our capital in a coordinated manner at all relevant levels within our organization."  ¶157.  DB further noted that each of its Group Divisions established a risk management unit that undertook to: (1) ensure that "business conducted within each division is consistent with the risk appetite that the Capital and Risk Committee has set"; (2) "[f]ormulate and implement risk and capital management policies, procedures and methodologies that are appropriate to the businesses within each division"; (3) "[a]pprove credit risk [and] market risk . . . limits"; (4) "[c]onduct periodic portfolio reviews to ensure that the portfolio of risks is within acceptable parameters"; and (5) "[d]evelop and implement risk and capital management infrastructures and systems that are appropriate for each division."  *Id.*

DB also noted that the credit approval process included a detailed risk assessment, including evaluation of "both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure."  ¶63.  DB reassured investors that such an evaluation "not only affects

- 6 -

the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure." *Id*.

To further allay investors, DB detailed its in-house methodologies for evaluating creditworthiness, including a "granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution." *Id*. DB further noted that "[w]hen we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible." *Id*. This language was also repeated virtually verbatim in the 2006 and 2007 20-Fs. ¶¶85, 158.

The defendants also stated that DB assumed market risk "by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives." ¶64. According to the 2005 20-F:

> We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits. Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios. Value-at-risk is a common metric we use in the management of our trading market risks.

*Id*. DB also stated that it "set[s] a Group-wide value-at-risk limit for the market risks in the trading book. Group Market Risk Management sub-allocates this overall limit to our Group Divisions. Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions." *Id*. Again, this language was repeated virtually verbatim in the 2006 and 2007 20-Fs. ¶¶86, 159.

- 7 -

As early as the fall of 2006, well prior to DB's first disclosure of any U.S. subprime exposure, market events indicated the increasing risk to institutions with exposure to subprime related assets. For example, by September 2006, property foreclosure rates had increased 53% from a year earlier; by November 2006, subprime loans from 2006 were "going bad" 50% faster than the rates for 2005 loans; and by December 2006, subprime borrowers had a delinquency rate of more than 12.5% in the third quarter, the highest in more than three years, and the delinquency rate for borrowers holding adjustable-rate mortgages was even higher at more than 13% in the third quarter. ¶105.

On October 13, 2006, DB issued the first Offering, selling $600 million in preferred share to investors. ¶2. The October 2006 Offering Materials incorporated by reference the false and misleading 2005 20-F. *Id.*

The mortgage and credit market collapse continued into 2007. In February 2007, HSBC, the largest subprime mortgage originator in the U.S., announced that its loan loss provisions would exceed analysts' estimates due to, among other things, increasing subprime delinquencies and that it was raising its loan loss provision by 20%. ¶105. On February 9, 2007, *The Wall Street Journal* reported that foreclosure rates on subprime mortgage loans in 2006 more than doubled from 2005. *Id.* On February 13, 2007, ResMae Mortgage Corp., the country's 26th largest subprime lender, filed for Chapter 11 bankruptcy protection. *Id.* In March 2007, more subprime lenders declared bankruptcy, announced significant losses, or put themselves up for sale, including Accredited Home Lenders, DR Horton, Countrywide Financial, and SouthStar Funding LLC. *Id.* In early March 2007, the Mortgage Bankers Association reported that about 13% of subprime loans were delinquent, more than five times the delinquency rate for home loans to prime borrowers. *Id.*

- 8 -

By April 2007, the signs of distress turned into actual CDO failures, when Merrill Lynch had cancelled planned auctions for most of the securities that it had seized from the Bear Stearns funds and, instead, took them in-house. *Id.* These events caused a dramatic price drop in all CDO issues throughout the industry, which had to be marked down as much as 30 percent. *Id.*

Further evidence of the deteriorating market could be seen in the sharp decline in the ABX and TABX indices. The ABX Index was created in January 2006 when several banks collaborated with a company called "Markit" to create an index to track RMBSs and to estimate CDO market values. ¶106. The ABX Index, which tracked the performance of 15 to 20 equally weighted RMBS tranches backed by subprime collateral, was a leading indicator of the value of subprime-backed CDOs and other subprime assets, *and was used by DB as a barometer for assessing how subprime mortgage-related assets performed in the marketplace*. *Id.* Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating. *Id.* The "TABX Index," launched in February 2007, tracked the value of the BBB and BBB- tranches of the ABX indices, but also took into account varying levels of subordination. ¶107.

By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered serious declines, with some BBB- tranches dropping as much as 60%. By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters. ¶110. The TABX indices also plunged. From its inception in February 2007, when it was already indicating CDO values were more than 15% under par, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007. ¶112.

On May 16 and July 16, 2007 DB issued the next two Offerings of preferred securities, raising a total of $1.8 billion from investors. ¶2. These Offerings incorporated by reference the false

- 9 -

and misleading 2006 20-F, and failed to disclose any indication to the market that DB was holding more than €20 billion in mortgage-backed securities.

By the fall of 2007, the mortgage and credit industry had collapsed. In October 2007, Merrill Lynch announced that it would write-down its ABS CDOs by $12.4 billion. ¶115. That same month, Swiss bank UBS wrote-down $4.4 billion in subprime related RMBS and CDOs. *Id.* In November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion write-off, and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital. ¶116. In December 2007, UBS reported an additional $10 billion write-down in subprime related RMBS and CDOs, and Bank of America liquidated a $12 billion cash fund. ¶117.

In November 2007, DB issued another $805 million in preferred securities. ¶2. The November 2007 Offering incorporated the false and misleading 2006 20-F and the November 1, 2007 6-K, which for the first time disclosed DB had some exposure to toxic assets, stating "In the Corporate and Investment Bank (CIB), revenues were €1.9 billion, down by €2.1 billion, or 52%, reflecting charges totaling €2.2 billion in Corporate Banking & Securities. ¶¶2, 89. "Of these charges, €€1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities." ¶89. This statement, however, still failed to disclose the actual amount and type of DB's mortgage-backed securities, and at the same time reassured investors that "we continue to see demand for good quality assets at prices which reflect a reasonable balance between risk and reward. Our sales and trading business model, with its emphasis on intellectual capital, continues to be a critical part of our platform." *Id.* The 6-K also stated that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight." ¶114.

- 10 -

In February 2008, DB issued another $1.75 billion in preferred shares.  ¶2.  The February 2008 Offering incorporated the false and misleading 2006 20-F, and the February 7, 2008 6-K, which again reassured investors that "[f]ollowing our decision to proactively manage down troubled risk positions in the third quarter and ongoing active risk management, we took no further losses on our remaining CDO exposures in the current quarter after taking into account related gains on hedge positions."  ¶125.  The February 7, 2008 6-K further reassured investors that, "Effective risk management resulted in contained losses in our collateralized debt obligations and U.S. residential mortgage businesses, despite the investment banking industry facing substantial problems in both sectors."  *Id*.  DB stated that market risk was mitigated by effective risk management the fourth quarter of 2007: "In the fourth quarter, we again demonstrated the quality of our risk management. *We had no net write-downs related to subprime, CDO or RMBS exposures*."  *Id.*

In February 2008, UBS announced that its write-downs for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages.  ¶118.  On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy.  ¶119.  The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to insure for potential Bear Stearns losses – mostly resulting from mortgage-backed securities.  *Id.*

As the mortgage and credit markets declined, DB sought to increase the profits generated by its traditional banking operations by developing a risky "proprietary" trading unit. ¶141.  During the Relevant Period, DB relied on its propriety trading unit to generate as much as 20% of its revenue. *Id*.  DB's traders specialized in credit and equity derivative trading, which often required the Company to risk several times the amount of capital it had on hand to execute the trading strategy.

- 11 -

¶142.  DB also engaged in "capital structure arbitrage" whereby DB's traders would try to take advantage of gaps in pricing between various securities of a single company.  *Id.*

DB failed to maintain any risk management controls for the Company's proprietary trading operations, led by one of DB's most powerful traders, Boaz Weinstein.  ¶143.  In fact, throughout 2006 and into 2007, DB's proprietary trading positions continued to increase and the Company's exposure to losses increased dramatically.  Weinstein's trading group used the complex financial instruments described above to augment their bets with borrowed money, multiplying profits when they won but magnifying huge losses when they lost.  *Id.*

By early 2008, Weinstein's group was leveraged approximately 300%, exposing DB to $30 billion in market risk.  ¶145.  This was especially worrisome because the group had purchased huge positions in corporate bonds or loans, as well as Credit Default Swaps, taking the gamble that the mortgage crisis was contained.  *Id.*  Weinstein increased these positions in March 2008, as corporate bonds rallied after the Federal Reserve's brokering of a deal for the troubled Bear Stearns stabilized the credit markets.  ¶146.

Proprietary trading was much riskier than trading undertaken in the normal course of conducting its clients' business, a fact DB never disclosed to investors.  Instead, the 2006 20-F blandly noted that "[m]ost trading activity [DB conducts] is undertaken in the normal course of facilitating client business."  ¶87.  The 2006 20-F stated that while "traders will maintain long positions (accumulating securities) and short positions (selling securities we do not yet own) in a range of securities and derivative products," DB did not view this as proprietary trading.  *Id.*  DB then discussed four types of arbitrage which it viewed as proprietary trading:

> For example, in index arbitrage we identify differences between the prices of exchange-traded derivatives (such as futures contracts on an equity index) and the underlying prices on the stock exchange of the individual stocks in the index.  In convertible arbitrage, we identify volatility-related pricing differences between the

- 12 -

market for convertible debt instruments and the cash and derivatives markets. In credit and equity arbitrage, we use statistics-driven trading strategies based on short-term market movements and indicators to manage our trading book so that the market value of our long positions remains roughly equal to the market value of our short positions. We also undertake risk-arbitrage, which is generally related to mergers and acquisitions, involving, for example, transactions such as buying a target company's shares at the same time as selling the bidding company's shares.

*Id*. This language was repeated virtually verbatim in the 2007 20-F. ¶164.

On March 26, 2008, DB filed its 2007 20-F stating that it had €1,103 million in exposure to monoline insurers. ¶166. The 2007 20-F also stated that DB's equities trading VaR ranged between $43.5 million and $90.5 million during 2007. Despite DB's assurances relating to its VaR calculation that its "trading market risk outside of these units is immaterial," the Company reported equities trading losses for 2008 ***almost 700% above the supposed "maximum exposure"*** of $90.5 million. ¶162.

