UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ─────────────────── x | | |
| In re DEUTSCHE BANK AG SECURITIES LITIGATION | : | Master File No. 1:09-cv-01714-DAB |
| ─────────────────── | : : | CLASS ACTION |
| This Document Relates To: | : : : | THIRD CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | : : : | |
| ─────────────────── x | : | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all persons who purchased or acquired securities issued by Deutsche Bank AG ("DB" or the "Company") pursuant or traceable to the registration statement, prospectus and prospectus supplements (referred to collectively as the "Offering Materials") set forth hereafter.   The Offering Materials used to sell $5.4 billion of preferred securities were false and/or misleading in violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o.  This action is brought against DB, its senior insiders and the investment banks that underwrote the Offerings (collectively, "defendants").

2.      On or about October 10, 2006, DB filed with the Securities and Exchange Commission ("SEC") a Form F-3 Registration Statement and Prospectus (the "Registration Statement") utilizing a "shelf" registration process which allowed defendants to sell, from time to time, any combination of securities described in the prospectus.  Subsequently, between May 2007 and May 2008, DB conducted five offerings of preferred securities (collectively the "Offerings"), and filed, pursuant to Rule 424(b)(2) of the Securities Act, prospectus supplements to the Registration Statement.  The five offerings raised over $5.4 billion of Tier 1 capital from plaintiffs and the class via the sale of 224 million shares of the preferred securities at a price of $25 per share as follows:

758080_2

| Offering | Date Filed | Total Proceeds (Including over Allotment) | SEC Filings Incorporated by Reference[1] |
|---|---|---|---|
| 6.55% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | May 16, 2007 | $800 million | 4/20/07 6-K; 5/8/07 6-K; 2006 20-F |
| 6.625% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust IX | July 16, 2007 | $1 billion | 4/20/07 6-K; 5/8/07 6-K; 2006 20-F |
| 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X | November 6, 2007 | $805 million | 4/20/07 6-K; 8/2/07 6-K & 6-K/A; 8/13/07 6-K; 11/1/07 6-K; 2006 20-F |
| 7.60% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III | February 14, 2008 | $1.75 billion | 4/20/07 6-K; 8/2/07 6-K & 6-K/A; 8/13/07 6-K; 11/1/07 6-K; 2/7/08 6-K; 2006 20-F |
| 8.05% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | May 5, 2008 | $1.1 billion | 4/29/08 6-K; 2006 20-F; 2007 20-F |

3.     The securities were sold pursuant to materially, objectively and subjectively false and misleading Offering Materials which, in violation of Generally Accepted Accounting Principles ("GAAP"), SEC regulations and International Financial Reporting Standards ("IFRS"), misrepresented or omitted material facts, including: (i) that DB had as much as €20 billion in exposure to high-risk subprime and nonprime residential mortgage markets through residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") assets; (ii) that the Company's disclosures concerning market risks and credit risks misrepresented DB's true

---

[1]     The Form 6-K is similar to the Form 10-Q, and the Form 20-F is similar to the Form 10-K used by U.S. companies.

exposure to RMBS/CDOs and other mortgage-related assets; (iii) that, as detailed in two U.S. Government reports on the financial crisis, the value of DB's RMBS and CDO assets was collapsing, those assets were "pigs" and "crap" because the mortgages underlying the securities were far riskier than DB had represented, and DB's Executive Committee had approved a $5 billion bet against the mortgage market; (iv) that the Company's assertions concerning its compliance with GAAP were false and misleading as DB's 2006 Form 20-F did ***not*** comply with GAAP; (v) that the Company was engaged in high-risk proprietary trading, *i.e*., gambling on the Company's own account using huge, undisclosed leverage; and (vi) that the Company's 2007 Form 20-F disclosures failed to reflect the actual risks in DB's reported Value at Risk ("VaR") metric.

## INTRODUCTION

4.      Between 2005 and 2007, DB significantly increased its involvement in structuring, trading and investing in highly risky RMBS and CDOs backed by U.S. residential subprime and nonprime ("Alt-A") mortgages.  During this period, the Individual Defendants caused the Company to acquire billions of dollars in these highly risky securities.

5.      Subprime and Alt-A (nonprime) RMBS are securities backed by residential mortgages extended to borrowers who do not qualify for standard loans, and therefore are inherently more risky than RMBS backed by conforming loans.  DB's portfolio of subprime and Alt-A RMBS and CDOs was made riskier still by the fact that a significant amount of these RMBS/CDOs were comprised of "option ARM" and negative amortization ("NegAm") loans – loans that allowed borrowers to pay low monthly payments for a period of time before payments increased dramatically, often forcing borrowers to default.

6.      The value of DB's subprime and Alt-A RMBS/CDO portfolios was directly tied to the strength of the U.S. housing market.  When housing prices began to stall and interest rates began

- 3 -

to rise in early 2006, homeowners who over-extended themselves and those with poor credit and unstable income began to default on their loans.  Default rates began to rise dramatically throughout 2006 and accelerated into 2007, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

7.     The Offering Materials were objectively and subjectively materially false and misleading, in that they misrepresented and/or omitted material facts regarding the Company's significant exposure to RMBS/CDO securities and other mortgage-related assets, in violation of GAAP, SEC regulations and later IFRS.  For example, in spite of the historic collapse of the U.S. housing and mortgage markets, defendants omitted in the Offering Materials used in connection with the first four offerings (May 2007, July 2007, November 2007 and February 2008) that: (i) DB was holding more than $20 billion of these high-risk securities; (ii) DB's position included RMBS and CDOs backed by some of the very riskiest mortgages with the highest rates of default; and (iii) the financial and the liquidity risks those securities posed to the Company, including the huge losses DB was suffering throughout 2007 which totaled $4.5 billion in losses on its mortgage-backed securities in 2007 alone.

8.     The Offering Materials also omitted the significant risks inherent in DB's highly leveraged "proprietary trading" operations.   While defendants were exposing the Company to billions in potential trading losses, defendants were publicly characterizing the Company's risk controls as, among other things, "highly sophisticated" and "industry leading."  Even as late as 2008, defendant Josef Ackerman (Chairman of DB's Management Board) continued to represent that "we again demonstrated the quality of our risk management.  We had no net write-downs related to sub-

prime, CDO or RMBS exposures.  Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter."

9.      Defendants' misrepresentation of DB's risk management policies and controls and omission of the true extent of the risks facing the Company was both material and false and misleading as the Company lacked meaningful risk controls, permitting DB traders to expose the Company to billions of euros in losses.

10.     Defendants were aware that their representations and omissions in the Offering Materials regarding their valuation of DB's mortgage-backed assets and VaR metrics rendered their statements false and misleading.  Defendants' knowledge of the poor quality of their mortgage-related assets has been detailed by recent government investigations and reports into DB's role in the collapse of the mortgage market.   On April 13, 2011 the United States Senate Permanent Subcommittee on Investigations (the "Subcommittee") issued a report entitled, "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse" (the "Levin Coburn Report"), which was "the product of a two-year, bipartisan investigation by the [Subcommittee] into the origins of the 2008 financial crisis" and based upon tens of millions of pages of documents, 150 interviews and depositions, and consultation with "dozens of government, academic, and private sector experts." Levin Coburn Report at 1.

11.     The Levin Coburn Report details defendants' knowledge that – before the first Offering in May 2007 – (i) the mortgage-backed securities market was in a state of collapsing and would continue to fall; (ii) DB was determined to build a massive hedge position against RMBS and CDOs; and (iii) the bank was in the process of dumping many of its own "long" mortgage assets before the music stopped because of the risk those assets posed to the Company.

12.     Starting in 2004, DB became a global leader in the creation and structuring of CDOs and RMBS.  Levin Coburn Report at 333-35.  DB structured and issued 15 new CDOs securitizing nearly $11.5 billion of primarily mortgage related assets between December 2006 and December 2007.  *Id*.  As the mortgage-market slowed in 2006, DB was forced to retain more and more of the riskiest portions of the mortgage-backed securities it created on its own books.  *Id*.  By 2007, DB had a long position in mortgage related holdings with a face value of about $128 billion and a market value of more than $25 billion.  *Id.* at 346.

13.     DB knew, however, that the ***value*** of these mortgage-backed securities was in the process of collapse.  Gregg Lippmann, the global head of DB's CDO, asset-backed securities ("ABS"), and ABS Correlation Trading Desks described the CDO business in 2006 as a "Ponzi scheme," and described RMBS as "***pigs***," "***horrible***," "***crap***,"  "***crap we shorted***," and that the securities "blow."  Levin Coburn Report at 10-11, 319, 330-36, 338-40, 347, 359-62.  Lippmann specifically targeted RMBS created by DB's subsidiary, ACE Securities, Inc. ("ACE"), saying in a September 21, 2006 e-mail that "'***ace is generally horrible***,'" and "***Lippmann confirmed to the [Senate] Subcommittee that he believed ACE was 'horrible*.'"  *Id.* at 339 n.1283, 360 n.1409.

14.     Prior to the Offerings, DB used its inside knowledge to attempt to rid itself of the economic risk of these defective assets by building a massive hedge against the very securities it was creating, and began unloading deteriorating RMBS and CDO positions from its own books into CDOs that it was arranging for its customers.  As confirmed by the Levin Coburn Report, by the end of 2005, DB had already purchased $1 billion worth of credit-default swaps ("CDS") protection on mortgage-backed securities.  CDS are "short" bets – similar to insurance contracts – that pay off when investments like RMBS decline in value.  During 2006, DB grew its short position against

mortgage-backed securities to $2 billion.  And by early 2007, DB had ballooned its CDS short position on mortgage securities over $5 billion.

15.     The Levin Coburn Report also confirmed DB's senior management knew of and approved the bank's massive short position. In early March 2007 (before the first Offering), "as the ABX Index showed subprime RMBS securities losing value and subprime mortgages continued incurring delinquencies at record rates," *Lippmann personally attended a meeting of DB's Executive Committee in London* to discuss the bank's risk exposure in mortgage-related securities. Levin Coburn Report at 345.  After Lippmann's presentation, DB's Executive Committee approved his $5 billion short position against the mortgage market.  But Lippmann's CDS "short" was not the only effort DB used to unload its own RMBS and CDO risk.  When asked why its large long position in mortgage holdings did not lose more value, "Deutsche Bank told the Subcommittee that [in 2007] it *had placed large hedges, using U.S. Treasury bonds, which reduced its losses*." *Id.* at 346.  "Deutsche Bank told the Subcommittee that, despite the size of these holdings and their declining value" of the mortgage-backed securities market, *DB lost "about $4.5 billion on those mortgage related holdings for [2007]*." *Id.*  This loss was not disclosed in the Offering Materials.

16.     The Financial Crisis Inquiry Commission ("FCIC"), released written materials and testimony in September 2010 (the "FCIC Report") demonstrating that DB knew the mortgage-backed securities it held and were selling to clients were far less valuable than DB represented.[2]  The

---

[2]     The FCIC was created to "examine the causes, domestic and global, of the current financial and economic crisis in the United States."  The Commission was established as part of the Fraud Enforcement and Recovery Act (Public Law No. 111-21) passed by the United States Congress and signed by the President in May 2009.  This independent, ten-member panel was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking and consumer protection.  Six members of the Commission were appointed by the Democratic leadership of Congress and four by the Republican leadership.  The FCIC's statutory instructions set

FCIC's evidence revealed DB was well aware of the systematic abandonment of underwriting guidelines by loan originators, that DB actively participated in the creation of the defective loans, and that DB had knowingly included defective loans in the mortgage-backed securities while intentionally misrepresenting the nature of the loans.

17.     As disclosed in the FCIC Report, DB knew that the mortgage-backed securities it was creating did not meet underwriting criteria (and thus were much riskier than their credit ratings suggested) because by 2006 DB hired an outside due diligence vendor named Clayton Holdings, Inc. ("Clayton") to conduct an independent third-party review of samples of the loans that would be included in its RMBS.  Clayton was hired to determine if the loans complied with the underwriting guidelines stated in the SEC filings and examine the validity of the appraisals/valuations used to support the loans.  According to the FCIC, after testing samples of the loans, Clayton informed DB that nearly 35% of the tested loans did not meet the stated underwriting guidelines and/or were supported by falsely inflated appraisals/valuations.  Thus, DB was expressly informed by both its vendor and by its own due diligence that by 2007 large percentages of the loans did not comply with the underwriting guidelines. *Instead, defendants put half of those defective loans into DB's RMBS while falsely representing that the loans complied with the stated underwriting guidelines*.  Even worse, the 35% defect rates on the test samples informed DB that there were large numbers of defective loans in the remainder of the even larger, untested population of loans.  Defendants used this negative information for their own profit – negotiating lower prices on the defective loans they bought from their originator clients, and then dumping those defective loans into the RMBS.

out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the United States government.  http://fcic.law.stanford.edu/about/history (last visited Oct. 14, 2015).

758080_2

18.     The Levin Coburn Report summarizes the overwhelming evidence that defendants knowingly created highly risky mortgage-backed securities that did not comply with the stated underwriting guidelines: "***Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world***."  Levin Coburn Report at 11.

19.     While DB realized the CDOs and RMBS its was selling and retaining on its books were "crap" and would ultimately lose value, DB also wanted to keep making money from the fees it received in structuring mortgage-backed deals for as long as possible.  In a 2006 e-mail, Lippmann wrote: "Why have we done this?  It is not without reluctance and ***we are looking for ways to get out of this risk***, but for now the view has been, ***we like the fees and the league table credit (and dammit we have a budget to make)***."  When asked what he meant by saying "we have a budget to make," Lippmann explained to the Subcommittee that new CDO deals had to be completed continuously to produce the revenues needed to support the budgets of the CDO desks and departments involved with their creation.  The head of DB's CDO Group, Michael Lamont, sent an e-mail acknowledging the risk the bank took on by purchasing the earlier unsold securities, but also noting the "nice" fee being paid to the bank: "[T]hat is part of the risk we took when we were awarded the mandate and we are still making a nice all in fee."  As the Levin Coburn Report concluded:

> Because the fees charged to design and market CDOs were in the range of $5 to $10 million per CDO, investment banks had strong incentives to continue issuing CDOs despite increasing risks and waning investor interest, since reduced CDO activity meant less revenues for structured finance units and even the disappearance of CDO departments and trading desks, which is eventually what occurred.

Levin Coburn Report at 333.

- 9 -

20.     Despite this knowledge, defendants failed to disclose DB's true exposure to the mortgage-backed securities to investors, and knowingly omitted and/or misrepresented the size of its losses and value of those securities.

21.     DB's trading portfolio was so toxic that DB was forced to announce on January 14, 2009 that the firm anticipated a loss after taxes of *€4.8 billion* for fiscal 2008 fourth quarter, driven by *€4.8 billion* in losses in the Company's sales and trading businesses: Credit Trading, Equity Derivatives and Equity Proprietary Trading.  On February 5, 2009, the Company further announced *its first annual net loss since World War II of €5.7 billion for fiscal 2008*.  The deterioration of DB's mortgage-related assets also contributed to the Company's historic 2008 losses.  For the full fiscal year, the Company recorded *€5.3 billion* in write-downs on debt securities and other mortgage-related products, including leveraged loans and loan commitments, RMBS/CDOs, monoline insurers, and commercial real estate.

22.     By November 12, 2008, DB's mortgage-backed securities losses were more than $11 billion.

23.     Each of the securities was purchased in connection with the initial Offerings at $25 per share.  By February 24, 2009, the date that the initial lawsuit in this litigation was commenced, the value of the 6.55% Securities was $8.00 per share, 68% below when they were sold, the 6.625% Securities was $7.98 per share, the 7.35% Securities was $8.35 per share, the 7.60% Securities was $8.99 per share, and the 8.05% Securities was $11.20 per share.  Plaintiffs have suffered billions of dollars of damages as a result of defendants' misconduct.

### JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

- 10 -

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22(a) of the Securities Act, 15 U.S.C. §77v(a).

26.     Venue is proper in this Judicial District pursuant to §22(a) of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b), because many of the alleged acts, transactions, and conduct constituting violations of law, including the issuance and dissemination of materially false and misleading information to the investing public, occurred, at least in part, in this District. Additionally, defendants reside, maintain their headquarters, or conduct substantial business in this District.

27.     In connection with the acts, conduct, and other wrongs alleged in this Second Consolidated Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiffs**

28.     Lead Plaintiff Belmont Holdings Corp. ("Belmont") acquired or purchased 400,000 of the 7.60% securities on February 14, 2008 at a price of $25 per share and 400,000 of the 8.05% securities on May 5, 2008 at a price of $25 per share, as set forth in the Certification filed with the Court on April 20, 2009.  Both securities were issued and acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for each Offering.  Belmont was appointed Lead Plaintiff by Order on November 24, 2009.

29.     Lead Plaintiffs Norbert G. Kaess ("Kaess") and Maria G. Farruggio ("Farruggio") acquired or purchased 12,000 of the 6.625% securities on July 13, 2007 at a price of $25 per share and 7,000 of the 7.35% securities on November 7, 2007 at a price of $25 per share, as set forth in the

- 11 -

Certification filed with the Court on March 17, 2009.  Both securities were issued and acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for each Offering.  Kaess and Farruggio were appointed Lead Plaintiffs by Order on November 24, 2009.

30.     Plaintiff Plumbers' Union Local No. 12 Pension Fund acquired or purchased 1,800 shares of the 6.55% securities on May 16, 2007 at a price of $25 per share. These securities were issued and acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for the Offering.

**The Company Defendants**

31.     Defendant DB is a global financial services firm with its principal executive offices in Frankfurt am Main, Germany.  The Company's businesses offer a variety of products and services to private individuals, corporate entities and institutional clients throughout the world.  DB is the Registrant of the false and misleading Registration Statement and Prospectuses, and created the entities listed below for the purposes of issuing the securities.

32.     Defendant Deutsche Bank Contingent Capital Trust II ("DB Trust II") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust II was formed by DB for the purpose of issuing the 6.55% Securities.  DB Trust II used the proceeds from the May 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC II.

33.     Defendant Deutsche Bank Contingent Capital LLC II ("DB Capital LLC II") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC II, a sponsor of DB Trust II, issued and sold the 6.55% Securities to DB Trust II, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC II to DB.

- 12 -

34.     Defendant Deutsche Bank Capital Funding Trust IX ("DB Trust IX") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust IX was formed by DB for the purpose of issuing 6.625% Securities.  DB Trust IX used the proceeds from the July 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Capital Funding LLC IX.

35.     Defendant Deutsche Bank Capital Funding LLC IX ("DB Capital LLC IX") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC IX issued and sold the 6.625% Securities to DB Trust IX, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC IX to DB.

36.     Defendant Deutsche Bank Capital Funding Trust X ("DB Trust X") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust X was formed by DB for the purpose of issuing 7.35% Securities.  DB Trust X used the proceeds from the November 2007 offering to buy the Class B preferred securities issued by Deutsche Bank Capital Funding LLC X.

37.     Defendant Deutsche Bank Capital Funding LLC X ("DB Capital LLC X") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC X issued and sold the 7.35% Securities to DB Trust X, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC X to DB.

38.     Defendant Deutsche Bank Contingent Capital Trust III ("DB Trust III") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust III was formed by DB for the purpose of issuing the 7.60% Securities.  DB Trust III used the proceeds from the February 2008 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC III.

- 13 -

39.     Defendant Deutsche Bank Contingent Capital LLC III ("DB Capital LLC III") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital LLC III issued and sold the 7.60% Securities to DB Trust III, and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital LLC III to DB.

40.     Defendant Deutsche Bank Contingent Capital Trust V ("DB Trust V") is a Delaware statutory trust with its principal offices in New York, New York.  DB Trust V was formed by DB for the purpose of issuing the 8.05% Securities.  DB Trust V used the proceeds from the May 2008 offering to buy the Class B preferred securities issued by Deutsche Bank Contingent Capital LLC V.

41.     Defendant Deutsche Bank Contingent Capital LLC V ("DB Capital LLC V") is a Delaware limited liability company with its principal offices in New York, New York.  DB Capital V issued and sold the 8.05% Securities to DB Trust V, issued and sold one Class A preferred security to DB, and issued and sold one common security representing a limited liability company interest in DB Capital V to DB.

42.     DB Trust II, DB Trust IX, DB Trust X, DB Trust III and DB Trust V are referred to herein as the "Trust Defendants."  DB Capital LLC II, DB Capital LLC IX, DB Capital LLC X, DB Capital LLC III and DB Capital LLC V are referred to herein as the "LLC Defendants."

**Individual Defendants**

43.     Defendant Josef Ackermann ("Ackermann") was, at all relevant times, Chairman of the Management Board of DB.  Ackermann signed the materially false and misleading October 2006

and July 2007[3] Registration Statements, and the Company's 2006 and 2007 Form 20-Fs.

44.     Defendant Anthony Di Iorio ("Di Iorio") was, at all relevant times, Chief Financial Officer ("CFO") and a member of the Management Board of DB.  Di Iorio retired in September 2008.  Di Iorio signed the materially false and misleading October 2006 and July 2007 Registration Statements, and the Company's 2006 and 2007 Form 20-Fs.

45.     Defendant Hugo Banziger ("Banziger") was, at all relevant times, Chief Risk Officer and a member of the Management Board of DB.  Banziger signed the materially false and misleading October 2006 and July 2007 Registration Statements.

46.     Defendant Hermann-Josef Lamberti ("Lamberti") was, at all relevant times, Chief Operating Officer ("COO") and a member of the Management Board of DB.  Lamberti signed the materially false and misleading October 2006 and July 2007 Registration Statements.

47.     Defendant Martin Edelmann ("Edelmann") was, at all relevant times, a Managing Director of DB.  Edelmann signed the materially false and misleading October 2006 and July 2007 Registration Statements.

48.     Defendant Peter Sturzinger ("Sturzinger") was, at all relevant times, DB's Authorized Representative in the United States for DB.  Sturzinger signed the materially false and misleading October 2006 and July 2007 Registration Statements.

49.     Defendant Marco Zimmermann ("Zimmermann") was, at all relevant times, Vice President of DB, DB Trust IX, and DB Trust X.  Zimmermann signed the materially false and

---

[3]     DB's July 2007 Registration Statement was simply an amendment to add two registrants (DB Capital Funding LLC IX and DB Capital Funding Trust IX) to its October 2006 Registration Statement.

misleading October 2006 and July 2007 Registration Statements.  Zimmermann also signed the May

2007, November 2007, February 2008 and May 2008 Form 8-A Registration Statements.

50.     Defendant Rainer Rauleder ("Rauleder") was, at all relevant times, Global Head of

Capital Management & Treasurer Europe DB and DB Trust IX.  Rauleder signed the false and

misleading October 2006 and July 2007 Registration Statements.

51.     Defendant Jonathan Blake ("Blake") was, at all relevant times, a director of DB.

Blake signed the false and misleading July 2007 Registration Statement.  Blake also signed the

November 2007, February 2008 and May 2008 Form 8-A Registration Statements.

52.     Defendants named above in ¶¶43-51 are referred to herein as the "Individual

Defendants."

**Underwriter Defendants**

53.     Defendant Deutsche Bank Securities Inc. ("DB Securities") is the investment banking

arm of DB.  DB Securities acted as an underwriter in connection with all of the Offerings.

54.     Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and

securities arm of UBS Investment Bank.  UBS Investment Bank provides a range of financial

products and services worldwide.  UBS acted as an underwriter in connection with the July 2007,

November 2007, February 2008 and May 2008 Offerings.

55.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial

services institution that through subsidiaries and divisions provides commercial and investment

banking services, commercial loans to corporate entities, and acts as underwriter in the sale of

corporate securities.  Citigroup acted as an underwriter in connection with the July 2007, November

2007, February 2008 and May 2008 Offerings.

56.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a wholly owned subsidiary of Merrill Lynch & Co. and acted as underwriter in the sale of corporate securities.  In January 2009, Merrill Lynch & Company became a wholly owned subsidiary of Bank of America Corporation.  Merrill Lynch acted as an underwriter in connection with the July 2007, November 2007, February 2008 and May 2008 Offerings.

57.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing.  It also offers real estate financing, risk management services, and structured products such as asset-backed and mortgage-backed securities.  Wachovia Capital acted as an underwriter in connection with the July 2007, November 2007, February 2008 and May 2008 Offerings.

58.     Defendant Morgan Stanley & Co. ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions, and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley acted as an underwriter in connection with the July 2007, November 2007, February 2008 and May 2008 Offerings.

59.     Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America.  Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts,

and mergers and acquisitions.  Banc of America acted as an underwriter in connection with the July

2007, November 2007, February 2008 and May 2008 Offerings.

60.     Defendants referenced in ¶¶53-59 above are referred to herein as the "Underwriter

Defendants."

61.     Each of the Individual Defendants and each of the Underwriter Defendants

participated in the drafting, preparation, or approval of various materially false and misleading

statements contained in the Offering Documents, as complained of herein.  Each of the defendants

was responsible for ensuring the truth and accuracy of the statements contained in these documents.

62.     Each of the defendants owed to the purchasers, including plaintiffs and the Class, the

duty to make a reasonable and diligent investigation of the statements contained in the Offering

Documents at the time of the Offerings.  This duty included performing an appropriate investigation

to ensure that the statements contained therein were true, and that there were no omissions of

material fact required to be stated in order to make the statements contained therein not misleading.

As herein alleged, each of the defendants violated these specific duties and obligations.  The

Underwriter Defendants are liable for the materially false and misleading statements in the Offering

Documents.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated

the Offering Documents and were paid fees in connection therewith.  The Underwriter Defendants'

failure to conduct an adequate due diligence investigation was a substantial factor leading to the

harm complained of herein.

### THE MATERIALLY, OBJECTIVELY AND SUBJECTIVELY FALSE AND MISLEADING REGISTRATION STATEMENT, PROSPECTUS AND PROSPECTUS SUPPLEMENTS

63.     On October 10, 2006, DB filed an SEC Form F-3 Registration Statement and

Prospectus, signed by defendants Ackerman, Di Iorio, Banziger, Lamberti, Edelmann, Sturzinger

and Zimmermann.  By utilizing a "shelf" registration, or continuing offering process, DB was

entitled to sell any combination of securities described in the prospectus by issuing future prospectus

supplements.  More specifically, the Registration Statement and Prospectus stated:

> This prospectus is part of a registration statement on Form F-3 that we filed with the Securities and Exchange Commission utilizing a "shelf" registration process.  Under this shelf registration process, we may from time to time sell any combination of the securities described in the prospectus in one or more offerings. . . . [this prospectus] provides you with a general description of the securities we may offer. Each time we sell securities we will provide one or more prospectus supplements that will contain specific information about the terms of the offering.

64.     The Registration Statement also contained the following statement from KPMG:

Consent of Independent Registered Public Accounting Firm

To the Supervisory Board of Deutsche Bank Aktiengesellschaft:

We consent to the incorporation by reference in the Registration Statement as filed with the Securities and Exchange Commission on October 10, 2006 of Deutsche Bank Aktiengesellschaft, Deutsche Bank Capital Funding LLC VIII and Deutsche Bank Capital Funding Trust VIII of our audit report dated March 9, 2006 with respect to the consolidated balance sheets of Deutsche Bank Aktiengesellschaft and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, comprehensive income, changes in shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2005, and to the reference to our firm under the heading "Independent Registered Public Accounting Firm" in the prospectus.

**May 16, 2007 Offering**

65.     On or about May 16, 2007, DB and DB Trust II filed with the SEC, pursuant to Rule

424 (b)(2) of the Securities Act, a prospectus supplement (the "May 2007 Prospectus Supplement"),

in connection with the primary offering of securities on a delayed basis.

66.     The May 2007 Prospectus Supplement offered for sale 32,000,000 6.55% preferred

securities for $25 per share with an issue date of May 21, 2007 (the "May 2007 Offering").

- 19 -

67.     The May 2007 Prospectus Supplement incorporated by reference the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2006 filed on March 27, 2007 ("2006 20-F").

**July 16, 2007 Offering**

68.     On or about July 16, 2007 DB and DB Trust IX filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "July 2007 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

69.     The July 2007 Prospectus Supplement offered for sale 40,000,000 6.625% preferred securities for $25 per share with an issue date of July 20, 2007 (the "July 2007 Offering").

70.     The July 2007 Prospectus Supplement incorporated by reference the 2006 20-F, filed with the SEC on March 27, 2007.

**November 6, 2007 Offering**

71.     On or about November 6, 2007, DB and DB Trust X filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "November 2007 Prospectus Supplement"), in connection with the primary offering of securities on a delayed basis.

72.     The November 2007 Prospectus Supplement offered for sale 32,200,000 7.35% preferred securities for $25 per share with an issue date of November 7, 2007 (the "November 2007 Offering").

73.     The November 2007 Prospectus Supplement incorporated by reference the 2006 20-F, filed with the SEC on March 27, 2007.

74.     The 2006 20-F incorporated into the three 2007 Offerings stated the following with

respect to the Company's Credit Risk Ratings:

> A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with a counterparty.  Our risk assessment procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure.  This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

> We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties.  Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution.  While we generally rate all our credit exposures individually, at times we rely on rating averages for measuring risk.  When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

75.     Regarding market risk, the 2006 20-F provided:

**MARKET RISK MANAGEMENT FRAMEWORK**

> We assume market risk in both our trading and our nontrading activities.  We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

> We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits.  Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios.  Value-at-risk is a common metric we use in the management of our trading market risks.

> Our Management Board and Risk Executive Committee, supported by Market Risk Management, which is part of our independent risk and capital management function, set a Group-wide value-at-risk limit for the market risks in the trading book.  Market Risk Management sub-allocates this overall limit to our Group Divisions.  Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

76.     Regarding Proprietary Trading, the incorporated 2006 20-F provided:

- 21 -

Within Corporate Banking & Securities, we conduct proprietary trading, or trading on our own account, in addition to providing products and services to customers. ***Most trading activity is undertaken in the normal course of facilitating client business***. For example, to facilitate customer flow business, traders will maintain long positions (accumulating securities) and short positions (selling securities we do not yet own) in a range of securities and derivative products, reducing this exposure by hedging transactions where appropriate. ***While these activities give rise to market and other risk, we do not view this as proprietary trading***. However, we also use our capital to exploit market opportunities, and this is what we term proprietary trading.

We undertake designated proprietary trading across all asset classes. Some of this proprietary trading activity takes the form of arbitrage. For example, in index arbitrage we identify differences between the prices of exchange-traded derivatives (such as futures contracts on an equity index) and the underlying prices on the stock exchange of the individual stocks in the index. In convertible arbitrage, we identify volatility-related pricing differences between the market for convertible debt instruments and the cash and derivatives markets. In credit and equity arbitrage, we use statistics-driven trading strategies based on short-term market movements and indicators to manage our trading book so that the market value of our long positions remains roughly equal to the market value of our short positions. We also undertake risk-arbitrage, which is generally related to mergers and acquisitions, involving, for example, transactions such as buying a target company's shares at the same time as selling the bidding company's shares.

