UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In re DEUTSCHE BANK AG
SECURITIES LITIGATION
------------------------------------X        09 CV 1714 (DAB)

This Document Relates to:                    <u>OPINION</u>

ALL ACTIONS


------------------------------------X

DEBORAH A. BATTS, United States District Judge.

        This Action involves a series of securities offerings

between May 2007 and May 2008 where allegedly false or

misleading offering materials were used to sell $5.4 billion of

preferred securities in violation of Sections 11, 12(a)(2) and

15 of the Securities Act of 1933.  Before the Court is

Defendants' Motion to Dismiss the Third Consolidated Amended

Complaint.  For the reasons stated below, Defendants' Motion to

Dismiss is GRANTED IN PART and DENIED IN PART.



I.   <u>Background and Operative Complaint</u>

          A. <u>Procedural History</u>

        This Action arises out of six putative class action cases

filed between February and May 2009 against Deutsche Bank AG

("DB," "Deutsche Bank," or "the Company") and other related

entities and individuals.  This Court consolidated those Actions

by Order dated August 11, 2009.  (ECF No. 19.)  On November 23,
2009, this Court appointed Co-Lead Plaintiffs and Co-Lead
Counsel and directed the filing of a Consolidated Amended
complaint ("CAC").  (ECF No. 27.)  The CAC alleged violations of
Sections 11, 12(a)(2) and 15 of the Securities Act by certain DB
and individual defendants, underwriters, and the auditor
relating to a Form F-3 Registration Statement and Prospectus
filed with the Securities Exchange Commission on October 10,
2006, and various prospectus supplements to that Registration
Statement used to conduct six offerings of preferred securities
between October 2006 and May 2008.  (CAC ¶¶ 1-2 (ECF No. 34).)
The CAC alleged that the securities were sold pursuant to
materially false and misleading offering materials which
misrepresented or omitted material facts, including: (1) that
the Company had as much as €20 billion in exposure to high-risk
subprime and nonprime residential mortgage markets through
Residential Mortgage Backed Securities ("RMBS") and
Collateralized Debt Obligation ("CDO") assets, in violation of
Generally Accepted Accounting Principles ("GAAP"), SEC
regulations and International Financial Reporting Standards
("IFRS"); (2) that the Company's disclosures concerning market
risks and credits risks were false and misleading in that they
misrepresented DB's true exposure to RMBS/CDO securities and
other mortgage-related assets; (3) that the Company's assertions

concerning its compliance with GAAP were false and misleading as DB's 2005 and 2006 Form 20-Fs did not comply with GAAP in that they omitted and/or misrepresented DB's true exposure to RMBS/CDO securities and other mortgage-related assets; (4) that the Company engaged extensively in high-risk proprietary trading, i.e., gambling on the Company's own account using huge, undisclosed leverage; and (v) that the Company's 2007 Form 20-F disclosures were false and misleading in that they failed to reflect the actual risk associated with Deutsche Bank's proprietary trading practices. (Id. ¶ 3.) The CAC explicitly "exclude[d] and disclaim[ed] any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as [the Section 11 and 12(a)(2) Claims were] based solely on claims of strict liability and/or negligence under the Securities Act." (Id. ¶¶ 189, 203; see also id. ¶ 1.)

Defendants subsequently moved to dismiss the CAC. On August 19, 2011, this Court granted in part and denied in part Defendants' Motion to Dismiss. (ECF No. 59.) Specifically, the Court granted with prejudice the motion to dismiss with respect to Plaintiffs' Section 11, 12(a)(2) and 15 claim relating to the October 2006 Offering, finding that Plaintiffs' allegations regarding failure to disclose a group concentration of risk constituted an unsupported legal conclusion. (Id. at 10-11.) The Court also found that, contrary to the allegations,

Defendants did actually disclose DB's intention to increase activities in mortgage-backed securities and that increased trading activities could lead to losses.  (<u>Id.</u> at 11-12.)

With respect to the 2007 and February 2008 offerings, the Court declined to adopt Defendants' argument that they had no duty to "disaggregate" or quantify the particular types or quality of the Company's mortgage-related holdings, noting that the CAC alleged specific facts about the Company's subprime holdings and trends in the subprime market that put those holdings at risk.  (<u>Id.</u> at 15-19.)  With respect to the May 2008 Offering, the Court found that the factual allegations of trading vastly in excess of stated VaR limits were sufficient to state a claim.  (<u>Id.</u> at 23.)  The Court then granted without prejudice the motions to dismiss with respect to Plaintiffs' remaining claims under Section 12(a)(2), denied the motions in all other aspects, and set a schedule for filing of a Second Consolidated Amended Complaint and Answer.[1]  (<u>See id.</u> at 30)

Four days later, on August 23, 2011, the Second Circuit issued an opinion in <u>Fait v. Regions Financial Corp.</u>, 655 F.3d 105 (2d Cir. 2011), holding that estimates of goodwill and loan loss reserves are not "facts," but instead "opinions."  (<u>Fait</u>, 655 F.3d at 110, 113.)  Defendants subsequently moved for

---

[1] The Court also granted Plaintiffs' Motion to Strike certain documents.

reconsideration of this Court's August 19, 2011 Order, arguing that Fait constituted an intervening change in the governing law.  (ECF No. 60.)  Before the Court ruled on the Motion for Reconsideration, Plaintiffs filed a Second Consolidated Amended Complaint (ECF No. 65).

On August 9, 2012, this Court granted Defendants' Motion to Reconsider and dismissed the CAC with prejudice and without leave to replead.  (ECF No. 70.)  In doing so, the Court emphasized that "Plaintiffs concede that the claims in the Complaint 'exclusively rely on theories of strict liability and negligence'" (id. at 5 (quoting CAC ¶ 1)), and that Plaintiffs "specifically aver that none of their claims are based on knowing misconduct by the Defendants," a fact that "alone is fatal to Plaintiffs' claims after Fait." (Id. (citation omitted)).)  Plaintiffs then moved the Court to reconsider its August 9, 2012 Order and sought leave to file a proposed Third Consolidated Amended Complaint.  This Court denied Plaintiffs' Motion for Reconsideration with prejudice and without leave to amend on May 15, 2013.  (ECF No. 78.)

Plaintiffs appealed from the August 9, 2012 Order and the August 17, 2012 Judgment dismissing the CAC with prejudice, and the May 15, 2013 denial of their motion for reconsideration and request for leave to file a Third Consolidated Amended

Complaint.  The Second Circuit affirmed this Court's dismissal

of the CAC without leave to replead:

> With respect to the dismissal of the CAC, the district
> court was correct to hold that DB's estimation of the
> extent of its investment in and exposure to
> residential mortgage-backed securities, as well as its
> statements about its Value-at-Risk ("VaR") metrics,
> amounted only to statements of opinion. See Fait at
> 655 F.3d at 110-11 ("Estimates of goodwill depend on
> management's determination of the fair value of the
> assets acquired and liabilities assumed, which are not
> matters of objective fact.... In other words, the
> statements regarding goodwill at issue here are
> subjective ones rather than objective factual
> matters.") (internal quotation marks and citations
> omitted). As such, to have survived a motion to
> dismiss, Plaintiffs needed to have alleged that
> Defendants' statements about market risk, proprietary
> lending risk, and exposure to the real estate market
> were "both objectively false and disbelieved by the
> defendant[s] at the time [these statements] w[ere]
> expressed." Id. at 110. There are no allegations in
> the CAC that DB disbelieved its own disclosures about
> credit trading, market risk and its exposure to the
> subprime and nonprime markets, or its own VaR metrics
> and internal valuation models. Further, though
> Plaintiffs allege that Defendants were under an
> affirmative obligation to disclose their Q20 billion
> exposure to nonprime and subprime assets, there is no
> requirement that offering documents identify every
> type of asset that a security contains. See Hunt v.
> Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d
> 723, 730 (2d Cir.1998) (declining to require more
> particularized disclosures even though the specific
> type of asset at issue allegedly posed far greater
> risk than the general category of assets described,
> and holding that the challenged prospectuses
> disclosures "contained disclosures broad enough to cover these
> instruments"). Thus, we affirm the district court's
> dismissal of the CAC.
>
> We also hold that the district court did not abuse its
> discretion in denying Plaintiffs' motion, brought
> pursuant to Rules 59 and 60 of the Federal Rules of
> Civil Procedure, which asked the district court to set

aside the judgment, reconsider its prior decision, and
grant Plaintiffs leave to file a TCAC. Where "a party
does not seek leave to file an amended complaint until
after judgment is entered, Rule 15's liberality must
be tempered by considerations of finality." Williams,
659 F.3d at 213. The district court correctly held
that there was no intervening change in controlling
law between the court's August 2012 decision and
judgment and Plaintiffs' September 2012 motion for
reconsideration. And, as noted by the district court,
the "new" evidence Plaintiffs claimed to incorporate
had been available prior to entry of the August 2012
judgment. As such, Plaintiffs did not meet the strict
standard governing applications for reconsideration or
for setting aside the August 2012 judgment. See
Analytical Surveys, Inc. v. Tonga Partners, L.P., 684
F.3d 36, 52 (2d Cir. 2012) ("It is well-settled that
Rule 59 is not a vehicle for relitigating old issues,
presenting the case under new theories, securing a
rehearing on the merits, or otherwise taking a second
bite at the apple." (internal quotation marks
omitted)), cert. denied, --- U.S. ----, 133 S. Ct.
1805, 185 L.Ed.2d 812 (2013).

(Kaess v. Deutsche Bank AG, 572 F. App'x 58, 59-60 (2d Cir.

2014.)

     Plaintiffs sought review of the Second Circuit's Opinion

affirming this Court's Orders.  While Plaintiffs' petition for

certiorari was pending, the Supreme Court issued a decision in

Omnicare, Inc. v. Laborers District Council Construction

Industry Pension Fund, 135 S. Ct. 1318 (2015), in which the

Supreme Court explicitly addressed how courts should analyze

Section 11 claims (which is discussed in detail below).

Subsequently, on June 8, 2015, the Supreme Court entered a

textual Order granting Plaintiffs' Petition for certiorari,

vacating the Judgment and remanding "for further consideration

in light of [Omnicare]." (Belmont Holdings Corp, et al., v.
Deutsche Bank AG, et al., 135 S. Ct. 2805 (2015).) On July 21,
2015, the Second Circuit recalled the Mandate, vacated this
Court's Judgment, and remanded the case "for further
consideration in light of [Omnicare], and for such further
proceedings as the district court may deem necessary and
appropriate, which proceedings may, but shall not necessarily,
include allowing plaintiffs to replead their causes of action."
(Kaess, et al. v. Deutsche Bank AG, et al., 13-2364-cv (Dkt. No.
177-78) (July 21, 2015).)

On July 27, 2015, Defendants filed a Motion in Response to
the Court of Appeals' Order Remanding the Action in Light of
Omnicare, Inc. v. Laborers District Council Construction
Industry Pension Fund, 135 S. Ct. 1318 (2015) ("Motion"),
arguing that the Plaintiffs' complaint should again be dismissed
and that leave to replead should again be denied. (ECF Nos. 90-
91.) On August 7, 2015, Plaintiffs submitted a letter seeking a
pre-motion conference on an anticipated motion for leave to file
a TCAC in light of the Supreme Court's decision in Omnicare.
(ECF No. 92.) In this Letter, Plaintiffs requested leave to
file an amended complaint "that explicitly incorporates
Omnicare's new legal standard." (Id.) Defendants' opposed this
request via letter dated August 10, 2015. (ECF No. 93.) On
September 15, 2015, this Court denied Defendants' Motion as

premature and ordered Plaintiff to file a Third Consolidated Amended Complaint ("TCAC") "that incorporates the proper pleading standard under controlling Second Circuit precedent and Omnicare." (ECF No. 97.)


   B. <u>TCAC</u>

The TCAC brings claims under Section 11 against all Defendants,[2] under Section 12(a)(2) against the Deutsche Bank Defendants and the Underwriter Defendants, and under Section 15 against the Deutsche Bank and the Individual Defendants in connection with the five[3] offerings between May 2007 and May 2008. (TCAC ¶¶ 1-2 (ECF No. 98).) Unlike the prior complaints, the TCAC does not disclaim any allegations sounding in fraud.

---

[2] Defendants collectively refers to the Deutsche Bank Defendants (Deutsche Bank AG; Deutsche Bank Capital Funding Trust IX, Deutsche Bank Capital Funding LLC IX, Deutsche Bank Capital Funding Trust X, Deutsche Bank Capital Funding LLC X, Deutsche Bank Contingent Capital Trust II, Deutsche Bank Contingent Capital LLC II, Deutsche Bank Contingent Capital Trust III, Deutsche Bank Contingent Capital LLC III, Deutsche Bank Contingent Capital Trust V, Deutsche Bank Contingent Capital LLC V and Deutsche Bank Securities Inc.), the Individual Defendants (Josef Ackermann, Hugo Banziger, Detlef Bindert, Jonathan Blake, Anthony Di Iorio, Martin Edelmann, Tessen von Heydebreck, Hermann-Josef Lamberti, Rainer Rauleder, Peter Sturzinger, and Marco Zimmerman), and the Underwriter Defendants (UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, individually and as successor by merger to defendant Banc of America Securities LLC, Wachovia Capital Markets, LLC (n/k/a Wells Fargo Securities, LLC) and Morgan Stanley & Co.).

[3] The TCAC does not bring any claims based on the 2006 offering, which this Court had dismissed in the now-vacated August 19, 2011 Order.

The TCAC alleges that on or about October 10, 2006, DB filed a Form F-3 Registration Statement and Prospectus ("Registration Statement") utilizing a "shelf" registration process which allowed Defendants to sell any combination of securities described in the prospectus.  (TCAC ¶ 2.)  From May 2007 to May 2008, DB conducted five offerings of preferred securities at a price of $25 per share:

- 6.55% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II, offered on May 16, 2007;
- 6.625% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust IX, offered on July 16, 2007;
- 7.35% Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X, offered on November 6, 2007;
- 7.60% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III, offered on February 14, 2008; and
- 8.05% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V, offered on May 5, 2008.