On April 29, 2008, DB filed a 6-K stating that its net revenues for the first quarter of 2008 were €4.6 billion, versus €9.6 billion in the first quarter of 2007. In Corporate Banking & Securities (CB&S), net revenues for the first quarter of 2008 were €880 million, versus €6.1 billion in the first quarter of 2007. In Sales and Trading, net revenues for the first quarter of 2008 were €1.3 billion, versus €3.4 billion in the first quarter of 2007, "reflecting mark-downs on Commercial Real Estate activities and on Residential Mortgage-Backed Securities, together with significantly lower revenues in the credit trading business." ¶170.

On May 5, 2008, DB issued another $1.1 billion in preferred shares. ¶2. The May 2008 Offering Materials incorporated the false and misleading 2006 and 2007 20-Fs, and also mislead investors regarding the Company's high risk trading operations, the inadequacy of its risk management procedures, and its exposure to monoline insurers. *Id*; ¶¶160-171.

- 13 -

By 2009, defendants were forced to reveal the true extent of their exposure, as well as huge losses. On January 14, 2009, DB issued a press release announcing that it was taking a loss, after taxes of €4.8 billion for the fourth quarter of 2008, blaming "exceptional market conditions, which severely impacted results in the sales and trading businesses" and "exposure reduction and other de-risking measures, a significant increase in provisions against certain of our monoline counterparties, and certain other exceptional gains and charges, including reorganization charges." ¶172.

On February 5, 2009, DB issues a press release confirming this figure, stating that the loss was "driven by significant losses in key businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading." The release noted that "[t]he fourth quarter 2008 included losses in Credit Trading of EUR 3.4 billion, of which EUR 1.0 billion related to the Credit Proprietary Trading business." ¶173.

On March 23, 2009, DB issued its 2008 Annual Report, finally detailing all of DB's ultimate exposure and losses. DB reported that net losses from Sales & Trading were "€6.6 billion in 2008, compared to a gain of €3.9 billion in 2007." ¶178. DB blamed this loss on "mark-downs relating to reserves against monoline insurers, provisions against residential mortgage-backed securities and commercial real estate loans and significant losses in our credit trading businesses, including our proprietary trading businesses in the third and fourth quarter of 2008." *Id.* DB also reported that losses from Credit Trading were "€3.2 billion, predominantly in the fourth quarter, of which €1.7 billion related to Credit Proprietary Trading." *Id.* DB blamed this drop "on losses on long positions in the U.S. automotive sector and by falling corporate and convertible bond prices, as well as basis widening on significant other debt trading inventory versus the credit default swaps (CDS) established to hedge them." *Id.*

- 14 -

## III.    ARGUMENT

### A.    Legal Standard Governing Defendants' Motions to Dismiss

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. Rule 8(a), which requires a "short plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 206 (S.D.N.Y. 2004) ("*IPO*").  In ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  All reasonable inferences are drawn in the plaintiffs' favor.  *Bell Atl.*, 550 U.S. at 555-56.  As such, in order to survive a Rule 12(b)(6) motion the Complaint here need only "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 129 S.Ct. at 1949.  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*[5]

---

[5]    Defendants' footnoted argument that some of the CAC's allegations "sound in fraud" and therefore should be subject to heightened pleading requirements of Rule 9(b) is incorrect.  Defs.' Mem. at 20 n.12.  Where, as here, the Complaint's allegations are clearly based on theories of strict liability and negligence, Rule 9(b) does not apply and Rule 8(a) governs plaintiffs' claims.  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631 (S.D.N.Y. 2007).  The CAC does not assert *any* claims of fraud, and expressly pleads strict liability and negligence as the basis for its Securities Act claims, using the language from the Act itself.  ¶¶1-3, 189-216.  Moreover, the CAC does not allege any facts suggesting defendants acted with fraudulent intent.  *See, e.g.*, ¶90(a) (defendants "failed to disclose" DB's mortgage-backed securities exposure); ¶94 (DB "fail[ed] to comply with the IASB"); ¶129(b) (defendants "failed to disclose" DB's high-risk proprietary trading).  None of the CAC's allegations "sound in fraud," as they do nothing more than follow the language of the Securities Act.  *See Refco*, 503 F. Supp. 2d at 631-32 ("Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent."); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008) ("Because plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no 'averments of fraud'" and Rule 8(a)

- 15 -

To state a claim for violation of §11 of the 1933 Act, plaintiffs must allege the registration statement: (1) "contain[ed] an 'untrue statement of a material fact'"; (2) "'omit[ed] to state a material fact required to be stated therein'"; or (3) omitted to state a material fact "'necessary to make the statements therein not misleading.'"  *In re WorldCom Sec. Litig.*, 496 F.3d 245, 248-49 (2d Cir. 2007) (quoting 15 U.S.C. §77k(a)); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 440 (S.D.N.Y. 2009) ("'A prospectus will violate federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly.'").[6]

Once plaintiffs have made a *prima facie* case, *"[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements*."  *Herman & MacLean*, 459 U.S. at 382; *see* 15 U.S.C. §77k(a).  This is because §11 "was designed to assure compliance with the disclosure provisions of [the Securities] Act by imposing stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 381-82.  Thus, claims under §§11 and 12(a)(2) do not require a plaintiff to allege scienter, reliance, or other elements of fraud. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  Accordingly, "'Section 11 "places a relatively minimal burden on a plaintiff," requiring simply that the plaintiff  allege that he purchased

---

applies.), *aff'd* 347 Fed. Appx. 665 (2d Cir. 2009).  As the CAC does not allege defendants acted "know[ingly]" or with an "intent to defraud," the cases cited by defendants are inapposite.

[6]    Section 12(a)(2) liability parallels the §11 standard for "'any person who offers or sells securities by means of a prospectus containing material misstatements.'"  *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007).

- 16 -

the security and that the registration statement contains false or misleading statements concerning a material fact.'" *IPO*, 358 F. Supp. 2d at 206.  The CAC easily meets these standards.[7]

### B. The Offering Materials for Each of the Offerings in 2006 and 2007 Were False and Misleading

The CAC alleges in detail that the October 2006, and the May and July 2007 Offerings, were false and misleading because DB failed to disclose ***any indication*** of its huge concentration of high-risk exposure, in violation of GAAP and SEC regulations.  *See* ¶¶67-75, 90-117.  Similarly, the November 2007 and February 2008 Offering Materials only disclosed that the Company had taken a €1.6 billion write down on "trading activities . . . CDO correlation trading and residential mortgage-backed securities" (¶89), but still did not disclose the actual amount of the Company's mortgage-related exposure.  ¶90(a)-(c).

In response, defendants do not dispute that these toxic assets were not disclosed, nor that the amount of the assets was material to the Company's financial statements.[8]  Defs.' Mem. at 21-22.

---

[7]    The Individual Defendants claim that, despite moving to dismiss under Rule 12(b)(6), they "preserve all issues of personal jurisdiction and service."  Defs.' Mem. at 1 n.4.  By appearing before this Court and failing to properly raise the issue of personal jurisdiction they have waived the issue. *Bryant Park Capital, Inc. v. Jelco Ventures*, No. 05 Civ. 8702 (GEL), 2007 U.S. Dist. LEXIS 54747, at *2-*3 (S.D.N.Y. July 23, 2007)  (where defendants argued in a footnote "that at some future date they plan to object to this Court's exercise of personal jurisdiction . . . defendants are mistaken in contending that they 'do not waive' any of the listed objections; the failure to properly raise a Rule 12(b)(2) motion for lack of personal jurisdiction at this juncture is preclusive"); *Bates v. C & S Adjusters, Inc*., 980 F.2d 865, 868 (2d Cir. 1992) (defendants failure to allege lack of personal jurisdiction in its answer or motion to dismiss constitutes waiver); *Indymac Mortgage Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222, 233-34 (D. Conn. 2001) (defendant "waived her ability to raise a defense of lack of personal jurisdiction because she failed to raise the defense in other Rule 12(b) motions").

[8]    Defendants' claim that the 2007 20-F provided "extensive disclosures" regarding DB's mortgage exposure is both inaccurate and irrelevant, as the 2007 20-F was not filed until March, 2008 and thus was ***not incorporated*** into the October 2006, May, July, or November 2007, or February 2008 Offerings Materials.  ¶2.

Instead, defendants claim they had ***no duty*** to disclose the Company's €20 billion in mortgage-related exposure.  *Id.*  Defendants' arguments ignore the CAC's well-pled facts and the law.

### 1.  DB's Mortgage-Backed Securities Portfolio Was Material

Defendants do not contest that DB's €20 billion in high-risk, subprime, and nonprime mortgage-backed securities was material to the Company.  Nor could they.  Information is material as a matter of law when there is "'a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  In order to prevail on a motion to dismiss based on a claim of immateriality, defendants have the burden to demonstrate that the false statements or omissions "'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Here, the existence of DB's €20 billion mortgage-backed securities portfolio was undeniably information that any reasonable investor would have considered to be important, as it constituted a tremendous amount of the Company's capital and posed a major risk to its financial health.  Moreover, in the context of the unprecedented collapse of the mortgage market and the amount of write-downs and losses companies were being forced to take from their subprime and other mortgage-related assets, it is impossible to claim investors would not have wanted to know about DB's portfolio during this time.  *Id.* at 162 ("whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case").

### 2.  Defendants Had a Duty to Disclose DB's €20 Billion of Mortgage-Backed Securities

The Company's highly concentrated and substantial investment in high-risk CDOs and RMBS, in relation to DB's financial results and capital adequacy, independently triggered a duty to

520844_1

disclose these risks to the market. "'A prospectus will violate [Section 11 of the] federal securities laws if it does not disclose "material objective factual matters" or buries those matters beneath other information, or treats them cavalierly.'" *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 WL 22953163, at *10 (S.D.N.Y. Dec. 15, 2003) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)).

Although the material risk to the Company's balance sheet was enough to require disclosure of DB's subprime-related assets, DB's statements that it did trade in "equity derivatives and mortgage-backed securities" (Declaration of Christine Bateup ("Bateup Decl.") Ex. A at 17) and that it held some mortgage-backed securities "available for sale" (*id.* at 46; Bateup Decl., Ex. B at 21) also triggered the Company's duty to fully disclose the extent and material risk of its mortgage-related exposure. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (same).