\*     \*     \*

***While we have taken selective trading opportunities and risks throughout the year, our value-at-risk for the trading units remained within a band between €58.3 million and €82.0 million. The higher value-at-risk levels continue to be driven by interest rate risk exposures and/or equity positions. The average value-at-risk in 2006 was €69.5 million, which is 5.5% above the 2005 average of €65.8 million***.

77.   Additionally, the 2006 20-F also included the following statement from the

Company's auditor KPMG:

**Report of Independent Registered Public Accounting Firm**

\*     \*     \*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Deutsche Bank Aktiengesellschaft and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year

- 22 -

period ended December 31, 2006, *in conformity with U.S. generally accepted accounting principles*.

78.     On November 1, 2007, DB filed a Form 6-K which was incorporated by reference in the November 2007 and February 2008 Offerings.  The Form 6-K included the following statements regarding the Company's trading operations:

> In the Corporate and Investment Bank (CIB), revenues were €1.9 billion, down by €2.1 billion, or 52%, reflecting charges totaling €2.2 billion in Corporate Banking & Securities (CB&S).  *Of these charges, €€1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities*.  Reflecting these charges, revenues in Sales & Trading (Debt and other products) declined 71% versus the prior year quarter to €576 million.
>
>             *       *       *
>
> SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €576 million in the third quarter 2007, a decrease of 71%, or €1.4 billion, versus the third quarter 2006.  Performance suffered primarily from the rapid loss of liquidity in credit markets from August onwards.  The substantial market turbulence caused breakdowns in relationships between credit securities and hedging instruments such as derivatives based on broad market indices.  These together with the loss of liquidity negatively impacted credit trading positions in relative value trading, CDO correlation trading and residential mortgage-backed securities, even after taking into account significant gains on offsetting hedge positions.
>
>             *       *       *
>
> Looking forward, challenges undoubtedly remain.  Difficulties in the U.S. residential mortgage market may persist, impacting the wider economy.  Financial markets are likely to remain more cautious in their appetite for risk.  However, this is also a time of opportunity for Deutsche Bank.  As a market leader in investment banking, and a major global asset gatherer, we stand to benefit from the flight to quality.  We have forged deep client relationships, and while clients' priorities may change, our ability to act as trusted advisor and partner will remain.  Our capital strength and well-diversified funding base are valuable competitive advantages in an environment where liquidity and capital commitment command a premium in the eyes of clients.  *Investors continue to search for yield, and we continue to see demand for good-quality assets at prices which reflect a reasonable balance between risk and reward.  Our sales and trading business model, with its emphasis on intellectual capital, continues to be a critical part of our platform*.

- 23 -

758080_2

79.     The statements in ¶¶74-78 above were materially, objectively and subjectively false and misleading for the following reasons:

(a)     As set forth below, in violation of GAAP, SEC regulations and IFRS, DB failed to disclose that the Company had €20 billion of exposure to the high-risk subprime and nonprime residential mortgage markets via its RMBS and CDO-related assets.  Prior to the Offerings (as described at ¶¶161-179), defendants knew the value of its subprime/nonprime-related assets had already collapsed and the market was continuing to deteriorate such that defendants were required under GAAP and SEC regulations to disclose DB's ***entire*** subprime/nonprime exposure and its losses on those assets.  Although the disclosure of these exposures and risks was necessary to prevent DB's financial statements from being materially misleading, the Offering Materials for the May 2007, July 2007 and November 2007 Offerings failed to disclose any information whatsoever about the Company's subprime/nonprime exposure, and failed to ***fully disclose its true exposure and risks until early 2009***, when the Company finally recorded significant write-downs;

(b)     DB knew that its valuations of its mortgage-backed securities were wrong (as described in ¶¶161-179), and as confirmed by the Levin Coburn Report and the FCIC Report, DB knew that the residential mortgages underlying billions of dollars of its RMBS and CDOs had been underwritten in contravention of stated underwriting guidelines, that the RMBS and CDOs which those mortgages were underlying were falsely rated and that the securities had a high and undisclosed risk of default, and therefore the values of the mortgage-backed securities on DB's balance sheet were materially overstated and were required to be written down.  These facts rendered DB's valuations of its RMBS and CDO assets false  and required the amount of those assets and the true amount of the losses on those assets to be disclosed;

- 24 -

(c)     The Company's first disclosure providing any indication of its RMBS/CDO exposure in its November 1, 2007 Form 6-K stated only that the Company would take a €1.6 billion charge "on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities."  The November 1, 2007 Form 6-K (which was incorporated by reference into the November 2007 Offering Documents) did not contain any other information regarding the actual amount and true losses of DB's RMBS/CDO holdings.  The disclosure of the Company's total exposure, the true losses suffered, and the future risks posed by the toxic securities was necessary to prevent DB's financial statements from being materially misleading, especially since the Company in the same Form 6-K assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight."

(d)     Defendants' statements in the Offering Materials that the Company had (i) losses of  "€1.6 billion . . . on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities" in the third quarter of 2007, and (ii) *no losses at all "related to subprime, CDO or RMBS exposures*" in the fourth quarter of 2007 were also materially false and misleading.  The facts as confirmed in the Levin Coburn Report were that DB's long and short mortgage-related positions "together resulted *in 2007 losses to the bank of about $4.5 billion*."  Levin Coburn Report at 333.  This rendered such statements about the lack of losses related to RMBS and CDOs false and misleading;

(e)     As set forth in ¶¶81-82 below, defendants violated Item 303 at Regulation S-K [17 C.F.R. §229.303] by failing to disclose any known trends, events, or uncertainties that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, results of operations, liquidity and/or capital resources that is material to

- 25 -

investors.  In light of the adverse events and uncertainties arising out of DB's exposure to high-risk subprime and nonprime residential mortgage markets via its RMBS and CDO-related assets were reasonably likely to have a material impact on DB's continuing operations and therefore were required to be disclosed in the Offering Materials.  They were not.  DB's failure to disclose its exposure to mortgaged-backed securities and its losses on those securities also "masked a change in earnings or other trends" in violation of SAB No. 99, 64 Fed. Reg. at 45,152, because DB's failure to disclose its exposure to highly risky mortgage-backed securities, the true value of those securities, and the losses it had already suffered masked a reasonably likely change in earnings, as well as the trend, event or uncertainty that was likely to cause such a change; and

(f)    As set forth below in ¶¶79(f)(i)-(iv) and 150-160, DB's assertions concerning compliance with GAAP were false and misleading because the Company's 2006 20-F did not comply with GAAP, as:

(i)    DB violated GAAP by failing to properly disclose material concentrations of risk and exposure to risk arising from subprime/nonprime-backed CDOs and nonprime mortgage-related assets.  Paragraph 15A of Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 107, Disclosures about Fair Value of Financial Instruments, required DB to disclose "*all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties*."  Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.

(ii)    DB's subprime/nonprime exposure represented a group concentration of credit risk, and when a significant concentration of risk represents a material contingency, that

risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion ("APB") No. 28, *Interim Financial Reporting*. The purpose behind the risk disclosure provisions in GAAP is to warn investors about concentrations that may result in losses under changed conditions – not to wait until those losses become substantial and disclose the concentration of risk ***after*** the losses are already harming investors.

      (iii)     SFAS No. 5, ¶10 also requires that financial statements disclose contingencies when it is at least reasonably possible (*e.g.*, a greater than slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made. *Id.* The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S‑X [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

      (iv)     The SEC has also stated in SEC Release Nos. 33-8040; 34-45149; FR-60: *Cautionary Advice Regarding Disclosure About Critical Accounting Policies*, that public companies should be mindful of existing disclosure requirements in GAAP. The SEC commented that accounting standards require information in financial statements about the risks and uncertainties inherent in significant estimates. Specifically, AICPA Statement of Position No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6"), requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. SOP 94-6

defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity."

80.     Each of the statements in ¶¶74-78 above were false and misleading because they omitted material facts concerning the quantity and valuation of DB's high-risk subprime and nonprime residential mortgage related assets, and the Company's exposure to the high-risk subprime and nonprime residential mortgage market.  The Offering Materials for the May 2007, July 2007 and November 2007 Offerings failed to disclose that the value of DB's subprime/nonprime-related assets had already collapsed and the market was continuing to deteriorate such that defendants were required under GAAP and SEC regulations to disclose DB's entire subprime/nonprime exposure and its losses on those assets.  The disclosure of these exposures, trends, and risks was necessary in each of the Offerings to prevent DB's financial statements from being materially false and misleading, and was information that was necessary to make DB's statements not misleading to a reasonable investor.

81.     Defendants had a duty to disclose pertinent information in the Registration Statement and Prospectuses pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."  By failing to disclose *any* information about the level and structure of its subprime/nonprime asset holdings nor any of the required disclosures about the nature, extent, concentrations, or exposure of risks arising from its subprime and nonprime asset holdings, the Offering Materials prevented investors from determining the effect that the subprime and nonprime mortgage crisis was having on the Company prior to the Offering(s), *i.e.*, its exposure to the subprime crisis.  Accordingly, investors were unable to consider the impact on DB of the adverse events in the

subprime and nonprime markets because defendants effectively represented that the Company had no exposure.

82.    In addition, pursuant to Item 11 of Form S-1, registrants are required to provide in a registration statement the information required by Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

(i)    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation. *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated that:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

(ii)    The SEC further stated that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future." *Id*. at *17.

(iii)    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

(iv)     Here, known trends, events and uncertainties, including the deterioration of the Company's RMBS/CDO securities and other mortgage-related assets, had already come to fruition at the time of the Offerings and would continue to have a negative impact on the Company's continuing operations going forward.  Accordingly, the Offering Materials were required to disclose these facts but did not.

(v)     For example, in spite of the historic collapse of the U.S. housing and mortgage-backed securities markets, and defendants' knowledge that the collapse was having and would continue to have a material impact on the Company's financial condition, defendants failed to disclose in the Offering Materials DB's €20 billion exposure to these high-risk securities, including the nature and extent of DB's investment in those securities, that DB's position included RMBS and CDOs backed by some of the very riskiest mortgages with the highest rates of default, and the financial and the liquidity risks those securities posed to the Company.

(vi)     These known trends, events or uncertainties that were reasonably likely to have a material adverse effect on DB's future operating results, were omitted from the Offering Materials.  DB's omissions "masked a change in earnings or other trends" in violation of SAB No. 99, 64 Fed. Reg. at 45,152, because DB's failure to disclose its true exposure to highly

risky mortgage-backed securities and the true value of those securities masked a reasonably likely change in earnings, as well as the trend, event, or uncertainty that was likely to cause such a change.

83.     Under FASB SFAS No. 157, "*Fair Value Measurement*," DB was also required to accurately value its subprime-backed CDOs and other subprime-related assets at their fair value at each reporting period and to record losses in its income statement, in the form of write-downs, arising from any decreases in fair value since the prior reporting period.  SFAS No. 157, issued in September 2006 and effective January 1, 2008, defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  "At the measurement date" means that fair value must reflect the conditions that exist as of the date of the relevant balance sheet.  SFAS No. 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or liability."

84.     Although SFAS No. 157 did not become formally effective until January 1, 2008, it reflected essentially the same definition of fair value as had previously existed under GAAP, including SFAS 107, "Disclosures about Fair Value of Financial Instruments."   Under SFAS No. 107, quoted market prices are the best indication of fair value.  In the absence of quoted market prices, a company is required to develop its "best estimate" using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services.  Under SFAS No. 107, DB was required to incorporate all relevant factors, including those described herein at ¶¶98-113 and 171-181, as opposed to relying on its own contrived valuation assumptions to calculate the fair value of its subprime-backed assets and to determine if write-downs were necessary.

85.     SFAS Nos. 107 and 157 applied to DB's portfolio of subprime/nonprime-backed assets.  As the subprime/nonprime crisis worsened, DB was required at the end of each period to value its subprime/nonprime-backed CDOs and other assets at their true fair value based on the then-current market conditions - not a hypothetical value based on DB's own internal assumptions.  Sir David Tweedie, Chairman of the International Accounting Standards Board ("IASB"), commenting on the fair value calculations of instruments affected by the subprime crisis, stated, "accounts [including those affected by the subprime crisis] are supposed to reflect the current situation, not a probable future one."  Tweedie also commented that "*[a]ccounting has to reflect facts, not assume stability when it doesn't exist*."

86.     Similarly, the IASB has issued the following comments related to fair value calculations affected by the subprime crisis:

> Some have suggested that, when market prices are depressed or markets are 'in crisis,' fair value should be measured using a fundamental value approach based primarily on management's estimate of future cash flows.  In such an approach, if cash flow estimates are not expected to decline over the life of the instrument (*i.e.*, until settlement or maturity), there should be no decline in the fair value of the instrument.  The argument put forward is that, in market turmoil, adverse market sentiment creates an illogical view of risk, and this should not be taken into account when measuring fair value.
>
> *However, fundamental values are not consistent with the objective of a fair value measurement because they do not take into account factors that market participants would consider when pricing the instrument, such as illiquidity and credit risk.  Fair value reflects the amount for which financial instruments can be exchanged in the market for those instruments.  Transaction prices continue to reflect fair value and cannot be ignored, even in a market crisis.  Accordingly, a value measured using a 'fundamental value' approach might not represent an estimate of a current transaction price*.  (IASB draft release: Fair value of financial instruments in markets that are no longer active; Sept, 2008).

87.     Consistent with DB's failure to comply with the IASB disclosure requirements described above, DB specifically failed to comply with GAAP in valuing its subprime and other mortgage-backed assets.  DB knowingly and improperly valued these assets using internally

- 32 -

generated valuation models that relied on variables and highly subjective forward-looking estimates supplied by DB's own management, which defendants knew were clearly inconsistent with (i) current market pricing and (ii) that most of the loans underlying DB's mortgage-backed securities did not comply with underwriting guidelines, and that actual current market conditions (including the factors described at ¶¶98-113 and 161-179) did not support DB's valuation. The manipulated valuations allowed DB to avoid reporting significant losses on its subprime/nonprime exposure prior to the Offering(s), despite the fact that defendants knew all indications of fair value (as described herein) explicitly showed these assets were nowhere near the value that DB's models purported to show.

88. Under GAAP and/or IFRS (*see* ¶¶79(f)(i)-(iv), 150-160), DB was required to incorporate the risks arising from these assets in valuing and writing down its RMBS/CDOs and other mortgage-backed assets. Specifically, defendants were aware of all of the following:

(a) DB's subprime/nonprime exposure was massive, totaling more than **€20 billion**, and highly susceptible to the adverse events occurring in the U.S. subprime real estate market; and

(b) the confirmation that the U.S. subprime crisis was directly affecting the collateral underlying DB's subprime-backed assets, included that the ABX index (a leading indicator of the value of mortgage-backed assets) was rapidly declining; and DB's own trading experience revealed the increasing illiquidity of its CDOs and mortgage-backed assets. As the Levin Coburn Report and the FCIC Report concluded, DB knew that the mortgage-backed securities market was collapsing prior to the Offerings, and took a $5 billion short position against mortgage-backed securities, attempted to reduce its own risk by unloading risky RMBS and CDO assets on its customers while not disclosing the securities' true risk, and knew from their own practice of

- 33 -

structuring RMBS and CDOs that the mortgages underlying the securities DB was holding were likely to default.  *See* ¶¶161-179.