(Id. ¶ 2.)  The Registration Statement, Prospectus, and the various Prospectus Supplements are collectively referred to as the "Offering Materials."  (Id. ¶ 1.)  The TCAC alleges that the securities were sold pursuant to materially, objectively and subjectively false and misleading Offering Materials which, in violation of GAAP, SEC regulations and IFRS,[4] misrepresented or

---

[4] The TCAC alleges that, "[p]ursuant to Regulation (EC) 1606/2002, beginning with fiscal year 2007 DB prepared their consolidated financial statements in accordance with IFRS."  (TCAC ¶ 150.)

omitted material facts, such as (1) that DB had as much as €20 billion in exposure to high-risk subprime and nonprime residential mortgage markets through RMBS and CDO assets; (2) that the Company's disclosures concerning market risks and credit risks misrepresented DB's true exposure to RMBS/CDOs and other mortgage-related assets; (3) that, as detailed in two U.S. Government reports on the financial crisis, the value of DB's RMBS and CDO assets was collapsing, the mortgages underlying the securities were far riskier than DB had represented, and DB's Executive Committee had approved a $5 billion bet against the mortgage market; (4) that the Company's assertions concerning its compliance with GAAP were false and misleading as DB's 2006 Form 20-F did not comply with GAAP; (5) that the Company was engaged in high-risk propriety trading, i.e., gambling on the Company's own account using large, undisclosed leverage; and (6) that the Company's 2007 Form 20-F disclosures failed to reflect the actual risks in DB's reported Value at Risk ("VaR") metric. (TCAC ¶ 3.)  The TCAC alleges that the Offering Materials were objectively and subjectively false and misleading, as they misrepresented and/or omitted material facts regarding DB's exposure to RMBS/CDOs:  "For example, in spite of the historic collapse of the U.S. housing and mortgage markets, defendants omitted in the Offering Materials used in connection with the first four offerings (May 2007, July 2007, November 2007 and

February 2008) that: (i) DB was holding more than $20 billion of
these high-risk securities; (ii) DB's position included RMBS and
CDOs backed by some of the very riskiest mortgages with the
highest rates of default; and (iii) the financial and the
liquidity risks those securities posed to the Company, including
the huge losses DB was suffering throughout 2007 which totaled
$4.5 billion in losses on its mortgage-backed securities in 2007
alone." (Id. ¶ 7.)  The Plaintiffs also allege that the
Offering Materials "omitted the significant risks inherent in
DB's highly leveraged 'proprietary trading' operations" and
misrepresented DB's risk management policies and controls,
alleging that the Company "lacked meaningful risk controls."
(Id. ¶¶ 8-9.)  The TCAC alleges that DB's trading portfolio was
"so toxic that DB was forced to announce on January 14, 2009
that the firm anticipated a loss after taxes of €4.8 billion for
fiscal 2008 fourth quarter, driven by €4.8 billion in losses in
the Company's sales and trading businesses: Credit Trading,
Equity Derivatives and Equity Proprietary Trading." (Id. ¶ 21
(emphasis in original).)  Plaintiffs allege that in February
2009, DB announced its first annual net loss since World War II
of €5.7 billion for fiscal year 2008, and that the deterioration
of DB's mortgage-related assets contributed to the Company's
historic 2008 losses. (Id.)  Plaintiffs allege that, at the
time this lawsuit was commenced in 2009, the securities, which

had an original purchase price of $25, were valued somewhere between $11.20 and $7.98 per share.  (Id. ¶ 23.)

The essence of the eighty-nine page TCAC is that Defendants were aware of facts regarding the status of the sub-prime market and DB's specific subprime assets that required DB to disclose more information about DB's subprime exposure, particularly as the subprime crisis worsened.  These facts fall into two categories allegedly giving rise to a duty to disclose additional information in order to render Defendants' other statements not misleading: (1) Management's knowledge at the Time; and (2) Regulatory duties.

### 1.    Management's Knowledge at the Time

#### i.    Levin Coburn Report

Plaintiffs cite to an April 13, 2011 report entitled, "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse" issued by the United States Senate Permanent Subcommittee on Investigations ("Levin Coburn Report"), to demonstrate that Defendants were "aware that their representations and omissions in the Offering Materials regarding their valuation of DB's mortgage-backed assets and VaR

metrics rendered their statements false and misleading.[5]  (Id. ¶

10.)  Plaintiffs allege that this Report "details defendants'

knowledge that – before the first Offering in May 2007 – (i) the

mortgage-backed securities market was in a state of collapsing

and would continue to fall; (ii) DB was determined to build a

massive hedge position against RMBS and CDOs; and (iii) the bank

was in the process of dumping many of its own 'long' mortgage

assets before the music stopped because of the risk those assets

posed to the Company."  (Id. ¶ 11.)

The Levin Coburn Report[6] includes a case study of DB that

examines the role of Deutsche Bank USA in the design, marketing,

and sale of collateralized debt obligations (CDOs) that

---

[5] Plaintiffs attempted to rely on this Report when submitting a proposed Third
Consolidated Amended Complaint in connection with Plaintiffs' Motion for
Reconsideration, arguing that the Report constituted "newly discovered
evidence." (See Mem. of Law In Support of Pls.' Mot. for Reconsideration 7-
11 (ECF No. 73) The Court denied Plaintiffs' leave to replead, noting that
this Report did not constitute newly discovered evidence as it was available
before judgment had been entered dismissing the CAC with prejudice. (See
Order dated May 14, 2013 at 5-6) (ECF No. 78).)

[6] The TCAC relies heavily on the Levin Coburn Report. The Reports is a public
document not subject to reasonable dispute. Accordingly, the Court considers
the Report in determining the merits and context of the allegations of the
TCAC that are based on the Report.  (IBEW Local Union No. 58 Pension Trust
Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 390
(2d Cir. 2015) ("Plaintiffs' complaint relies heavily on a report issued by
the FSA (the "FSA Report") and on testimony given in a parliamentary inquiry
on RBS's collapse for its factual allegations regarding misleading statements
by RBS made with scienter. Both the FSA Report and the testimony are cited in
the SCAC, and their contents as public documents are not subject to
reasonable dispute. We may, therefore, consider them in determining the
merits and context of the allegations of the SCAC that are based on them.")
(internal citations omitted).)

incorporated or referenced residential mortgage backed

securities.  (Permanent Subcomm. on Investigations of the Comm.

on Homeland Sec. & Govt'l Affairs, 112th Cong., <u>Wall Street and</u>

<u>the Financial Crisis: Anatomy of a Financial Collapse</u> (2011) at

330, <u>available at</u>

https://www.hsgac.senate.gov/subcommittees/investigations/reports

("Levin Coburn Report").)  The Report provides in part that:

> In the case of Deutsche Bank, during 2006 and 2007,
> the bank's top CDO trader, Greg Lippmann, repeatedly
> warned and advised his Deutsche Bank colleagues and
> some of his clients seeking to buy short positions
> about the poor quality of the RMBS securities
> underlying many CDOs, describing some of those
> securities as "crap" and "pigs."  At one point, Mr.
> Lippmann was asked to buy a specific CDO security and
> responded that it "rarely trades," but he "would take
> it and try to dupe someone" into buying it. . . . Mr.
> Lippmann at times referred to the industry's ongoing
> CDO marketing efforts as a "CDO machine" or "Ponzi
> scheme,"[7] and predicted that the U.S. mortgage market
> as a whole would eventually plummet in value. Deutsche
> Bank's senior management disagreed with his negative
> views, and used the bank's own funds to make large
> proprietary investments in mortgage related securities
> that, in 2007, had a notational or face value of $128
> billion and a market value of more than $25 billion.
> At the same time, Deutsche Bank allowed Mr. Lippmann
> to develop for the bank a $5 billion proprietary short
> position in the RMBS market, which it later cashed in
> for a profit of approximately $1.5 billion.  Despite
> that gain in 2007, due to its substantial long

---

[7] The Levin Coburn Report also provides:
  When asked about his comments, Mr. Lippmann told the Subcommittee
  that the CDO market was not really a ponzi scheme, because people
  did receive an investment return, and asserted that he had used
  the term because he was "grasping at things" to prove he was
  right in his short position. . . . He also told the Subcommittee
  that he "told his views to anyone who would listen" but most CDO
  investors disagreed with him.
(<u>Id.</u> at 340-41.)

> investments, Deutsche Bank incurred an overall loss of about $4.5 billion from its mortgage related proprietary investments.

(Levin Coburn Report at 319-20.)   "One publication noted that Mr. Lippmann 'made his name with big bets on a housing bust,' continuing: 'Mr. Lippmann emerged as a Cassandra of the financial crisis, spotting cracks in the mortgage market as early as 2006. His warnings helped Deutsche brace for the crisis. He also helped investors – and himself – land huge profits as big bets that the housing market would collapse materialized." (Id. at 337 (citing Lippmann, Deutsche Trader, Steps Down, New York Times (4/21/2010), available at

http://dealbook.nytimes.com/2010/04/21/lippmann-deutsche-trader-steps-down/).)

The Report continues that "Mr. Lippmann also told the Subcommittee that while he knew that the major credit rating agencies had given AAA ratings to an unusually large number of RMBS and CDO securities and most people believed in the ratings, he did not. He also told the Subcommittee that he 'told his views to anyone who would listen' but most CDO investors disagreed with him." (Id. at 340-41.)   "Mr. Lippmann stressed that his negative view of RMBS securities was based primarily on his view that moderating home prices would cause subprime

16

mortgage defaults and was not dependent upon the quality of the subprime loans."  (<u>Id.</u> at 342.)

"Despite the views of virtually all other senior executives at the bank that RMBS and CDO securities would gain in value over time, Mr. Lippmann convinced the bank to allow him to initiate and build a substantial proprietary short position that would pay off only if mortgage related securities lost value." (<u>Id.</u> at 341)  The Report notes that Mr. Lippmann approached his supervisor in the fall of 2005 for permission to enter into CDS agreements to short RMBS securities totaling $1 billion.  (<u>Id.</u> at 342.)  The trade was "so big and controversial" that Mr. Lippmann had to get approval from the Global Head of Credit Trading, Securitization and Commodities, Rajeev Misra, based in London.  (<u>Id.</u> at 343.)  Although Mr. Misra "reluctantly gave his approval for the short position," "Mr. Misra believed mortgage related securities would continue to increase in value over time."  (<u>Id.</u>)  Mr. Lippmann even "told the Subcommittee that, at one point in 2006, Boaz Weinstein, who reported to Mr. Misra, told him that the carrying costs of his position, which required the bank to pay insurance-like premiums to support the $2 billion short position, had become so large that he had to find a way to pay for them."  (<u>Id.</u>)  "According to Mr. Lippmann, the bank's senior management asked him to persuade them that he was right by demonstrating that others were willing to 'short' the

market as well." (Id.)  "Mr. Lippmann told the Subcommittee that
he spent much of 2006 pitching his clients to short the mortgage
market." (Id.)  "According to Mr. Lippmann, in December 2006, he
met in London with a senior bank official, Anshu Jain, Head of
Global Markets at Deutsche Bank, and suggested that Deutsche
Bank's long positions in mortgage related securities created too
much exposure for the bank and should be reduced." (Id. at
344.)  "Mr. Lippmann recommended that the bank hedge its risk
using his short strategy." (Id.)  "His suggestion was not acted
upon, but as the market grew more volatile in late 2006 and
early 2007, Mr. Lippmann's short position began to gain in value
and caught the attention of senior management at the bank."
(Id.)  In "late February or early march 2007," Mr. Lippmann
attended "an ad hoc meeting of Deutsche Bank's executive
committee" where "Deutsche Bank executives discussed whether the
recent market volatility reflected short term or longer term
trends and whether the bank should make any changes in its
holdings." (Id. at 345)  "At that time, Mr. Lippmann held the
only large short position on behalf of the bank, then about $4
to 5 billion in size." (Id.)  "In contrast, the Deutsche Bank
mortgage group held $102 billion in long RMBS and CDO
securities, and Winchester Capital, Deutsche Bank's hedge fund
affiliate, held a net long position of $8.9 billion." (Id.)
"Mr. Lippmann told the Subcommittee that he was the only person

at the meeting who argued for the bank to increase its short position." (Id.)   Later, however, in "July 2007, the major credit rating agencies began issuing downgrades of RMBS and CDO securities, in particular those that incorporated or referenced subprime mortgages." (Id.)   "By the end of the summer of 2007, Deutsche Bank initiated efforts to sell off the long positions held by Winchester Capital and other Deutsche Bank entities, reflecting a shift in the bank's strategy, but its sales force had difficulty due to the lack of customers willing to buy long." (Id. at 345-46.)

The TCAC alleges that "[p]rior to the Offerings, DB used its inside knowledge to attempt to rid itself of the economic risk of these defective assets by building a massive hedge against the very securities it was creating, and began unloading deteriorating RMBS and CDO positions from its own books into CDOs that it was arranging for its customers." (TCAC ¶ 14.) The TCAC alleges that Lippmann's CDS "short" was "not the only effort DB used to unload its own RMBS and CDO risk." (Id. ¶ 15) Plaintiffs allege that, "[w]hen asked why its large long position in mortgage holdings did not lose more value, 'Deutsche Bank told the Subcommittee that [in 2007] it had placed large hedges, using U.S. Treasury bonds, which reduced its losses.' 'Deutsche Bank told the Subcommittee that, despite the size of these holdings and their declining value' of the mortgage-backed

securities market, <u>DB lost 'about $4.5 billion on those mortgage related holdings for [2007].'"</u>  (<u>Id.</u> (quoting Levin Coburn Report at 346) (emphasis in original).)  The TCAC alleges that this loss was not disclosed in the Offering Materials.  (<u>Id.</u>)


### ii.    Clayton Holdings

Plaintiffs also look to a report issued by the Financial Crisis Inquiry Commission issued in September of 2010 ("FCIC Report") to demonstrate that DB knew that the mortgage-backed securities it held and were selling to clients were far less valuable than DB represented as DB "was well aware of the systematic abandonment of underwriting guidelines by loan originators, that DB actively participated in the creation of the defective loans, and that DB had knowingly included defective loans in the mortgage-backed securities while intentionally misrepresenting the nature of the loans."  (<u>Id.</u> ¶ 16.)  The TCAC alleges that the FCIC Report provides that DB hired an outside due diligence vendor named Clayton Holdings, Inc. as early as 2006[8] to conduct an independent third-party

---

[8] The FCIC Report, however, does not indicate that DB hired Clayton Holdings in 2006.  (<u>See</u> Fin. Crisis Inquiry Comm'n, <u>The Financial Crisis Inquiry Report</u> 165-69 (2011) (discussing banks' due diligence and third-party due diligence services such as Clayton Holdings) ("FCIC Report").)  The FCIC Report does contain a chart, (<u>see id.</u> at 167), that includes DB with other banks for January through June 2007.  This information (through June 2007) was not available in 2006.

review of samples of the loans that would be included in DB's RMBS. (Id. ¶ 17.) Plaintiffs allege that, "after testing samples of the loans, Clayton informed DB that nearly 35% of the tested loans did not meet the stated underwriting guidelines and/or were supported by falsely inflated appraisals/valuations." (Id.) Plaintiffs allege that Defendants "put half of those defective loans into DB's RMBS while falsely representing that the loans complied with the stated underwriting guidelines" and further "used this negative information for their own profit – negotiating lower price on the defective loans they bought from their originator clients, and then dumping those defective loans into the RMBS." (Id.; see also id. ¶ 171 ("Clayton's reports to defendants revealed that, from January 2006 through June 2007, nearly 35% of the mortgages defendants submitted to Clayton for review did not comply with the stated underwriting guidelines and did not have compensating factors otherwise justifying approval of the loans. Nonetheless, of the mortgages that Clayton found defective, 50% were subsequently 'waived' back into the RMBS by DB.") (emphasis in original).) The TCAC alleges that DB continued to sell and retain on its books CDOs and RMBS that would ultimately lose value because of the "nice" fees and revenue the CDO deals generated. (Id. ¶ 19; see also id. ¶ 168.)

### iii.   <u>MortgageIT</u>

The TCAC also alleges that DB knew that the mortgage-backed securities were overvalued through DB's affiliation with and acquisition of a number of loan originators, including MortgageIT in July of 2006. (<u>Id.</u> ¶ 174.)  The TCAC alleges that "DB knew that MortgageIT was issuing and had issued billions of dollars of mortgage loans which did not comply with stated lending practices, misrepresented the borrowers' ability to repay the loans, and were likely to default." (<u>Id.</u>)  The TCAC alleges that the DOJ filed a complaint against MortgageIT and DB in 2011[9] accusing them of knowingly, wantonly, and recklessly permitting violations of underwriting guidelines. (<u>Id.</u> ¶ 175.) The TCAC alleges that "[a]s part of the May 10, 2012 $202.3 million settlement paid by DB to the U.S. Government to resolve the DOJ's investigation into MortgageIT's lending and underwriting practices and disclosures, DB and some of its affiliates '<u>admit, acknowledge, and accept responsibility</u> for the fact' that after MortgageIT was acquired by DB, defendants '<u>were in a position to know that the operations of MortgageIT did not conform fully to all of HUD-FHA's regulations, policies, and handbooks</u>' and that 'contrary to the representations in MortgageIT's annual certifications, MortgageIT <u>did not conform</u>

---

[9] The DOJ complaint was not for securities regulations violations, but for housing agencies' violations.

to all applicable HUD-FHA regulations.'" (<u>Id.</u> ¶ 179 (emphasis
in original).)