Likewise, DB's disclosure in the November 1, 2007 6-K (incorporated by reference into the November 2007 and February 2008 Offering Materials) that the Company had taken a €1.6 billion charge on "trading activities . . . CDO correlation trading and residential mortgage-backed securities" (¶89), also triggered the Company's obligation to fully disclose its ***total*** mortgage backed exposure. *In re MBIA, Inc., Sec. Litig.*, __ F. Supp. 2d __, No. 08-CV-264 KMK, 2010 WL 1253925, at *10 (S.D.N.Y. Mar. 31, 2010) (citing *Ganino*, 228 F.3d at 167-68) (violation of §11 adequately pled where a company's omission of a portion of its CDO exposure "could have affected

- 19 -

'the total mix of information and thereby misle[d] a reasonable investor regarding' the amount of [the company]'s RMBS-backed CDO exposure.").[9]

The cases relied upon by defendants for the proposition that they had no duty to disclose the Company's €20 billion in mortgage-related exposure in fact dictate exactly the opposite conclusion. Defs.' Mem. at 22. In *In re New York Community Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006), the court held in part because "[t]he 2003 Form 10-K ***plainly disclosed that the company had 5.5 billion invested in mortgage-backed securities***" its statements regarding interest-rates were immaterial. *Id.* at 479-80. Here, of course, defendants did not disclose its portfolio of mortgage-backed securities (nearly three times the size of that in *Bancorp*). Likewise, in *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311 (4th Cir. 2004), the court held plaintiffs had not pled fraud under §10(b) where the company did not disclose its subprime credit card portfolio because there was no "industry-wide approach" to defining "'subprime.'" *Id.* at 317. Here, however, plaintiffs need only allege DB failed to disclose its mortgage-related assets, and in this case there is no definitional dispute. Finally, in *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006), the court found no §10(b) liability where plaintiffs did not allege any "accounting or reporting requirements which would require the disaggregation of acquisition costs."

---

[9]     The Company's statements regarding its risk polices, procedures, and methodologies also independently obligated defendants to disclose DB's subprime exposure. ¶¶66-66, 85-88. For example, in the 2005 20-F (incorporated into the October 2006 Offering), the Company stated that DB utilized a "detailed risk assessment of every credit exposure" and that "[o]ur risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility." ¶63. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

- 20 -

*Id.* Here, plaintiffs have alleged specific IFRS, GAAP and SEC regulations which required the disclosure of DB's mortgage-related assets. ¶¶68-75, 90.

DB's failure to disclose its €20 billion toxic assets violated GAAP, SEC Regs S-K and S-X, and IFRS, rendering the Offering Materials materially false and misleading. ¶¶68-75, 90, 134-140; *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706, at *19 (S.D.N.Y. Mar. 26, 2010) (upholding §11 claims where plaintiffs alleged defendants' omissions violated Reg. S-K and Reg. S-X); *Seow Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008) ("Item 503(c) of Regulation S-K regards mandatory risk disclosures for public offerings. It requires, *inter alia*, that offering documents include a section on the 'most significant factors that make the offering speculative or risky.'") (citing 17 C.F.R. §229.503(c)). The "'[f]ailure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act.'" *Fuwei Films*, 634 F. Supp. 2d at 443.

Defendants' argument that the CAC's accounting claims are nothing more than "hindsight" pleading is simply wrong. Defs.' Mem. at 24-27. Far from requiring defendants to be "clairvoyant" (*id.* at 23), GAAP required DB to disclose "all significant concentrations of credit risk from all financial instruments" (¶68, citing SFAS No. 107), to disclose contingencies when there is greater than a slight chance that a loss may be incurred (¶70, citing SFAS No. 5), and to give an estimate of the possible loss, a range of the loss, or state that such an estimate cannot be given (*id.*) *at the time of the Offerings*. Here, defendants did not disclose *any information* regarding the Company's €20 billion in risky, mortgage-backed securities and thereby violated accounting regulations. *Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *19; ¶¶6-7.

Simply because DB was eventually forced to disclose *losses* to these assets in later quarters does not render the allegation that DB should have disclosed the existence of and risk posed by the

assets earlier a "fraud by hindsight claim." Indeed, it is both common and expected that post-class period information will be used to establish facts that existed during the class-period. "The fact that plaintiff relies on evidence that post-date the [registration statement] does not vitiate the false or misleading nature of the registration statement." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 175 (S.D.N.Y. 2003); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant," including post-class period disclosures.).

The misapplication of defendants' "fraud by hindsight" argument is again demonstrated by the very authorities they rely upon. In *Scibelli v. Roth*, No. 98 CIV. 7228, 2000 WL 122193 (S.D.N.Y. Jan. 31, 2000), the court dismissed the plaintiffs' omission claim because the complaint failed to allege defendants possessed the information *at the time of the offering*. *Id*. at *3 ("[t]o *infer* that Nortel *possessed* such information on July 24 because Nortel *announced* such information on September 29 is not a reasonable inference") (emphasis in original). To the contrary, here, the CAC alleges – and defendants have never argued otherwise – that DB *did in fact* possess €20 billion in mortgage-backed securities and related investments at the time of the offerings, and that information was not disclosed. Likewise, in *Panther Partners Inc. v. Ikanos Communications Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008), the plaintiffs' claims were based upon the defendants' failure to disclose certain "known trends" or "uncertainties" which were allegedly "known to the offering company at the time the registration statements are made." *Id.* The court noted that its "critical inquiry" was "whether-and to what extent- [the company] was aware of the issues and their potential impacts at the time of the offering statements." *Id*. The court dismissed plaintiffs' claims

- 22 -

when they failed to allege "**what [the company] knew, and when they knew it**." But the same cannot be said of the allegations here.[10]

Defendants' assertion that the CAC fails to state a claim because the application of GAAP requires "significant professional judgment" (Defs.' Mem. at 23) is similarly without merit. These disclosures were mandatory under the statute – regardless of what the accountants or management thought about them. ¶¶68-75. Indeed, courts routinely hold that accounting violations are actionable where, as here, contemporaneous facts existed which contradicted the so-called "judgments" made by reporting entities.[11] *See, e.g., In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 WL 5378164, at *6-*8 (E.D. Pa. Dec. 22, 2008) (sustaining claims that company failed to properly value the assets collateralizing its CDOs); *In re New Century*, 588 F. Supp. 2d 1206, 1215, 1226-27, 1239 (C.D. Cal. 2008) (rejecting argument that misstatements of value of residual RMBS interests were judgmental and sustaining §11 claim for those misstatements); *In re Wash. Mut.*, 259 F.R.D.

---

[10]    Defendants' reliance on *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp 2d 299, 309 (D. Mass. 2009), is likewise unpersuasive. There, the court dismissed the plaintiffs' claims that investment rating of mortgage pass-through certificates were false and misleading because the plaintiffs did not allege that, at the time of the Offering, defendants knew or could have known that Moody's and S&P's ratings were inaccurate. *Id.* Here, once again, there is no issue as to what the defendants knew, or when they knew it. DB failed to disclose the Company's massive MBS exposure, despite the fact that the securities were material to investors and that failure to disclose the exposure violated SEC regulations and the applicable accounting rules.

[11]    Nor do the cases defendants cite say differently. Defs.' Mem. at 23-24. In *City of Omaha v. CBS Corp.*, No. 08 CIV. 10816 (PKC), 2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010), plaintiffs failed to meet the PSLRA standard of **pleading fraud** where they failed to allege that a company should have written down its goodwill earlier. *Id.* at *11. Likewise, in *CIBC*, 2010 WL 961596, the court held that the plaintiffs' allegations that defendants "intentionally or recklessly" did not adhere to GAAP were "insufficient to support an inference of 'intent to defraud.'" *Id.* at *12-*13

- 23 -

490, 507 (W.D. Wash. 2009) (holding misstatements of loan loss reserve actionable even though "provisioning required some exercise of judgment").

Defendants' failure to make ***any disclosure of the size or risk associated with its non-prime mortgage portfolio*** or to properly mark down those asstes, in blatant disregard of GAAP and SEC regulations distinguishes the CAC's allegations from the cases cited by defendants. Defs.' Mem. at 25. In *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003), the court held plaintiffs failed to allege $217 million in "round-trip trades" had resulted in any material misrepresentation or concealment of the company's true financial condition, or that defendants' mark-to-market accounting (which was publically disclosed) was improper. *Id.* at 160-61. Likewise, *Garber*, 537 F. Supp. 2d at 613, held that while "Securities Acts claims are not required to be supported by 'detailed factual allegations,'" the plaintiffs' allegation that the company had experienced "a dramatic increase in integration-related expenses" was conclusory and immaterial. *Id.* Here, in contrast, defendants have conceded the €20 billion in mortgaged-related assets was material to the Company (as they must), and that the exposure was not disclosed to investors as required by GAAP and SEC regulations. ¶¶90-95.

### C.    DB's Financial Statements Overstated the Value of Its Mortgage-Backed Securities

In addition to failing to disclose the Company's exposure to mortgage-backed securities, DB failed to record any write-downs to those securities as the U.S. housing market collapsed. ¶¶90-113. GAAP and IFRS required DB to not only disclose the risks associated with these assets, but also timely write down the value of its RMBS/CDO holdings in accordance with SFAS Nos. 107 and 157 and the applicable IFRS rules. ¶¶130-140.

Although the Company's subprime/nonprime CDOs and RMBSs suffered significant deteriorations in value as a result of the mortgage market decline during 2006 and 2007, DB did not

- 24 -

record *any write-downs* to its €20 billion mortgage-backed securities in the Offering Materials incorporated into the October 2006 and May and July 2007 Offering Materials.  ¶¶2, 90.  DB's first mortgage-related write-down in the November 1, 2007 6-K (incorporated into the November 2007 and February 2008 Offering Materials) was unquestionably inadequate and belated.  ¶¶90-114.

For instance, the collapse of the ABX and TABX indices made it clear that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had plummeted prior to the November 2007 and February 2008 Offerings.  ¶113.  The ABX index, created by several commercial and investment banks to gauge the market value of subprime RMBSs by tracking the cost of insurance for those securities, served as an observable market input that DB was required to consider in valuing its positions.  ¶106.  In fact, the American Institute of Certified Public Accountants Center for Audit Quality, in a white paper titled Measurements of Fair Value in Illiquid (or Less Liquid) Markets, stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans."  ¶109.  The "TABX Index," launched in February 2007, tracked the value of the BBB and BBB-tranches of the ABX indices, but *also* takes into account varying levels of subordination.  ¶107.  Like CDOs, which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as those owned by DB.  *Id*.  Thus, the ABX and TABX indices were additional objectives, directly observable, *real-time* indicators of the value of DB's subprime-backed CDOs and other subprime-related assets.  ¶108.  And these indicators had declined substantially long before November 2007.  ¶¶110-113.