89.     Unbeknownst to investors (due to the Company's failure to comply with GAAP and/or IFRS disclosures or any indication of write-downs in the Offering Materials), DB had massive exposure to the U.S. residential real estate mortgage market, totaling over €20 billion.  This exposure clearly represented a concentration that was significant to DB's financial position and performance as evidenced by the more than €5.3 billion in write-downs that DB recorded on these assets in fiscal 2008 alone.  DB's primary exposures consisted of CDOs, exposure to monocline insurers, RMBS, and CDS:

   **a.     CDOs**

90.     In 2007, DB had €3.46 billion of gross exposure to CDOs backed primarily by subprime/nonprime mortgages.

91.     Of this amount, 30% or €1.1 billion consisted of mezzanine CDOs.  Mezzanine CDOs were particularly risky and susceptible to the decline of the subprime mortgage market because they were backed by nothing more than the ***lowest rated*** and ***highest risk*** tranches of RMBS.  In fact, DB's Mezzanine CDOs were susceptible to catastrophic loss, even at relatively benign stages of what would become the subprime financial crisis.  The collateral underlying DB's €1.1 billion of Mezzanine CDOs consisted of 10% subprime mortgages.  Not only did DB fail to quantify its total exposure to CDOs, but the Company also did not disclose that ***100% of its Mezzanine CDOs could be wiped out even if the default rate of the underlying subprime mortgages only reached 10%***.

b.      **Exposure to Monoline Insurers**

92.     DB also had an additional portfolio of approximately €9 billion of net counterparty exposures to monoline insurers with respect to residential mortgage-related activity.[4]  Even though these investments were purportedly "hedges," they represented significant exposure to U.S. subprime mortgages losses and ultimately resulted in significant losses.

93.     DB's risks and exposures were tied to the values of the CDOs (and other market-traded securities) ***and the ability of the monoline insurers to absorb the losses on the billions of dollars' worth of subprime/nonprime assets they insured***.  In the event the monoline insurers failed – and many did – exposure on hedged CDOs was no different than on unhedged and Mezzanine CDOs.  Therefore, the nature, extent and concentrations of risk associated with these monoline exposures were required to be disclosed under the GAAP rules described above (and the applicable IFRS rules described at ¶¶79(f)(i)-(iv), 83-87 and 150-60).  The purpose behind the GAAP/IFRS disclosure requirements was to warn investors about concentrations in financial instruments that ***may*** result in losses under changed conditions  not to wait until those losses were substantial and realized and then disclose the concentration of risk ***after*** the losses were already recorded.

94.     By early 2007, it was clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, were overextending themselves by insuring hundreds of billions of dollars' worth of subprime-backed CDOs and other mortgage-backed assets.  Accordingly, the notion that such assets were "hedges" was illusory, as

---

[4]     The €9.9 billion figure represents DB's "gross national value of bought protection."  *See* April 29, 2008 Company Form 6-K.

monoline insurers could quickly be wiped out, leaving the holders of such assets to absorb the losses themselves.  On March 14, 2007, *The Wall Street Journal* reported that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults."  Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of subprime-backed CDOs and other subprime-related assets.

   **c.**  **RMBS**

95.  In 2007, DB also had an additional €9.7 billion of RMBS backed primarily by U.S. subprime and other nonprime mortgages.  Of the subprime collateral, a large percentage was originated in 2006 and 2007 vintages for which mortgage default rates were more than double the loss rates of 2005 and earlier vintages.  Despite not disclosing the true nature and extent of its mortgage-related exposure prior to the offerings, DB recorded almost €5.3 billion in losses on these assets in fiscal 2008.

   **d.**  **CDS**

96.  DB also had a significant unknown amount of CDS.  These instruments allowed traders to bet on the creditworthiness of individual companies, but the value of CDS had been questioned by economists, who thought the market became little more than a casino – a casino with $60 trillion of bets outstanding at its peak in 2008.  Despite not disclosing a single word about its significant CDS exposure prior to the Offerings, DB recorded almost $2 billion in losses associated with these assets by the end of 2008.

97.     Because defendants omitted and failed to disclose much of DB's massive subprime/nonprime exposure at all, investors were unable to evaluate the risk or understand the effect the U.S. subprime crisis was having on DB.  Instead, investors were led to believe that DB was **not** exposed to the U.S. subprime crisis.

## MARKET-WIDE INDICATIONS THAT DEFENDANTS' INTERNAL VALUATIONS WERE OBJECTIVELY AND SUBJECTIVELY FALSE AND MISLEADING

98.     As fully described in ¶¶159-179 below, DB knew that its internal valuations of its mortgage-backed securities were incorrect and required the Company to disclose those holdings and losses to investors.  In addition, market-wide indicators from late 2006 to early 2007 (well before DB's first disclosure of any U.S. subprime related-assets to investors) also required defendants to disclose the material risk posed by the Company's mortgage-related assets.  These market conditions include:

- By September 2006, the number of properties that had entered into foreclosure had increased 53% from a year earlier.

- By November 2006, subprime loans made in 2006 were "going bad" at a rate of 50% faster than the rate for those made in 2005.

- By December 2006, subprime borrowers had a delinquency rate of more than 12.5% in the third quarter, ***the highest in more than three years***.  The delinquency rate for borrowers holding adjustable-rate mortgages was even higher at more than 13% in the third quarter.

- By February 2007, HSBC (the largest subprime mortgage originator in the United States) announced that's its loan loss provisions would exceed analysts' estimates due to, among other things, increasing subprime delinquencies and that it was raising its loan loss provision by 20%.

- According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on subprime mortgage loans in 2006 ***more than doubled*** from 2005.

- On February 13, 2007, ResMae Mortgage Corp., the country's 26th largest subprime lender, filed for Chapter 11 bankruptcy protection.

- 37 -

- In early March 2007, the Mortgage Bankers Association reported that about 13% of subprime loans were delinquent, more than five times the delinquency rate for home loans to prime borrowers.

- During March 2007, the subprime mortgage industry continued to collapse with several more subprime lenders declaring bankruptcy, announcing significant losses, or putting themselves up for sale, including Accredited Home Lenders, DR Horton, Countrywide Financial, and SouthStar Funding LLC.

- By April 2007, the signs of distress described above turned into actual CDO failures, when Merrill Lynch had cancelled planned auctions for most of the securities that it had seized from the Bear Stearns funds and, instead, took them in-house.  Investors were too baffled by the ultra-complex securities, known as CDOs, to offer attractive bids because the instruments were so illiquid that trades – even at fire sale prices – would have forced a wide scale re-evaluation of prices across the sector, perhaps *leading some CDO issues to be marked down as much as 30%*.

Despite these known red flags, DB failed to disclose its subprime/nonprime exposure to investors in the Offering Materials.

99.     The ABX Index was created in January 2006 when several banks collaborated with a company called "Markit" to create an index which provided banks with the ability to track RMBS and to estimate CDO market values.  The ABX Index tracked the performance of 15-20 equally weighted RMBS tranches backed by subprime collateral and was a leading indicator of the value of subprime-backed CDOs and other subprime assets.  In fact, the ABX Index was used by DB as a barometer for assessing how subprime mortgage-related assets were performing in the marketplace.  The ABX Index tracked the cost of buying and selling CDS on selected RMBS tranches.  Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating.

100.     The "TABX Index," launched in February 2007, tracked the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination.  Like CDOs, which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as

- 38 -

those owned by DB.  The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%.

101.    The ABX and TABX indices were additional objective, directly observable, ***real-time*** indicators of the value of DB's subprime-backed CDOs and other subprime-related assets.  These indices were closely tracked by defendants.

102.    Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans."  Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation.  Therefore, defendants reasonably should have known that the ABX should have been used in valuing RMBS and CDOs and that disregarding this market index in the Company's mark-to-market valuations was a violation of SFAS Nos. 107 and 157, as described above.

103.    By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered serious declines, with some BBB- tranches dropping as much as 60%.  By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters.

104.    The ABX Index showed that all subprime RMBS tranches were being adversely affected by the subprime mortgage crisis beginning in late 2006 and into 2007.  As shown in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted.



105.   The TABX indices also plunged.  From its inception in February 2007, when it was already indicating CDO values were more than 15% under par, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007.

| Date | Value (100 = 100% of par) |
|------|---------------------------|
| 3/30/07 | 83.8 |
| 6/29/07 | 69.08 |
| 9/28/07 | 34.25 |

106.   The ABX and TABX were market indicators followed by DB on a daily basis.  The collapse of the ABX and TABX indices made it clear to defendants who traded the ABX and TABX that the value of DB's subprime/nonprime-backed RMBS/CDOs and other subprime/nonprime-related assets had declined significantly prior to the May 2007 Offering.  GAAP and IFRS required DB to: (1) disclose the risks associated with these assets; and (2) timely write down the value of its RMBS/CDO holdings to fair value in accordance with SFAS Nos. 107 and 157 (and the applicable IFRS rules described at ¶¶150-160).  Nonetheless, DB failed to disclose or record its first write-downs of its RMBS/CDO holdings until October 2007.

- 40 -

107.    Indeed, DB's November 1, 2007 Form 6-K – the Company's first Form 6-K disclosure concerning its RMBS/CDO exposure – stated only that the Company would be taking a €1.6 billion charge "on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities."  This SEC filing, which was incorporated by reference into the November 2007 and February 2008 Offerings, did *not* contain any other information regarding the nature and extent of DB's RMBS/CDO holdings.  The disclosure of these exposures and risks was necessary to prevent DB's financial statements from being materially misleading, especially since the Company in the same Form 6-K assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight."

**Industry Signs of an Impending Collapse in Mortgage-Related Asset Values**

108.    By October 2007, banks continued to reveal losses as a consequence of the mortgage crisis.  Merrill Lynch announced that it would write down its ABS CDOs by $12.4 billion.  Also in October 2007, Swiss banking giant UBS wrote down $4.4 billion in subprime related RMBS and CDOs.

109.    In November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion write-off and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital.  The Federal Reserve also injected $41 billion into the money supply for the banks to borrow, the largest single expansion since September 11, 2001.

110.    In December 2007, UBS reported an additional $10 billion write-down in subprime related RMBS and CDOs and Bank of America liquidated a $12 billion cash fund.  During the same time frame, Merrill Lynch received a $6.2 billion cash infusion from outside investors.

111.     The year 2008 saw the housing and credit crisis continue unabated.  On January 30, 2008, UBS announced that it had written down an additional $4 billion on its mortgage-related assets as of December 31, 2007.  Then in February 2008, UBS announced that its write-downs for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages.  This total included a $2 billion write down for the fourth quarter of 2007 on the bank's $26.6 billion Alt-A portfolio.

112.     By March 2008, the collapsing real estate and credit markets led to the destruction of one of this country's oldest investment banks.  On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy.  The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to cover potential Bear Stearns losses – mostly resulting from mortgage-backed securities.

113.     In sum, as property values dropped and the mortgages underlying mortgaged-backed securities defaulted, the market for those securities became illiquid.  As a result, the value of DB's subprime and nonprime RMBS/CDO portfolios plummeted.

**February 14, 2008 Offering**

114.     On or about February 14, 2008, DB and DB Trust III filed with the SEC an amendment to the Form F-3 Registration Statement and pursuant to Rule 424 (b)(2) of the Securities Act, a prospectus supplement (the "February 2008 Prospectus Supplement") in connection with the primary offering of securities on a delayed basis.

115.     The February 2008 Prospectus Supplement offered for sale 70,000,000 7.6% preferred securities for $25 per share with an issue date of February 20, 2008 (the "February 2008 Offering").

116.     The February 2008 Prospectus Supplement incorporated by reference the false and misleading 2006 20-F described above, filed with the SEC on March 27, 2007.

- 42 -

117.    On February 7, 2008, DB filed a Form 6-K with the SEC which was also incorporated by reference into the February 2008 Prospectus Supplement.

(a)    The Form 6-K attached a release from the Company which asserted that DB had sustained "no further losses" on its remaining mortgage-backed securities exposure, noting:

> In Sales & Trading (Debt and other products), revenues in foreign exchange, interest rate trading, and money markets saw strong year-on-year growth while revenue levels in some credit trading areas, and residential mortgage-backed securities, were significantly lower, reflecting conditions in credit markets.  Sales & Trading (Equity) saw a modest year-on-year growth, driven by the customer-focused businesses, while revenues in designated proprietary trading were lower than in the prior year quarter.
>
> *          *          *
>
> Revenues from Sales & Trading (Debt and other products) were EUR 1.6 billion in the fourth quarter, a decrease of 10% or EUR 185 million versus the fourth quarter 2006, reflecting weaker performance in trading of asset backed securities (including those backed by residential and commercial mortgages), partly offset by continued strength in CB&S's foreign exchange, interest rates and money markets businesses.  Our credit trading businesses showed a significant recovery after an exceptionally difficult third quarter, though revenues were lower than in the fourth quarter 2006.  ***Following our decision to proactively manage down troubled risk positions in the third quarter and ongoing active risk management, we took no further losses on our remaining CDO exposures in the current quarter after taking into account related gains on hedge positions***.

(b)    The Form 6-K also emphasized that DB's "[e]ffective risk management" was responsible for DB's ability to avoid write-offs for the fourth quarter of 2007, noting:

> Revenues from Sales & Trading (Equity) totalled EUR 1.1 billion in the fourth quarter, an increase of 1%, or EUR 8 million, versus the fourth quarter 2006, reflecting significant improvements across customer-driven businesses, offset by a decline in the contribution from designated proprietary trading.  Both customer-driven and designated proprietary trading businesses improved versus the third quarter 2007.
>
> For the full year, Sales & Trading performed well, given the exceptionally challenging markets of the second half 2007.  Sales & Trading (Debt and other products) revenues were EUR 8.4 billion, a decrease of 7%, or EUR 609 million, compared to 2006.  ***Effective risk management resulted in contained losses in our collateralized debt obligations and U.S. residential mortgage businesses, despite the investment banking industry facing substantial problems in both sectors***.

- 43 -

\*       \*       \*

He added: "***In the fourth quarter, we again demonstrated the quality of our risk management.  We had no net write-downs related to sub-prime, CDO or RMBS exposures***.  Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter.  In leveraged finance, where we had significant write-downs in the third quarter, net write-downs in the fourth quarter were less than EUR 50 million."

118.    The Form 6-K also stated the following concerning DB's overall performance:

Dr. Josef Ackermann, Chairman of the Management Board, said: "I am pleased to report robust earnings for the fourth quarter, which concludes one of our best years ever and a year of solid performance in challenging times.  In 2007 we clearly strengthened our competitive position and delivered another year of profit growth while simultaneously maintaining our capital strength.  This performance enables us to recommend to our shareholders another increase in our dividend, to EUR 4.50 per share."

119.    The statements contained in 2006 20-F were materially, objectively and subjectively false and misleading for the following reasons:

(a)     As set forth above, defendants knew but failed to disclose that the Company had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets, in violation of GAAP and SEC regulations, as set forth in ¶¶161-179;

(b)     Defendants knew that DB's valuations of its mortgage-backed securities were wrong.  As revealed by the Levin Coburn Report and the FCIC Report, DB knew that the residential mortgages underlying billions of dollars of its RMBS and CDOs were improperly underwritten, that the RMBS and CDOs holding those mortgages were falsely rated and that the securities had a high and undisclosed risk of default, and therefore the value of its mortgage-backed securities was overstated and needed to be written down, as set forth in ¶¶161-179;

(c)     DB's November 1, 2007 Form 6-K – the Company's first disclosure providing any indication of its RMBS/CDO exposure – only stated that the Company would be taking a €1.6

- 44 -

billion charge "on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities."  The November 1, 2007 Form 6-K, which was incorporated by reference into the February 2008 Offering, did not contain any other information regarding the nature and extent of DB's RMBS/CDO holdings.  The disclosure of the Company's total exposure, the true losses suffered, and the future risks posed by the toxic securities was omitted but necessary to prevent DB's financial statements from being materially misleading, especially since the Company in the same Form 6-K assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight."