2.      Regulatory Duties

i.      Item 303 of Regulation S-K

Plaintiffs allege that "registrants are required to provide
in a registration statement the information required by Item 303
of Regulation S-K[17 C.F.R. § 229.303], and the SEC's related
interpretive releases thereto, including 'any known trends or
uncertainties that have had or that the registrant reasonably
expects will have a material favorable or unfavorable impact on
net sales or revenues or income from continuing operations."
(<u>Id.</u> ¶ 82.)  Plaintiffs allege that "known trends, events and
uncertainties, including the deterioration of the Company's
RMBS/CDO securities and other mortgage-related assets, had
already come to fruition at the time of the Offerings and would
continue to have a negative impact on the Company's continuing
operations going forward.  Accordingly, the Offering Materials
were required to disclose these facts but did not." (<u>Id.</u> ¶
82(iv).)

ii.   Item 503 of Regulation S-K

Plaintiffs allege that Defendants had a duty to disclose pertinent information in the Registration Statement and Prospectuses pursuant to Item 503 of Regulation S-K, 17 C.F.R. § 229.503, "including, among other things, a 'discussion of the most significant factors that make the offering speculative or risky." (Id. ¶ 81.) "By failing to disclose any information about the level and structure of its subprime/nonprime asset holdings nor any of the required disclosures about the nature, extent, concentrations, or exposure of risks arising from its subprime and nonprime asset holdings, the Offering Materials prevented investors from determining the effect that the subprime and nonprime mortgage crisis was having on the Company prior to the Offering(s), i.e., its exposure to the subprime crisis." (Id. (emphasis in original).)


C. Allegedly False and Misleading Statements

The TCAC alleges that DB's management's knowledge at the time rendered the following statements materially false and misleading.

24

1.    <u>2006 20-F and November 2007 6-K</u>

DB's March 27, 2007 SEC Form 20-F for calendar year 2006 was incorporated into all five sets of Offering Materials.  The TCAC alleges that statements regarding DB's proprietary trading and VaR analysis were misleading.  (<u>See</u> TCAC ¶ 79.)[10]  The TCAC also alleges that the 2007 20-F also contained a misleading statement from auditor KPMG that the consolidated financial statements present fairly DB's financial statements as of December 31, 2006 "<u>in conformity with U.S. generally accepted accounting principles</u>."  (<u>Id.</u> ¶ 77 (emphasis in original).)

On November 1, 2007, DB filed a Form 6-K, which was incorporated by reference in the November 2007 and February 2008 Offerings.  (TCAC ¶ 78.)  Plaintiffs allege that this was the first time DB disclosed its exposure to RMBS/CDO assets, and the disclosure involved taking a "charge" on trading activity in those markets.  (<u>Id.</u>)

---

[10] The TCAC alleges that DB stated the following regarding proprietary trading: "[m]ost trading activity is undertaken in the normal course of facilitating client business," and while the Company may facilitate customer business by maintaining long positions (accumulating securities) and short positions (selling securities the Company does not yet own) and that "these activities give rise to market and other risk, we do not view this as proprietary trading."  (TCAC ¶ 76.)  The 2006 20-F also states that "[w]hile we have taken selective trading opportunities and risks throughout the year, our value-at-risk for the trading units remained within a band between €58.3 million and €82.0 million. The higher value-at-risk levels continue to be driven by interest rate risk exposures and/or equity positions. The average value-at-risk in 2006 was €69.5 million, which is 5.5% above the 2005 average of €65.8 million."  (<u>Id.</u>)

The TCAC alleges that the November 2007 Form 6-K provides in part:

> In the Corporate and Investment Bank (CIB), revenues were €1.9 billion, down by €2.1 billion, or 52%, reflecting charges totaling €2.2 billion in Corporate Banking & Securities (CB&S). <u>Of these charges, €€ [sic] 1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities.</u> Reflecting these charges, revenues in Sales & Trading (Debt and other products) declined 71% versus the prior year quarter to €576 million.
>
> * * *
>
> SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €576 million in the third quarter 2007, a decrease of 71%, or €1.4 billion, versus the third quarter 2006. Performance suffered primarily from the rapid loss of liquidity in credit markets from August onwards. The substantial market turbulence caused breakdowns in relationships between credit securities and hedging instruments such as derivatives based on broad market indices. These together with the loss of liquidity negatively impacted credit trading positions in relative value trading, CDO correlation trading and residential mortgage-backed securities, even after taking into account significant gains on offsetting hedge positions.
>
> * * *
>
> Looking forward, challenges undoubtedly remain. Difficulties in the U.S. residential mortgage market may persist, impacting the wider economy. Financial markets are likely to remain more cautious in their appetite for risk. However, this is also a time of opportunity for Deutsche Bank. As a market leader in investment banking, and a major global asset gatherer, we stand to benefit from the flight to quality. We have forged deep client relationships, and while clients' priorities may change, our ability to act as trusted advisor and partner will remain. Our capital strength and well-diversified funding base are valuable competitive advantages in an

environment where liquidity and capital commitment command a premium in the eyes of clients. <u>Investors continue to search for yield, and we continue to see demand for good-quality assets at prices which reflect a reasonable balance between risk and reward. Our sales and trading business model, with its emphasis on intellectual capital, continues to be a critical part of our platform.</u>

(<u>Id.</u> ¶ 78 (emphasis in original).)

Plaintiffs allege that the statements in the 2006 20-F and the November 2007 6-K were misleading for the following reasons: First, DB failed to disclose in violation of GAAP, SEC regulations, and IFRS that DB had €20 billion of exposure to high-risk subprime and nonprime residential mortgage markets where Defendants knew that the value of the subprime/nonprime-related assets had already collapsed, such that the Offering Materials for the May 2007, July 2007 and November 2007 Offerings improperly failed to disclose "any information whatsoever about the Company's subprime/nonprime exposure," and failed to fully disclose its true exposure and risks until early 2009, when the Company finally recorded significant write-downs. (<u>Id.</u> ¶ 79(a).)  Second, DB knew that its valuations of its mortgage-backed securities were wrong as the residential mortgages underlying billions of dollars of its RMBS and CDOs had been underwritten in contravention of stated underwriting guidelines, the RMBS and CDOs which those mortgages were

27

underlying were falsely rated and had a high and undisclosed risk of default, and thus the values of mortgage-backed securities on DB's balance sheet were materially overstated and needed to be written down. (Id. ¶ 79(b).)  Third, the Company's first disclosure providing any indication about DB's RMBS/CDO exposure was in its November 1, 2007 Form 6-K, stating that the Company would take a €1.6 billion charge "on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities," was materially misleading because it did not disclose the Company's total exposure, true losses suffered, or the future risks posed by the toxic securities but instead assured investors that "[t]he strained situation in financial markets has eased somewhat of late, and a slight market recovery is in sight." (Id. ¶ 79(c).)  Fourth, the Company's statement that it had (i) losses of "€1.6 billion . . . on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities" in the third quarter of 2007, and (ii) "no losses at all 'related to subprime, CDO or RMBS exposures' in the fourth quarter of 2007" were materially false and misleading as DB's long and short mortgage-related positions were later revealed to have "together resulted in 2007 losses to the bank of about $4.5 billion."

(Id. ¶ 79(d) (emphasis in original).)[11]  Fifth, defendants

violated Item 303 at Regulation S-K, 17 C.F.R. §229.303, by

failing to disclose any known trends, events, or uncertainties

that have or are reasonably likely to have a current or future

effect on the registrant's financial condition, changes in

financial condition, results of operations, liquidity and/or

capital resources that is material to investors, in light of the

adverse events and uncertainties arising out of DB's exposure to

high-risk subprime and non-prime residential mortgage markets.

(Id. ¶ 79(e).)  Plaintiffs allege that "known trends, events and

uncertainties, including the deterioration of the Company's

RMBS/CDO securities and other mortgage-related assets had

already come to fruition at the time of the Offerings," and "in

spite of . . . defendants' knowledge that the collapse was

having and would continue to have a material impact on the

Company's financial condition, defendants failed to disclose in

the Offering Materials DB's €20 billion exposure to these high-

risk securities . . .  and the financial and the liquidity risks

those securities posed to the Company."   (Id. ¶ 82(iv)-(v).)

Sixth, the 2006 20-F did not comply with GAAP because, (a) DB

---

[11] It appears that these allegedly misleading statements can only find support
in the February 2008 Form 6-K, and not the 2006 20-F or November 2007 6-K.
(See discussion in section 2 infra.)  Plaintiffs nonetheless include this
allegation in the section describing why the statements in the 2006 20-F and
November 2007 6-K were "materially, objectively and subjectively false and
misleading."  (See e.g., TCAC ¶ 79.)

failed to properly disclose material concentrations of risk and exposure to risk arising from subprime/non-prime-backed CDOs and nonprime mortgage-related assets because Paragraph 15A of Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 107 (and subsequently, No. 157), Disclosures about Fair Value of Financial Instruments required DB to disclose "<u>all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties;</u>"[12] (b) DB's subprime/nonprime exposure represented a group concentration of credit risk required be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion ("APB") No. 28, Interim Financial Reporting; (c) SFAS No. 5, ¶10 requires that financial statements disclose contingencies when it is at least reasonably possible (<u>e.g.</u>, a greater than slight chance) that a loss may have been incurred; and (d) AICPA Statement of Position No. 94-6, Disclosure of Certain Risks and Uncertainties ("SOP 94-6"), requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties

---

[12] Plaintiffs also allege that FASB SFAS No. 157, which concededly did not become formally effective until January 1, 2008, also required DB to accurately value its subprime-backed assets at their fair value in the form of write-downs, arising from any decreases in fair value since the prior reporting period.  (<u>See, e.g.</u>, TCAC ¶¶ 83-85.)

that might have a "severe impact" on future operations.  (Id. ¶
79(f) (emphasis in original).)  The TCAC alleges that "[u]nder
GAAP and/or IFRS" DB was required to incorporate the risks
arising from these assets in valuing and writing down its
RMBS/CDO assets, particularly where "DB knew that the mortgage-
backed securities market was collapsing prior to the Offerings,
and took a $5 billion short position against mortgage-backed
securities, attempted to reduce its own risk by unloading risky
RMBS and CDO assets on its customers while not disclosing the
securities' true risk, and knew from their own practice of
structuring RMBS and CDOs that the mortgages underlying the
securities DB was holding were likely to default."  (Id. ¶ 88.)

The TCAC alleges that "investors were unable to consider
the impact on DB of the adverse events in the subprime and
nonprime markets because defendants effectively represented that
the Company had no exposure."  (Id. ¶ 81.)[13]  Plaintiffs allege
that DB recorded almost €5.3 billion in losses on RMBS assets
and $2 billion in losses in CDS assets in fiscal year 2008,
despite not having disclosed DB's significant disclosure to
these assets.  (Id. ¶¶ 95-96.)

---

[13] See also id. ¶ 97.

2.    February 2008 Form 6-K

On February 7, 2008, DB filed a Form 6-K with the SEC that
was incorporated by reference into the February 2008 Prospectus
Supplement issued in connection with the February 2008 Offering.
(TCAC ¶¶ 114-117.)  The February 2008 Form 6-K stated that,
"[f]ollowing our decision to proactively manage down troubled
risk positions in the third quarter and ongoing active risk
management, we took no further losses on our remaining CDO
exposures in the current quarter after taking into account
related gains on hedge positions."  (Id. ¶ 117 (emphasis in
original).)  The Form 6-K also emphasized that "[e]ffective risk
management resulted in contained losses in our collateralized
debt obligations and U.S. residential mortgage businesses,
despite the investment banking industry facing substantial
problems in both sectors."  (Id. (emphasis in original).)  The
Form 6-K continued that "[i]n the fourth quarter, we again
demonstrated the quality of our risk management. We had no net
write-downs related to sub-prime, CDO or RMBS exposures."  (Id.
(emphasis in original).)  The Form 6-K also described DB's
overall performance, indicating that Dr. Josef Ackerman,
Chairman of the Management Board was "pleased to report robust
earnings for the fourth quarter, which concludes one of our best
years ever and a year of solid performance in challenging times.
In 2007 we clearly strengthened our competitive position and

32

delivered another year of profit growth while simultaneously maintaining our capital strength."  (Id. ¶ 118.)

Plaintiffs reiterate that the statements alleged in the 2006 20-F, which were incorporated into the February 2008 Offering Materials, were materially, objectively and subjectively false and misleading for the reasons already discussed.  (See id. ¶ 119(a)-(e).)  In addition, Plaintiffs allege that absent accounting improprieties in properly writing down mortgage-backed assets and valuation techniques, "DB would not have reported the 'robust earnings,' 'another year of profit growth,' and/or maintain DB's 'capital strength' for the fourth quarter of 2007."  (Id. ¶ 119(f).)

Plaintiffs also allege that DB failed to disclose risky proprietary trading, such as trading lead by an individual named Boaz Weinstein.  (Id. ¶¶ 138-149.)  Specifically, Plaintiffs allege that throughout 2006 and 2007, "DB's proprietary trading positions continued to increase and the Company's exposure to losses increased dramatically. By early 2008, Weinstein's group was leveraged approximately 300%, exposing DB to $30 billion in market risk. This was especially worrisome because the group had taken the extreme-minority position in mid-2007 that that [sic] the mortgage crisis was contained – purchasing huge positions in corporate bonds or loans, as well as CDS."  (Id. ¶ 142.)

Plaintiffs allege that "[b]y the end of 2008, trading losses from Weinstein's group alone ballooned to almost $2 billion. In total, DB reported a loss of approximately $6.8 billion in the fourth quarter, mainly attributed to losses in the Company's credit-market proprietary trading and exposure to troubled bond insurers and mortgage-backed securities." (Id. ¶ 145.) The February 2008 Form 6-K failed to disclose these risks and instead "were publicly characterizing the Company's risk controls as, among other things, 'highly sophisticated' and 'industry leading.'" (Id. ¶ 147.) Plaintiffs allege that Defendant Ackerman told investors in the February 2008 Form 6-K that "we again demonstrated the quality of our risk management. We had no net writedowns related to sub-prime, CDO or RMBS exposures. Those trading businesses in which we reported losses in the third quarter produced a positive result in the fourth quarter." (Id. ¶ 147 (emphasis in original).) Plaintiffs allege that later "[s]hortly after reporting its disappointing 2008 results, the Company announced that it would significantly scale back the amount of borrowed money it puts at risk in the markets. Defendant Ackerman, DB's Chairman, admitted to analysts in February 2009 that to earn a $1.5 billion profit from proprietary trading the bank needed to risk several times that amount in capital: 'You can easily lose two to three billion. That's what we have seen in 2008 and something we don't

want to see again.' Defendant Ackerman also confirmed that
Weinstein was no longer with the Company." (<u>Id.</u> ¶ 146.)