Even when DB finally began disclosing mortgage-related write-downs to investors, the marks it took on these positions were insufficient to reflect their true market value.  For the third

- 25 -

quarter of 2007, the Company disclosed only a €726 million write-down on its CDO and RMBS portfolio. *See* Defs.' Mem. at 9. Further, at the end of 1Q08 (April 29, 2008), DB disclosed only €885 million in net write-downs on RMBSs and commercial real estate loans. *Id*. at 12. These write-downs were extremely small and inadequate, however, in comparison to the rapidly deteriorating nature of its holdings and massive size of its residential mortgage portfolio. *See, e.g.*, ¶¶106-120 (market indices showing steepening declines in the value of residential mortgage assets prior to DB's write-downs, and comparatively larger and earlier write-downs recorded by DB's peers holding similar assets).[12]

Unlike DB, its peers recorded ***multi-billion*** dollar write-downs. ¶¶115-120. For example, in October 2007, Merrill Lynch announced that it would write down its CDOs by $12.4 billion, and Swiss banking giant UBS wrote down $4.4 billion in subprime related RMBSs and CDOs. ¶115. In December 2007, UBS reported an additional $10 billion write-down in subprime related RMBSs and CDOs, followed by another $4 billion charge to its mortgage-related assets on January 30, 2008. ¶¶117-118. One month later, UBS announced that its write-downs for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages. *Id*. This total included a $2 billion write-down for the fourth quarter of 2007 on the bank's $26.6 billion Alt-A (nonprime) portfolio. *Id*.

---

[12]     Defendants' argument that the Court should "disregard" the CAC's allegations regarding the ABX and TABX simply because there are "no facts demonstrating that DB held ***any*** of the handful of mortgage-backed-securities that comprised these indices" is unavailing. Defs.' Mem. at 29, 37 (emphasis in original). *See* ¶109 (the AICPA stated companies may use the ABX as a basis for valuation of subprime ABS and the SEC considered the ABX as a market index for CDOS). *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411 (NRB), 2010 WL 727227, at *23-*24 (S.D.N.Y. Feb. 22, 2010) (rejecting defendants argument that the ABX and TABX "should not be used as valuation tools" of CDOs, and holding "even if the ABX is a flawed valuation tool or a poor comparative for [the company's CDO] portfolio, plaintiffs have successfully pleaded material misstatements").

- 26 -

During the same period, DB, despite holding approximately €20 billion in subprime exposure, recorded only a €726 million, or less than 4%, net write-down, *and did not even disclose whether all of it was related to the Company's mortgage positions*. Defs.' Mem. at 9. The plainly insufficient write-downs DB recorded prior to the November 2007 and February 2008 Offerings, and its failure to disclose the gross amount of its write-downs before filing its 2007 20-F or to identify the asset types that were written down, overstated DB's financial results and left investors without material information about DB's assets and the extent of its exposure to the deteriorating mortgage market.

Despite defendants' assertions, plaintiffs allege precisely why DB's subprime assets should have been disclosed under IFRS accounting standards. *See* Defs.' Mem. at 34. The collateralized debt obligations and mortgage-backed securities *constituted significant concentrations of risk sharing similar characteristics* – they were all mortgage-related assets, based on loans marked by poorer credit quality, unverified borrower income, and higher sensitivity to interest-rate increases compared to prime loans. ¶¶97-98, 102. Furthermore, these features of the underlying loans gave rise to a particular risk, namely, a significantly higher risk of defaults (and hence a decrease in the value of the assets they backed) should real estate prices decline and mortgage rates increase. *Id.*; *see also* ¶¶96-103 (30% of DB's CDOs consisted of the riskiest "mezzanine" CDOs, which would be wiped out if only 10% of the underlying subprime mortgages defaulted; the Company's RMBS consisted of billions of euros in 2006 and 2007 vintage subprime loans, which had default rates more than double that of 2005 vintage loans). IFRS *required* DB to disclose not only the risks inherent in its mortgage-related portfolios, but also that it had as much as €20 billion in exposure to the high-risk subprime and nonprime mortgage markets. ¶¶130-139 (describing the standards set forth in IFRS 7 and IAS 30 & 32). DB failed to do so.

- 27 -

Ignoring many of the CAC's allegations, defendants contend the facts concerning the collapsing real estate and mortgage markets are not sufficiently "connect[ed]" to DB's mortgage-backed securities to establish that "DB's specific investments were perceived to be risky or impaired prior to the third quarter of 2007 when its first write-downs were taken."  *See* Defs.' Mem. at 28. The district court case defendants principally rely upon for this theory, *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532 (S.D.N.Y. 2009), is easily distinguishable on its facts – the facts missing from the *Landmen* complaint are supplied in the instant one.

In *Landmen*, the plaintiffs alleged the company's prospectus omitted important information concerning its real estate investments, because the residential real estate market was in a precipitous decline at the time of the offering.  The *Landmen* court found plaintiffs' allegations insufficient under *Bell Atlantic*, because:

> First, the CAC does not identify a single real estate investment or allege a single fact capable of linking the problems in the subprime residential mortgage market in late 2006 and early 2007 and the roughly contemporaneous decline in home prices (which are well-documented by the CAC) to Blackstone's real estate investments, 85% of which were in commercial and hotel properties.  Plaintiff alleges that Blackstone invested in real estate and the real estate market was starting to deteriorate.  But "without further factual enhancement" as to *how* the troubles in the residential mortgage and housing markets could possibly (let alone plausibly) have a foreseeable material affect on Blackstone's real estate investments, such allegations "stop[] short of the line between possibility and plausibility."

*Landmen,* 659 F. Supp. 2d at 544 (emphasis in original).

The allegations in this case stand in stark contrast to those of *Landmen*.  For one thing, in this case the alleged omitted information predominantly concerns securities backed by high-risk nonprime and exotic ***residential*** mortgages – not "commercial and hotel properties."  *Id.*  For another, the Complaint here clearly ties the larger market events directly to DB's mortgage-backed securities portfolio.  *See, e.g.*, ¶¶97-103 (describing and quantifying the types of securities ***comprising DB's mortgage-backed securities***); ¶¶105-113 (describing market events ***specific to the***

- 28 -

*types of mortgages underlying DB's portfolios*).  In light of these allegations, defendants cannot

seriously contend plaintiffs fail to allege a "plausible" theory of how the collapsing real estate

market had a material impact on DB's massive mortgage-backed securities portfolio.  *Bell Atl.*, 550

U.S. at 555-56.[13]

Defendants attempt to reduce DB's accounting violations with respect to the valuation of its

assets to matters of "judgment," arguing "[p]laintiffs do not allege facts showing that DB did not

honestly believe the valuations it assigned to these assets at the time of each of its filings."  Defs.'

Mem. at 31-32.[14]   This argument badly mischaracterizes both the law and the allegations

summarized above.  Because scienter is not an element of plaintiffs' Securities Act claims, plaintiffs

need not show that defendants acted recklessly or knowingly when valuing its RMBS and debt

securities.  *See* §III.B.2 above.  As such, the cases cited by defendants are clearly inapposite.  For

example, the court in *Global Crossing* dismissed allegations that an underwriter's *fairness opinion*

was false and misleading where the underwriter specifically disclosed that its opinion was based

only on public information provided by the company and "*if that information was true*, the

_____

[13]      Likewise, in *Yu*, 2010 WL 668645, at *9, the plaintiffs failed to allege any facts about the fund's mortgage-related holdings (such as whether they were backed by subprime loans) or "other facts by which the 'quality' of mortgage-related holdings might be judged."  *Id*. at *5.  Due to this lack of detail, and the failure to allege that the company deviated from its stated valuation methods, the court dismissed the plaintiffs' allegations that those assets were over-valued.  *Id*. at *9.  Here, however, the CAC alleges the exact type of mortgage-backed securities DB was holding on its books (¶¶96-103), alleges contemporaneous facts which demonstrate that the value of the assets had fallen (¶¶105-120), and specifically alleges that the Company deviated from its proscribed method of valuing the securities.  ¶94.

[14]      Defendants (and the CAC) note that SFAS No. 157 did not "become formally effective until January 1, 2008."  ¶91; Defs.' Mem. at 30.  As alleged in the CAC, however, SFAS No. 157 "reflected essential the same definition of fair value as had previously existed under GAAP, including SFAS 107."  ¶91. Moreover, the CAC alleges defendants violated both SFAS 157 and 107.  ¶¶91-92

- 29 -

exchange ratio was fair." *In re Global Crossing, Ltd., Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003) (emphasis in original). In contrast, plaintiffs here have alleged DB materially misrepresented that ***its own financial statements*** complied with SFAS by negligently failing to value its assets based upon then current market conditions. ¶92. And although defendants cite two Rule 10b-5 cases, *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005), and *In re Salomon Analyst Level 3 Litigation*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005), for the proposition that DB's valuations were merely "opinions" or "judgments" regarding the assets' fair values, those cases do not address valuation under SFAS Nos. 107 and 157.[15] ¶¶90-96, 140.

As noted above, these accounting standards created a defined set of inputs that defendants were required to follow in valuing their securities. *Id.* Because contemporaneous facts existed which contradicted defendants' supposed "judgments," they are unable to hide behind a claim that they were acting within the purview of the accounting laws. *See, e.g.*, *RAIT*, 2008 WL 5378164, at *6-*8; *New Century*, 588 F. Supp. 2d at 1215, 1226-27, 1239; *Wash. Mut.*, 259 F.R.D. at 507; §III.B.2 above.

---

[15]    In addition, *Salomon* did not involve a company valuing its own financial assets, but rather a securities analyst providing an estimate in a research report. 373 F. Supp. 2d at 250. Thus, while the analyst in *Salomon* could use whatever valuation methods he desired in setting out his opinion as to the value of the company on which he was reporting, defendants here were required to follow SFAS Nos. 107 and 157 and determine what the true value of the assets were, based upon the conditions in the market at the time. ¶¶90-92. Likewise, in *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004), the company's loan loss reserve was based upon management's judgment of losses in the portfolio, not specific market conditions and external valuations. *Id.* As plaintiffs here have adequately pled the existence of specific market conditions that demonstrate the Company's assets were overvalued, they have met their pleading burden. ¶¶94-120.