(d)     As set forth in ¶¶81-82, defendants violated Items 303 and 503 of Regulation S-K by failing to disclose a "discussion of the most significant factors that make the offering risky or speculative" or the known trends, events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. Defendants knew the adverse events and uncertainties associated with DB's full exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets were reasonably likely to have a material impact on DB's continuing operations and therefore were required to be disclosed in the Offering Materials, but were not.  DB's misstatements and omissions also "masked a change in earnings or other trends" in violation of SAB No. 99, 64 Fed. Reg. at 45,152, because DB's failure to disclose its true exposure to highly risky mortgage-backed securities and the true value of those securities masked a reasonably likely change in earnings, as well as the trend, event, or uncertainty that was likely to cause such a change;

(e)     As set forth in ¶¶79(f)(i)-(iv), 83-87 and 150-160, DB's disclosures concerning its compliance with GAAP were false and misleading; and

- 45 -

(f)     Absent the accounting improprieties detailed in ¶¶79(f)(i)-(iv) and150-160 herein, DB would not have reported the "robust earnings," "another year of profit growth" and /or maintain DB's "capital strength" for the fourth quarter of 2007.

120.    Each of the statements in ¶¶117-118 above were false and misleading because they omitted material facts concerning the quantity and valuation of DB's high-risk subprime and nonprime residential mortgage related assets, and the Company's exposure to the high-risk subprime and nonprime residential mortgage market.  The Offering Materials for the May 2007, July 2007 and November 2007 Offerings failed to disclose that the value of DB's subprime/nonprime-related assets had already collapsed and the market was continuing to deteriorate such that defendants were required under GAAP and SEC regulations to disclose DB's entire subprime/nonprime exposure and its losses on those assets.  The disclosure of these exposures, trends, and risks was necessary in each of the Offerings to prevent DB's financial statements from being materially false and misleading, and was information that was necessary to make DB's statements not misleading to a reasonable investor.

**May 5, 2008 Offering**

121.    On or about May 5, 2008, DB and DB Trust V filed with the SEC pursuant to Rule 424 (b)(2) of the Securities Act a prospectus supplement (the "May 2008 Prospectus Supplement") in connection with the primary offering of securities on a delayed basis.

122.    The May 2008 Prospectus Supplement offered for sale 44,000,000 8.05% preferred securities for $25 per share with an issue date of May 9, 2008 (the "May 2008 Offering").

123.    The May 2008 Prospectus Supplement incorporated by reference the Annual Report on Form 20-F of Deutsche Bank AG for the year ended December 31, 2007 filed on March 26, 2008 ("2007 20-F").

124.    In addressing DB's income for the year, the 2007 20-F provided in part:

In 2007, income before income tax expense was €8.7 billion, a 5% increase over 2006, and revenues were €30.7 billion, up 8%. We reported a pre-tax return on average active equity of 29% in 2007 and 33% in 2006, with the decline due largely to an increase in average active equity to €29.8 billion in 2007 versus €25.5 billion in 2006 (pre-tax return on average shareholders' equity was 24% and 28%, for 2007 and 2006, respectively). **In 2007, net income was €6.5 billion, up 7% versus 2006**. Diluted earnings per share increased by 14% to €13.05.

125.    The incorporated 2007 20-F also stated the following regarding DB's risk policies,

procedures and methodologies:

• Our Management Board provides overall risk and capital management supervision for our consolidated Group as a whole. Our Supervisory Board regularly monitors our risk and capital profile.

• We manage credit, market, liquidity, operational, business, legal and reputational risks as well as our capital in a coordinated manner at all relevant levels within our organization. This also holds true for complex products which we typically manage within our framework established for trading exposures.

*       *       *

Dedicated legal, risk & capital units are established with the mandate to:

• Ensure that the business conducted within each division is consistent with the risk appetite that the Capital and Risk Committee has set;

• Formulate and implement risk and capital management policies, procedures and methodologies that are appropriate to the businesses within each division;

• Approve credit risk, market risk and liquidity risk limits;

• Conduct periodic portfolio reviews to ensure that the portfolio of risks is within acceptable parameters; and

• Develop and implement risk and capital management infrastructures and systems that are appropriate for each division.

126.    Emphasizing DB's rigorous risk management processes and procedures regarding

Credit Risk Ratings, the incorporated 2007 20-F stated:

A primary element of the credit approval process is a detailed risk assessment of every credit exposure associated with a counterparty. Our risk assessment

- 47 -

procedures consider both the creditworthiness of the counterparty and the risks related to the specific type of credit facility or exposure. This risk assessment not only affects the structuring of the transaction and the outcome of the credit decision, but also influences the level of decision-making authority required to extend or materially change the credit and the monitoring procedures we apply to the ongoing exposure.

We have our own in-house assessment methodologies, scorecards and rating scale for evaluating the creditworthiness of our counterparties. Our granular 26-grade rating scale, which is calibrated on a probability of default measure based upon a statistical analysis of historical defaults in our portfolio, enables us to compare our internal ratings with common market practice and ensures comparability between different sub-portfolios of our institution. . . . We generally rate all our credit exposures individually. When we assign our internal risk ratings, we compare them with external risk ratings assigned to our counterparties by the major international rating agencies, where possible.

127.    Regarding DB's market risk management framework, the incorporated 2007 20-F

stated:

### MARKET RISK MANAGEMENT FRAMEWORK

We assume market risk in both our trading and our nontrading activities. We assume risk by making markets and taking positions in debt, equity, foreign exchange, other securities and commodities as well as in equivalent derivatives.

We use a combination of risk sensitivities, value-at-risk, stress testing and economic capital metrics to manage market risks and establish limits. Economic capital is the metric we use to describe and aggregate all our market risks, both in trading and nontrading portfolios. ***Value-at-risk is the primary metric we use in the management of our trading market risks***. Our risk sensitivities, value-at-risk, stress testing and economic capital metrics also reflect basis risks arising from our trading activities.

Our Management Board and Risk Executive Committee, supported by Market Risk Management, which is part of our independent legal, risk & capital function, set a Group-wide value-at-risk limit for the market risks in the trading book. Market Risk Management sub-allocates this overall limit to our group divisions. Below that, limits are allocated to specific business lines and trading portfolio groups and geographical regions.

128.    One key measure of DB's risk was its reported VaR, a key statistical measure of

market risk based on estimated likelihood of losses. VaR is a measure, with a given degree of

confidence, of how much one can lose from one's portfolio over a given time horizon. VaR analysis

- 48 -

assumes a kind of "grading curve" for investors.  Just as a few students in a class with a grading curve receive low grades, investors can expect that on a few trading dates of each year they will lose money.  VaR analysis assumes that investor returns for each day can be arrayed along a bell-shaped normal distribution, like student grades.  The trading dates with the largest losses – like "D" and "F" grades – are grouped in the left-most tail of the distribution, and the size of the losses in that tail are called the VaR.  For example, of approximately 250 trading days in a year, a VaR measure might describe the expected losses on the worst two or three days.

129.    The 2007 20-F stated that DB's equities trading VaR ranged between $43.5 million and $90.5 million during 2007.  Despite DB's assurances relating to its VaR calculation that its "trading market risk outside of these units is immaterial," the Company reported equities trading losses for 2008 almost 700% above the supposed "maximum exposure" of $90.5 million.  In fact, for 2008 DB reported total losses in equities sales and trading amounted to a massive *$630 million*.

130.    These reported VaR metrics were therefore knowingly false as they failed to reflect the actual risk associated with DB's equities trading.  If DB had reported an accurate VaR measure in the Offering Materials, to account for the volatility of the Company's positions, investors and analysts would have applied a higher discount rate to DB's expected future cash flows to adjust for the increased risk associated with the Company's trades.

131.    Regarding proprietary trading the 2007 20-F stated:

> Within Corporate Banking & Securities, we conduct proprietary trading, or trading on our own account, in addition to providing products and services to customers.  Most trading activity is undertaken in the normal course of facilitating client business.  For example, to facilitate customer flow business, traders will maintain long positions (accumulating securities) and short positions (selling securities we do not yet own) in a range of securities and derivative products, reducing this exposure by hedging transactions where appropriate.  While these activities give rise to market and other risk, we do not view this as proprietary trading.  However, we also use our capital to exploit market opportunities, and this is what we term proprietary trading.

- 49 -

We undertake designated proprietary trading across all asset classes. Some of this proprietary trading activity takes the form of arbitrage. For example, in index arbitrage we identify differences between the prices of exchange-traded derivatives (such as futures contracts on an equity index) and the underlying prices on the stock exchange of the individual stocks in the index. In convertible arbitrage, we identify volatility-related pricing differences between the market for convertible debt instruments and the cash and derivatives markets. In credit and equity arbitrage, we use statistics-driven trading strategies based on short-term market movements and indicators to manage our trading book so that the market value of our long positions remains roughly equal to the market value of our short positions. We also undertake risk-arbitrage, which is generally related to mergers and acquisitions, involving, for example, transactions such as buying a target company's shares at the same time as selling the bidding company's shares.

*     *     *

Designated proprietary trading gains were lower compared to 2006, in both absolute terms and as a percentage of net revenues, having been negatively affected by the market dislocations occurring in the second half of the year.

132.   Regarding exposure to monoline insurers, the 2007 20-F stated:

MONOLINE EXPOSURE: The deterioration of the U.S. subprime mortgage market has generated large exposures for financial guarantors, such as monoline insurers, that have insured or guaranteed the value of pools of collateral referenced by CDOs and other market-traded securities. This has led to some uncertainty as to whether the ultimate liabilities of monoline insurers to banks and other buyers of protection will be met and may, in some cases, lead to a ratings downgrade of those insurers. The following table summarizes our net counterparty exposures to monoline insurers with respect to residential mortgage-related activity, as of December 31, 2007, on the basis of the mark-to-market value of the assets compared with the face value guaranteed or underwritten by monoline insurers.

| Monoline exposure related to U.S. residential Mortgages in €m. | Market value of bought protection Dec 31, 2007 |
| --- | --- |
| Super Senior ABS CDO | 805 |
| Other subprime | 69 |
| Alt-A | 229 |
| **Total value of bought CDS protection** | **1,103** |

*     *     *

As of December 31, 2007, we had made credit valuation adjustments of €82 million against these exposures, including a full provision against our exposure to

- 50 -

one monoline counterparty. The credit valuation adjustments are based on a name-by-name assessment of credit worthiness.

In addition to the residential mortgage-related activities shown in the table above, we have other exposures of €1.2 billion as of December 31, 2007, related to net counterparty exposure to monoline insurers, based on the mark-to-market value of other insured assets. These arise from a range of client activity, including financing of collateralized loan obligations, commercial mortgage-backed securities, trust preferred securities, student loans and public sector or municipal debt.

133. By the end of 2008, the Company was forced to mark-down **€2.2 billion** relating to additional reserves against monoline insurers, and still maintained an additional **€1.6 billion** in monoline exposure going forward.

134. Additionally, the 2007 20-F also included the following statement from the Company's auditor KPMG:

**Report of Independent Registered Public Accounting Firm**

\*        \*        \*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Deutsche Bank Aktiengesellschaft and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2007, *in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.*

135. On April 29, 2008, DB filed a Form 6-K which was incorporated by reference in the May 2008 Prospectus Supplement. The Form 6-K reported DB's financial results for the quarter ending March 31, 2008, providing:

NET REVENUES were €4.6 billion in the quarter, versus €9.6 billion in the first quarter of 2007. In Corporate Banking & Securities (CB&S), net revenues were €880 million, versus €6.1 billion in the prior year quarter. Revenues in Sales & Trading (Debt and other products) were €1.3 billion, down from €3.4 billion in the record prior year quarter, reflecting mark-downs on Commercial Real Estate activities and on Residential Mortgage-Backed Securities, together with significantly lower revenues in the credit trading business. This development was to some extent counterbalanced by substantial year-on-year revenue growth in foreign exchange and money market trading, core fixed income trading and commodities trading. Revenues in Sales & Trading (Equity) were €745 million, down from €1.7 billion in the

- 51 -

prior year quarter, reflecting significantly lower revenues in equity derivatives trading and a modest loss in designated equity proprietary trading. Revenues in cash equities were somewhat below the exceptional levels of the prior year quarter, while revenues in prime services were ahead of the prior year quarter. Revenues in Advisory were €128 million, down from €250 million in the prior year quarter, while revenues in Origination (Equity) were €85 million, down €146 million both reflecting lower levels of market activity. Revenues in Origination (Debt) were negative €1.4 billion, versus €401 million in the prior year quarter, primarily reflecting the mark-downs in leveraged finance of €1.8 billion. Revenues for the quarter included a gain of €77 million from changes in the credit spreads on certain of the firm's own debt on which the fair value option was used. The application of the fair value option on our liabilities remained unchanged from prior reporting periods. The aggregate gain recorded on our own debt since January 1, 2007 is less than €100 million, a very modest amount by industry standards.

*       *       *

SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €1.3 billion in the first quarter, a decrease of €2.0 billion, or 61%, compared to the first quarter 2007. The decrease includes net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans. Earnings in our structured credit business also fell as a result of depressed client activity in CDOs and related products, and challenging markets in which previously stable relationships between cash and derivative instruments broke down. . . .

SALES & TRADING (EQUITY) generated revenues of €745 million, a decrease of €969 million, or 57%, versus the first quarter 2007. Performance in our equity derivatives business was negatively impacted by the increased correlation between equity markets, which led to a deterioration in the value of residual derivative positions arising from our activities in European retail structured products. Growth in cash equities' revenues in Asia and North America was more than offset by a decline in Europe. The prime services business benefited from investors' increasing preference for more stable prime brokerage counterparties. Designated Equity Proprietary Trading reported a small loss in the quarter, compared to a positive contribution in the first quarter 2007.

136.     The statements in ¶¶124-135 above were materially, objectively and subjectively false and misleading for the following reasons:

(a)     As set forth in ¶¶161-179, defendants knew that DB's valuations of its mortgage-backed securities were false, and that DB's "net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans" did not reflect the actual value of the securities at the time of the May 2008 Offering. As revealed by the Levin Coburn

- 52 -

Report and the FCIC Report, DB knew that the residential mortgages underlying its RMBS and CDO assets had been underwritten in contravention of stated underwriting guidelines, that the RMBS and CDOs which those mortgages were underlying were falsely rated and that the securities had a high undisclosed risk of default, and therefore the value of its mortgage-backed securities was overstated and were required to be written down, which rendered DB's valuations of its RMBS and CDO assets subjectively false;

(b)     As set forth in ¶¶138-146, the Company engaged extensively in high-risk proprietary trading, *i.e.*, gambling on the Company's own account using huge undisclosed leverage that would ultimately cost DB billions of euros in trading losses.  Defendants knew that the actual risk associated with DB's proprietary trading was not disclosed to investors.

137.     Each of the statements in ¶¶124-135 above were false and misleading because they omitted material facts concerning the true value of DB's high-risk subprime and nonprime residential mortgage related assets, and the Company's true exposure to the high-risk subprime and nonprime residential mortgage market.  The Offering Materials for the May 2008 Offering failed to disclose the true value of DB's subprime/nonprime-related assets, and that the market was continuing to deteriorate such that defendants were required under GAAP and SEC regulations to disclose DB's true losses on those assets.  The disclosure of these actual losses, trends, and ongoing risks was necessary in the May 2008 Offering to prevent DB's financial statements from being materially false and misleading, and was information that  was necessary to make DB's statements not misleading to a reasonable investor.