### 3.    2007 20-F

The May 2008 Prospectus Supplement filed in connection with
the May 2008 Offering incorporated by reference the March 26,
2008 Annual Report on Form 20-F of Deutsche Bank AG for the year
ended December 31, 2007. (<u>Id.</u> ¶¶ 121-23.) The 2007 20-F stated
that, "<u>[i]n 2007, net income was €6.5 billion, up 7% versus
2006.</u>" (<u>Id.</u> ¶ 124 (emphasis in original).) It also provided
that "<u>[v]alue-at-risk is the primary metric we use in the
management of our trading market risks,</u>" and that "<u>DB's equities
trading VaR ranged between $43.5 million and $90.5 million
during 2007.</u>" (<u>Id.</u> ¶ 129 (emphasis in original).) Plaintiffs
allege that, "[d]espite DB's assurances relating to its VaR
calculation that its 'trading market risk outside of these units
is immaterial,' the Company reported equities trading losses for
2008 almost 700% above the supposed 'maximum exposure' of $90.5
million."[14] (<u>Id.</u> ¶ 129.) Plaintiffs allege that the reported
VaR metrics "were therefore knowingly false as they failed to

---

[14] Plaintiffs allege DB reported a total loss in equities sales and trading in
2008 of $630 million. TCAC ¶ 129. Defendants argue that "at the time $630
million was less than 0.0003 percent of Deutsche Bank's then over €2 <u>trillion</u>
in assets." (Mem. In Support of Mot. To Dismiss at 12 n. 15 (emphasis in
original).)

reflect the actual risk associated with DB's equities trading,"
and that had DB reported an accurate VaR measure in the Offering
Materials "to account for the volatility of the Company's
positions, investors and analysts would have applied a higher
discount rate to DB's expected future cash flows to adjust for
the increased risk associated with the Company's trades."  (Id.
¶ 130.)

The 2007 20-F also provided a "table summarize[ing] our net
counterparty exposures to monoline insurers with respect to
residential mortgage-related activity, as of December 31, 2007."
(Id. ¶ 132.)  The 2007 20-F noted that in addition to the
figures provided in the table, "we have other exposures of €1.2
billion as of December 31, 2007, related to net counterparty
exposure to monoline insurers, based on the mark-to-market value
of other insured assets.  These arise from a range of client
activity, including financing of collateralized loan
obligations, commercial mortgage-backed securities, . . . ."
(Id.)  Plaintiffs allege that by the end of 2008, the Company
was forced to mark-down €2.2 billion relating to additional
reserves against monoline insurers, and still maintained an
additional €1.6 billion in monoline exposure going forward.
(Id. ¶ 133.)  The 2007 20-F also included a statement from the
Company's auditor, KPMG, that the consolidated financial
statements presented fairly the operations and cash flows for

each of the two years in the period ended December 31, 2007, in

conformity with International Financial Reporting Standards as

issued by the International Accounting Standards Board.  (<u>Id.</u> ¶

134.)[15]

---

[15] Not mentioned in the TCAC, the 2007 20-F also stated:

MARKET DECLINES AND VOLATILITY CAN MATERIALLY ADVERSELY AFFECT OUR REVENUES AND PROFITS.

In recent years we have increased our exposure to the financial markets as we have emphasized growth in our investment banking activities, including trading activities. Accordingly, we believe that we are more at risk from adverse developments in the financial markets than we were when we derived a larger percentage of our revenues from traditional lending activities. Market declines can cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode. Volatility can sometimes also adversely affect us. . . .

Since the second half of 2007, financial markets have experienced exceptionally difficult conditions, which have been reflected in considerably lower volumes of business activity in the areas most directly affected and concerns about slowing economic and business momentum more generally. Among the principally affected areas in which we do business have been the leveraged finance and structured credit markets. In addition to causing reduced business activity and revenues in these and other areas, continuing difficult market conditions may require us to write down the carrying values of some of our portfolios of assets, including leveraged loans and loan commitments. Compensating for these negative effects on our profitability through performance in our other businesses may not be feasible, particularly if assumptions for continuing, albeit slower, economic growth in 2008 are not correct and less favorable economic conditions prevail. See "Item 5: Operating and Financial Review and Prospects – Results of Operations by Segment – Corporate Banking & Securities Corporate Division" for information on the impact of the current market environment on a number of our key businesses.

WE MAY INCUR SIGNIFICANT LOSSES FROM OUR TRADING AND INVESTMENT ACTIVITIES DUE TO MARKET FLUCTUATIONS.

. . .

PROTRACTED MARKET DECLINES CAN REDUCE LIQUIDITY IN THE MARKETS, MAKING IT HARDER TO SELL ASSETS AND POSSIBLY LEADING TO MATERIAL LOSSES.

In some of our businesses, protracted market movements, particularly asset price declines, can reduce the level of activity in the market or reduce market liquidity. These developments can lead to material losses if we cannot close out deteriorating positions in a timely way. This may especially be the case for assets we hold for which there are not very liquid markets to begin with. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate.

The exceptionally difficult market conditions since the second half of 2007 have resulted in greatly diminished liquidity in certain markets in which we

do business, including the leveraged finance and structured credit markets. Continuing difficult market conditions may require us to write down the carrying values of some of our portfolios of assets. See "Item 5: Operating and Financial Review and Prospects - Results of Operations by Segment - Group Divisions - Corporate and Investment Bank Group Division - Corporate Banking and Securities Corporate Division" for information on the impact of the current market environment on a number of our key businesses.

. . .

WE MAY INCUR LOSSES AS A RESULT OF CHANGES IN THE FAIR VALUE OF OUR FINANCIAL INSTRUMENTS

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. See "Item 5: Operating and Financial Review and Prospects - Significant Accounting Policies and Critical Accounting Estimates - Fair Value Estimates - Methods of Determining Fair Value" for information on fair value accounting. Fair value is defined as the price at which an asset or liability could be exchanged in a current transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding write-down is recognized in the income statement. These write-downs could be significant.

Observable prices or inputs are not available for many financial instruments. Fair value is determined in these cases using valuation techniques appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record further write-downs. Market volatility increases the risk that the value of financial instruments carried at fair value will change in the future.

Furthermore, our exposure and related write-downs are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Although such declines may be independent of the fair values of the underlying hedged assets, they may nonetheless result in the need for further write-downs in future periods.

Our results for the fiscal year 2007 included losses relating primarily to the write down in the fair values of our trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities, and the leveraged loan book including loan commitments. We continue to have exposure to these markets and products and, therefore, could be required further to write down their carrying values and incur further losses. Any of these write-downs could have a material adverse effect on our results of operation and financial condition. See "Item 5: Operating and Financial Review and Prospects - Results of Operations by Segment - Group Divisions - Corporate and Investment Bank Group Division - Corporate Banking and Securities Corporate Division" for information on the impact of the current market environment on a number of our key businesses.

OUR RISK MANAGEMENT POLICIES, PROCEDURES AND METHODS MAY LEAVE US EXPOSED TO UNIDENTIFIED OR UNANTICIPATED RISKS, WHICH COULD LEAD TO MATERIAL LOSSES. We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, our risk management techniques and strategies may not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. These tools and metrics may fail to predict future risk exposures. In addition, our quantitative modeling does not take all risks into account. As a result, risk exposures could, for example, arise from factors we did not anticipate or correctly evaluate in our statistical models. This would limit our ability to manage our risks. Our losses thus could be significantly greater than the historical measures indicate.

For example, the value-at-risk approach we use to derive quantitative measures for our trading book market risks is designed to model risk factors assuming normal market conditions, and the statistical parameters required for the value-at-risk calculation are based on a 261 trading day history with equal weighting being given to each observation.

However, in our regulatory back-testing in 2007, we observed 12 outliers, which are hypothetical buy-and-hold losses that exceeded our value-at-risk estimate for the trading units as a whole versus two to three outliers statistically expected in any one year. While we believe that the majority of these outliers were related to extreme events outside standard market conditions, we are also re-evaluating our modeling assumptions and parameters for potential improvements in unusual market conditions, such as those observed in the last two quarters of 2007.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. See "Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk" for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks. If existing or potential customers believe our risk management is inadequate, they could take their business elsewhere. This could harm our reputation as well as our revenues and profits.

. . .

During the third and fourth quarters of 2007, fears of further U.S. homeowner delinquencies on subprime loans led to a significant deterioration in the subprime-related and other credit markets. The effect of this, in some cases, caused spreads to widen and liquidity levels to decline. During this difficult period, we reported relatively lower losses than some of our competitors in our Collateralized Debt Obligations (CDO) and U.S. residential mortgage businesses, despite the investment banking industry facing substantial problems in both sectors. This was due to the relative size of our exposure, protection purchased and significant sales activity.

In the third quarter of 2007, we announced losses of € 1.6 billion related to relative value trading (both debt and equity), CDO correlation trading and Residential Mortgage-Backed Securities (RMBS). Of this amount, € 726 million related to CDO correlation and RMBS and was principally driven by exposure to positions linked to subprime residential mortgages. In the fourth quarter of

2007, the CDO and RMBS businesses produced an overall net positive result after factoring in gains from hedges.

. . .

Revenues from Origination and Advisory of € 2.7 billion were € 226 million, or 8 %, lower than in 2006. The reduction in revenue year-on-year arose principally from the deterioration in the market for private equity leveraged loans and financing as part of the overall dislocation of credit markets experienced in the second half of the year. Mark-to-market losses of € 759 million (excluding fees and hedges, € 1.4 billion) were taken against leveraged finance loans and loan commitments during 2007.

. . .

KEY EXPOSURES OF CDO TRADING AND ORIGINATION BUSINESSES: The activities of the Group's CDO trading and origination businesses span multiple asset classes. Managing our remaining exposure to the U.S. subprime residential mortgage market continues to be a particular focus.
The following table outlines our overall U.S. subprime residential mortgage-related exposures in our CDO trading businesses as of December 31, 2007.

. . .

In addition to our trading-related exposure, the table below summarizes our exposure to U.S. subprime ABS CDOs held within our "Available for Sale" category. These exposures arise from asset financing activities. Our potential economic exposure is hedged by additional short positions in our trading book. In our 2007 results, we have recorded charges of € 207 million against these positions.

. . .

OTHER U.S. MORTGAGE BUSINESS EXPOSURE: We also have ongoing exposure to the U.S. residential mortgage market through our trading, origination and securitization businesses in residential mortgages. These are summarized below, which does not include agency CMOs and agency eligible loans.

. . .

In the table above, our total net exposure is defined as the market value of the gross exposure on RMBS bonds, loans and portions of loans, less the value of protection provided by the associated hedges. The trading-related positions arise from our market-making and secondary activities in credit-sensitive U.S. mortgage markets. Hedges consist of a number of different market instruments, including single-name CDS contracts with market counterparties, protection provided by monoline insurers and index-based contracts. The comments made above in relation to CDOs regarding ongoing exposure to absolute and relative market movements therefore also apply to this portfolio.
MONOLINE EXPOSURE:

. . .

A proportion of this mark-to-market exposure has been mitigated with CDS protection arranged with other market counterparties and other economic hedge activity.

. . .

COMMERCIAL REAL ESTATE EXPOSURE: In conducting its activities, our Commercial Real Estate business takes positions in whole loans, assets held for securitization and commercial mortgage-backed securities. The following is a summary of our gross exposure to loans and loan securities secured in part or whole on commercial property or commercial mortgage pools as of December 31, 2007.

. . .

RISK MANAGEMENT TOOLS

. . .

### i. April 2008 Form 6-K

On April 29, 2008, DB filed a Form 6-K which was incorporated by reference into the May 2008 Prospectus Supplement. (Id. ¶ 135.)  The TCAC quotes certain excepts from the April 2008 Form 6-K describing net revenues (see, e.g., TCAC ¶ 135 ("Revenues in Sales & Trading (Debt and other products) were €1.3 billion, down from €3.4 billion in the record prior year quarter, reflecting mark-downs on Commercial Real Estate activities and on Residential Mortgage-Backed Securities, together with significantly lower revenues in the credit trading business.")), mark-downs on RMBS (id. ("SALES & TRADING (DEBT AND OTHER PRODUCTS) generated revenues of €1.3 billion in the first quarter, a decrease of €2.0 billion, or 61%, compared to the first quarter 2007. The decrease includes net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans.")), and proprietary trading (id. ("The prime services business benefited from investors' increasing preference for more stable prime brokerage

---

VALUE-AT-RISK. We use the value-at-risk approach to derive quantitative measures for our trading book market risks under normal market conditions. Our value-at-risk figures play a role in both internal and external (regulatory) reporting. For a given portfolio, value-at-risk measures the potential future loss (in terms of market value) that under normal market conditions, will not be exceeded with a defined confidence level in a defined period. The value-at-risk for a total portfolio represents a measure of our diversified market risk (aggregated using pre-determined correlations) in that portfolio.
(2007 20-F at 6-11, 70-74, 129-153.)

counterparties. Designated Equity Proprietary Trading reported a small loss in the quarter, compared to a positive contribution in the first quarter 2007.")).

Plaintiffs allege that the statements in the 2007 20-F and April 2008 6-K were materially, objectively and subjectively false and misleading because defendants knew that DB's valuations of its mortgage-backed securities were false, and that DB's "net mark-downs of €885 million on residential mortgage-backed securities and commercial real estate loans" did not reflect the actual value of the securities at the time of the May 2008 Offering. (Id. ¶ 136(a).) The values were overstated and needed to be written down because DB knew that the residential mortgages underlying its RMBS and CDO assets had been underwritten in contravention of stated underwriting guidelines and were falsely rated. (Id.)

II.  Overview of the Applicable Law

A. Motion to Dismiss Standard

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, (Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)), and draws all reasonable inferences in plaintiffs' favor, (see Tongue v. Sanofi, 816 F.3d 199, 209 (2d

Cir. 2016)).  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  (Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).)  Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."  (Id.; see also Iqbal, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").)

To state a plausible claim for relief, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." (Twombly, 550 U.S. at 555.) The Twombly standard "ask[s] for more than a sheer possibility that a defendant has acted unlawfully." (Iqbal, 556 U.S. at 678.) Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief," and the complaint must therefore be dismissed. (Id. at 679 (quotations and citations omitted).)

"In the context of a securities class action, a court may consider not only the complaint itself, but also 'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents

possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" (In re Poseidon Concepts Secs. Litig., 13cv1213 (DLC), 2016 WL 3017395 at *10 (S.D.N.Y. May 24, 2016) (quoting Tongue, 816 F.3d at 209).)


###### B. Statutory Provisions

The TCAC alleges that the Offering Materials used to sell $5.4 billion of preferred securities were false and/or misleading in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. The Second Circuit described the applicable law for Plaintiffs' Securities Act claims as follows:

> Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications.
>
> Section 15, in turn, creates liability for individuals or entities that "control[ ] any person liable" under section 11 or 12. Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12.

(In re Morgan Stanley Information Fund Secs. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (internal citations omitted).)  "Section

44

11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." (Id. (citing 15 U.S.C. § 77k(a)).) "In the event of such a misdeed, the statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties." (Id. (citing 15 U.S.C. § 77k(a)).) "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" (Id. at 358-59 (citing 15 U.S.C. § 77k(a)).) "Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." (Id. at 359 (citing 15 U.S.C. § 77l(a)(2)).) "Whereas the reach of section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." (Id. (citations omitted).)

"An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" (Id.)  "As a result of this interpretation and the remaining statutory text, the elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"  (Id. (citing 15 U.S.C. § 77l(a)(2)).)

Claims under sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the interrorem nature of the liability they create."  (Id.)  "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."  (Id.)  "In many cases .