Creating an issue of fact, defendants also improperly claim plaintiffs' allegations are wrong, and DB's mortgage-backed securities valuations *did* comply with GAAP and IFRS. Defs.' Mem. at 30-31. Defendants' contention is entirely misplaced and inappropriate at this stage, especially where plaintiffs have alleged multiple violations of applicable accounting standards. Because plaintiffs' allegations are taken as true on these motions, defendants' argument that DB's financial statements *were* prepared in accordance with accounting rules simply creates an issue of fact that cannot be resolved on a motion to dismiss. *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (whether accounting practices were consistent with accounting standards is a question of fact that should not be addressed on a motion to dismiss); *Florida St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (the issue of whether accounting practices amounted to recklessness should not be decided at the motion to dismiss); *Refco*, 503 F. Supp. 2d at 656-57 ("'Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is "generally accepted" makes this difficult to decide as a matter of law.' At the motion to dismiss stage, the plaintiffs' assertion that certain practices were not generally accepted 'must be taken as true.'"); *RAIT*, 2008 WL 5378164, at *7 ("'[I]t is a factual question whether [a company's] accounting practices were consistent with GAAP,' and thus, we cannot determine this issue on a motion to dismiss.").

Perhaps recognizing the deficiencies in their argument, defendants insist that more *evidence* of DB's mortgage-backed securities is required at the pleading stage. Defs.' Mem. at 28. But the type of detail defendants insist upon can only come from discovery, as it is solely in defendants' possession. Rule 8(a) does not require plaintiffs to plead evidence, it merely requires a "'short and plain statement'" sufficient to put defendants on notice of the basis for plaintiffs' claims. *Bell Atl.*, 550 U.S. at 555. "Even with the heightened pleading standard under Rule 9(b) and the Securities

- 31 -

Reform Act [courts] do not require the pleading of detailed evidentiary matter in securities litigation." *Scholastic*, 252 F.3d at 72. The Complaint here satisfies Rule 8(a).

### D.    The February 2008 Offering Materials Were False and Misleading

The February 2008 Offering Materials, which incorporated by reference DB's 2006 20-F and the November 1, 2007 6-K, was false and misleading for the same reasons set forth above. In addition, the February 2008 Offering Materials also incorporated the February 7, 2008 6-K, which reported that DB had reported "robust earnings", that DB had sustained "no further losses" on its CDO exposure (still without actually disclosing what that exposure was), claimed that the Company's "effective risk management" was responsible for DB's ability to avoid write-offs, and stated "*[w]e had no net write-offs related to sub-prime, CDO or RMBS exposures*." ¶¶125-126.

### 1.    DB's Statements Regarding the Company's Risk Management, Lack of Further Write-downs, and Overstated Earnings Were Materially Misleading

The inadequate write-downs taken by DB on its mortgage-related positions caused the Company's 4Q07 "robust" earnings figures to be materially overstated. *See* ¶¶106-120, 126, 128(a)-(b). At the time of the February 2008 Offering, DB possessed tens of billions of euros in high-risk residential mortgage-related assets, including approximately €3.46 billion of CDOs and €9.7 billion of RMBSs, both backed primarily by subprime/nonprime mortgages. *See* ¶¶97-103. For the same reasons stated above, these assets were materially overvalued due to DB's failure to timely and adequately write them down as they became impaired. ¶¶124-129.

### a.    The Challenged Statements Are Not "Puffery"

Challenging only a portion of the false statements from this Offering, defendants argue that statements concerning DB's risk management is immaterial "puffery." Defs.' Mem. at 34. In order for a statement to be considered immaterial "puffery," statements must be "'generalized expressions

of corporate optimism.'" *Lapin*, 506 F. Supp. 2d at 239.  Defendants' statements here were material

because omitting the ***real risks*** posed by the Company's mortgage-backed securities portfolio while

claiming that DB's "effective risk management resulted in contained losses in our [CDO] and U.S.

residential mortgage business" and that due to the "quality of our risk management" DB had "no net

write-downs related to sub-prime, CDO or RMBS exposures" would have caused a reasonable

investor to believe that DB had taken significant precautions in ensuring its exposure to the ongoing

mortgage collapse was minimized and not that DB had failed to accurately mark down more than

€20 billion in toxic assets.  ¶125.  Such statements are not immaterial as a matter of law when, in

fact, the Company was neither managing nor disclosing its huge risks.  *Lapin*, 506 F. Supp. 2d at 239

(rejecting defendants' claim that statements proclaiming the company's "'integrity and honesty'"

were mere puffery and too vague to be actionable).

      Contrary to defendants' position, this is not a paradigmatic puffery case in which a company

boasted that it "'"set the standard" for integrity."'"  *See ECA & Local 134 IBEW Joint Pension Trust

of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009).  Plaintiffs describe

particularized, concrete risk management procedures that DB claimed to follow and did not.  *See,

e.g.*, ¶85 ("Our granular 26-grade rating scale, which is calibrated on a probability of default

measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare

our internal ratings with common market practice and ensures comparability between different sub-

portfolios of our institution."); ¶86 ("We use a combination of risk sensitivities, value-at-risk, stress

testing and economic capital metrics to manage market risks and establish limits.").

      These statements were not merely declarations of "intention, hope, or projections of future

earnings [which courts have identified] as the hallmarks of inactionable puffery."  *In re Moody's

Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (holding Moody's statements that the

- 33 -

company "steadfastly maintained independence as a cornerstone of its business" and that its "'operating, financial, and regulatory strategies [are] . . . strategies of trust'" were actionable because they were not "'vague,'" "'non-specific,'" or incapable of being verified); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (statements that the company would follow a particular markdown policy were materially misleading where company actually followed a different policy); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (statements such as "'[t]he fundamentals of our business remain strong,'" and "'our business remains profitable'" are actionable).

### b.    Defendants' "Warnings" Were Ineffective

Likewise, the few generic "warnings" that defendants claim should have put investors on notice of the market risks to which DB was exposed, or that DB was taking inadequate writedowns, do not insulate defendants from liability.  Defs.' Mem. at 34; Bateup Decl., Ex. A at 10; Bateup Decl. Ex. B at 12.  In fact, defendants do not even make a serious attempt to categorize these "warnings" as sufficient to protect the statements under the "bespeaks caution" doctrine.  Defs.' Mem. at 34.  Nor could they.

The judicially-created "bespeaks caution" doctrine will protect defendants from liability for forward looking statements accompanied by adequate cautionary language only "[if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  *Rombach*, 355 F.3d at 173.  Here, defendants' "warning" that its risk management procedures "*may* leave us exposed to *unidentified or unanticipated risks*, which *could* lead to material losses" (Defs.' Mem. at 34)  does not meet the requirements of the bespeaks caution doctrine.  This purported warning did not alert investors to the billions in capital that DB had sunk into subprime assets while claiming to maintain a prudent relationship between the

- 34 -

capital base and the underlying risks of the business. "The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed. . . . The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) ("*Flag Telecom II*"). Moreover, the bespeaks caution doctrine "only applies to forward-looking statements, and not to misrepresentations of present or historical fact." *Fuwei Films*, 634 F. Supp. 2d at 442. Here, the CAC alleges *existing* facts that were not disclosed.

Even assuming that some of DB's representations regarding its risk management are forward-looking and are properly identified as such in the Offering Materials (they are not), the bespeaks caution doctrine will not immunize defendants from liability for those statements because they (1) lack sufficient cautionary language, and (2) the future risks supposedly cautioned against actually existed at the time of the Offerings. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[16]

Cautionary language is only "meaningful" when it is "'sufficiently specific to render reliance on the false or omitted statement unreasonable.'" *Globalstar*, 2003 WL 22953163, at *8. "General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution." *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary

---

[16]    To the extent defendants are arguing the bespeaks caution or PSLRA safe harbor applies to their material omissions, courts have routinely held that when a defendant omits current, material information, the safe harbor does not apply. *Oxford Health Plans*, 187 F.R.D. at 141 (safe harbor does not apply to omissions that undermine the reliability of financial projections and estimates); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (where defendants "already knew" but did not disclose "that certain risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions").

language "must precisely address the substance of the specific statement or omission that is challenged"). ***The so-called "warnings" which defendants claim immunize them from liability did not mention the Company's mortgage-backed securities or the fact that the Company was failing to properly mark them down***. ¶¶124-128. Like these so-called the "warnings," the "cautionary language that did not expressly warn of, or directly relate to, the risk that Plaintiffs allege brought about their loss . . . cannot trigger the 'bespeaks caution' doctrine and shield Defendants from liability." *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009).

Last, and contrary to the Underwriter Defendants' assertions, the fact that DB's financial statements were never restated and the auditors' opinions were not withdrawn "does not indicate, much less prove, the accuracy of those figures." *Feiner v. SS&C Techs. Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998).[17] Nor does it automatically relieve defendants of liability, because it is ***their*** burden, as an affirmative defense, to demonstrate that they "had no reasonable ground to believe and did not believe . . . that the statements therein were untrue . . . [or] misleading." *See* 15 U.S.C. §77k(b)(3)(C). Indeed, this determination should wait for trial. *See In re WorldCom Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 664 (S.D.N.Y. 2004) ("*WorldCom II*") (addressing underwriters' due diligence and reasonable reliance on audited financial statements as a question of fact); *In re Software Toolworks Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994) (same).[18]

---

[17]    *See also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.").

[18]    Defendants' reliance on *AXIS*, 456 F. Supp. 2d at 587 and *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) is misplaced. *See* Defs.' Mem. at 33. Plaintiffs have not alleged that DB's fourth quarter of 2007 "robust earnings" were accurate. Instead, plaintiffs allege that the inadequate mark-to-market writedowns taken by DB on its mortgage-related

- 36 -

## 2.     The February 2008 Offering Materials Violated IFRS

The financial statements incorporated into the February 2008 Offering also violated IAS 39 because they were based on a material overvaluation of DB's mortgage-backed securities.  ¶140. Contrary to defendants' assertion, plaintiffs explain why the holdings were overvalued at the time of the offering.  ¶¶95, 105-112, 115-119.  For instance, prior to the February 2008 Offering, key indices tracking the market value of nonprime-backed securities and CDOs had already declined sharply due to increased defaults on nonprime loans.  Moreover, many of the country's largest nonprime-mortgage originators had filed for bankruptcy.  ¶¶105, 113.  Indeed, DB's own trading experience revealed the increasing illiquidity (and rapidly declining values) of its CDOs and mortgage-backed securities.  ¶95.

Given these specific facts supporting plaintiffs' allegations of accounting violations, defendants' effort to dismiss them as invoking "professional judgment" should be rejected.  *See* Defs.' Mem. at 35.  Whether plaintiffs have stated a claim for accounting violations is a fact-specific question that usually requires expert testimony and cannot be resolved on a motion to dismiss.  *See, e.g.*, *Burlington Coat Factory*, 114 F.3d at 1421 (whether plaintiffs have alleged accounting violation is a question of fact); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 494 n.30 (S.D.N.Y. 2005) (same).  Taking plaintiffs' allegations as true, the February and May 2008 Offering materials contained material untrue statements and omissions concerning DB's financial results and compliance with IFRS.  *See New Century*, 588 F. Supp. 2d at 1215, 1226-27, 1239 (rejecting argument that misstatements of value of RMBS were judgmental and sustaining §11 claim).