**DB's Undisclosed Proprietary Trading Practices**

138.     Although DB engages in traditional banking, during the relevant period the Company relied on massive risk-taking by aggressive traders deploying the firms' own money for much of

DB's profit.  The Company publicly referred to this practice as "proprietary trading," in which the bank hired traders to gamble with large amounts of its own capital using complex financial instruments such as derivatives and CDS.  In 2006, as much as 20% of the Company's revenue was generated by proprietary trading, which is inherently riskier than trading undertaken in the normal course of facilitating client business.  Neither the extremely risky nature of this practice nor the large percentage of revenues relied upon by the Company from this practice was properly disclosed to investors prior to the Offerings.

139.    In the years leading up to the Offerings, DB specialized in credit and equity derivative trading, which often required the Company to risk several times the amount of capital it had on hand to execute the trading strategy.  One of DB's signature trades was a strategy called "capital structure arbitrage," based on gaps in pricing between various securities of a single company.  Arbitrage involves engaging in offsetting trades and then capturing the difference in yield, which results in a small profit margin.  With proper risk control management systems in place, arbitrage activities should carry little risk.  The essential key to this type of trading, however, is risk control management.

140.    There was no such risk control management for the Company's "proprietary trading" operations.  The freewheeling gambling culture at DB can best be illustrated through the rise and fall of its most powerful trader, Boaz Weinstein.  As a chess master, poker and blackjack devotee and top trader at DB, Weinstein made big bets on behalf of the Company using complex financial instruments.  These complex instruments let his trading group augment their bets with borrowed money, multiplying profits when things went right but magnifying huge losses during bad times.

141.    Weinstein brought in traders to his group who shared his interest in gambling.  For example, one of Weinstein's most trusted traders was Bing Wang, who was recruited because he was

an avid poker player who finished 34th in the World Series of Poker in 2005.  On Fridays after the closing bell, Weinstein's group would gather for high-stakes poker in a room off DB's trading floor. Weinstein also regularly led a group of DB traders – including members of an infamous card-counting blackjack team who had purportedly been banned from every U.S. casino – on "team-bonding" trips to Las Vegas where the group would reportedly wager large sums of money on the blackjack and poker tables.

142.    This behavior extended to their work at DB; but there, they were gambling with firm money.  Throughout 2006 and into 2007, DB's proprietary trading positions continued to increase and the Company's exposure to losses increased dramatically.  By early 2008, Weinstein's group was leveraged approximately 300%, exposing DB to $30 billion in market risk.  This was especially worrisome because the group had taken the extreme-minority position in mid-2007 that that the mortgage crisis was contained – purchasing huge positions in corporate bonds or loans, as well as CDS.  As reported by *The Independent* (London) on February 7, 2009, in an article entitled "Exposed: Chess Genius Who Lost His Bank $1.8 bn; Deutsche Trader Had Taken Home $40m Annual Bonuses," "these instruments allowed traders to bet on the creditworthiness of individual companies, but their value has been questioned by economists, who [thought] the market became little more than a casino – a casino with $60 trillion of bets outstanding at its peak [in 2008]."

143.    As corporate bonds rallied in March 2008, after the Fed's brokering of a deal for the troubled Bear Stearns stabilized the credit markets, Weinstein added to DB's risky position in succeeding months – even as the financial crisis showed signs of further deterioration.

144.    The value of DB's holdings of corporate bonds and loans continued to plummet as banks and institutional investors, needing to raise capital, sold such securities.  At the same time, trading in CDS was curtailed because market players were concerned about entering trades with

- 55 -

banks that potentially could collapse.  This left DB increasingly unprotected against losses in corporate bonds and loans, because the Company used CDS to hedge these positions.

145.    By the end of 2008, trading losses from Weinstein's group ***alone*** ballooned to almost $2 billion.  In total, DB reported a loss of approximately $6.8 billion in the fourth quarter, mainly attributed to losses in the Company's credit-market proprietary trading and exposure to troubled bond insurers and mortgage-backed securities.

146.    Shortly after reporting its disappointing 2008 results, the Company announced that it would significantly scale back the amount of borrowed money it puts at risk in the markets. Defendant Ackerman, DB's Chairman, admitted to analysts in February 2009 that to earn a $1.5 billion profit from proprietary trading the bank needed to risk several times that amount in capital: "You can easily lose two to three billion.  That's what we have seen in 2008 and something we don't want to see again."  Defendant Ackerman also confirmed that Weinstein was no longer with the Company.

147.    While Weinstein and the Individual Defendants were exposing the Company to billions in trading losses, defendants not only failed to disclose these risks but were publicly characterizing the Company's risk controls as, among other things, "highly sophisticated" and "industry leading."  Defendant Ackerman told investors on February 7, 2008 (in the above Form 6-K at ¶117(b)) that "***we again demonstrated the quality of our risk management.  We had no net write-downs related to sub-prime, CDO or RMBS exposures.  Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter***."

148.    DB's risk management policies and its inadequate risk controls necessary to prevent traders at the Company from exposing DB to billions of euros in losses was material to investors. Investors would have considered this information, including the lack of risk controls at DB, to be

highly material information given the Company's highly leveraged positions and purported risk control expertise and the importance of risk control to the Company's business, particularly its highly risky proprietary trading.

149.    In the end, DB's trading portfolio was so toxic to the Company's balance sheet that it announced on January 14, 2009 that the firm anticipated a loss after taxes in the area of **€4.8 billion** for the fiscal 2008 fourth quarter, driven by negative revenues of **€4.8 billion** in the Company's Sales and Trading businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading.  In a press release dated February 5, 2009, the Company further announced *its first annual net loss since World War II of €3.9 billion* for the entire fiscal year 2008, and a loss before income taxes of **€5.7 billion**.

**Applicable Accounting Standards**

150.    Pursuant to Regulation (EC) 1606/2002, beginning with fiscal year 2007 DB prepared their consolidated financial statements in accordance with IFRS.

151.    IFRS are those principles adopted by the IASB and recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted international accounting practices at a particular time.  IFRS are promulgated by the IASB (formerly the Board of the International Accounting Standards Committee ("IASC")).  Narrowly, IFRS refers to the numbered series of pronouncements currently being issued by the IASB, as distinct from the IAS's numbered series of pronouncements issued by its predecessor.

152.    DB's compliance with IFRS and all statements describing the fair presentation of its financial results were covered by IAS 1, which states:

> An entity whose financial statements comply with IFRSs shall make an explicit and unreserved statement of such compliance in the notes.  Financial Statements shall not be described as complying with IFRSs unless they comply with all the requirements of IFRSs. . . .  The application of IFRSs, with additional

- 57 -

disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.

153.    As a publicly traded company, DB was required by the EU Commission, Regulation (EC) No. 1606, Article 4 to issue financial results in accordance with IFRS.

**IFRS Required DB to Disclose the Risks Arising from Its Subprime and Nonprime Exposure**

154.    The statements in ¶¶74-78, 117-118 and 124-135 were subjectively and materially false and misleading when made because the Company failed to disclose, in violation of the IFRS, that it had as much as €20 billion in exposure to the high-risk subprime and nonprime residential mortgage markets through RMBS and CDO-related assets.

155.    International Financial Reporting Standard No. 7 *Financial Instruments: Disclosures* ("IFRS 7"), which was effective beginning January 1, 2007, requires disclosures that enable users of the financial statements to evaluate the significance of financial instruments, such as subprime-backed CDOs and other subprime-related assets, to an entity's financial position and performance. IFRS 7 also requires the disclosure of the nature and extent of risks arising from those financial instruments.

156.    Specifically IFRS 7 states:

An entity shall disclose information that ***enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed*** at the end of the reporting period. . . . These risks typically include, but are not limited to, ***credit risk, liquidity risk and market risk***.

For each type of risk arising from financial instruments, an entity ***shall disclose***:

(a)     the ***exposures to risk*** and how they arise;

(b)     its objectives, policies and processes for managing the risk and the methods used to measure the risk; and

(c)     any changes in (a) or (b) from the previous period.

- 58 -

*       *       *

Entities [are required] to provide disclosures in their financial statements that enable users to evaluate:

(a)     ***the significance or financial instruments for the entity's financial position and performance***; and

(b)     the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the end of the reporting period, and how the entity manages those risks.

157.    Prior to the effective date of IFRS 7, International Accounting Standard No. 32 Financial Instruments: Disclosure and Presentation ("IAS 32") and International Accounting Standard No. 30 Disclosures in Financial Statements of Banks and Similar Financial Institutions ("IAS 30") required similar disclosures.

158.    Specifically, IAS 32 states:

Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. ***The required disclosures provide information that assists users of financial statements in assessing the extent of risk related to*** both recognized and unrecognized ***financial instruments***:

(a)     Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

*       *       *

(iii) ***Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices*** whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

*       *       *

(b)     ***Credit risk*** – Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and ***cause the other party to incur a financial loss***.

(c)     ***Liquidity risk*** – Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments

- 59 -

associated with financial instruments. ***Liquidity risk may result from an inability to sell a financial asset quickly at close to its fair value***.

\*       \*       \*

For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose: (a) information about the extent and nature of financial instruments, ***including significant terms and conditions that may affect the amount, timing and certainty of future cash flows*** . . . .

159.    IAS 30 states:

***A bank should disclose any significant concentrations of its assets, liabilities and off balance sheet items.*** Such disclosures shall be made in terms of geographical areas, customer or industry groups ***or other concentrations of risk***. . . .

***A bank discloses significant concentrations*** in the distribution of its assets and in the source of its liabilities ***because it is a useful indication of the potential risk inherent in the realization of the assets and the funds available to the bank***. Such disclosures are made in terms of geographical areas, customer or industry groups or other concentrations of risk which are appropriate in the circumstances of the bank.

160.    Similar to SFAS Nos. 157 and 107, under IAS 39, DB was also required to accurately value its subprime-backed CDOs and other subprime-related assets at their fair value at each reporting period and to record losses in its income statement, in the form of write-downs, arising from any decreases in fair value since the prior reporting period. Under IAS 39, DB was required to incorporate all relevant factors, including those described herein at ¶¶98-113 and 161-179, as opposed to relying on its own unrealistic valuation assumptions to calculate the fair value of its subprime-backed assets and to determine if write-downs were necessary. IAS 39 states, in relevant part:

The objective of using a valuation technique is to ***establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations***. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same. . . . ***The chosen valuation technique makes maximum use of market inputs*** and relies as little as possible on entity-specific inputs. ***It incorporates all factors that market participants would consider in setting a price***

- 60 -

*and is consistent with accepted economic methodologies for pricing financial instruments*. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (*i.e.*, without modification or repackaging) or based on any available observable market data.

## DEFENDANTS KNEW DB'S VALUATIONS OF THEIR MORTGAGE-BACKED ASSETS AND VAR WERE FALSE

161.    Defendants knew that the misrepresentations and omissions in the Offering Materials regarding DB's exposure and valuation of its mortgage-backed assets, its write-downs on those assets, and its VaR metrics were subjectively false.

**Findings of the Levin Coburn Report Demonstrate Defendants Knew Their Mortgage-Backed Securities Valuations Were Wrong**

162.    The Levin Coburn Report dedicates over 50 pages to DB's role in the financial crisis and its knowledge that, as early as 2005, the market for mortgage-backed securities was vastly overvalued and would collapse.   In reaching its conclusions regarding the Company, the Subcommittee "reviewed hundreds of thousands of Deutsche Bank documents including reports, analyses, memoranda, correspondence, transcripts, spreadsheets, and email,"  and collected and reviewed documents from financial institutions that purchased mortgage related securities from DB and the SEC.   Levin Coburn Report at 333.   The Subcommittee also conducted 14 interviews of "current and former Deutsche Bank and HBK executives, managers, sales representatives, and traders; spoke with personnel from the financial institutions that invested in [a Deutsche Bank CDO named] Gemstone 7; and consulted with a number of experts from the SEC, academia, and industry."  *Id.*

163.    The Levin Coburn Report also considered the testimony and documents written by Lippmann, "who served as global head of Deutsche Bank's CDO, ABS and ABS Correlation Trading Desks," was  responsible for overseeing "trading a variety of RMBS, CDO, and other asset

- 61 -

backed securities on the secondary market" and had "a staff of approximately 30 employees, 20 in the United States and 10 in London." *Id*. at 336. "Mr. Lippmann was also the head of risk management for all new issue CDOs and described himself as 'involved in underwriting, structuring, marketing and hedging our warehouse risk for new issue cdos.'" *Id.* at 336-37.

164.    In 2005, Lippmann expressed his opinion to individuals throughout DB that the mortgage-related securities market was going to collapse and that the Company should take a "short" position by betting that mortgage related securities would lose value. Lippmann explained to the Subcommittee that "he had concluded that even a moderate slowdown in rising housing prices would result in significant subprime mortgage defaults" and "that his negative view of RMBS securities was based primarily on his view that moderating home prices would cause subprime mortgage defaults and was not dependent upon the quality of the subprime loans." *Id*. at 342.

165.    In November 2005, Lippmann sought and was given permission by DB executives to enter into $1 billion "short" position against mortgage-related securities. In a presentation supporting his position entitled, "Shorting Home Equity Mezzanine Tranches," Lippmann told fellow DB executives:

- "Over 50% of outstanding subprime mortgages are located in MSAs [metropolitan statistical areas] with double digit 5 year average of annual home price growth rates.

- There is a strong negative correlation between home price appreciation and loss severity.

- Default of subprime mortgages are also strongly negatively correlated with home price growth rates.

- Nearly $440 billion subprime mortgages will experience payment shocks in the next 3 years.

- Products that may be riskier than traditional home equity/subprime mortgages have become popular."

- 62 -

*Id.* at 342-43.

166.    By 2006 – long before the first Offering in this case – Lippmann had taken (on behalf of and with the permission of DB) a short position of $4-$5 billion against the U.S. mortgage related securities.  Lippmann also expressed his belief that the mortgage-backed securities market would collapse.  The Levin Coburn Report found:

> In addition to disparaging individual RMBS securities, Mr. Lippmann expressed repeated negative views about the CDO market as a whole.  At times during 2006 and 2007, he referred to CDO underwriting activity by investment banks as the workings of a "CDO machine" or "ponzi scheme."  In June 2006, for example, a year before CDO credit ratings began to be downgraded en masse, Mr. Lippmann sent an email to a hedge fund trader warning about the state of the CDO market: "[S]tuff is flat b/c [because] the cdo machine has not slowed but I am fielding 2-4 new guys a day that are kicking the tires so we probably don't go tighter."  A few months later, in August 2006, Mr. Lippmann wrote about the coming market crash: "I don't care what some trained seal bull market research person says this stuff has a real chance of massively blowing up."

*Id.* at 340.

167.    In "late February or early March 2007, as the ABX Index showed subprime RMBS securities losing value and subprime mortgages continued incurring delinquencies at record rates," Lippmann was asked to address DB's Executive Committee "to discuss the bank's risk exposure in mortgage related securities" and expressed his belief that the market would continue to decline.  *Id.* at 345.  At the conclusion of the meeting, Mr. Lippmann was directed by the Executive Committee to maintain the $4-$5 billion short position against the mortgage market.  *Id.*  The Levin Coburn Report also concluded that DB's long and short mortgage positions "together resulted *in 2007 losses to the bank of about $4.5 billion*."  *Id.* at 333.