46

. . two issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality. The definition of materiality is the same for these provisions as it is under section 10(b) of the Exchange Act: Whether the defendants' representations, taken together and in context, would have misled a reasonable investor." (Id. at 360 (internal quotations and alterations omitted).)  "However, because the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss:

> [A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

(Id. (citations omitted).)


### A. Omnicare

Discussion of the Supreme Court's recent decision in Omnicare requires a brief explanation of the Second Circuit's earlier decision in Fait.  Fait involved allegations that the defendant was liable under Sections 11 and 12(a)(2) for misstating the corporation's goodwill and loan loss reserves in violation of GAAP.  (Fait v. Regions Fin. Corp., 655 F.3d 105,

108 (2d Cir. 2011).) The Second Circuit underscored that there was no objective standard for measuring goodwill and loan loss reserves, and thus any estimate would be inherently subjective and reflect management's determination of the "fair value" of the assets or a judgment or opinion regarding which loans may not be collectible. (Id. at 110, 113.) Accordingly, because goodwill estimates and loan loss reserves are matters of opinion, they would be subject to the rule articulated in Virginia Bankshares v. Sandberg, 501 U.S. 1083 (1991), which requires a plaintiff to plausibly allege that the statement was both objectively false and disbelieved by the defendant at the time it was expressed. (Fait, 655 F.3d at 110, 112-113.)

The Supreme Court's decision in Omnicare similarly addressed how Section 11 applies to statements of opinion. Omnicare involved claims arising out of a registration statement that Omnicare filed in connection with a public offering of common stock. (Omnicare, Inc. v. Laborers Dist. Council Const. Indus., 135 S. Ct. 1318, 1323 (2015).) Two sentences in the registration statement expressed Omnicare's views on its compliance with legal requirements. (Id.) Respondents, pension funds that purchased Omnicare stock in the public offering ("Funds"), brought suit alleging that the company's two opinion statements about legal compliance gave rise to liability under § 11. Citing lawsuits that the Federal Government later brought

against Omnicare, the complaint alleged that the company's receipt of paybacks from drug manufacturers violated anti-kickback laws and, as a result, Omnicare asserted "materially false" representations about legal compliance and "omitted to state [material] facts necessary" to make its representations not misleading. (Id. at 1324.) The complaint alleged that none of the officers or directors had reasonable grounds for thinking that the opinions offered were true or complete. (Id.) The complaint chose to "exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct." (Id.) The District Court granted defendant's motion to dismiss, reasoning that "statements regarding a company's belief as to its legal compliance are considered 'soft' information" and were actionable only if the people who made them "knew [the statements] were untrue at the time." (Id.) The Sixth Circuit reversed. Although emphasizing that the complaint expressed Omnicare's opinion of legal compliance, rather than hard facts, the Sixth Circuit held that "the Funds had to allege only that the stated belief was 'objectively false'; they did not need to contend that anyone at Omnicare 'disbelieved [the opinion] at the times it was expressed." (Id.)

The Supreme Court granted certiorari. First, the Court underscored that it would separately address the claims that

Omnicare made "untrue statement[s] of . . . material fact," and the claims that Omnicare "omitted to state a material fact . . . necessary to make the statements [in the registration statement] not misleading." (Id. at 1324-25.) Both the district court and the Sixth Circuit "conflated" those distinct claims, but the Supreme Court viewed them as "presenting different issues." (See id. at 1325 & n.1 (majority opinion), 1337 (Thomas, J., concurring).)[16]

With respect to untrue statements, the Court distinguished untrue statements of fact from untrue statements of opinion: Section 11 "expos[es] issuers to liability not for 'untrue statement[s]' full stop (which would have included ones of opinion), but only for 'untrue statement[s] of . . . fact.'" (Id. at 1325-26 (quoting 15 U.S.C. § 77k(a)) (emphasis in original).) Opinion statements do, however, "explicitly affirm[ ] [at least] one fact: that the speaker actually holds the stated belief." (Id. at 1326-27.) As Fait had earlier made clear in this Circuit, the Supreme Court in Omnicare held that

---

[16] In his concurring opinion, Justice Thomas asserted that the Court should limit the scope of its review to the lower courts' erroneous conflation of the two issues. Justice Thomas concurred only in the judgment that the statements of opinion at issue did not contain an untrue statement of material fact, finding it not "advisable to opine, as the majority does, on an additional theory of liability that is not properly before [the Court.]" (Id. at 1337 (Thomas, J., concurring).) The Majority disagreed, noting that "[a]lthough the Funds could have written a clearer complaint, they raised a discrete omissions claims" and that the Court saw "no reason to ignore the issue." (Id. at 1325 n.1 (majority opinion).)

allegations that an opinion is both objectively false and disbelieved by the speaker at the time the statement was made plead a material misstatement claim.  (Id. at 1327.)  Having disclaimed any allegations sounding in fraud or deception, plaintiffs' allegations did not give rise to a claim as a material misstatement.  (Id.)

Omissions, on the other hand, may be actionable depending on the context.  "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view."  (Id. at 1328.)  A reasonable investor, upon hearing a statement of opinion from an issuer, "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time."  (Id. at 1329.)  For example, if an issuer tells investors that "We believe our conduct is lawful," an investor in such a situation "likely expects such an assertion to rest on some meaningful inquiry—rather than, say, on mere intuition."  (Id. at 1328.)  Accordingly, "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability."  (Id.

at 1329.)  The Court warned that "whether an omission makes an expression of opinion misleading always depends on context," because "an investor reads each statement within [registration statements], whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." (<u>Id.</u> 1330.)  The focus is whether the omitted facts would "conflict with what a reasonable investor would take from the statement itself." (<u>Id.</u>)  The Court then held that, to state a claim, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." <u>Omnicare</u>, 135 S. Ct. at 1332.)  The Court warned, "[t]hat is no small task for an investor." (<u>Id.</u>)

The Court then remanded the case because "[n]either court below considered the Funds' omissions theory with the right standard in mind – or indeed, even recognized the distinct statutory questions that theory raises." (<u>Id.</u> at 1332-33.)

The holding in <u>Omnicare</u> "altered the standard announced by [the Second Circuit] in Fait . . . ." (<u>Tongue</u>, 816 F.3d at 209.)  "Omnicare affirmed that liability for making a false

statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'"  (Id. (quoting Omnicare, 135 S. Ct. at 1327).) "But Omnicare went on to hold that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." (Id. at 210 (citing Omnicare, 135 S. Ct. at 1332).)  "The Court [in Omnicare], however, cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement.'"  (Id. (quoting Omnicare, 135 S. Ct. at 1329).)  "The Court went on to say that a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'"  (Id. (quoting Omnicare, 135 S. Ct. at 1329).)  "The Court also recognized the unique context in which securities claims arise. Acknowledging the formality and legal weight of documents filed with the SEC, the Court noted that '[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments'; '[a]t the same time, an investor reads each statement within such a document . . . in

light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.'" (Id. (quoting Omnicare, 135 S. Ct. at 1330).)  "The Court further stated that 'the investor takes into account the customs and practices of the relevant industry,' and instructed that 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" (Id. (quoting Omnicare, 135 S. Ct. at 1330).)

### B. Regulatory Sections

#### 1.    Item 503 of Regulation S-K

Item 503 requires that a registrant, "[w]here appropriate, provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." (17 C.F.R. § 229.503(c).)  "Although there is scant caselaw on Item 503, the inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid." (Christine Asia Co., Ltd. v. Alibaba Grp. Holding Ltd., No. 15-md-02631 (CM), 2016 WL 3648965, at *17 (S.D.N.Y. June 24, 2016) (citations and internal quotations omitted).)

## 2.   Item 303 of Regulation S-K

"Item 303 imposes specific disclosure requirements on companies filing Registration Statements with the SEC, as well as annual, quarterly, and periodic financial statements." (Alibaba, 2016 WL 3648965, at *16.)   Item 303 requires that registrants "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." (17 C.F.R. § 229.303(a)(3)(ii).)   "According to the SEC's interpretive release regarding Item 303, disclosure under Item 303 is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." (Indiana Pub. Retirement Sys. v. SAIC, Inc., 818 F.3d 85, 94 (2d Cir. 2016) (citations and alterations omitted).)   "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC." (Id. at 95 (emphasis added).)   "It is not enough that it should have known of the existing trend, event, or uncertainty." (Id.)

"Due to the obligatory nature of these regulations, a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of "known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 102 (2d Cir. 2015).)  Failing to comply with Item 303 by omitting known material trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2).  (Id. at 101.)  Although companies are not required to announce internal business strategies or identify the particulars of certain trading positions, they are "required to connect the trends to its financial position" and to offer more than "generic cautionary language.'"  (Id. at 105-06 & n.7.)


C. Pleading Standard

"When assessing the sufficiency of claims under sections 11 and 12(a)(2) of the Securities Act, the structure of the analysis is guided by a preliminary inquiry into the nature of the plaintiff's allegations. Where the claims are 'premised on allegations of fraud,' the allegations must satisfy the heightened particularity requirements of Rule 9(b) of the

56

Federal Rules of Civil Procedure. However, if the pleading does not sound in fraud, then Rule 8(a) governs." (In re Morgan Stanley, 592 F.3d at 358 (citing Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004)).) "While 'fraud is not an element or a requisite' to a claim under §§ 11 or 12(a)(2) of the '33 Act, a '33 Act claim that is predicated on fraud is subject to the particularity requirement of Rule 9(b), despite any disclaimer a plaintiff makes to the contrary." (Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC, 902 F. Supp. 2d 329, 338 (S.D.N.Y. 2012) (citing Rombach, 355 F.3d at 171), aff'd sub nom. IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383 (2d Cir. 2015)).)

Rule 9(b) requires that fraud allegations be stated with particularity. Fed R. Civ. P. 9(b). "To satisfy the particularity requirement of Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp., No. 14 CV 3876-LTS, 2016 WL 1261135, at *8 (S.D.N.Y. Mar. 30, 2016) (internal quotation marks omitted).)

III.  <u>Application</u>

    A. <u>Pleading Standard</u>

    Unlike Plaintiffs' prior complaints in this Action, the
TCAC does not disclaim any allegations sounding in fraud;
instead, Plaintiffs assert that Defendants' statements and
omissions were "knowingly false and misleading" and appear to
allege a fraudulent motive. (<u>See, e.g.,</u> TCAC ¶ 14 ("Prior to
the Offerings, DB used its inside knowledge to attempt to rid
itself of the economic risk of these defective assets by
building a massive hedge against the very securities it was
creating, and began unloading deteriorating RMBS and CDO
positions from its own books into CDOs that it was arranging for
its customers."), ¶ 16 ("DB actively participated in the
creation of the defective loans" and "DB had knowingly included
defective loans in the mortgage-backed securities while
intentionally misrepresenting the nature of the loans."), ¶ 20
("Despite this knowledge, defendants failed to disclose DB's
true exposure to the mortgage-backed securities to investors,
and knowingly omitted and/or misrepresented the size of its
losses and value of those securities."), ¶ 87 ("DB knowingly and
improperly valued these assets using internally generated
valuation models that relied on variables and highly subjective
forward-looking estimates supplied by DB's own management . . .
."), ¶ 181 ("Defendants VaR metric was knowingly false and

misleading . . . .).)  Allegations that Defendants statements were knowingly false and misleading is "classically associated with fraud." (See, e.g., Rombach, 355 F.3d at 171; Lighthouse Financial, 902 F. Supp. 2d at 339.)

Although Plaintiffs appear to attempt to allege certain claims that sound in negligence, (see TCAC ¶ 62 ("Each of the defendants owed to the purchasers, including plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents . . . . The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.")), Plaintiffs do not articulate which defendant engaged in the allegedly fraudulent conduct but instead aggregate "Defendants" generally when alleging fraudulent conduct, (see, e.g., id. ¶ 20 ("Despite this knowledge, defendants failed to disclose DB's true exposure to the mortgage-backed securities to investors, and knowingly omitted and/or misrepresented the size of its losses and value of those securities."), ¶ 161 ("Defendants knew that the misrepresentations and omissions in the Offering Materials regarding DB's exposure and valuation of its mortgage-backed assets, its write-downs on those assets, and its VaR metrics were subjectively false."); see also id. ¶¶ 200, 213, 220 (repeating and realleging "each and every allegation contained

above" in the counts for Section 11, 12(a)(2) and 15 claims)).
Accordingly, the Court will apply Rule 9(b) because the TCAC
makes little to no effort to distinguish any potential
negligence claims from those sounding in fraud. (See, e.g.,
Rombach, 355 F.3d at 172 (citing In re Ultrafem Inc. Secs.
Litig., 91 F. Supp. 2d 678, 690-91 (S.D.N.Y. 2000) (applying
Rule 9(b) where "plaintiffs [made] little, if any, effort to
differentiate their asserted negligence claims from the fraud
claims which permeate the Complaint ... [and] merely disavow[ed]
any allegations that would make Rule 9(b) applicable ... without
specifying the allegations that would support a negligence cause
of action.")).)  The Court's holding would not differ, however,
even if it only held the TCAC to the Rule 8(a) standard.

First and foremost, it is questionable whether the TCAC
satisfies the low bar of Rule 8.  The TCAC improperly lumps
together allegations, rendering it difficult to determine
whether Plaintiffs bring a misstatement or an omission claim.
It is important to keep in mind that Section 11 "creates two
ways to hold issuers liable for the contents of a registration
statement – one focusing on what the statement says and the
other on what it leaves out." (Omnicare, 135 S. Ct. at 1323.)
Allegations that Defendants made untrue statements of material
fact and allegations that Defendants omitted to state a material
fact necessary to make the statements in the registration

statements not misleading "present[] different issues." (Id. at 1325.)  Allegations must then be broken down to analyze whether the statement allegedly giving rise to liability involves a statement of fact or a statement of opinion.  (Id.)  This is because only untrue statements of material fact give rise to liability under Section 11. (Id.)  Accordingly, if the registration statement asserts a material fact that is untrue, Section 11 provides for liability.  (Id.)

A statement of opinion, on the other hand, can only give rise to liability if (1) the opinion was both objectively false and disbelieved by the defendant at the time it was expressed; (2) the opinion statement contains an embedded statement of fact, and the supporting fact provided was untrue; or (3) a sincerely held opinion and otherwise true as a matter of fact omits information whose omission makes the statement misleading to a reasonable investor.  (Id. at 1326-27, 1332 & n.2; see also Tongue, 816 F.3d at 209-210.)

Finally, Section 11 also provides for liability if the issuer omits or fails to make a disclosure mandated by law. (Omnicare, 135 S. Ct. 1327 at n.3; 15 U.S.C. § 77k(a).)

Again, the question whether a statement of a material fact is untrue "present[s] different issues" than the question whether the speaker has "omitted to state a material fact"

necessary to make its statement(s) "not misleading." (Omnicare,
135 S. Ct. at 1325.)  The TCAC, however, does not make this
distinction.  (See, e.g., TCAC ¶ 20 ("Despite this knowledge,
defendants failed to disclose DB's true exposure to the
mortgage-backed securities to investors, and knowingly omitted
and/or misrepresented the size of its losses and value of those
securities) (emphasis added), ¶ 79 (alleging that certain
statements in the 2006 20-F and the November 2007 6-K "were
materially, objectively and subjectively false and
misleading").)  Instead, the TCAC asserts a hodgepodge of
allegations, rendering it unclear what material facts are
alleged to be untrue and what omissions are alleged to render
any statements misleading.  For example, the TCAC alleges one
general omission: that DB omitted to disclose the item-by-item
securitizations making up less than 1% of the bank's assets,
which comprised the bank's exposure to nonprime and subprime
assets.  Before proceeding it bears mentioning that even this
general "omission" is pled in a confusing and inconsistent
manner.  It is not even clear whether the allegation is that
Defendants failed to disclose 20 billion Euros or Dollars in
exposure to subprime markets, as the TCAC uses Dollars and Euros
interchangeably.  (Compare TCAC ¶ 3 (alleging that DB
"misrepresented or omitted" that "DB had as much as €20 billion
in exposure to high-risk subprime and nonprime residential

mortgage markets"), with id. ¶ 7 (alleging that DB
"misrepresented and/or omitted material facts regarding the
Company's significant exposure to RMBS/CDO securities and other
mortgage-related assets" by "omit[ing] in the Offering
Materials" that "DB was holding more than $20 billion of these
high-risk securities").)