---

positions caused the Company's "robust" earnings figures to be materially overstated.  *See* ¶¶106-120, 126, 128(a)-(b).

### 3.    DB's Statements Regarding Its Proprietary Trading Operations Were Materially False and Misleading

The February 2008 Offering Materials omitted material facts and materially misrepresented DB's risk management policies and the adequacy of the Company's risk management controls necessary to prevent traders from exposing DB to billions of euros in losses.  ¶¶141-152. Throughout 2006 and into 2007, DB's proprietary trading positions increased dramatically and the Company's exposure to losses increased exponentially.  ¶145.  By early 2008, one single proprietary trading group within DB was leveraged as much as 300%, exposing the Company to **$30 billion** in market risk.  *Id.*  This was especially worrisome because the group had taken the extreme-minority position in mid-2007 that that the mortgage crisis was contained – purchasing huge positions in corporate bonds or loans, as well as risky CDSs.  ¶¶103, 145.  Investors would have considered this information, including the lack of risk controls at DB, to be highly material information given the Company's highly leveraged positions, defendants statements of purported risk control expertise, and the importance of risk control to the Company's business, particularly its proprietary trading operations.  Indeed, by May 2008 the market had already experienced "extreme market movements," rendering DB's VaR metric – based on "normal market conditions" – unreliable and false and misleading.  Accordingly, defendants had a duty to either modify their VaR metric to account for the increased market volatility or explicitly state that their VaR was unreliable under the existing market conditions.

Defendants argue they "***did*** disclose that DB engaged in extensive proprietary trading, that this activity came with significant risks and that a significant portion of its revenues was derived from these activities."  *See* Defs.' Mem. at 35-38 (emphasis in original).  But as illustrated in their papers, none of these disclosures quantified the Company's highly leveraged positions or detailed the amount of discretion given to individual DB traders who made big bets on behalf of the

- 38 -

Company using complex financial instruments. *See* ¶¶141-152 (detailing the Las Vegas casino-culture pervading the group in charge of DB's trading). Even when DB finally began disclosing trading-related write-downs to investors, the Company failed to identify the asset types or trading instruments that were effected, and left investors without material information about DB's trading "strategies" and the extent of its exposure to the deteriorating mortgage market. ¶¶152, 174-179.

Despite defendants' assertions, simply disclosing that the Company engaged in "arbitrage" trading is not enough – in this case it was even misleading. *See* Defs.' Mem. at 36. A responsible investor could not appreciate the risks inherent in "arbitrage trading" unless he/she is told the amount the Company is willing to risk (including leverage) to execute that strategy. In order to make an investment decision, an investor needs to know the ***level of risk*** associated with the underlying assets. *Ambac*, 2010 WL 727227, at *28-*29 (Securities Act claims upheld where registration statement contained "no statement disclosing the additional risk imposed by Ambac's guarantees of RMBS and CDOs."). Instead, while individual DB traders were exposing the Company to billions in trading losses, defendants were trumpeting that "we again demonstrated the quality of our risk management," and assuring investors that "[w]e use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits." ¶¶86, 150.

Coupling these representations with vague, boilerplate disclosures regarding "potential losses" does not insulate defendants from liability. *See* Defs.' Mem. at 37-38. As set forth above, cautionary language is only "meaningful" when it is "'sufficiently specific to render reliance on the false or omitted statement unreasonable.'" *Globalstar*, 2003 WL 22953163, at *8. "General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution." *Prudential,* 930 F. Supp. at 72 (cautionary language "must precisely address the substance of the

- 39 -

specific statement or omission that is challenged"). The so-called "risk factors" which defendants claim are prominently disclosed in the Company's 2006 20-F regarding DB's proprietary trading activities simply provide a litany of general risks that *already existed* at the time of the Offering. *See* Defs.' Mem. at 37-38. This is plainly insufficient. Indeed, the cautionary risks relied upon by defendants are those general market risks that may impact "the business and economic environment" of any financial services company.

### E.    The May 2008 Offering Materials Were False and Misleading

By the time of the May 2008 Offering, the U.S. housing and credit markets had collapsed. ¶¶115-120. Despite the fact that the impact of the economic meltdown was foremost on investors minds, as set forth above in III.D.3., DB continued to materially misrepresent and omit crucial information regarding its holdings and proprietary trading of mortgage-backed securities. Moreover, the May 2008 Prospectus contained false and misleading statements concerning the Company's "Value at Risk" measurement and exposure to monocline insurers.

### 1.    The May 2008 Offering Materials Falsely Misrepresented DB's Reported "Value at Risk"

In the 2007 20-F, which was incorporated into the May 2008 Offering Materials, DB stated that its VaR ranged between $43.5 million and $90.5 million during 2007. A company's VaR is a measure of how much risk is in its portfolio, and how large its potential losses can be. ¶161. DB assured investors that any potential loss out side of this VaR disclosure would be "immaterial." ¶162. Despite these assurances, DB suffered equities trading losses of $630 million, almost 700% above its supposed "maximum exposure." *Id*.

Defendants argue that the CAC's claims regarding DB's inaccurate VaR statements should be dismissed because the 2007 20-F contained "meaningful cautionary language" that warned investors that the VaR should be "'viewed in the context of the limitations of the methodology we

use and are therefore not the maximum amounts that we can lose on our market risk positions'" and that its VaR model had underestimated losses during "'extreme events'" in late 2007.  Defs.' Mem. at 41.  This argument ignores the fact that such "cautionary language" is totally meaningless because it failed to state any details about the actual risk of the "methodology."  *Flag Telecom II*, 618 F. Supp. at 321-22 (cautionary language must be specifically address the risk plaintiffs claim was not disclosed).  DB's warning that within "the context of the limitations of the methodology" is meaningless, as the Company never told investors what the "limitations of the methodology" were. Such a warning amounts to no warning at all.  Defs.' Mem. at 38.

Defendants heavy reliance on *CIBC* for the notion that allegations regarding VaR are "non-actionable" is misplaced, as the court in *CIBC* impliedly found defendants' representations concerning VaR were false.  *Id*. at 42.  In *CIBC*, the court found that while "CIBC's VaR metric was *objectively* inaccurate," the plaintiffs had failed to plead that "[d]efendants had the *subjective intent* to defraud."  *CIBC*, 2010 WL 961596, at *11.  As "subjective intent" is not an element of plaintiffs' claims here, such an analysis is irrelevant.

### 2.    DB Materially Misrepresented Its Monoline Exposure

The May 2008 Offering Materials also misrepresented DB's exposure to monoline insurers. ¶¶166-167.  In order to protect itself from the risks associated with many of its CDOs, DB supposedly "hedged" its exposure by purchasing insurance. ¶100.  By 2007, however, these insurers were woefully undercapitalized relative to the hundreds of billions of dollars in CDOs they had insured, leaving them inadequate as a hedge. ¶101.  As the credit markets imploded and the value of the subprime/nonprime assets they insured fell, many monoline insurers could not cover the defaults and ultimately failed.  *Id*.

- 41 -

In the 2007 20-F, DB reported that it had net-counterparty exposure of €1.1 billion to monoline insurers related to its mortgage related assets. ¶166. In fact, however, DB was far more exposed to these failing institutions than it disclosed to investors. In 2008, the Company was forced to mark down €2.2 billion in additional reserves against monoline insurers, and reserved an additional €1.6 billion going forward. ¶167. Defendants' argument that the CAC's allegations equate to simple hindsight pleading once again misstate the allegations. Defs.' Mem. at 42. The fact that defendants wrote down €2.2 billion in monoline exposure in 2008 is not hindsight – it is an admission that their prior statement was false.

Nor does the CAC "miscomprehend" DB's disclosure. *Id*. As alleged in the CAC, DB's failure to adequately disclose its monoline insurer exposure in the 2007 20-F violated IFRS and materially misstated the Company's financial results. ¶¶167-169. Any subsequent disclosure by the Company of additional monoline exposure did not correct the fact that DB's 2007 financials did not comply with applicable accounting regulations, and were therefore presumptively false and misleading. *Citiline Holdings*, 2010 U.S. Dist. LEXIS 29706, at *16 (financial statements that do not comply with applicable accounting standards are presumptively false and misleading).

## F.    Plaintiffs' Claims Asserted in Connection with the May 2007 Offering Are Timely

Contrary to defendants' arguments, the Securities Act claims asserted by Plumbers' Union Local No. 12 Pension Fund ("Plumbers"), a class member and additionally named plaintiff to the instant Action who purchased the 6.55% Trust Preferred Securities issued in the May 2007 Offering, are timely.[19] Defendants incorrectly represent to the Court that Plumbers' Securities Act claims are

---

[19]    Defendants do not challenge the timeliness of plaintiffs' claims related to the other Offerings in the Complaint, including an Offering that ***pre-dates*** the May 2007 Offering. ¶2.

- 42 -

time-barred as they were filed "for the first time on January 25, 2010" in the CAC. Defs.' Mem. at
46. In fact, a complaint filed on **_April 17, 2009_** – just three months after January 14, 2009 disclosure
that defendants admit began the statute of limitations period – alleged that the May 2007 Offering
Documents were false and misleading. *See Gerson v. Deutsche Bank AG*, No. 1:09-cv-03884-DAB
(S.D.N.Y.), Docket No. 1. The *Gerson* complaint was subsequently consolidated with the instant
action. As such, defendants' attempt to foreclose **_all_** claims related to the May 2007 Offering on
statute of limitations grounds is baseless.

Section 13 of the Securities Act provides that claims under §§11 and 12(a)(2) must be
brought within one year "after the discovery of the untrue statement or the omission, or after such
discovery should have been made by the exercise of reasonable diligence . . . [but] [i]n no event . . .
more than three years after the sale." 15 U.S.C. §77m; *see, e.g.*, *Rombach v. Chang*, No. 00 CV
0958 (SJ), 2002 U.S. Dist LEXIS 15754, at *32 (E.D.N.Y. June 7, 2002) (declining to dismiss
Securities Act claims against underwriters on statute of limitations grounds), *aff'd*, 355 F.3d 164 (2d
Cir. 2004). Here, defendants contend that the statute of limitations period began to run on January
14, 2009 to conclude that Plumbers' claims are time-barred.[20] Defs.' Mem. at 46. Defendants are
wrong.