168.    Based upon the evidence, the Levin Coburn Report made the following "findings of fact regarding Deutsche Bank":

> 1.    **CDO Machine**.  From late 2006 through 2007, despite increasing mortgage delinquencies, RMBS losses, and investor flight from the U.S. mortgage

market, U.S. investment banks continued to issue new CDOs, including Deutsche Bank which issued 15 new CDOs securitizing nearly $11.5 billion of primarily mortgage related assets from December 2006 to December 2007.

2.      **Fee Incentives**.  Because the fees charged to design and market CDOs were in the range of $5 to $10 million per CDO, investment banks had strong incentives to continue issuing CDOs despite increasing risks and waning investor interest, since reduced CDO activity meant less revenues for structured finance units and even the disappearance of CDO departments and trading desks, which is eventually what occurred.

3.      **Deutsche Bank's $5 Billion Short**.  Although Deutsche Bank as a whole and through an affiliated hedge fund, Winchester Capital, made proprietary investments in long mortgage related assets, the bank also permitted its head CDO trader to make a $5 billion short investment that bet against the mortgage market and produced bank profits totaling approximately $1.5 billion.

4.      **Proprietary Loss**.  By 2007, Deutsche Bank, through its mortgage department and an affiliated hedge fund, had substantial proprietary holdings in the mortgage market, including more than $25 billion in long investments and a $5 billion short position, which together resulted in 2007 losses to the bank of about $4.5 billion.

*Id.*

169.    The Levin Coburn Report's findings of fact regarding DB's structuring and selling of the "Gemstone 7" CDO product further demonstrates that the Offering Materials were false and misleading.  As the Report found:

Deutsche Bank issued the Gemstone 7 securities in March 2007.  Six out of Gemstone's seven tranches received investment grade ratings, including AAA ratings for the top three tranches.  ***Two months later, in July 2007, the major credit rating agencies issued mass rating downgrades of RMBS and CDO securities, including 19 of the 115 RMBS securities included or referenced in Gemstone 7.  In November 2007, the credit rating agencies began to downgrade the Gemstone 7 securities***.  Today, all seven tranches have been downgraded to junk status, and the Gemstone 7 securities are nearly worthless.

\*     \*     \*

**$400 Million of Unsold Securities**.  The mortgage market continued to worsen in March [2007] as Deutsche Bank continued to market the Gemstone securities.  On March 8, 2007, one week before the Gemstone 7 deal closed, New Century – the subprime lender whose RMBS securities made up part of Gemstone – filed an 8-K with the SEC which said: "The Company has only been able to fund a

portion of its loans this week.  In addition, its capacity to fund new originations is substantially limited due to its lenders' restrictions or refusals to allow the Company to access their financing arrangements."  New Century's financial troubles were prominently reported in the financial press on March 11, 2007.  On March 15, 2007, the day Gemstone 7 closed, Bear Stearns said that "residential mortgage-related revenue decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market. . . .  New Century Financial Corp., which had been a major provider of loans to people with risky credit, said it has lost support from its financial backers and is being delisted from the NYSE."  New Century comprised 15% of Gemstone 7.

Ultimately $400 million of Gemstone 7 was unsold.  Although not contractually obligated to do so, Deutsche Bank agreed to split the unsold $400 million of Gemstone 7 securities between itself and HBK.  Meetings concerning taking back the $400 million were held at the highest levels of both Deutsche Bank and HBK.  As Mr. Lippmann put it: "[W]e don't have much choice . . . either we repo for them or we take it down."

*Deutsche Bank and HBK were unable to sell 36% of the securities and instead kept those securities on their books*.  Mr. Jenks of HBK told the Subcommittee that he always wanted to know if unsold portions of a CDO he was interested in investing in would be bought back by the underwriter, but he did not know if everyone asked about this.  M&T Bank told the Subcommittee that it would have been useful information, though it would have been more concerned if the tranches it was purchasing were not fully subscribed.

\*       \*       \*

Gemstone 7 closed on March 15, 2007, and received credit ratings from S&P and Moody's on the same day.  The top three tranches, representing 73% of the value of the CDO, received AAA ratings.  The next three tranches received investment grade ratings of AA, A, and BBB.  The CDO received these ratings even though one third of its underlying assets carried non-investment grade ratings.

Eight months later, in November 2007, five of its seven tranches were downgraded, including one of its AAA rated tranches.  By July 2008, all seven tranches had been downgraded  to junk status, and the Gemstone securities were nearly worthless.

*Id.* at 350, 369-71.  The Levin Coburn Report concluded:

[Deutsche Bank] continued to issue CDOs after mortgages began losing money at record rates, investor interest waned, and its most senior CDO trader concluded that the mortgage market in general and the specific RMBS securities being included in the bank's own CDOs were going to lose value. . . .

- 65 -

. . . Deutsche Bank allowed the inclusion of Gemstone 7 assets *which its most senior CDO trader was asked to review and saw as likely to lose value*. . . .  [T]he bank sold poor quality assets from its own inventory to the CDO . . . [and the] bank aggressively marketed the CDO securities to clients despite the negative views of its most senior CDO trader, falling values, and the deteriorating market. . . .  [T]he bank [also] failed to inform potential investors of Mr. Lippmann's negative views of the underlying assets and its inability to sell over a third of Gemstone's securities.  Each of these issues focuses on the poor quality of the financial product that Deutsche Bank helped assemble and sell.

*Id.* at 374-75.

**Defendants Knew, Based on Their Own Due Diligence,
that Their Mortgage-Backed Securities Were Not
Adequately Underwritten and Overvalued**

170.    As detailed in the FCIC Report, DB retained an outside vendor, Clayton, to review samples of the loans it was securitizing in its RMBS.  In connection with its sampling of loans for DB, Clayton provided DB with reports of its findings.  Clayton provided such reports to DB as it sampled loans throughout 2006 and 2007.  According to Clayton Vice President Vicki Beal ("Beal"), Clayton provided defendants with *daily reports* concerning the loans it tested during this time period and DB reviewed all such reports.

171.    Clayton's reports to defendants revealed that, from January 2006 through June 2007, *nearly 35% of the mortgages defendants submitted to Clayton for review did not comply with the stated underwriting guidelines and did not have compensating factors otherwise justifying approval of the loans*.  Nonetheless, of the mortgages that Clayton found defective, *50% were subsequently "waived" back into the RMBS by DB*.  This undisputedly demonstrates that defendants knew the loans underlying its RMBS did not comply with the stated underwriting guidelines, and were therefore much riskier and less valuable than represented.

172.    In response to Clayton's findings, defendants did not improve their practices by excluding the faulty loans from their offerings, or by expanding the number of loans that were

- 66 -

subject to review.  In fact, just the opposite occurred.  ***The sample size of loans reviewed by Clayton was decreased and no expanded testing was done***.  According to DB's Swartz, the sample size was negotiated between defendants' traders and the loan sellers – neither of which had any incentive to increase the sample size because it could result in more loans being rejected from the pool.  Indeed, according to Swartz, the sellers were "very, very sensitive about sample sizes" and "[t]hey always wanted . . . to sample less."  However, as the ***FCIC pointed out, "one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans***."  FCIC Report at 170.  In fact, it was highly probable, given the large defect rates detected in the sampled loans, that the massive numbers of untested loans would have similar defect rates. The FCIC concluded that the failure by defendants and other investment banks to disclose the Clayton findings in the offering documents or do further testing on the loans "rais[ed] the question of whether the disclosures were ***materially misleading, in violation of the securities laws***."  *Id.*

173.    Clayton's Beal agreed during her testimony that defendants' "waivers" of a high number of non-conforming loans into their RMBS offerings created the impression that defendants were "trying to get this stuff out the door," *i.e.*, defendants were attempting to sell it as fast as possible to unsuspecting investors, in order to get them off DB's books.  *See* July 22, 2010 FCIC Staff Interview of Vicki Beal ("Beal Interview").

**Defendants Knew that the Mortgage-Backed Securities Were Overvalued Through Their Affiliation with and Acquisition of MortgageIT**

174.    In DB's effort to gain control of the securitization process and to ensure a steady supply of mortgage loans to securitize, it acquired a number of loan originators, including MortgageIT.  Announcing the MortgageIT acquisition in a July 12, 2006 press release, defendants boasted that "the vertical integration of a leading mortgage originator like MortgageIT will provide significant competitive advantages, such as access to a steady source of product for distribution into

the mortgage capital markets."  DB knew that MortgageIT was issuing and had issued billions of dollars of mortgage loans which did not comply with stated lending practices, misrepresented the borrowers' ability to repay the loans, and were likely to default.

175.    On August 22, 2011, the DOJ filed a complaint against MortgageIT and DB, accusing them of "knowingly, wantonly, and recklessly" permitting violations of underwriting guidelines. The DOJ alleged that MortgageIT and DB falsely represented that mortgages included in certain DB and MortgageIT RMBS complied with certain federal origination requirements.

176.    According to the DOJ complaint, DB and MortgageIT "failed to implement basic quality control" procedures to ensure that the loans they originated conformed to those requirements. The DOJ further detailed MortgageIT's lax underwriting processes over several years.  Among other things, the DOJ claimed that MortgageIT had no in-house quality control procedure in place until late 2005; that it instead contracted with a vendor who prepared letters detailing "serious underwriting violations"; and that MortgageIT employees, rather than reviewing and acting upon those findings, "stuffed the letters, unopened and unread, in a closet in MortgageIT's Manhattan headquarters."

177.    Beginning in December 2004, MortgageIT's quality control manager attempted to implement MortgageIT's first quality control system.  However, according to the DOJ, that system "quickly proved dysfunctional" and "never worked."  For example, in late 2004-early 2005, the quality control manager identified a MortgageIT underwriter who "engaged in a pattern of serious underwriting violations with common brokers," which included "submitting ineligible and/or fraudulent mortgages."  The quality control manager asked MortgageIT's President and other senior executives to take action, but neither the President nor other executives acted on the report.

178.   The situation did not improve with DB's acquisition of MortgageIT.  In fact, beginning in 2006, during the period in which DB initially announced the planned acquisition and performed its due diligence for that transaction, MortgageIT, in an effort "[t]o increase sales," further cut down its quality control procedures, shifting the work of quality control personnel "from quality control reviews of closed mortgages . . . to assistance with production."  This led the DOJ to conclude that "*after Deutsche Bank acquired MortgageIT, it not only failed to fix the existing quality control deficiencies at MortgageIT, but it made a very bad problem even worse*."  As a result, according to the DOJ complaint, more than 12,500 loans by defendants and MortgageIT had defaulted by February 2011, basically one in every three loans.

179.   As part of the May 10, 2012 $202.3 million settlement paid by DB to the U.S. Government to resolve the DOJ's investigation into MortgageIT's lending and underwriting practices and disclosures, DB and some of its affiliates "*admit, acknowledge, and accept responsibility* for the fact" that after MortgageIT was acquired by DB, defendants "*were in a position to know that the operations of MortgageIT did not conform fully to all of HUD-FHA's regulations, policies, and handbooks*" and that "contrary to the representations in MortgageIT's annual certifications, MortgageIT *did not conform to all applicable HUD-FHA regulations*."

**Defendants Knew DB's VaR Metrics Were Materially False and Misleading**

180.   In the 2007 20-F, which was incorporated into the May 2008 Offering Materials, DB stated that its equities trading VaR ranged between $43.5 million and $90.5 million during 2007.  A company's VaR is a measure of how much risk is in its portfolio, and how large its potential losses can be.  DB assured investors that any potential loss outside of this VaR disclosure would be "immaterial."  DB also assured investors that the Company was "re-evaluating [its] modeling assumptions and parameters for potential improvements in unusual market conditions, such as those

- 69 -

observed in the last two quarters of 2007." Despite these assurances, DB suffered equities trading

losses of $630 million, almost 700% above its supposed "maximum exposure."

181.    Defendants VaR metric was knowingly false and misleading because, as DB

concedes in it 2007 20-F, the equity markets were indisputably experiencing "unusual market

conditions" during this time period (especially the last two quarters of 2007) and the VaR model

defendants used to reach their calculations was only an appropriate measure of DB's trading market

risk "under normal market conditions." As such, by failing to implement and use a VaR model that

accounted for the "unusual market conditions" that defendants were admittedly aware of during this

time period, DB knowingly reported false and misleading VaR metrics that failed to reflect the

actual risk associated with DB's equities trading.

## DEFENDANTS ARE FORCED TO ADMIT THE TRUTH

182.    On January 14, 2009, a press release was issued by DB entitled "Deutsche Bank

provides update on fourth quarter 2008 performance," which stated in part:

> Deutsche Bank today announced, on a preliminary and unaudited basis, key
> elements of its fourth quarter 2008 financial performance:
>
> **Fourth-quarter loss:** The bank currently anticipates a loss after taxes in the
> region of EUR 4.8 billion for the fourth quarter 2008. This development reflects
> exceptional market conditions, which severely impacted results in the sales and
> trading businesses, most notably in Credit Trading including its proprietary trading
> business, Equity Derivatives and Equities Proprietary Trading. The result also
> reflects exposure reduction and other de-risking measures, a significant increase in
> provisions against certain of our monoline counterparties, and certain other
> exceptional gains and charges, including reorganisation charges. In Asset and
> Wealth Management, the bank anticipates a fourth quarter loss driven by an
> impairment charge on intangible assets related to DWS Scudder and substantial
> injections into money market funds.

183.    Then on February 5, 2009, the Company issued a release concerning the loss, entitled

"***Deutsche Bank reports net loss of EUR 3.9 billion for the year 2008***," which stated in part:

- 70 -

For the fourth quarter 2008, the bank reported a net loss of EUR 4.8 billion, compared to net income of EUR 1.0 billion in the fourth quarter 2007.  The bank reported a loss before income taxes of EUR 6.2 billion, versus income before income taxes of EUR 1.4 billion in the prior year quarter.

\*         \*         \*

In the Corporate and Investment Bank (CIB), net revenues were EUR 3.0 billion negative, versus EUR 4.5 billion positive in the fourth quarter 2007.

In Corporate Banking & Securities (CB&S), net revenues were EUR 3.8 billion negative in the fourth quarter, versus EUR 3.8 billion positive in the fourth quarter 2007.  *This development reflects negative revenues of EUR 4.8 billion in Sales & Trading, driven by significant losses in key businesses: Credit Trading (both proprietary and customer), Equity Derivatives, and Equity Proprietary Trading*.  These losses reflect the impact on Deutsche Bank's business model of unprecedented levels of market volatility, correlation across asset classes, and the breakdown of historically observed relationships between asset classes, compounded by extreme illiquidity, in an exceptionally turbulent market environment.

\*         \*         \*

Provision for credit losses was EUR 591 million in the fourth quarter, up 80% versus the fourth quarter 2007, and including EUR 185 million of provisions in respect of loans reclassified in accordance with amendments to IAS 39.  In CIB, provision for credit losses was EUR 361 million, up 90% versus the prior year quarter, primarily reflecting provisions in respect of reclassified loans.  In PCAM, provision for credit losses was EUR 229 million, up 68%, primarily in PBC reflecting a rise in provision against the backdrop of a deteriorating credit environment and business growth.

\*         \*         \*

**Corporate Banking & Securities (CB&S)**

Deutsche Bank's Sales & Trading businesses were severely impacted by the unprecedented market turmoil that started in September and continued to deteriorate in the fourth quarter.  Many market participants, including hedge funds, were forced to liquidate substantial positions in assets such as convertibles, investment-grade and high-yield bonds, default swaps, and in long-short equity strategies.  These actions drove higher volatilities and correlations in all markets and a significant dislocation in the relationship (or basis) between trading positions and their hedges.