The TCAC also lumps together allegations involving several
different offering materials and numerous SEC filings rendering
it difficult to determine (1) what statements are alleged to be
misleading; (2) when, and with respect to what, a duty to
disclose existed, if one existed; and (3) when Defendants
allegedly knew what facts.  For example, paragraph 79(a) reads
as follows:

> As set forth below, in violation of GAAP, SEC
> regulations and IFRS, DB failed to disclose that the
> Company had €20 billion of exposure to the high-risk
> subprime and nonprime residential mortgage markets via
> its RMBS and CDO-related assets. Prior to the
> Offerings (as described at ¶¶161-179), defendants knew
> the value of its subprime/nonprime-related assets had
> already collapsed and the market was continuing to
> deteriorate such that defendants were required under
> GAAP and SEC regulations to disclose DB's entire
> subprime/nonprime exposure and its losses on those
> assets. Although the disclosure of these exposures and
> risks was necessary to prevent DB's financial
> statements from being materially misleading, the
> Offering Materials for the May 2007, July 2007 and
> November 2007 Offerings failed to disclose any
> information whatsoever about the Company's
> subprime/nonprime exposure, and failed to fully
> disclose its true exposure and risks until early 2009,

when the Company finally recorded significant write-downs.

(TCAC ¶ 79(a) (emphasis in original).)

Drawing all inferences in favor of the Plaintiffs, the Court has attempted to break down the allegations.

B. <u>Misstatements or Omissions</u>

1. <u>May and July 2007 Offerings</u>

The 2006 20-F, incorporated into all five securities offerings at issue, disclosed on several occasions that DB was exposed to the residential mortgage-backed securities market. For example, the 2006 20-F discussed DB's 2006 acquisition of MortgageIT Holdings, Inc., "a residential mortgage originator, which significantly expands [DB's] scope in residential mortgage-backed securities." (2006 20-F at 20.)  The 2006 20-F also stated that the Global Transaction Banking Corporate Division had an increase in net revenues, noting that "Trust & Securities Services improved through generating new business and expanding its lead as no 1 trustee for U.S. asset-backed and mortgage-backed securities." (<u>Id.</u> at 81.)  The 2006 20-F also included several pages of charts listing securities available for sale and their values and unrealized losses, which included

64

"[m]ortgage backed securities, including obligations of U.S.
federal agencies." (<u>Id.</u> at F-21 to F-24.) Another section of
the 20-F highlighted that "[f]or the years ended December 31,
2006, 2005 and 2004, [DB together with all entities in which DB
has a controlling financial interest] recognized gains of €262
million, €262 million and €216 million, respectively, on
securitizations primarily related to residential and commercial
mortgage loans." (<u>Id.</u> at F-28.)

In light of these disclosures, Plaintiffs' allegations that
"defendants effectively represented that the Company had no
exposure" to the subprime and nonprime markets, (TCAC ¶ 81), and
that "investors were led to believe that DB was <u>not</u> exposed to
the U.S. subprime crisis" (<u>id.</u> ¶ 97 (emphasis in original))
fails to meet <u>Twombly</u>'s plausibility standard given that the
Offering Materials do address DB's exposure to the residential
and commercial mortgage market. Defendants had no duty to
identify the portion of those securitizations that include
subprime residential mortgages where the offering materials
describe the securitization of residential mortgages. (<u>Freeman
Grp. v. Royal Bank of Scotland Grp. PLC</u>, 540 F. App'x 33, 36 (2d
Cir. 2013) (summary order);[17] <u>Hunt v. Alliance N. Am. Gov't</u>

---

[17] The Court in Freeman Group stated:
    While these statements did not disclose the percentage of the
    relevant securitizations that included subprime mortgages, we
    have previously held that offering documents need not identify

Income Trust, Inc., 159 F.3d 723, 730 (2d Cir. 1998) (declining to require more particularized disclosures even though the specific type of asset at issue allegedly posed far greater risk than the general category of assets described, and holding that the challenged prospectuses "contained disclosures broad enough to cover these instruments").)

Plaintiffs can still state an actionable Section 11 claim, however, by stating "particular (and material) facts going to the basis for [DB's] opinion – facts about the inquiry [DB] did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." (See Omnicare, 135 S. Ct. at 1332.) Being "no small task," (id.), Plaintiffs have failed to do so, notably with respect to those statements alleged prior to the fall of 2007.

---

> every type of asset a security contains so long as they provide "extensive descriptions" of the security's contents that are "broad enough to cover" the type of asset at issue. Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 730-31 (2d Cir.1998). In Hunt, we declined to require more particularized disclosures even though the specific type of asset at issue allegedly posed "far greater risk[s]" than the general category of assets described. Id. at 730. Because the offering documents here extensively described the "securitisations of residential mortgages" that RBS held, we conclude that the Defendants-Appellees had no further obligation to identify the portion of those securitizations that included subprime residential mortgages.

Freeman Grp., 540 F. App'x at 36.

Plaintiffs rely heavily on the Levin Coburn Report to demonstrate that Defendants knew "before the first Offering in May 2007 – (i) the mortgage-backed securities market was in a state of collapsing and would continue to fall; (ii) DB was determined to build a massive hedge position against RMBS and CDOs; and (iii) the bank was in the process of dumping many of its own 'long' mortgage assets before the music stopped because of the risk those assets posed to the Company." (TCAC ¶ 11.) Review of the Levin Coburn Report, however, does not render plausible such allegations.  For example, the Report emphasizes on multiple occasions that Mr. Greg Lippmann, DB's top CDO trader, was in the minority of one when arguing that the RMBS market was in severe decline.  (See, e.g., Levin Coburn Report at 320 (summarizing that "Deutsche Bank's senior management disagreed with [Mr. Lippmann's] negative views").)  In fact, contrary to Plaintiffs' allegations that prior to the May 2007 Offering, Defendants knew that "the mortgage-backed securities market was in a state of collapsing and would continue to fall," (TCAC ¶ 11), the Report notes that "virtually all other senior executives at the bank [thought] that RMBS and CDO securities would gain in value over time." (Id. at 341.)  Notably, Mr. Lippmann had to "request[] permission to establish a proprietary trading position that would short RMBS securities." (Id. at 341-42.)  The Report also notes that "Mr. Lippmann stressed that

his negative view of RMBS securities <u>was based primarily on his
view that moderating home prices would cause subprime mortgage
defaults</u> and was <u>not dependent upon the quality of the subprime
loans</u>." (<u>Id.</u> at 342 (emphasis added).)

   The TCAC also mischaracterizes the assertions in the Report
when alleging that Mr. Lippmann "described the CDO business in
2006 as a 'Ponzi scheme,'" (TCAC ¶ 13), as the Report explicitly
notes that:

> When asked about his comments, Mr. Lippmann told the
> Subcommittee that the CDO market was not really a
> ponzi scheme, because people did receive an investment
> return, and asserted that he had used the term because
> he was "grasping at things" to prove he was right in
> his short position.  Mr. Lippmann also told the
> Subcommittee that while he knew that the major credit
> rating agencies had given AAA ratings to an unusually
> large number of RMBS and CDO securities and most
> people believed in the ratings, he did not. He also
> told the Subcommittee that he "told his views to
> anyone who would listen" but most CDO investors
> disagreed with him.

(<u>Id.</u> at 340-41.)  Mr. Lippmann's view was apparently so in the
minority at the time that the Report even includes a reference
to Mr. Lippmann as "a Cassandra of the financial crisis."[18]  (<u>Id.</u>
at 337.)

---

[18] "In Greek mythology, Cassandra had the gift of prophesy. She was able to
accurately articulate dangers ahead." (Carol A. Needham, <u>Listening to
Cassandra: The Difficulty of Recognizing Risks and Taking Action</u>, 78 Fordham
L. Rev. 2329, 2329 (Apr. 2010).)  "On numerous occasions she warned of
impending catastrophe. Before anyone else was aware of the danger, for

Even after Mr. Lippmann requested permission in November 2005 to establish a short position from Rajeev Misra, Global Head of Credit Trading, Securitization and Commodities, Mr. Misra only "reluctantly gave his approval for the short position [because] Mr. Misra believed mortgage related securities would continue to increase in value over time." (Id. at 343.)  And although Mr. Lippmann "gradually accumulated a larger short position" "throughout 2006," "[a]ccording to Mr. Lippmann, Deutsche Bank senior management <u>reluctantly</u> went along." (Id. (emphasis added).)  Mr. Lippmann even "told the Subcommittee that, at one point in 2006, Boaz Weinstein, who reported to Mr. Misra, told him that the carrying costs of his position, which required the bank to pay insurance-like premiums to support the $2 billion short position, had become so large that he had to find a way to pay for them." (Id.)  "According to Mr. Lippmann, the bank's <u>senior management asked him to persuade them</u> that he was right by demonstrating that others were willing to 'short' the market as well." (Id. (emphasis added).)  "Mr. Lippmann told the Subcommittee that he spent much of 2006 pitching his clients to short the mortgage market." (Id.)

---

example, she tried to warn the people of Troy of the danger posed by the army hidden in the wooden horse given to the city. But, no one listened." (Id.) "As a result of Apollo's curse, Cassandra is condemned to endlessly warn people who do not heed her warnings." (Id.)

"According to Mr. Lippmann, <u>in December 2006</u>, he met in London with a senior bank official, Anshu Jain, Head of Global Markets at Deutsche Bank, and suggested that Deutsche Bank's long positions in mortgage related securities created too much exposure for the bank and should be reduced." (<u>Id.</u> at 344 (emphasis added).)  "Mr. Lippmann recommended that the bank hedge its risk using his short strategy." (<u>Id.</u>)  "<u>His suggestion was not acted upon</u>, but as the market grew more volatile in late 2006 and early 2007, Mr. Lippmann's short position began to gain in value and caught the attention of senior management at the bank. (<u>Id.</u> (emphasis added))

The Report continues that "Mr. Lippmann told the Subcommittee that, <u>in January 2007</u>, he met with Mr. Jain, Mr. Misra, and Mr. D'Albert at a hotel in Lisbon, where <u>all three again challenged him to defend his short position</u> by noting that it had required him to pay out $20 million in CDS premiums during 2006." (<u>Id.</u> (emphasis added))  "Mr. Lippmann told the Subcommittee that he countered by pointing out, while he had paid out $20 million, his desk made $200 million from trading in RMBS and CDO shorts for his clients. He said that the three concluded he could keep his short position." (<u>Id.</u>)

"According to Mr. Lippmann, <u>in late February or early March 2007</u>, as the ABX Index showed subprime RMBS securities losing

70

value and subprime mortgages continued incurring delinquencies at record rates, an ad hoc meeting of Deutsche Bank's executive committee took place in London to discuss the bank's risk exposure in mortgage related securities." (Id. at 345 (emphasis added).)  "He said that, at the meeting, Deutsche Bank executives discussed whether the recent market volatility reflected short term or longer term trends and whether the bank should make any changes in its holdings." (Id.)  "At that time, Mr. Lippmann held the only large short position on behalf of the bank, then about $4 to 5 billion in size. In contrast, the Deutsche Bank mortgage group held $102 billion in long RMBS and CDO securities, and Winchester Capital, Deutsche Bank's hedge fund affiliate, held a net long position of $8.9 billion." (Id. (emphasis added).)  "Mr. Lippmann told the Subcommittee that he was the only person at the meeting who argued for the bank to increase its short position." (Id. (emphasis added).)  "At the time of the London meeting, Mr. Lippmann's position was showing a significant profit. Mr. Misra brought up the alternative of cashing in his position while RMBS prices were down, because he thought prices were in a short term dip and the profits might disappear later on." (Id. (emphasis added))  "Mr. Lippmann contended that the bank should not only keep his short position, but increase it, but more senior voices disagreed with him." (Id. (emphasis added).)  "He told the Subcommittee that the

decision at the end of the meeting was for all parties to keep their positions unchanged, including Mr. Lippmann." (Id.)

"In July 2007, the major credit rating agencies began issuing downgrades of RMBS and CDO securities, in particular those that incorporated or referenced subprime mortgages. The value of those securities began to plummet." (Id. (emphasis added).) "By the end of the summer of 2007, Deutsche Bank initiated efforts to sell off the long positions held by Winchester Capital and other Deutsche Bank entities, reflecting a shift in the bank's strategy, but its sales force had difficulty due to the lack of customers willing to buy long." (Id. at 345-46 (emphasis added).)

Assuming these facts to be true at this juncture, Plaintiffs cannot state a claim for a material omission. First, Defendants were not required, under Omnicare, to disclose that senior bank officials disagreed with the opinion of a more junior employee. (Omnicare, 135 S. Ct. at 1329 ("Suppose, for example, that in stating an opinion about legal compliance, the issuer did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval. That omission would not make the statement of opinion misleading, even if the minority position ultimately proved correct."); Waterford Twp., 2016 WL

1261135, at *10 (dismissing Section 11 claims because "[a]lthough Plaintiffs have alleged that lower-level branch staff were skeptical of RM's live check underwriting and were experiencing difficulties in servicing live check loans, Plaintiffs have alleged no facts demonstrating that RM's management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type . . . .").)  This is because "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement."  (Omnicare, 135 S. Ct. at 1329.)