---

[20]    The Complaint alleges that on January 14, 2009, DB announced disappointing fourth quarter
2008 financial results, including a loss after taxes of €4.8 billion, reflecting market conditions that
severely impacted results in the sales and trading businesses "most notably in Credit Trading
including its proprietary trading business, Equity Derivatives and Equities Proprietary Trading."
¶172. Further negative announcements were made by the Company on February 5, 2009 (¶¶173-
177) and on March 23, 2009 (¶178).

### 1.    The Claims Relate Back to the First-Filed Complaint

When a later-filed §11 or §12(a)(2) claim is based on the same registration statement as an earlier filed claim – like the May 2007 Offering – the later-filed claim will relate back to the earlier date for purposes of the statute of limitations.  *See* Fed. R. Civ. P. 15(c) (Relation Back of Amendments); *see also In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 U.S. Dist. LEXIS 34459, at *28 (S.D.N.Y. Mar. 31, 2010) ("[R]elation back is only appropriate in securities actions where the new allegations relate to the same or similar conduct complained of in the original complaint.").  Here, Plumbers' claims alleged in the operative Complaint logically relate back to the *Gerson* complaint filed on April 17, 2009; only three months after the January 14, 2009 disclosure by defendants and well under the one year statute of limitations.  *See* ¶202 ("Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed the complaint.").  Additionally, when consolidating the related actions in August 2009, the Court ordered: "Any other actions now pending **or later filed in this district which arise out of or are related to** the same facts as alleged in the above-identified case shall be consolidated for all purposes, if and when they are brought to the Court's attention."  Order dated Aug. 11, 2009, at 14.[21]

---

[21]    The initial class action complaints, all alleging materially misleading Securities Act claims related to the October 10, 2006 "shelf" Registration Statement and supplemental offerings, were all filed well within the one year statute of limitations period.  *See Zemprelli* complaint filed on February 24, 2009 (No. 09cv1714); *Kaess* complaint, filed on March 19, 2009 (No. 09cv2556); *Bachrach* complaint filed on March 30, 2009 (No. 09cv3075); *Gerson* complaint filed on April 17, 2009 (No. 09cv3884); *Laiti* complaint filed on April 17, 2009 (No. 09cv3889); *Ridge Oak Management* complaint filed on May 1, 2009 (No. 09cv4270).  The cases were consolidated by Order dated August 11, 2009.  *See* Docket No. 19.

In a factually similar case, *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008), the court denied defendants' motion to dismiss finding that the Securities Act claims of a newly named plaintiff in the consolidated amended complaint did not lack standing as plaintiff's claims were not time-barred.  There, the court found that the claims of the additional named plaintiff properly related back to the original complaint which put defendants on notice of any Securities Act claims brought within three years under 15 U.S.C. §77m; *Juniper*, 542 F. Supp. 2d at 1052-53; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455-56 (S.D.N.Y. 2005) ("*Flag Telecom I*") (finding that §12(a)(2) claims of a newly named plaintiff in the amended complaint were filed within three year period allotted under 15 U.S.C. §77m).  Hence, all Securities Act claims related to the May 2007 Offering are timely asserted under §13.  15 U.S.C. §77m.

### 2.    Plaintiffs' Claims Were Tolled Until the Filing of the CAC

The well-established class action tolling doctrine undermines defendants' time-barred arguments rooted in plaintiffs' standing.  *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("the commencement of a class action suspends the applicable statute of limitations as to all asserted class members of the class who would have been parties had the suit been permitted to continue as a class action").  Under the tolling doctrine, the filing of a class action tolls any applicable statute of limitations or statute of repose for all putative members of the potential class when an action is pending, up to the point that the court denies class certification.  *Flag Telecom I*, 352 F. Supp. 2d at 455; *see also Korwek v. Hunt*, 827 F.2d 874, 876-77 (2d Cir. 1987).

Forced to concede the existence of the tolling rule under *American Pipe*, defendants try to convince the Court to reject its application based on scant legal authority that has been rejected in this District as well as other federal courts.  Relying on *In re Colonial Ltd. Partnership Litig.*, 854

F. Supp. 64 (D. Conn. 1994), defendants contend that tolling is foreclosed here because the plaintiff in the initial complaint alleging claims involving the May 2007 Offering (*i.e.*, the *Gerson* complaint) lacked standing as he did not actually purchase securities in the May 2007 Offering. Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss Counts I and II of the Consolidated Amended Complaint ("Underwriter Defs.' Mem.") at 12. Defendants' argument, however, has been rejected as a misapplication of *American Pipe*.

> In *Flag Telecom I*, 352 F. Supp. 2d at 455, the Court disagreed with *Colonial* and opined:
>
> [T]he failure to apply the *American Pipe* rule to cases where a class action was dismissed for lack of standing undermines the policies underlying Rule 23 and is inconsistent with the Court's reasoning in *American Pipe*. Second, the court in *Colonial* cited [the Second Circuit case] *Korwek* to support its assertion that *American Pipe* is inapplicable to cases where the original plaintiff lacked standing to file a class action. However, *Korwek* is silent on this subject and stands only for the proposition that once class certification is denied, putative class members may not rely on the *American Pipe* rule to commence a new, substantially identical class action because this would allow the putative class members to argue and reargue the question of class certification by filing new but repetitive complaints.

*Id.* at 455 n.20. *See also In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 709 (S.D. Tex. 2006) (rejecting argument that doctrine of relation back cannot save Securities Act claims of a newly added plaintiff by acknowledging that class action tolled under *American Pipe*); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285 (GEB), 2002 U.S. Dist. LEXIS 27189, at *91-*93 (D.N.J. June 26, 2002) (rejecting *Colonial* and finding limitations period was tolled upon filing of original class action complaint which allowed proper class representative to be substituted for standing purposes to assert additional claims in amended complaint), *aff'd*, 394 F.3d

- 46 -

126 (3d Cir. 2004).[22]  Tolling is therefore applicable and protects all of plaintiffs' Securities Act

claims related to the May 2007 Offering.

Indeed, since the Lead Plaintiffs are responsible for managing and directing the litigation

under the PSLRA, 15 U.S.C. §78u-4(a)(3)(B), *Global Crossing*, 313 F. Supp. 2d at 204, adding a

named plaintiff prior to class certification is actually expected by courts in the securities class action

context.  As the Second Circuit noted, "because the PSLRA mandates that courts choose a party who

has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in

some cases, the lead plaintiff will not have standing to sue on every claim."  *Hevesi v. Citigroup Inc.*,

366 F.3d 70, 82-83 (2d Cir. 2004) (affirming the lead plaintiff's ability to add named plaintiffs to aid

in representing the class where a lead plaintiff does not have standing to bring every available

claim); *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 438 (S.D.N.Y. 2008) ("the Second Circuit has

held that there is no requirement that a court select as lead plaintiff only a movant with standing to

assert every possible claim against every defendant, nor does the presumptive lead plaintiff fail to

satisfy the typicality prong if he or she cannot assert every possible claim").

Hence, additional plaintiffs, such as Plumbers here, may be added to the litigation prior to

class certification in order to cure any potential deficiencies in class representation.  *See In re Initial*

*Pub. Offering*, 214 F.R.D. 117, 122-23 (S.D.N.Y. 2002) (granting leave to add new named plaintiffs

for purposes of conferring standing prior to class certification); *In re Enron Corp. Sec., Derivative &*

*"ERISA" Litig.,* No. H-01-3624, 2004 U.S. Dist. LEXIS 8158, at *93 (S.D. Tex. Feb. 25, 2004)

---

[22]      In addition to relying on *Colonial*, which was decided prior to the PSLRA, the Underwriter
Defendants rely on two additional cases that did not allege federal securities law violations.  *See*
*Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998) (inmate class action involving due process
claims); *Kruse v. Wells Fargo Home Mortgage, Inc.*, No. 02-CV-3089 (ILG), 2006 WL 1212512
(E.D.N.Y. May 3, 2006) (class action involving violations of RESPA §8).

- 47 -

(granting motion to intervene to confer standing through named plaintiff); *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 670 n.38 (C.D. Cal. 2005) ("Even if none of the presently named plaintiffs has standing to pursue such a claim, however, plaintiffs may seek to add new named plaintiffs in order to assert the claim.").

### G. Plaintiffs Allege Standing to Pursue Their §12(a)(2) Claims Against the Underwriter and the DB Defendants

The Underwriter Defendants and the DB Defendants challenge plaintiffs' statutory standing to assert §12(a)(2) claims. Section 12(a)(2) of the Securities Act imposes liability on any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. §77l(a)(2); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 582 (1995). A defendant can be liable as a "seller" under §12(a)(2) if it "passed title, or other interest in the security, to the buyer for value," or "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).

First, the Underwriter Defendants erroneously argue that plaintiffs lack statutory standing to assert §12(a)(2) claims because they have not identified which plaintiff bought from which Underwriter and have therefore not pled that each Underwriter was a "seller" under §12(a)(2).[23] Underwriter Defs.' Mem. at 14-15. This level of detailed pleading is not required. It is well-established that plaintiffs need not allege a direct purchase from the underwriters against whom they

---

[23]    "In some instances, courts have acknowledged that determining whether a defendant qualifies as a statutory seller under §12(a)(2) is 'a question of fact, not properly decided on a motion to dismiss.'" *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 402 (D. Md. 2004) (quoting *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998).

have brought §12(a)(2) claims. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 283 (S.D.N.Y. 2003) ("Since [plaintiff] purchased its bonds during the [offering], [plaintiff] would have standing to bring a §12(a)(2) claim against any underwriter [in the offering]."). When a plaintiff acquires the securities in the same offerings in which the firm commitment[24] underwriter defendant sells those securities to the public, this is sufficient to establish §12(a)(2) standing because it creates "[a] reasonable inference . . . that plaintiffs acquired their securities from the [exact] [u]nderwriter [d]efendants" they sued. *Scottish Re*, 524 F. Supp. 2d at 399-400; *see also Flag Telecom I*, 352 F. Supp. 2d at 456-57 (plaintiff's allegations that he purchased shares in the IPO in which Citigroup served as lead underwriter were sufficient to state a claim against Citigroup under §12(a)(2)); *Schoenhaut v. Am. Sensors*, 986 F. Supp. 785, 790 n.6 (S.D.N.Y. 1997) ("Plaintiffs need not specify which underwriter sold securities to each plaintiff" to establish "a buyer-seller relationship" sufficient for §12(a)(2) standing) (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715-16 (3d Cir. 1996)).