In this challenging environment, Deutsche Bank continued to suffer significant losses in the Credit Trading business, including Credit Proprietary Trading, and Equity Proprietary Trading (EFT) books.  Proprietary positions were significantly reduced in size, although market liquidity was not sufficient to eliminate

- 71 -

risk in all cases and the bank retains some potential exposure to any further deterioration in these positions.

Sales & Trading (Debt and other products) revenues were negative EUR 2.7 billion in the fourth quarter 2008, compared to positive EUR 1.6 billion in the fourth quarter 2007.

***The fourth quarter 2008 included losses in Credit Trading of EUR 3.4 billion, of which EUR 1.0 billion related to the Credit Proprietary Trading business***. The losses in the Credit Proprietary Trading business were mainly driven by losses on long positions in the U.S. Automotive sector and by falling corporate and convertible bond prices and basis widening versus the Credit Default Swaps (CDS) established to hedge them. The remaining losses in the Credit Trading business were driven across many sectors as bonds were sold off and basis spreads widened, driven by significant market de-leveraging and low levels of liquidity.

Further mark-downs of EUR 1.7 billion were taken relating to additional reserves against monoline insurers (EUR 1.1 billion), driven in part by additional specific reserves related to certain insurers, and additional provisions against residential mortgage-backed securities (EUR 244 million), commercial real estate loans (EUR 214 million), and impairment losses on available for sale positions (EUR 58 million).

\*       \*       \*

For the full year, Sales & Trading (Debt and other products) revenues were EUR 124 million, compared to EUR 8.4 billion in 2007. ***Key drivers of the decline were mark-downs of EUR 5.3 billion, compared to EUR 1.6 billion in 2007, and the aforementioned trading losses in the fourth quarter 2008***. . . .

Sales & Trading (Equity) revenues were negative EUR 2.1 billion in the fourth quarter 2008, compared to positive EUR 1.1 billion in the same quarter 2007. In an environment characterized by severely dislocated equity markets, with unprecedented levels of volatility and very low levels of liquidity, Equity Derivatives incurred losses of EUR 1.7 billion from managing structural risks, particularly around correlation, volatility and dividend risk related to single stocks. Equity Proprietary Trading losses of EUR 413 million were driven by market-wide de-leveraging which drove down convertible values and widened basis risk.

184.   On February 5, 2009, during the Company's Q4 2008 and preliminary 2008 earnings

conference call, defendant Ackermann made the following statements:

But we use the leverage ratio as a benchmark just to demonstrate that we take the assets serious, and have of course, contrary than what we did in the past, in the last six months very, very much focused on granular trading and balance sheet positions, and that is what we want to demonstrate.

- 72 -

* * *

The focus was on getting a 10% and getting the leverage ratio down and, of course, getting risk down that we start on a different platform into 2009.

* * *

[T]here were two areas, prop trading where relative value strategy suffered from all that I just said, and our assumptions were wrong in this very difficult market.

Some would argue they come back and make a lot of money, it may well be. But we had a different approach we said we just can't afford that. So we get rid of it, we take the losses and want to have – start from a new platform, even if in five years from now someone says opportunity costs would have been pretty important.

The second one is scale. We have been too big, and that is something we have to work down and we will work on that, that's fine. We came down in non-derivative trading assets from EUR460b some time ago to slightly over EUR200b, and we will have a further cut in the first quarter of this year. We want to get the kind of exposure down so whatever happens we cannot have similar volatilities on our P&L.

And the last point is complexity what I said with intellectual leadership, and so we had exposure to volatility and correlation risk. Also something we have to control and monitor better.

185.    On that same call, further illustrating the earlier material omissions, Ackermann stated:

I think we told you many, many times that our prop trading is about 10% to 15% of our revenues. And we also felt that a relatively modest number.

But in order to, if you take 10% out of EUR15b it's only EUR 1.5b. But to achieve EUR1.5b you need actually a risk allocation and a risk equivalent and capital equivalent of several times more. So let's assume it's a 20% return you need five times more so you talk about EUR7b to EUR8b.

And if you have swings, as we had, on this EUR8b you can easily lose EUR2b, EUR3b. And that is what we have seen in 2008, and something we don't want to see again.

* * *

So the proprietary trading risk has been reduced by 90%. Then we have reduced our RMBS exposures to 50%.

- 73 -

186.    During the call, Ackermann referred to the below presentation that illustrates the extent of the Company's involvement in proprietary trading during the period in which the Offerings were made, demonstrating the true extent of the Company's exposure to proprietary trading risk:



187.    During the call, Krause referred to a presentation that illustrated the Company's true exposure to the subprime market, as well as the Company's dangerously high leverage ratio, during the period of time in which the Offerings were made:

758080_2



188.    Further disclosing the deterioration caused by the Company's toxic trading portfolio,

the Company issued its 2008 Annual Report on March 23, 2009, which stated in part:

758080_2

Net gains (losses) on financial assets/liabilities at fair value through profit or loss from CIB – Sales & Trading (debt and other products) were a loss of €5.6 billion in 2008, compared to a gain of €3.9 billion in 2007. This development was mainly driven by mark-downs relating to reserves against monoline insurers, provisions against residential mortgage-backed securities and commercial real estate loans and significant losses in our credit trading businesses, including our proprietary trading businesses in the third and fourth quarter of 2008, which are described in more detail in the discussion of the results of CB&S. . . . The main contributor to the net loss of €1.8 billion on financial assets/liabilities at fair value through profit or loss from Other products were net mark-downs of €1.7 billion on leveraged finance loans and loan commitments during 2008.

\*      \*      \*

Sales & Trading (debt and other products) revenues for the year were €124 million, compared to €8.4 billion in 2007. Key drivers of the decline were mark-downs of €5.8 billion, relating to additional reserves against monoline insurers (€2.2 billion), further mark-downs on residential mortgage-backed securities (€2.1 billion) and commercial real estate loans (€1.1 billion), and impairment losses on available for sale positions (€490 million), compared to a total of €1.6 billion in 2007. If reclassification, in accordance with the amendments to IAS 39, had not been made, the income statement for the year would have included additional negative fair value adjustments of €2.3 billion in Sales & Trading (debt and other products).

In Credit Trading, we incurred further losses of €3.2 billion, predominantly in the fourth quarter, of which €1.7 billion related to Credit Proprietary Trading. The losses in the Credit Proprietary Trading business were mainly driven by losses on long positions in the U.S. automotive sector and by falling corporate and convertible bond prices, as well as basis widening on significant other debt trading inventory versus the credit default swaps (CDS) established to hedge them.

\*      \*      \*

As of December 31, 2008, the [€868 million in] Super Senior and Mezzanine [subprime residential mortgage-related available-for-trading CDO] gross exposures and hedges consisted of approximately 1% 2007, 30% 2006, 35% 2005, and 34% 2004 and earlier vintages.

\*      \*      \*

On December 31, 2008, the [€4.8 billion in] Alt-A and subprime gross assets, and hedges and other protection purchased, consisted of approximately 89% 2007, 9% 2006, and 2% 2005 and earlier vintages.

\*      \*      \*

- 76 -

Exposure to Monoline Insurers: The deterioration of the U.S. subprime mortgage and related markets has generated large exposures to financial guarantors, such as monoline insurers, that have insured or guaranteed the value of pools of collateral referenced by CDOs and other market-traded securities. Actual claims against monoline insurers will only become due if actual defaults occur in the underlying assets (or collateral). There is ongoing uncertainty as to whether some monoline insurers will be able to meet all their liabilities to banks and other buyers of protection. Under certain conditions (e.g. liquidation) we can accelerate claims regardless of actual losses on the underlying assets.

The following table summarizes the fair value of our counterparty exposures to monoline insurers with respect to U.S. residential mortgage-related activity, on the basis of the fair value of the assets compared with the notional value guaranteed or underwritten by monoline insurers. [Table shows €1.576 billion in exposure.]

189. By November 12, 2008, DB's mortgage-backed securities losses were more than $11 billion.

190. Plaintiffs have suffered billions of dollars of damages as a result of defendants' dissemination of the false and misleading Offering Materials. Each of the securities was purchased in connection with the initial Offerings at $25 per share. By February 24, 2009, the date that the initial lawsuit in this litigation was commenced, the value of the 6.55% Securities was $8.00 per share, the 6.625% Securities was $7.98 per share, the 7.35% Securities was $8.35 per share, the 7.60% Securities was $8.99 per share, and the 8.05% Securities was $11.20 per share.

## CLASS ACTION ALLEGATIONS

191. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities pursuant to or traceable to the Offering Documents and who were damaged thereby, exclusive of defendants, the officers and directors of any defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any defendant has or had a controlling interest (the "Class").

192.    The members of the Class are so numerous that joinder of all members is impracticable.  The securities were traded on the New York Stock Exchange ("NYSE").  While the exact number of the members of the Class is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

193.    Plaintiffs' claims are typical of the claims of the other Class members as all Class members are similarly affected by defendants' illegal conduct that is complained of herein.

194.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

195.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the defendants misrepresented and/or failed to disclose material facts in the Offering Documents as described herein;

(c)    whether the Individual Defendants are "controlling persons" within the meaning of §15 of the Securities Act; and

(d)    whether defendants' acts caused damages, and if so, the proper measure of such damages.

- 78 -

758080_2

196.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
## AND BESPEAKS CAUTION DOCTRINE

197.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

198.     First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements, or statements (or omissions) of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

199.     To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with applicable accounting rules.

## COUNT I

### Violations of §11 of the Securities Act
### (Against All Defendants)

200.    Plaintiffs repeat and reallege each and every allegation contained above.

201.    This Count is asserted by plaintiffs against all defendants under and brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Class.

202.    As set forth above, the Registration Statement was materially, objectively and subjectively false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not materially misleading, and omitted to state material facts required to be stated therein.

203.    DB was the registrant for the Offerings, and created the Trust Defendants and the LLC Defendants for the sole purpose of issuing the securities and obtaining the proceeds therefrom. As issuers of the securities, DB, the Trust Defendants and the LLC Defendants are strictly liable to plaintiffs and the Class for the misstatements and omissions above pursuant to §11 of the Securities Act.

204.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement, was responsible for the contents and dissemination of the Registration Statement, and is liable to plaintiffs and the Class for the misstatements and omissions identified above pursuant to §11 of the Securities Act.

205.    The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement, and are liable to plaintiffs and the Class for the misstatements and omissions identified above pursuant to §11 of the Securities Act.

- 80 -

758080_2

206.    The Underwriter Defendants owed to the holders of securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement.

207.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

208.    Had these defendants conducted a reasonable investigation, they would have learned that the Registration Statement was false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

209.    By reason of the conduct herein alleged, each defendant violated §11 of the Securities Act.

210.    Plaintiffs acquired the securities pursuant and/or traceable to the Registration Statement.

211.    Plaintiffs and the Class have sustained damages.  The securities were sold at the initial offerings at $25 a share.  On February 24, 2009, the date that the initial litigation was filed against DB, the 6.55% Securities closed at $8.00, the 6.625% Securities closed at $7.98, the 7.35% Securities closed at $8.35, the 7.60% Securities closed at $8.99, and the 8.05% Securities closed at $11.20.

212.    At the time of their purchases of the securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 2009.  Less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which

- 81 -

this complaint is based to the time that plaintiffs filed the complaint.  Less than three years elapsed

between the time that the securities upon which this Count is brought were offered to the public and

the time plaintiffs filed the complaint.

**COUNT II**

**Violations of §12(a)(2) of the Securities Act**
**(Against DB, the Trust Defendants, the LLC Defendants**
**and the Underwriter Defendants)**

213.    Plaintiffs repeat and reallege each and every allegation contained above.

214.    This Count is asserted by plaintiffs pursuant to §12(a)(2) of the Securities Act, 15

U.S.C. §77l(a)(2), on behalf of all members of the Class.

215.    The Registration Statement contained a Prospectus and Prospectus Supplements in

connection with the Offerings.

216.    The Prospectus and the Prospectus Supplements contained untrue statements of

material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants

named in this Count owed plaintiffs and the other members of the Class who purchased the securities

pursuant to the Prospectus and Prospectus Supplements the duty to make a reasonable and diligent

investigation of the statements contained in the Prospectuses to ensure that such statements were true

and that there was no omission to state a material fact required to be stated in order to make the

statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should

have known of the misstatements and omissions contained in the Prospectus and Prospectus

Supplements as set forth above.

217.    By means of the defective Prospectus and Prospectus Supplements, defendants named

herein sold and assisted in the sale of the securities to plaintiffs and other members of the Class.

- 82 -

218.     Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus and Prospectus Supplements at the time plaintiffs acquired the securities.

219.     By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the securities pursuant to the Prospectus and Prospectus Supplements sustained substantial damages as described above in connection with their purchases of the securities.  Accordingly, plaintiffs and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

**COUNT III**

**Pursuant to §15 of the Securities Act**
**(Against DB and the Individual Defendants)**

220.     Plaintiffs repeat and reallege each and every allegation contained above.

221.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against DB and the Individual Defendants.

222.     DB owned and controlled the Trust Defendants and LLC Defendants, having created these entities for the sole purpose of issuing the securities.

223.     Each of the Individual Defendants acted as a control person of DB by virtue of his position as a director, senior officer, and/or major shareholder of DB which allowed each of these defendants to exercise control over DB and its operations.

224.     DB and the Individual Defendants were all culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the

signing of the Registration Statement and having otherwise participated in the process which allowed the Offerings to be successfully completed.

225.    By reason of their control person status, as alleged above, DB and the Individual Defendants are all jointly and severally liable for the violations of §11 of the Securities Act pursuant to §15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable, injunctive, or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  October 15, 2015                ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                    ANDREW J. BROWN
                                    ERIC I. NIEHAUS
                                    LUCAS F. OLTS
                                    CHRISTOPHER D. STEWART
                                    KEVIN S. SCIARANI

                                                  s/ ERIC I. NIEHAUS
                                                  ERIC I. NIEHAUS

758080_2

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
andrewb@rgrdlaw.com
ericn@rgrdlaw.com
lolts@rgrdlaw.com
cstewart@rgrdlaw.com
ksciarani@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com

LAW OFFICES OF BERNARD M.
   GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

Lead Counsel for Plaintiffs

GLANCY PRONGAY & MURRAY LLP
BRIAN P. MURRAY
LEE ALBERT
122 East 42nd Street, Suite 2920
New York, NY  10168
Telephone:  212/682-5340
212/884-0988 (fax)
bmurray@glancylaw.com
lalbert@glancylaw.com

Co-Lead Counsel for Plaintiffs

- 85 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 15, 2015.

s/ ERIC I. NIEHAUS
ERIC I. NIEHAUS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  ericn@rgrdlaw.com

# Mailing Information for a Case 1:09-cv-01714-DAB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Lee Albert**
  lalbert@glancylaw.com

- **Andrew J. Brown**
  andrewb@rgrdlaw.com,nhorstman@rgrdlaw.com,ldeem@rgrdlaw.com

- **Charles Alan Gilman**
  cgilman@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com,managingattorney@cahill.com

- **Deborah R Gross**
  debbie@bernardmgross.com

- **Eva Hromadkova**
  evah@murrayfrank.com

- **David George Januszewski**
  managingattorney@cahill.com,djanuszewski@cahill.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Matthew Montgomery**
  mattm@csgrr.com

- **Brian Philip Murray**
  bmurray@glancylaw.com

- **Scott D. Musoff**
  smusoff@skadden.com,aviva.nusbaum@skadden.com

- **Eric I. Niehaus**
  ericn@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,iveneck@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher D. Stewart**
  cstewart@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Harry            J. Weiss
450 Fifth Street, N.W.
Mail Stop 4-2
Washington, DC 20549
```