Second, the TCAC does not allege facts demonstrating that Defendants had a duty to disclose the allegedly omitted information prior to the fall of 2007.  For example, Plaintiffs allege that Defendants had a duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" under Item 303 of Regulation S-K.  (TCAC ¶ 82.)  Item 303 requires that companies filing SEC-mandated reports describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on (1) liquidity, (2) capital resources, (3) net sales or revenues or income from continuing operations, or (4) off-balance sheet arrangements that provide material

73

benefits to the company.  (17 C.F.R. § 229.303(a); <u>see also</u>
<u>SAIC</u>, 818 F.3d at 94.)  "According to the SEC's interpretive
release regarding Item 303, 'disclosure [under Item 303] is
necessary 'where a trend, demand, commitment, event or
uncertainty is both [1] presently known to management and [2]
reasonably likely to have material effects on the registrant's
financial conditions or results of operations.''"  (<u>SAIC</u>, 818
F.3d at 94.)  The Second Circuit recently held that "Item 303
requires the registrant to disclose only those trends, events,
or uncertainties that it <u>actually knows of when it files the</u>
<u>relevant report</u> with the SEC. It is <u>not enough</u> that it <u>should</u>
<u>have known</u> of the existing trend, event, or uncertainty."  (<u>Id.</u>
at 95 (emphasis added).)  Plaintiffs here allege that "known
trends, events and uncertainties, including the deterioration of
the Company's RMBS/CDO securities and other mortgage-related
assets, had already come to fruition at the time of the
Offerings . . . ."  (TCAC ¶ 82(iv).)  Yet, as this Court has
already found, the Reports on which the TCAC relies for its
factual allegations do not render plausible allegations that DB
"knew" that its subprime assets had "deteriorated," particularly
at the time that the 2006 20-F and February and July 2007 6-Ks
were filed with the SEC.[19]  For example, the Report provides that

---

[19] The TCAC alleges that the 2006 20-F was filed March 27, 2007, the May 2007
Prospectus Supplement was filed on or about May 16, 2007, and the July 2007

"in late February or early March 2007, as the ABX Index showed
subprime RMBS securities losing value and subprime mortgages
continued incurring delinquencies at record rates, an ad hoc
meeting of Deutsche Bank's executive committee took place in
London to discuss the bank's risk exposure in mortgage related
securities. . . . He said that, at the meeting, Deutsche Bank
executives discussed whether the recent market volatility
reflected short term or longer term trends and whether the bank
should make any changes in its holdings.  At that time, Mr.
Lippmann held the only large short position on behalf of the
bank, then about $4 to 5 billion in size. In contrast, the
Deutsche Bank mortgage group held $102 billion in long RMBS and
CDO securities, and Winchester Capital, Deutsche Bank's hedge
fund affiliate, held a net long position of $8.9 billion.  Mr.
Lippmann told the Subcommittee that he was the only person at
the meeting who argued for the bank to increase its short
position."  (Levin Coburn Report at 345.)  The Report provides
that Mr. Lippmann told the Subcommittee that "the decision at
the end of the meeting was for all parties to keep their
positions unchanged."  (Id.)  Given DB's significant proprietary
holdings, its decision not to change any investments is entirely
consistent with a finding that Management did not <u>know</u> of a

---

Prospectus Supplement was filed on or about July 16, 2007.  (TCAC ¶¶ 65, 67,
68.)

"trend," if it can be described as a trend at that time, would have a material impact on DB.  "Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible," their pre-Fall 2007 Item 303 and Item 503 claims must be dismissed."[20]  (See Twombly, 550 U.S. at 547; In re Ply Gem Holdings, Inc. Secs. Litig., 135 F. Supp. 3d 145, 154 (S.D.N.Y. 2015) (dismissing Item 503 claims, that were derivative of Item 303 claims, where plaintiff did not adequately plead that the omissions in question were the "most significant factors" that made the offering "speculative or risky").)


2.    November 2007 and February 2008 Offerings

As discussed above, in the Fall of 2007, the TCAC plausibly alleges facts sufficient to defeat a motion to dismiss that DB knew of trends or uncertainties that would be reasonably likely to have a material impact on DB.  Doing so is sufficient to establish that DB had a duty to discuss and analyze known material trends necessary to understand DB's performance and potential future results under Item 303.  (Stratte-McClure, 776 F.3d at 105.)  Plaintiffs have also sufficiently alleged that

---

[20] As well, the alleged non-conformance with GAAP applies only to pre-Fall 2007 filings, so those allegations are also dismissed.

Defendants have failed to "disclose[ the] known trend and the manner in which it might reasonably be expected to materially impact [the] company's overall financial position." (Id. (internal quotations and citation omitted).)  Defendants have not identified or directed the Court to any disclosures that may satisfy DB's duty under Item 303 for the November 2007 and February 2008 Offerings.  To the extent the Court has reviewed those SEC filings referenced by Plaintiffs, the Court finds that those disclosures are too generic and unconnected to the company's financial position.  (Id.)  Accordingly, the TCAC sufficiently alleges a claim under Item 303 of Regulation S-K (17 C.F.R. § 229.303), for the November 2007 and February 2008 Offerings.  The Court finds, for many of the same reasons, that the allegations are also sufficient to state a claim under Item 503 (17 C.F.R. § 229.503), requiring discussion of the most significant factors that make the offering speculative or risky.

To the extent Plaintiffs attempt to allege material misstatements or other omissions claims, those fail.  For example, Paragraph 79(d) alleges the following:

> Defendants' statements in the Offering Materials that the Company had (i) losses of "€1.6 billion . . . on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities" in the third quarter of 2007, and (ii) no losses at all "related to subprime, CDO or RMBS exposures" in the fourth quarter of 2007 were also materially false and misleading. The

> facts as confirmed in the Levin Coburn Report were
> that DB's long and short mortgage-related positions
> "together resulted in 2007 losses to the bank of about
> $4.5 billion." Levin Coburn Report at 333. This
> rendered such statements about the lack of losses
> related to RMBS and CDOs false and misleading.

(TCAC ¶ 79(d).  Besides being utterly confusing, the allegations

are just wrong.  Plaintiffs' generic reference to "Offering

Materials" completely fails to identify for the Court to which

documents the TCAC refers and what statements exactly are

misleading.  Drawing all reasonable inferences in Plaintiffs'

favor, the Court has attempted to decipher these allegations.

It appears that Defendants' statement that the company had

losses of "€1.6 billion . . . on trading activities in relative

value trading in both debt and equity, CDO correlation trading

and residential mortgage-backed securities" in the third quarter

of 2007 can be found in the November Form 6-K.  (See November

Form 6-K at 5 ("NET REVENUES for the third quarter 2007 were €

5.1 billion, down 20 % versus the third quarter 2006. In the

Corporate and Investment Bank (CIB), revenues were € 1.9

billion, down by € 2.1 billion, or 52 %, reflecting charges

totaling € 2.2 billion in Corporate Banking & Securities (CB&S).

Of these charges, € 1.6 billion were taken on trading activities

in relative value trading in both debt and equity, CDO

correlation trading and residential mortgage-backed

securities.").)  The next statement, that DB had "no losses at

all 'related to subprime, CDO or RMBS exposures' in the fourth

quarter of 2007," (TCAC ¶ 79(d) (emphasis in original)), appears

to find support in the February 2008 Form 6-K. (See February

Form 6-K at 2 ("[Dr. Josef Ackermann, Chairman of the Management

Board] added: "In the fourth quarter, we again demonstrated the

quality of our risk management. We had no net write-downs

related to sub-prime, CDO or RMBS exposures. Those trading

businesses in which we reported losses in the third quarter

produced a positive result in the fourth quarter. In leveraged

finance, where we had significant write-downs in the third

quarter, net writedowns in the fourth quarter were less than EUR

50 million.") (emphasis added).)  Plaintiffs allege that these

two statements were "materially false and misleading" because

"[t]he facts as confirmed in the Levin Coburn Report were that

DB's long and short mortgage-related positions 'together

resulted in 2007 losses to the bank of about $4.5 billion.'"

(TCAC ¶ 79(d).)

    First, Plaintiffs' allegation that DB said it had "no

losses at all 'related to subprime, CDO or RMBS exposures'" is

not accurate.  The February Form 6-K instead states that "we had

no net write-downs related to sub-prime, CDO, or RMBS

exposures."  Even on a motion to dismiss, the Court will not

infer that no losses is the accounting equivalent of no net

write downs.

Second, The reference to the €1.6 billion charge taken on trading activities appears to refer to a portion of a "charge[] totaling € 2.2 billion in Corporate Banking & Securities (CB&S). Of these charges, € 1.6 billion were taken on trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities." (November 2007 6-K at 5.)  Accordingly, this statement references a charge taken in relative value in the Corporate Banking & Securities group – not necessarily reflective of the Bank as a whole.

Third, the excerpt quoted in the Levin Coburn Report is vague.  Page 333 of the Levin Coburn Report provides, in part:

> Proprietary Loss. By 2007, Deutsche Bank, through its mortgage department and an affiliated hedge fund, had substantial proprietary holdings in the mortgage market, including more than $25 billion in long investments and a $5 billion short position, which together resulted in 2007 losses to the bank of about $4.5 billion.

(Levin Coburn Report at 333.)  It is not clear to the Court when those losses were accounted for, what groups they account for, or whether this statement can properly be compared to the charge taken in the Corporate Banking & Securities group.

As demonstrated, the TCAC does not allege facts from which this Court could infer that the statements are misleading but

instead attempts to conflate the issues and state a cause of action based on hindsight.  (*See, e.g.*, *In re TVIX Secs. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement.") (internal quotations and alterations omitted); *Lighthouse Fin. Grp.*, 902 F. Supp. 2d at 345 ("With the benefit of hindsight, Plaintiffs cannot establish falsity by simply pointing to the credit crisis and making conclusory allegations that because RBS ultimately was forced to take $11 billion in credit market write-downs, its earlier statements about portfolio risk were necessarily false.").)

Plaintiffs' other allegations regarding management "publicly characterizing the Company's risk controls as, among other things, 'highly sophisticated' and 'industry leading,'" (TCAC ¶ 147) are dismissed as inactionable puffery.  (*See* IBEW Local, 783 F. 3d at 392.)

### 3.   May 2008 Offering

Finally, the Court turns to the May 2008 Offering.  The 2007 20-F, filed March 26, 2008 and incorporated by reference into the May 2008 offering materials, disclosed that "MARKET

DECLINES AND VOLITILITY CAN MATERIALLY ADVERSELY AFFECT OUR REVENUES AND PROFITS." (2007 20-F at 6.) DB continued that "[i]n recent years we have increased our exposure to the financial markets as we have emphasized growth in our investment banking activities," and thus "we believe that we are more at risk from adverse developments in the financial markets than we were when we derived a larger percentage of our revenues from traditional lending activities." (Id.) DB stated that "[m]arket declines can cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode." (Id.) The 2007 20-F continued:

> Since the second half of 2007, financial markets have experienced exceptionally difficult conditions, which have been reflected in considerably lower volumes of business activity in the areas most directly affected and concerns about slowing economic and business momentum more generally. Among the principally affected areas in which we do business have been the leveraged finance and structured credit markets. In addition to causing reduced business activity and revenues in these and other areas, continuing difficult market conditions may require us to write down the carrying values of some of our portfolios of assets, including leveraged loans and loan commitments. Compensating for these negative effects on our profitability through performance in our other businesses may not be feasible, particularly if assumptions for continuing, albeit slower, economic growth in 2008 are not correct and less favorable economic conditions prevail. See "Item 5: Operating and Financial Review and Prospects – Results of Operations by Segment – Corporate Banking & Securities Corporate Division" for information on the impact of the current market environment on a number of our key businesses.

(<u>Id.</u> at 7.)  DB disclosed that, "WE MAY INCUR SIGNIFICANT LOSSES

FROM OUR TRADING AND INVESTMENT ACTIVITIES DUE TO MARKET

FLUCTUATIONS."  (<u>Id.</u>)  The 2007 20-F continued that:

> PROTRACTED MARKET DECLINES CAN REDUCE LIQUIDITY IN THE
> MARKETS, MAKING IT HARDER TO SELL ASSETS AND POSSIBLY
> LEADING TO MATERIAL LOSSES.
>
> In some of our businesses, protracted market
> movements, particularly asset price declines, can
> reduce the level of activity in the market or reduce
> market liquidity. These developments can lead to
> material losses if we cannot close out deteriorating
> positions in a timely way. This may especially be the
> case for assets we hold for which there are not very
> liquid markets to begin with. Assets that are not
> traded on stock exchanges or other public trading
> markets, such as derivatives contracts between banks,
> may have values that we calculate using models other
> than publicly-quoted prices. Monitoring the
> deterioration of prices of assets like these is
> difficult and could lead to losses we did not
> anticipate.
>
> The exceptionally difficult market conditions since
> the second half of 2007 have resulted in greatly
> diminished liquidity in certain markets in which we do
> business, including the leveraged finance and
> structured credit markets. Continuing difficult market
> conditions may require us to write down the carrying
> values of some of our portfolios of assets. See "Item
> 5: Operating and Financial Review and Prospects –
> Results of Operations by Segment – Group Divisions –
> Corporate and Investment Bank Group Division –
> Corporate Banking and Securities Corporate Division"
> for information on the impact of the current market
> environment on a number of our key  businesses.

(<u>Id.</u> at 8.)  The 2007 20-F then addressed Plaintiffs' concerns

regarding whether DB appropriately recognized the fair value of

the mortgage-related assets:

**WE MAY INCUR LOSSES AS A RESULT OF CHANGES IN THE FAIR VALUE OF OUR FINANCIAL INSTRUMENTS**

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. See "Item 5: Operating and Financial Review and Prospects – Significant Accounting Policies and Critical Accounting Estimates – Fair Value Estimates – Methods of Determining Fair Value" for information on fair value accounting. Fair value is defined as the price at which an asset or liability could be exchanged in a current transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding write-down is recognized in the income statement. These write-downs could be significant.

Observable prices or inputs are not available for many financial instruments. Fair value is determined in these cases using valuation techniques appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record further write-downs. Market volatility increases the risk that the value of financial instruments carried at fair value will change in the future.

Furthermore, our exposure and related write-downs are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Although such declines may be

independent of the fair values of the underlying hedged assets, they may nonetheless result in the need for further write-downs in future periods.

Our results for the fiscal year 2007 included losses relating primarily to the write down in the fair values of our trading activities in relative value trading in both debt and equity, CDO correlation trading and residential mortgage-backed securities, and the leveraged loan book including loan commitments. We continue to have exposure to these markets and products and, therefore, could be required further to write down their carrying values and incur further losses. Any of these write-downs could have a material adverse effect on our results of operation and financial condition. See "Item 5: Operating and Financial Review and Prospects – Results of Operations by Segment – Group Divisions – Corporate and Investment Bank Group Division – Corporate Banking and Securities Corporate Division" for information on the impact of the current market environment on a number of our key businesses.

(Id. at 9 (emphasis added).)  DB disclosed that its prior write-downs were related to exposure to the CDO and mortgage-backed securities market.  DB explained that the value of write-downs were net any gains from hedging, such as short positions.  DB disclosed, however, that those gains from hedges may never be realized gains.  DB therefore disclosed the "tentativeness of its belief," (Omnicare, 135 S. Ct. at 1332 ("And to avoid exposure for omissions under § 11, an issuer need only divulge an opinion's basis, or else make clear the real tentativeness of its belief.")), regarding the present value of the write-downs that were taken.  DB further disclosed that it continued to have exposure to CDOs and residential mortgage-backed securities and

85

"therefore[] could be required further to write down their carrying values and incur further losses." (2007 20-F at 9.)

DB then disclosed that it may be exposed to additional risk and loss as a result of its risk management policies:

OUR RISK MANAGEMENT POLICIES, PROCEDURES AND METHODS MAY LEAVE US EXPOSED TO UNIDENTIFIED OR UNANTICIPATED RISKS, WHICH COULD LEAD TO MATERIAL LOSSES.

We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, our risk management techniques and strategies may not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. These tools and metrics may fail to predict future risk exposures. In addition, our quantitative modeling does not take all risks into account. As a result, risk exposures could, for example, arise from factors we did not anticipate or correctly evaluate in our statistical models. This would limit our ability to manage our risks. Our losses thus could be significantly greater than the historical measures indicate.

For example, the value-at-risk approach we use to derive quantitative measures for our trading book market risks is designed to model risk factors assuming normal market conditions, and the statistical parameters required for the value-at-risk calculation are based on a 261 trading day history with equal weighting being given to each observation.

However, in our regulatory back-testing in 2007, we observed 12 outliers, which are hypothetical buy-and-hold losses that exceeded our value-at-risk estimate for the trading units as a whole versus two to three outliers statistically expected in any one year. While

we believe that the majority of these outliers were related to extreme events outside standard market conditions, we are also re-evaluating our modeling assumptions and parameters for potential improvements in unusual market conditions, such as those observed in the last two quarters of 2007.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. See "Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk" for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

(Id. at 9-10.)  DB disclosed that its risk management techniques may not be sufficient in unanticipated situations – even noting that outliers had occurred in the past year which could lead to losses that exceed DB VaR estimate.