The Complaint alleges that the defendants sold the securities as part of the six Offerings (¶¶20-33, 46-52), and that plaintiffs acquired the Securities sold as part of those Offerings (¶¶16-19). As in *Scottish Re*, the "Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the

---

[24]     All the offerings were "firm commitment" underwritings, in which the underwriters agree to purchase the shares being offered for the purpose of resale to the public. It is well-established that "[a]s underwriters in a firm commitment underwriting become the owners of any unsold shares, they may be liable as sellers for direct sales to the public." *WorldCom II*, 346 F. Supp. 2d at 659 (denying summary judgment on §12(a)(2) claim against underwriters); *see also Flag Telecom I*, 352 F. Supp. 2d at 456-57 (denying underwriter's motion to dismiss claims involving a firm commitment offering).

Offerings.  A reasonable inference is that plaintiffs acquired their securities from the Underwriter

Defendants."  524 F. Supp. 2d at 400.  No more specificity is required under Rule 8.

Not surprisingly, the DB Defendants hold out the Underwriter Defendants as a shield to

avoid §12(a)(2) liability.  The DB Defendants contend that under the *Pinter* "passed title" test, the

§12(a)(2) claims asserted against them must be dismissed because only the underwriters "passed

title" of securities to investors in offerings.  This is a non-starter – the DB Defendants have conceded

their seller status under §12(a)(2) in the Prospectuses.  In the original October 10, 2006 Registration

Statement, incorporated into each Prospectus, the DB defendants, as signing "Registrants," affirmed

that:

> *regardless of the underwriting method used to sell the securities to the purchaser,*
> *if the securities are offered or sold to such purchaser by means of [the prospectus],*
> *such undersigned Registrant will be a seller to the purchaser and will be*
> *considered to offer or sell such securities to such purchaser.*

Declaration of Lucas F. Olts in Support of Plaintiffs' Consolidated Memorandum of Law in

Opposition to Defendants' Motions to Dismiss ("Olts Decl."), Ex. A at II-4; *see also* ¶57.

Indeed, under §12(a)(2), the term "seller" is "not restricted to those who "pass title," but also

includes """the person "who successfully solicits the purchase, motivated at least in part by a desire

to serve his own financial interests or those of the securities owner.""" *In re APAC Teleservs., Inc.*

*Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *32 (S.D.N.Y. Nov. 19, 1999);

*Scottish Re*, 524 F. Supp. 2d at 399.  Here, the DB Defendants can be liable under §12(a)(2) for

soliciting purchases to serve DB's own financial interests as the entire securitization process was

structured to promote financial gain.[25]

---

[25]    Defendants' reliance upon *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (SHS),
2002 U.S. Dist. LEXIS 2627, at *13-*15 (S.D.N.Y. Feb. 20, 2002), is misplaced.  There, the court

Moreover, the allegations in the Complaint directly contradict the assertion that the DB Defendants did not actively participate in the Offerings. Defs.' Mem. at 45. The DB Defendants played an important role in marketing and selling the Securities and were more than merely "collateral" participants. *Pinter*, 486 U.S. at 651.[26] For example, DB was the Registrant for all the Offerings, and created the DB Trust Defendants and LLC Defendants *for the sole purpose of issuing the Securities and obtaining those proceeds*. ¶¶20-33, 192. Defendants also sold and assisted in the sale of the Securities to plaintiffs and other members of the Class. ¶207.

But plaintiffs are not required to allege "privity." Defs.' Mem. at 45. A "seller" is not limited to the underwriter who transferred titled in the securities to a plaintiff, but includes "other persons, not in privity, who 'solicited the sales in question for financial gain.'" *Scottish Re*, 524 F. Supp. 2d at 399 (quoting *Wilson*, 872 F.2d at 1126-27 (distinguishing the sale of securities for personal gain from ministerial tasks performed by attorneys)); *see also Capri v. Murphy*, 856 F.2d

---

granted a motion to dismiss a §12(a)(2) claim against a group of minority shareholders, not the issuing entity. *See also Credit Suisse First Boston Corp. v. Arm Fin. Group*, No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001) (court granted motion to dismiss §12(a)(2) claim against individual defendant officers and directors, not the issuing entity); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *5, *20-*24 (S.D.N.Y. Sept. 19, 2001) (dismissing §12(a) claims against the parent company, not the company that issued the certificates); *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 723 (S.D.N.Y. Sept. 20, 1990) (on a motion for summary judgment, after extensive fact discovery, the court found that an individual defendant, who was an agent for an insurance company that was a collateral participant in an offering, was not liable under §12(a)(2)).

[26]    *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126-27 (2d Cir. 1989) (refusing to extend §12(a)(2) liability to issuing company's attorney); *see also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229-30 (S.D.N.Y. 1999) (upholding §12(a)(2) claims against issuer); *cf. Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696 (LMM) (FM), 2003 U.S. Dist. LEXIS 1446, at *8-*10 (S.D.N.Y. Feb. 3, 2003) (liability of the issuing trust defendant was not even disputed and the court upheld claims against other collateral participants in an initial public offering).

- 51 -

473, 478 (2d Cir. 1988) (a defendant may be liable where significant involvement in the solicitation is found).

Finally, the Underwriter Defendants and the DB Defendants collectively argue that the §12(a)(2) claims should be dismissed because plaintiffs have not properly alleged that they purchased the Securities in the Offerings rather than the aftermarket. At the pleading stage, however, plaintiffs needs only allege that they purchased their securities pursuant or traceable to the Offering Documents. ¶¶16-19; *see Giant Interactive*, 643 F. Supp. 2d at 574; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d Cir. 2006). As one court in this District recently noted, §12(a)(2) "'draws no express distinction between shares purchased in the initial distribution and shares purchased in the aftermarket,' but instead requires only that 'a plaintiff have purchased a security, from a seller, pursuant to a misleading prospectus.'" *Giant Interactive*, 643 F. Supp. 2d at 574 (quoting *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 252 (D. Conn. 1999)). "To the extent that shares . . . were purchased in the aftermarket from the Underwriter Defendants acting as dealers who had an obligation to distribute a prospectus, Section 12(a)(2) liability could attach." *Id.* Thus, plaintiffs' allegations are sufficient.

### H.    Plaintiffs Allege a Violation of Section 15 Against the DB Defendants

The Complaint pleads a claim for control person liability under §15 of the Securities Act by alleging both a primary violation of the Securities Act and that the DB Defendants controlled the primary violators. *See* 15 U.S.C. §77o. To plead control, a plaintiff need only allege that the defendant "'possessed the "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."'" *Refco*, 503 F. Supp. 2d at 640. Control allegations are governed by Rule 8(a), and "'[w]hether a person is a

"controlling person" is a fact-intensive inquiry, and generally should not be resolved on motion to dismiss.'" *Scottish Re*, 524 F. Supp. 2d at 401.

Contrary to defendants' contention (Defs.' Mem. at 47-48), a "plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15." *Scottish Re*, 524 F. Supp. 2d at 387. *See also In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288 (DLC), 2005 U.S. Dist. LEXIS 4193, at *43 (S.D.N.Y. Mar. 21, 2005) (plaintiff need not prove culpable participation as there is no scienter requirement in §15).[27]  Indeed, as numerous courts have recognized, it simply does not make sense to require culpable participation for §15 claims when the predicate offense – a §11 claim – does not require culpable conduct but is instead grounded in strict liability.  *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (listing authorities in accord).

There can be no question that each of the DB-owned entities was controlled by DB.  The Company created and controlled the Trust Defendants and the LLC defendants for the sole purpose of issuing the Securities.  *See Dietrich v. Bauer*, 76 F. Supp. 2d 312, 333, 335 (S.D.N.Y. 1999) ("owner" is a "'position[] from which control can be directly inferred without more'").  The Trust Defendants – like the LLC Defendants – have their principal place of business at DB's U.S. corporate headquarters in New York, New York.  ¶¶21-32.  The DB Trusts and LLCs have no assets

---

[27]     Defendants cite to cases that are entirely distinguishable from the facts and claims alleged here.  *See* Defs.' Mem. at 47-48.  For example, in *P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 874 (S.D.N.Y. 2001), the court held that "nowhere is it alleged that [the sole dismissed officer] . . . was involved in the oral misrepresentations" in the context of §15 claims where the primary offense came only under §§5 and 12(a)(2).  By contrast, the Complaint here alleges that each of the Individual Defendants were directors and/or officers at the time of an Offering and signed one or more of the false and misleading Registration Statements and Prospectuses.  *See also DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (dismissing a §15 claim where the underlying Securities Act claims were dismissed), *aff'd*, 318 F.3d 170 (2d Cir. 2003).

other than the Securities issued by DB. *Id.* The Registration Statements for the Offerings were issued both by DB and the Trusts Defendants, and incorporated by reference DB's Form 20-Fs and 6-Ks. Further, the Prospectuses stated that, "as the holder of the Trust Common Security [only DB] will have the right to appoint, remove or replace any of the Trustees." *See, e.g.*, Olts Decl., Ex. B at 21.

As to the Individual Defendants, each of the them were directors and/or officers at the time of an Offering, and signed one or more of the false and misleading Registration Statements. ¶¶34-44. This alleges more than mere status (Defs.' Mem. at 45) since these defendants had the power to control and approve the disclosures made in the Offerings. *See Refco*, 503 F. Supp. 2d at 638 ("'It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'").

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs respectfully request this Court deny defendants' motions to dismiss in their entirety. Should this Court perceive any portion of the Complaint to be deficient, plaintiffs respectfully request leave to amend the Complaint and cure such perceived deficiencies. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

DATED:  May 10, 2010                          Respectfully submitted,

                                              ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              ANDREW J. BROWN
                                              LUCAS F. OLTS
                                              ERIC I. NIEHAUS


                                              _____
                                                    s/ANDREW J. BROWN
                                                   ANDREW J. BROWN

- 54 -

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)

Co-Lead Counsel for Plaintiffs

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: 212/682-1818
212/682-1892 (fax)

Co-Lead Counsel for Plaintiffs

- 55 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 10, 2010.

s/ ANDREW J. BROWN
ANDREW J. BROWN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:andrewb@rgrdlaw.com

# Mailing Information for a Case 1:09-cv-01714-DAB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Lee Albert**
  lalbert@murrayfrank.com

- **Andrew J. Brown**
  andrewb@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Deborah R Gross**
  debbie@bernardmgross.com

- **Eva Hromadkova**
  evah@murrayfrank.com

- **David George Januszewski**
  djanuszewski@cahill.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Matthew Montgomery**
  mattm@csgrr.com

- **Brian Philip Murray**
  bmurray@murrayfrank.com

- **Scott D. Musoff**
  smusoff@skadden.com

- **Eric I. Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Darren J. Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

**Harry J. Weiss**
450 Fifth Street, N.W.
Mail Stop 4-2
Washington, DC 20549