In Item 5, referred to several times in the above-disclosures, DB stated, inter alia:

During the third and fourth quarters of 2007, fears of further U.S. homeowner delinquencies on subprime loans led to a significant deterioration in the subprime-related and other credit markets. The effect of this, in some cases, caused spreads to widen and liquidity levels to decline. During this difficult period, we reported relatively lower losses than some of our competitors in our Collateralized Debt Obligations (CDO) and U.S. residential mortgage businesses, despite the investment banking industry facing substantial problems in both sectors. This was due to the relative size of our exposure, protection purchased and significant sales activity.

In the third quarter of 2007, we announced losses of € 1.6 billion related to relative value trading (both debt and equity), CDO correlation trading and Residential Mortgage-Backed Securities (RMBS). Of this

amount, € 726 million related to CDO correlation and RMBS and was principally driven by exposure to positions linked to subprime residential mortgages. In the fourth quarter of 2007, the CDO and RMBS businesses produced an overall net positive result after factoring in gains from hedges.

. . .

Designated proprietary trading gains were lower compared to 2006, in both absolute terms and as a percentage of net revenues, having been negatively affected by the market dislocations occurring in the second half of the year.

Revenues from Origination and Advisory of € 2.7 billion were € 226 million, or 8 %, lower than in 2006. The reduction in revenue year-on-year arose principally from the deterioration in the market for private equity leveraged loans and financing as part of the overall dislocation of credit markets experienced in the second half of the year. Mark-to-market losses of € 759 million (excluding fees and hedges, € 1.4 billion) were taken against leveraged finance loans and loan commitments during 2007.

. . .

KEY EXPOSURES OF CDO TRADING AND ORIGINATION BUSINESSES: The activities of the Group's CDO trading and origination businesses span multiple asset classes. Managing our remaining exposure to the U.S. subprime residential mortgage market continues to be a particular focus.

(Id. at 70-71.)  The 20-F then included a table outlining DB's

"overall U.S. subprime residential mortgage-related exposures in

our CDO trading businesses as of December 31, 2007." (Id. at

72.)  The 20-F noted that "our CDO businesses will also take

exposure to non-subprime residential mortgages (including Alt-A)

and to other asset classes, including commercial mortgages,

trust preferred securities, and collateralized loan obligations.

88

These exposures are typically hedged through transactions arranged with other market participants or through other related market instruments." (Id.) "In addition to our trading-related exposure," the 20-F included a table summarizing DB's "exposure to U.S. subprime ABS CDOs held within our 'Available for Sale' category. These exposures arise from asset financing activities. [DB's] potential economic exposure is hedged by additional short positions in our trading book. In our 2007 results, [DB had] recorded charges of € 207 million against these positions." (Id.) The 20-F continued that "[w]e also have ongoing exposure to the U.S. residential mortgage market through our trading, origination and securitization businesses in residential mortgages," which were summarized in a table. (Id. at 73.) The 20-F also discussed hedging against this exposure, where "[h]edges consist of a number of different market instruments, including single-name CDS contracts with market counterparties, protection provided by monoline insurers and index-based contracts." (Id.)

The 20-F then continued to discuss risks associated with monoline insurers in textual and table format:

> The deterioration of the U.S. subprime mortgage market has generated large exposures for financial guarantors, such as monoline insurers, that have insured or guaranteed the value of pools of collateral referenced by CDOs and other market-traded securities. This has led to some uncertainty as to whether the

> ultimate liabilities of monoline insurers to banks and
> other buyers of protection will be met and may, in
> some cases, lead to a ratings downgrade of those
> insurers. The following table summarizes our net
> counterparty exposures to monoline insurers with
> respect to residential mortgage-related activity, as
> of December 31, 2007, on the basis of the mark-to-
> market value of the assets compared with the face
> value guaranteed or underwritten by monoline insurers.
> . . .
> A proportion of this mark-to-market exposure has been
> mitigated with CDS protection arranged with other
> market counterparties and other economic hedge
> activity.

(Id. at 73.)  The 20-F continued that, in addition to the

residential-related activities discussed, DB had other exposures

of "€ 1.2 billion as of December 31, 2007, related to net

counterparty exposure to monoline insurers, based on the mark-

to-market value of other insured assets. These arise from a

range of client activity, including financing of collateralized

loan obligations, commercial mortgage-backed securities, trust

preferred securities, student loans and public sector or

municipal debt." (Id. at 74.)  The 20-F also noted that, in

addition, DB's Commercial Real Estate business takes positions

in whole loans, assets held for securitization and commercial

mortgage-backed securities. (Id.)  The 20-F continued that:

> Mark-to-market losses as of December 31, 2007 arose
> primarily from the illiquid market conditions that
> developed during the second half of 2007, which
> impacted our ability to securitize commercial real
> estate loans. The impact of these losses on our
> reported income was to some extent mitigated by the
> results of related hedge activity, and overall, the
> Commercial Real Estate business was profitable in

> 2007. Subsequent to December 31, 2007, there has been
> further widening in credit spreads for commercial real
> estate loans that, if sustained, could result in
> additional writedowns for loans that remain unsold,
> which may not be fully mitigated by offsetting hedge
> activity or by the realization of property or mortgage
> assets securing the exposures.

(Id.)

The 20-F again contained in-depth discussion about risk management tools and credit, market and liquidity risks, stating that the VaR model "is designed to take into account all material risk factors assuming normal market conditions," but that "it is possible for our market risk positions to lose more value than even our economic capital estimates. . . . Our value-at-risk analyses should be viewed in the context of the limitations of the methodology we use and are therefore not maximum amounts that we can lose on our market risk positions." (Id. at 149-50.) Plaintiffs' allegations regarding DB's VaR metrics being knowingly false are rendered implausible after reviewing the 2007 20-F. Plaintiffs alleged that "[d]espite DB's assurances relating to its VaR calculation that its 'trading market risks outside of these units is immaterial,' the Company reported equities trading losses for 2008 almost 700% above the supposed 'maximum exposure' of $90.5 million." (TCAC ¶ 129.) Plaintiffs' allegations that the reported VaR metrics "were therefore knowingly false as they failed to reflect the

actual risk associated with DB's equities trading," are implausible after reading the statement "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  (Omnicare, 135 S. Ct. at 1330.)

These disclosures sufficiently demonstrate satisfaction of the Item 303 and Item 503 requirements.  (See, e.g., Stratte-McClure, 776 F.3d at 105-06 ("Therefore, instead of being required to disclose the details of the Long Position, under Item 303, Morgan Stanley needed to disclose only that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposure to those markets, and that if the trends came to fruition, the company faced trading losses that could materially affect its financial condition."); Alibaba, 2016 WL 3648965, at *17 (dismissing Item 503 claim where registration statement was accurate and sufficiently candid).)  Accordingly, Plaintiffs' Item 303 and Item 503 claims for the May 2008 Offering are dismissed.

In the April 2008 Form 6-K, incorporated by reference into the May 2008 offering materials, DB noted that "[r]evenues in Sales & Trading (Debt and other products) were € 1.3 billion, down from € 3.4 billion in the record prior year quarter, reflecting mark-downs on Commercial Real Estate activities and on Residential Mortgage-Backed Securities, together with

significantly lower revenues in the credit trading business."
(April 2008 6-K at 5.)  It disclosed that "[w]e reported a LOSS
BEFORE INCOME TAXES of € 254 million for the quarter, versus
income before income taxes of € 3.2 billion in the first quarter
of 2007."  (Id. at 6.)  It continued that, "SALES & TRADING
(DEBT AND OTHER PRODUCTS) generated revenues of € 1.3 billion in
the first quarter, a decrease of € 2.0 billion, or 61 %,
compared to the first quarter 2007. The decrease includes net
mark-downs of € 885 million on residential mortgage-backed
securities and commercial real estate loans." (Id. at 7.)  The
6-K disclosed, numerically and using tables, DB's exposure to
"CDO subprime exposure," "U.S. residential mortgage business
exposure" and "monoline exposure related to U.S. residential
mortgages," warning that "[c]apital market conditions have
deteriorated further in the first quarter," "the near-term
outlook is highly uncertain," "[t]he U.S. housing market is
still weak," and "significant challenges and uncertainties still
exist." (Id. at 9-12, 20-21.)

     Review of the 2007 20-F in total demonstrates that
Plaintiffs have not plausibly alleged a material misstatement or
omission.  Notably, Plaintiffs do not identify any specific
statement in the May 2008 Offering Materials that was rendered
"misleading" by allegedly omitting DB's exposure to the subprime
market.  To the extent that the TCAC has alleged that DB had a

duty to disclose its exposure to the subprime market, the Court finds that review of the 2007 20-F renders implausible a claim that DB failed to fulfil that duty to disclose.  Accordingly, the Motion to Dismiss is granted with respect to the May 2008 Offering as well.


### C. Section 12(a)(2) Standing

Defendants argue that the Section 12(a)(2) claims must be dismissed for failure to allege standing.  "Section 12(a)(2) only applies to transactions stemming from a public offering of a security and accordingly 'a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary.'"  (In re BioScrip, Inc. Secs. Litig., 95 F. Supp. 3d 711, 744 (S.D.N.Y. 2015) (citing Yung v. Lee, 432 F.3d 142, 149 (2d Cir. 2005)).) "Moreover, the Supreme Court has explained that § 12(a) 'imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.'" (Id. (citing Pinter v. Dahl, 486 U.S. 622, 644 n. 21 (1988)).)  "Finally, a plaintiff may only bring a claim against a 'statutory seller' from which it 'purchased' a security 'pursuant to' the pertinent offering documents." (Id.; In re MF

Global Holdings Ltd. Secs. Litig., 982 F. Supp. 2d 277 (S.D.N.Y. 2013) (holding that allegations that a named plaintiff "purchased or otherwise acquired stock from" defendant underwriters "pursuant to the Secondary Offering Materials," was sufficient, on motion to dismiss) "In sum, Plaintiffs must allege that they made a direct purchase of a security from a statutory seller as part of a public offering." (In re BioScrip, 95 F. Supp. 3d at 744.)

This Court previously dismissed the Section 12(a)(2) claims in the CAC because the CAC merely alleged that the securities were acquired "pursuant or traceable to" the Registration Statement and Prospectus. (See Order dated Aug. 19, 2011 at 26.) This is because "[c]ourts within this district have been appropriately wary of allegations that a plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply 'pursuant to an offering,' because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser." (In re BioScrip, 95 F. Supp. 3d at 744. (collecting cases).) The TCAC, on the other hand, alleges that the securities were "acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for each Offering." (TCAC ¶¶ 28-30.) These allegations are sufficient to withstand a motion to dismiss. (See, e.g., MF Global, 982 F. Supp. 2d 324 (holding that allegations that named

plaintiff "purchased or otherwise acquired stock from" the
relevant underwriters "pursuant to the" offering materials was
sufficient to withstand a motion to dismiss); In re Lehman Bros.
Secs. & ERISA Litig., 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011)
(rejecting standing argument where plaintiffs alleged 12(a)(2)
claims on behalf of "all persons and entities who purchased or
otherwise acquired [the securities] pursuant to the materially
untrue and misleading Structured Note Offering Materials").

     The cases that Defendants cite to argue that the 12(a)(2)
claim fails because Plaintiffs do not allege from which
statutory seller they directly purchased the securities at issue
do not require this Court to hold otherwise.  (See Stadnick v.
Vivint Solar, Inc., 14-cv-9283 (KBF), 14-cv-9709 (KBF), 2015 WL
8492757, at *16 (S.D.N.Y. Dec. 10, 2015) (finding that lead
plaintiff lacked standing because "he represents that he bought
his shares at prices above the $16.00 offering price in the IPO,
which necessarily means that he did not buy through the initial
public offering itself"); In re UBS AG Sec. Litig., 07 Civ.
11225(RJS), 2012 WL 4471265, at *27 & n.26 (S.D.N.Y. Sept. 28,
2013) (finding that the complaint failed to demonstrate
"statutory seller" standing, noting that that even if it had,
the complaint still failed to state a claim), aff'd sub. nom.
City of Pontiac Policemen's & Firemen's Ret. Sys., v. UBS, 752
F.3d 173, 182 & n.37 (2d Cir. 2014) ("Because we affirm on the

basis of failure to plead a material misstatement or omission, we do not reach the standing issue.").)

D. Section 15 Claims

Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" § 11. (In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011) (citing 15 U.S.C. § 77o(a)).) "To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants." (In re BioScrip., 95 F. Supp. 3d at 746.) This Court has already found that the TCAC plausibly states a primary violation under Section 11 for the November 2007 and the February 2008 Offerings in connection with Item 303 and Item 503.

Defendants argue, however, that the Section 15 claim fails because Plaintiffs have failed to plead "culpable participation." (Mem. In Support of Mot. To Dismiss at 39-40.)

The Second Circuit has reserved decision on whether the proof of "culpable participation" required in Section 20(a) claims also applies to Section 15(a) claims – even though "[t]hat issue has divided district courts in this Circuit." (In

re Lehman Bros., 650 F.3d at 186; see also Federal Housing

Finance Agency v. Nomura Holding America, Inc., 104 F.Supp.3d

441, 574 n.187 (S.D.N.Y. 2015) ("The Second Circuit has

explicitly reserved judgment on whether a prima facie Section 15

claim, like its Section 20 counterpart for Exchange Act claims,

requires a showing of 'culpable participation' by the alleged

control person.").)  A majority of judges in this District,

including this Court in its August 19, 2011 Order, however, have

held that allegations of culpable participation are not

required.  (MF Global, 982 F. Supp. 2d at 308-09.)

Accordingly, this Court declines to impose a requirement that a

plaintiff allege "culpable participation" to state a violation

under Section 15.  The Motion to Dismiss the remaining Section

15 claims is therefore DENIED.


IV.  Leave to Replead

     The Court put Plaintiffs on notice in the September 15,

2015 Order that, upon appropriate motion, the TCAC would be

dismissed "with prejudice."  (Order dated Sept. 15, 2015 at 3.)

The Defendants have moved to dismiss the TCAC with prejudice.

Plaintiffs have not sought leave to amend.  (See Litwin v.

Blackstone Grp., L.P., 634 F.3d 706, 723 (2d Cir. 2011)

("However, we note that where, as here, leave to amend is

98

requested informally in a brief in opposition to a motion to dismiss, we have held that it is within the district "court's discretion to deny leave to amend implicitly by not addressing the request."). Plaintiffs have had ample opportunity to plead their claims. Most notably, the two Government Reports on which the TCAC heavily relies were available not only before Judgement had been entered in 2012, and before Plaintiffs sought leave to file a third consolidated amended complaint, but also before Plaintiffs filed their Second Consolidated Amended Complaint. (See ECF No. 65 on September 19, 2011.) Therefore those claims dismissed herein are dismissed WITH PREJUDICE.

V.   <u>Conclusion</u>

For the reasons stated herein, the Motion to Dismiss is
GRANTED with respect to the May and July 2007 Offerings and the
May 2008 Offering.   The Motion to Dismiss is DENIED with respect
to the November 2007 and February 2008 Offerings.   Defendants
shall answer the remaining causes of action within forty-five
days of the date of this Opinion.


SO ORDERED.

Dated:      July 25, 2016
            New York, New York


                              Deborah A. Batts
                         United States District Judge